**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x
                                              :
In re                                         :          **Chapter 11 Case No.**
                                              :
**SIGA TECHNOLOGIES, INC.,**                  :          **14-_____ (___)**
                                              :
                              **Debtor.**     :
                                              :
--------------------------------------------------------------x

### AFFIDAVIT OF ERIC A. ROSE
### PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

STATE OF NEW YORK            )
                             )      ss:
COUNTY OF NEW YORK           )

Eric A. Rose, being duly sworn, hereby deposes and says:

1.      I am the Chief Executive Officer and Chairman of the Board of SIGA

Technologies, Inc. ("**SIGA**").  On September 16, 2014 (the "**Commencement Date**"), SIGA

commenced in this Court a case under chapter 11 of title 11 of the United States Code (the

"**Bankruptcy Code**").  I am knowledgeable and familiar with the business and financial affairs

of SIGA, and I am authorized to submit this Affidavit on its behalf.  My background and

qualifications are set forth below in Paragraph 6.  This Affidavit is submitted pursuant to Rule

1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local**

**Rules**") for the purpose of apprising the Court and other parties in interest of the circumstances

that compelled the commencement of the chapter 11 case and in support of SIGA's chapter 11

petition and the motions and applications that SIGA has filed or will file with the Court,

including, but not limited to, the "first-day motions" (the "**First-Day Pleadings**").

## Preliminary Statement

2.      SIGA's lead product is Tecovirimat, also known as ST-246®, an orally administered antiviral drug that targets orthopoxviruses, such as smallpox.  Tecovirimat is a novel, small-molecule drug that is being delivered to the U.S. Strategic National Stockpile (the "**Strategic Stockpile**"),[1] under the Project BioShield Act of 2004 ("**Project BioShield**").  Tecovirimat has shown significant promise in nonclinical studies as a treatment for smallpox, which presents a serious and deadly biological threat to national security.

3.      SIGA is filing for protection under chapter 11 of the Bankruptcy Code because its ability to continue to function as a going concern, and to satisfy its commitment to supply Tecovirimat as part of Project BioShield to the Strategic Stockpile, has been jeopardized as a result of its pending litigation with PharmAthene, Inc. ("**PharmAthene**").  As a consequence, SIGA has no alternative but to seek relief under chapter 11.  As described more fully below, the Delaware Court of Chancery (the "**Court of Chancery**") earlier found SIGA liable to PharmAthene for failing to execute a license agreement. On remand from the Delaware Supreme Court, the Court of Chancery recently reversed its earlier conclusions concerning the appropriate measure of damages and held that PharmAthene is entitled to lump sum expectation damages for its lost profits related to Tecovirimat.  In doing so, the Court of Chancery modified a valuation model that it previously had rejected as too speculative, among other things. Although the Court of Chancery has not yet issued a final judgment specifying the dollar amount

---

[1] The Strategic Stockpile is a national repository of medical assets and countermeasures designed to provide public health agencies with medical supplies to treat and protect those affected by public health emergencies.

WEIL:\95075834\15\99980.0219

of such damages, SIGA expects it to be substantial – as much as $232 million (or more with post-judgment interest and attorneys' and expert fees).

4.     As set forth below, SIGA believes it has meritorious grounds to appeal any final judgment of the Court of Chancery.  But in order to do so under Delaware law, it must post a bond for the full amount of the damages award plus post-judgment interest through the pendency of the appeal.  Posting a bond simply is not possible.  In light of SIGA's inability to bond the judgment, only the automatic stay provisions under the Bankruptcy Code can prevent PharmAthene from immediately enforcing the Court of Chancery's judgment, executing on SIGA's assets, seizing its bank accounts, and effectively freezing SIGA's operations – thus depriving the nation of an important drug and depriving SIGA of the opportunity to pursue its appeal.  Filing for and obtaining protection under chapter 11 is the only way to ensure that SIGA can continue to innovate, operate, and manufacture and deliver Tecovirimat to the Strategic Stockpile in partnership with the United States government while SIGA appeals the Court of Chancery's damages award.

5.     SIGA's continued operation under chapter 11 and delivery of Tecovirimat to the Strategic Stockpile is vital to the nation's security.  In 2004 the Secretary of Homeland Security determined that smallpox presented a material threat to the U.S. population sufficient to affect national security.  Smallpox is classified as a high-priority biological threat agent.  Notwithstanding that smallpox was declared eradicated in the late 1970s, known stocks of the virus remain and can be created in laboratories.  Historically, of those infected, 20%-60% – and over 80% of infected infants – died from the disease.  Smallpox is responsible for an estimated 300-500 million deaths during the twentieth century alone.  Because routine smallpox vaccination ended in the United States in 1972, a large portion of the U.S. population is

3

susceptible to infection.  A smallpox release likely would result in a high infection rate and rapid

spread of the disease among the general population.  By way of reference, smallpox is just as

contagious – and has thirty times the mortality rate – as influenza (for which the federal

government has obtained millions of courses of Tamiflu under the Strategic Stockpile).

Smallpox poses a national security threat and has the potential to cause significant casualties and

massive disruption of political, economic, and social infrastructures in the United States.  Thus,

strong efforts to reduce America's vulnerability to smallpox – by, among other things,

stockpiling SIGA's drug Tecovirimat – are necessary to our national security.

## Background and Qualifications

6.      I was elected Chairman of the Board of Directors of SIGA on January 25,

2007, and became SIGA's Chief Executive Officer on March 1, 2007.  I have served as a director

of SIGA since April 19, 2001 and served as SIGA's Interim Chief Executive Officer during

April through June 2001.  Since 2007 I also have been the Executive Vice President for Life

Sciences at MacAndrews & Forbes Holdings Inc., which indirectly is SIGA's single largest

shareholder.  From 2007 through 2011, I served on the National Biodefense Scientific Board,

which advises the U.S. Secretary of Health and Human Services on biodefense, influenza, and

emerging diseases.  From 2008 through 2012, I chaired the Department of Health Evidence &

Policy at the Mount Sinai School of Medicine, where I now serve as co-chair and professor.

From 1994 through 2007, I served as Surgeon in Chief at New York-Presbyterian

Hospital/Columbia and Chairman of the Department of Surgery at the Columbia University

College of Physicians and Surgeons, where I held a distinguished professorship.  I am a graduate

of both Columbia College and Columbia University College of Physicians & Surgeons.

4

7.       Except as otherwise indicated, the facts set forth in this Affidavit are based on my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge, and information concerning the operations of SIGA.  If called upon to testify, I would testify competently to the facts set forth in this Affidavit.  Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis for SIGA.

8.       Section I of this Affidavit describes the nature of SIGA's business. Section II of this Affidavit describes the circumstances that compelled the commencement of SIGA's chapter 11 case.  Section III of this Affidavit describes the capital structure of SIGA. Section IV of this Affidavit identifies the attached schedules of information required by Local Bankruptcy Rule 1007-2.

## I.

### SIGA's Business

9.       SIGA is a publicly held company that was incorporated in December 1995.  SIGA is a biotech/pharmaceutical company that specializes in the development and commercialization of solutions for serious unmet medical needs and biothreats.

### SIGA's Lead Product – Tecovirimat

10.       SIGA believes that Tecovirimat is among the first new small-molecule drugs delivered to the Strategic Stockpile under Project BioShield.  While Tecovirimat is an investigational product that is not currently approved by the U.S. Food & Drug Administration ("**FDA**") as a treatment for smallpox or any other disease, the FDA has designated Tecovirimat for "fast-track" status, creating a path for expedited FDA review and eventual regulatory approval.  Tecovirimat is a novel, patented drug that is easy to store, transport, and administer.

WEIL:\95075834\15\99980.0219

Tecovirimat has been shown to be hundreds of times more effective than other smallpox antiviral drugs in animal models; indeed, in my view, there is no viable, market-ready alternative.  There are several potential uses for Tecovirimat under investigation:  (i) to reduce mortality and morbidity in those infected with the smallpox virus, (ii) to protect the nonimmune who risk developing smallpox following viral exposure, and (iii) as an adjunct to the smallpox vaccine to reduce the frequency of serious adverse events resulting from the form of virus used for vaccinations.

11.     Project BioShield was created by Congress with the goal of speeding the development and availability of modern, effective drugs, vaccines, and other countermeasures against chemical, biological, radiological, and nuclear (CBRN) threats.  Under Project BioShield, countermeasures against serious biothreats, like smallpox, are being acquired and stockpiled in the Strategic Stockpile.  The Biomedical Advanced Research and Development Authority ("**BARDA**"), a unit within the U.S. Department of Health and Human Services, has been authorized by Congress under Project BioShield to acquire drugs like Tecovirimat that have yet to achieve FDA approval.  By procuring Tecovirimat from SIGA for the Strategic Stockpile, BARDA is bolstering the nation's ability to organize an effective response to bioterrorist events, thus enhancing national security.

12.     In 2011, as part of Project BioShield, SIGA executed an agreement with BARDA (the "**BARDA Contract**") to deliver 2 million courses of the smallpox antirviral Tecovirimat to the Strategic Stockpile.  The BARDA Contract also contains options that will permit SIGA to continue its work on pediatric and geriatric formulations of the drug as well as on the use of Tecovirimat for smallpox prophylaxis.  The BARDA Contract (without taking into account options) is worth approximately $463 million, including $409.8 million for

6

procurement-related activities and $54 million of potential reimbursements related to development and supportive activities.  SIGA has been developing Tecovirimat since 2003.

13.     As of the Commencement Date, SIGA has delivered approximately 1.3 million courses of Tecovirimat to the Strategic Stockpile and SIGA has received $198.3 million for its procurement-related performance.  Another approximately 710,000 courses of Tecovirimat are eligible for delivery, and SIGA is eligible to receive an additional $211.5 million under the BARDA Contract for future performance, including (i) $88.5 million of payments following additional future physical deliveries of courses of Tecovirimat to the Strategic Stockpile, (ii) a $20.5 million milestone payment for successful submission to the FDA of a complete application for Tecovirimat regulatory approval, and (iii) a $102.5 million payment if and when Tecovirimat receives FDA approval.  With the BARDA Contract, SIGA has used a disciplined business strategy to commercialize Tecovirimat successfully.

**Manufacturing**

14.     SIGA uses third parties known as Contract Manufacturing Organizations ("**CMOs**") both to procure commercial raw materials and supplies and to manufacture Tecovirimat.  SIGA's CMOs apply methods and controls in facilities that are used for manufacturing, processing, packaging, and holding pharmaceuticals that conform to the standard set by the FDA for the manufacture of pharmaceuticals intended for human use (i.e., current good manufacturing practices).

**Product Candidates**

15.     In addition to its work on Tecovirimat, SIGA has a development program for a Dengue antiviral.  Currently, SIGA is seeking a partner for this program to support further development activity.

7

16.     The World Health Organization estimates that forty percent of the world's population is at risk for dengue fever, with an estimated 50-100 million people infected with the virus each year.  Dengue fever is an acute febrile disease characterized by a sudden onset of fever and abnormally high internal body temperature.  The dengue virus may be transmitted via the bite of an infected mosquito found in tropical and subtropical regions around the world.  Currently there is no approved antiviral or vaccine for the treatment or prevention of dengue-mediated disease.  SIGA has identified a lead preclinical drug candidate with activity against all four serotypes of virus; the candidate has shown efficacy in a murine model of disease.

**Market for Biological Defense Programs**

17.     The market for biodefense countermeasures reflects the continued threat of global terror and biowarfare activity.  The United States government is the largest source of development and procurement funding for academic institutions and biopharmaceutical companies conducting biodefense research or developing vaccines, anti-infectives, and immunotherapies directed at potential agents of bioterror or biowarfare.  United States government spending on biodefense programs includes development funding awarded by BARDA, the Department of Defense, and the National Institute of Allergy and Infectious Diseases, and procurement of countermeasures by BARDA, the U.S. Centers for Disease Control and Prevention, and the Department of Defense.

18.     In addition to the United States government, other potential markets for the sale of biodefense countermeasures include (i) foreign governments (including defense and public health agencies), (ii) state and local governments, (iii) healthcare providers (including hospitals and clinics), and (iv) nongovernmental organizations and multinational companies (including transportation and security companies).

8

**Research Agreements and Facilities**

19.    SIGA's research and development facilities are located in Corvallis, Oregon.  Its headquarters is located in New York City.

20.    SIGA obtains funding in the form of grants or contracts from various agencies of the United States government to support research and development activities.  In addition to the BARDA Contract, which is expected to provide approximately $46 million of future reimbursements for development and supportive activities, SIGA has a separate development contract with BARDA and a grant with the National Institute of Allergy and Infectious Diseases.  Approximately $10 million of potential funding is available as of the Commencement Date under these two initiatives.

**Intellectual Property and Proprietary Rights**

21.    SIGA's commercial success depends in part on its ability to obtain and maintain patent protection for its proprietary technologies, drug targets, and potential products and to preserve its trade secrets.  For its lead product Tecovirimat, SIGA owns seven U.S. patents, four foreign patents, three U.S. patent applications, two international PCT patent applications, and forty-two foreign patent applications as of the most recent available information.  SIGA also owns patents and patent applications for pre-clinical drug candidates.

**Optimization Program/Labor**

22.    In the fourth quarter of 2013, SIGA commenced an optimization program (the "**Optimization Program**") to maximize efficiencies within its operations and to position SIGA to build upon the success of the BARDA Contract/Tecovirimat business.  The Optimization Program includes a significant reduction in employee headcount and a partnering initiative for early-stage preclinical development programs.

WEIL:\95075834\15\99980.0219

23.     SIGA maintains a streamlined business infrastructure.  As of the

Commencement Date, SIGA has thirty-five employees/full-time business consultants.  SIGA's

employees are not covered by a collective bargaining agreement.

24.     Among the responsibilities of SIGA's streamlined employee base, the

continued regulatory development of Tecovirimat is paramount.  There are $123 million of

payments within the BARDA Contract that are tied to the regulatory progress of Tecovirimat.

As such, SIGA's development program for Tecovirimat is very active.  Currently, SIGA is

coordinating laboratory efficacy studies in rabbits, coordinating and conducting various

supporting studies, and planning the protocol for an expanded clinical safety trial.  Most costs

related to these development activities are expected to be reimbursed by BARDA as part of the

BARDA Contract.

## II.

### The Need for Chapter 11 Relief and the Events
### Necessitating the Commencement of This Chapter 11 Case

25.     As described above, SIGA is developing and producing a drug currently

being supplied to the Strategic Stockpile to address otherwise unmet national security needs and

biothreats.  SIGA is a party to a contract with BARDA to supply this drug – Tecovirimat – under

Project BioShield as part of a national repository of medical assets and countermeasures

designed to provide federal, state, and local public health agencies with medical supplies needed

to treat and protect those affected by terrorist attacks, natural disasters, industrial accidents, and

other public health emergencies.  Simply put, the critical importance of SIGA's continued and

uninterrupted production and supply of Tecovirimat to the health and welfare of the entire

population of the United States cannot be overstated.  The current events taking place in the

10

world, including terrorist group activities and the Ebola crisis, vividly demonstrate the value and purpose of Project BioShield and SIGA's contribution to that initiative.

26.     SIGA's ability to continue to function as a going concern, and to satisfy its commitment to supply Tecovirimat as part of Project BioShield to the Strategic Stockpile, has been jeopardized as a consequence of its pending litigation with PharmAthene, described more fully below, leaving SIGA with no alternative but to seek relief under chapter 11.

**The PharmAthene Litigation**

27.     In December 2006 PharmAthene commenced an action against SIGA alleging breach of contract and other claims (the "**PharmAthene Action**"), in the Delaware Court of Chancery, styled *PharmAthene, Inc. v. SIGA Technologies, Inc.*, Civ. Action No. 2627-VCP.  In its amended complaint, PharmAthene requested that the Court of Chancery (i) order SIGA to enter into a license agreement with PharmAthene with respect to Tecovirimat, (ii) declare that SIGA is obligated to execute such license agreement, and (iii) award damages resulting from SIGA's alleged breach of such obligation.  PharmAthene also alleged that SIGA breached an obligation to negotiate such license agreement in good faith and sought damages for promissory estoppel and for unjust enrichment based on supposed information, capital, and assistance that PharmAthene allegedly provided to SIGA during the negotiation process.  The Court of Chancery tried the PharmAthene Action in January 2011.

28.     In September 2011 the Court of Chancery issued its post-trial opinion. Although the Court found that there was no binding license agreement and denied PharmAthene's requests for specific performance and expectation damages measured by the present value of estimated future profits (finding such an exercise to be too speculative), it held that SIGA breached its duty to negotiate in good faith and was liable under the doctrine of

11

promissory estoppel.  The Court consequently awarded to PharmAthene what the Court

described as an equitable payment stream or equitable lien that would consist of fifty percent of

the net profits that SIGA achieved from sales of Tecovirimat after SIGA earned $40 million in

net profits, for ten years following the first commercial sale.  The Court also awarded

PharmAthene one-third of its reasonable attorneys' fees and expert witness expenses.

29.     In May 2012 the Court of Chancery entered its final order and judgment

implementing its post-trial opinion.  The final judgment and order provided, among other things,

that (i) net profits would be calculated in accordance with generally accepted accounting

principles applied consistently with how they are applied in the preparation of SIGA's financial

statements, (ii) the net profits calculation would take into account expenses relating to

Tecovirimat commencing with SIGA's acquisition of Tecovirimat in August 2004, and

(iii) PharmAthene could recover $2.4 million of attorneys' fees and expenses.  As of June 30,

2014, SIGA has accrued a $2.7 million loss contingency with respect to the fee, expense, and

interest portion of the judgment.

30.     In June 2012 SIGA appealed the final order and judgment and certain

earlier rulings of the Court of Chancery to the Supreme Court of Delaware.  Shortly thereafter,

PharmAthene filed a cross-appeal from the Court of Chancery's rulings regarding a binding

license agreement, specific performance, and expectation damages.

31.     On May 24, 2013, the Supreme Court issued its decision, which affirmed

the Court of Chancery's judgment in part, reversed it in part, and remanded the matter to the

Court of Chancery.  Specifically, the Supreme Court (i) affirmed the determination that SIGA

breached its contractual obligation to negotiate in good faith, (ii) reversed the promissory

estoppel holding, and (iii) reversed the equitable damages award.  It also held that, under

12

Delaware law, it is permissible for a trial court to award expectation damages for breach of a

contractual duty to negotiate in good faith if such damages are proven with reasonable certainty

and are not speculative or conjectural, and remanded to the Court of Chancery for consideration

of a remedy consistent with that holding.  The Delaware Supreme Court also reversed the award

of attorneys' fees and expert witness fees because it was predicated in part on a now-reversed

finding of liability on PharmAthene's promissory estoppel claim.  The Delaware Supreme Court

held that the Court of Chancery could reevaluate on remand an alternative award, if any, of

attorneys' fees and expert testimony expenses consistent with the Delaware Supreme Court's

opinion.  The Delaware Supreme Court declined to consider any of the claims that were raised in

PharmAthene's cross-appeal because it affirmed the finding that SIGA was liable for breaching

its contractual obligation to negotiate in good faith.

        32.     On June 26, 2013, the parties appeared before the Court of Chancery to

discuss the remand, at which time PharmAthene stated its desire to supplement the record with

further evidence.  Following briefing and argument on August 15, 2013, the Court granted

PharmAthene's motion to supplement the record and allowed SIGA to submit responsive

evidence.  On December 18 and 19, 2013, the Court held an evidentiary hearing with respect to

that evidence.  On January 15, 2014, after briefing, the parties appeared for oral argument

regarding what, if any, remedy the Court should impose in light of the remand.

        33.     On August 8, 2014, the Court of Chancery issued its memorandum

opinion and order.  *PharmAthene, Inc. v. SIGA Techs, Inc.*, Civ. Action No. 2627-VCP, 2014

WL 3974167 (Del. Ch. Aug. 8, 2014) (the "**Remand Opinion**"); *Pharmathene, Inc. v. Siga

Techs., Inc.*, Civ. Action No. 2627-VCP, 2014 WL 3893449 (Del. Ch. Aug. 9, 2014) (the

"**Remand Order**").  In its Remand Opinion, the Court of Chancery reversed its earlier

conclusions and held that PharmAthene had carried its burden of demonstrating its entitlement to lump sum expectation damages for its lost profits related to Tecovirimat by a preponderance of the evidence.  It also stated that in order to calculate PharmAthene's lost profits, several modifications to the valuation model presented at trial (which the Court of Chancery had rejected as too speculative, among other things, in its post-trial opinion) were required, which modifications the Court of Chancery set forth in the Remand Opinion.  The Court of Chancery ruled that PharmAthene is entitled to the value of the revised calculations plus pre- and postjudgment interest at the legal rate, compounded quarterly, with prejudgment interest to accrue from December 20, 2006.  The Court of Chancery also denied and dismissed with prejudice PharmAthene's claims that it is entitled to specific performance or an equitable payment stream, on the grounds that PharmAthene is limited to a contractual remedy and has an adequate remedy at law.   Finally, the Court of Chancery ruled that PharmAthene was entitled to (i) forty percent of the reasonable attorneys' fees and expenses it incurred through post-trial argument, (ii) one-third of the reasonable attorneys' fees and expenses it incurred in the remand proceedings, (iii) sixty percent of expert witness fees it incurred in the pretrial and trial phases, and (iv) and one-tenth of the expert witness fees it incurred in the remand proceedings.

34.    The Remand Order provided that within ten days thereof, (i) PharmAthene, through its damages expert, shall recalculate the present value of its lost profits utilizing the same discounted future earnings method used in connection with the expert testimony at trial to account for the adjustments specified in the Remand Opinion and (ii) PharmAthene shall deliver a copy of the new calculations and a functional copy of any financial models or spreadsheets (the "**Backup Material**") used to arrive at the revised calculations.  The Remand Order further required SIGA to serve on PharmAthene any objections to the revised

14

calculations within ten days of receiving the revised calculations and Backup Material.  The

Remand Order also provided that, if SIGA has objections to the revised calculations, the parties

shall make a good faith effort to resolve the dispute among themselves.  If the parties cannot

resolve their dispute, they shall submit within thirty days after receipt of the revised calculations

and the Backup Material competing letters to the Court of Chancery explaining the nature of the

dispute and the basis for their respective positions.

35.     On August 18, 2014, PharmAthene submitted its expert's calculations of

damages and the Backup Material.  Based on such calculations, PharmAthene stated that the

amount of damages is approximately $232 million (inclusive of pre-judgment interest but

exclusive of professional fees and expenses).  On September 3, 2014, SIGA (reserving all rights

to appeal) submitted its objections and damage calculations and asserted that, based on the

methodology ordered by the Court of Chancery, the damages are approximately $173 million

(inclusive of pre-judgment interest but exclusive of professional fees and expenses).

36.     Based on the foregoing, and the fact that the Court of Chancery limited

SIGA's objections solely to computational errors made by PharmAthene's expert, SIGA has

assumed that any judgment to be entered in this matter will be no less than $180 million

(inclusive of pre-judgment interest through the date of entry of judgment by the Court of

Chancery as well as professional fees and expenses).  I have been advised that under Delaware

law, in order to stay the judgment of the Court of Chancery pending any appeal, SIGA would be

required to post a bond in an amount no less than the judgment and, in all likelihood, a higher

amount to cover post-judgment interest for one year.

37.     Under my direction, SIGA undertook significant efforts to determine

whether a bond in a sufficient amount could be obtained.  I have been advised that a bond in

excess of $180 million simply is not obtainable under the circumstances, and that, even if a bond

in a somewhat lesser amount were available, it would require the pledging of a significant

amount of cash and other collateral that would leave SIGA with inadequate liquidity and other

resources necessary to continue to operate its business and perform under the BARDA Contract.

38.    SIGA intends to appeal the ruling and judgment of the Court of Chancery

once a final order is entered; moreover, SIGA believes it has meritorious grounds for an appeal

that either will eliminate any claim for expectation damages that PharmAthene may have or will

substantially reduce the amount of such damages.  Significant grounds are summarized as

follows:

- The Court of Chancery erroneously reversed its own earlier findings that proof of expectation damages was "speculative and too uncertain, contingent and conjectural." These clear findings were not disturbed on appeal by the Delaware Supreme Court and ought to have precluded any award of expectation damages on remand.

  o The Court of Chancery also improperly relied upon evidence of developments as much as seven years after the breach to resolve the utterly speculative nature of PharmAthene's proof of damages, despite the fact that contract damages are to be based on the parties' reasonable expectations at the time of breach.

  o The Court of Chancery then compounded its error by ignoring other post-breach evidence that clearly showed the speculative nature of PharmAthene's damages case and should have led to no damages at all, or at most to a much smaller damages calculation.

    ▪ For example, the Court ignored the fact that the first sale of Tecovirimat did not occur until 2013, instead speculating without any reasonable basis in fact that sales would have begun in 2010.  This erroneous conclusion itself more than doubled the damages calculation.

    ▪ Similarly, the Court, while relying on evidence of sales seven years post-breach, ignored the fact that only 2.0 million courses have ever been sold, instead speculating on the basis of a discredited model that 14.9 million courses were reasonably likely to be sold between 2010 and 2014.  This utterly speculative conclusion also greatly inflated the calculation of damages.

16

- The Court of Chancery's reliance on SIGA's "bad faith" conduct in imposing enormous, speculative damages amounts to an impermissible award of punitive damages, which exceeds the jurisdiction of that Court.

39.     The failure to stay the enforcement of any judgment would jeopardize SIGA's viability, its ability to produce and deliver Tecovirimat, and its critical role in Project BioShield, to the detriment of the nation's security as well as the interests of SIGA's creditors, employees, and other economic stakeholders.  As set forth above, SIGA has meritorious grounds to appeal and cause the reversal of any judgment that may be entered in favor of PharmAthene. Accordingly, it is essential that the right to appeal not be effectively extinguished or rendered nugatory because of the inability to bond any judgment.

40.     In light of the inability to bond the judgment, only the automatic stay provisions under the Bankruptcy Code can prevent PharmAthene from immediately enforcing the Court of Chancery's judgment, executing on SIGA's assets, seizing SIGA's bank accounts, and effectively placing a stranglehold on SIGA's operations.  If such a scenario were permitted to unfold, it would destroy SIGA's viability and ability to perform under the BARDA Contract, to the detriment and prejudice of all parties in interest, and totally undermine the scientific benefits derivative of SIGA's business and its importance to the public health and welfare and the nation's security.

41.     As stated, bonding of the judgment simply is not a realistic alternative.  It is my understanding that, even if a bond in a sufficient amount were available, the conditions of securing such bond would have a similar impact – choking SIGA's liquidity and its ability to continue as a going concern.

42.     As a result, management and the Board of Directors of SIGA have determined that the only feasible alternative for SIGA is seeking relief under chapter 11.

17

Chapter 11 will enable SIGA to preserve its business enterprise and important work, while

permitting the prosecution of an appeal from any judgment entered in the PharmAthene Action.

From a national policy perspective, chapter 11 will assure that SIGA can fulfill its obligations

that are crucial to the nation's security.  From a business perspective, it will protect SIGA's

ongoing ability to perform fully under the BARDA Contract, including:  focused and responsive

management of the Tecovirimat supply chain, culminating in the timely delivery of quality

product to the Strategic Stockpile; continued, uninterrupted regulatory progress toward FDA

approval of Tecovirimat; and continued close coordination with BARDA in addressing existing

and new government requirements.  Furthermore, chapter 11 will allow SIGA to continue to

build its cash balance, which would broadly benefit all stakeholders.

43.     SIGA intends to continue operations in chapter 11 and has adequate

liquidity to do so.  SIGA also intends to prosecute expeditiously its appeal from the order of the

Court of Chancery so that the PharmAthene Action can be finally determined and, at that time,

propose a plan of reorganization to address its liabilities in accordance with the intent and

purpose of chapter 11 of the Bankruptcy Code.

### III.

### Capital Structure

44.     SIGA is a public reporting company under Section 12(b) of the Securities

Exchange Act of 1934.  SIGA's shares of common stock, par value $.0001, are publicly traded

under the symbol "SIGA" on the Nasdaq Global Market.  As of August 31, 2014, there were

53,504,296 shares of SIGA common stock outstanding.  As of the Commencement Date, there

are 250,000 warrants to purchase SIGA common stock outstanding.  At the close of business on

September 15, 2014, SIGA's stock was trading at $1.44 per share.

18

45.    SIGA is a Delaware corporation.  It has one wholly owned subsidiary, SIGA Pharmaceuticals (Europe) Limited, which is a private limited company incorporated under the laws of England and Wales that currently has no ongoing operations.

46.    As of June 30, 2014, SIGA reported consolidated assets and liabilities of approximately $209 million and $198 million, respectively.  The amount of reported liabilities does not include any amount attributable to the PharmAthene Action (other than certain attorneys' fees and expenses).

47.    SIGA has grown its cash and investment balance over time.  On June 30, 2013, cash and investments were $33 million.  As of June 30, 2014, cash and investments at SIGA had grown to $99 million.  As of August 31, 2014, SIGA's cash and investment balance was approximately $110 million.

48.    The significant prepetition indebtedness of SIGA as of August 31, 2014, consists primarily of the following:

*Secured Indebtedness*

49.    On December 31, 2012, SIGA entered into that certain Loan and Security Agreement with General Electric Capital Corporation, as administrative and collateral agent, and the financial institutions who are lenders under the agreement (the "**Loan and Security Agreement**").  The Loan and Security Agreement provided SIGA with a term loan of $5.0 million with a fixed interest rate of 9.85% per annum and a revolving line of credit of $7.0 million with a variable interest rate.  Borrowings under the revolving line of credit are based on eligible outstanding accounts receivable and bear interest at a rate per annum equal to 5.25% plus the higher of (i) 1.50% and (ii) three-month LIBOR divided by a defined factor.  SIGA may draw down from the revolving line of credit up to 85% of qualified eligible accounts receivable

WEIL:\95075834\15\99980.0219

as defined in the Loan and Security Agreement.  SIGA is obligated to repay its outstanding loan

balance by December 1, 2015.  It is also obligated to make monthly interest payments on the

outstanding principal amount of the term loan in addition to monthly principal payments.  The

term loan and revolving facility are secured by a first priority lien on all of SIGA's existing and

after acquired property (including deposit accounts), other than certain excluded assets, which

include (i) the final drug product under the brand names Arestvyr™ or ST-246®, (ii) the final

drug product whose active ingredient has the United States Adopted Name ("**USAN**")

designation Tecovirimat, (iii) any final drug product chemically derived from the active

ingredient that has the USAN designation Tecovirimat, (iv) any other orthopox related small

molecule therapeutic product derived from the same family of tricyclononenes from which

Tecovirimat was derived, and (v) intellectual property related to the foregoing.  As of the

Commencement Date, $2.50 million was outstanding under the term loan and no amounts were

outstanding under the revolving line of credit.

*Trade Payables*

50.     As of the Commencement Date, SIGA had unsecured trade payables of

approximately $3.3 million.

## IV.

## Information Required by Local Rule 1007-2

51.     Local Rule 1007-2 requires that SIGA provide certain information, which

is set forth below.

52.     Pursuant to Local Rule 1007-2(a)(3), Schedule 1 hereto lists the names

and addresses of the members of, and attorneys for, any committee organized prior to the

Commencement Date and a brief description of the circumstances surrounding the formation of

the committee and the date of its formation.

20

53.     Pursuant to Local Rule 1007-2(a)(4), Schedule 2 hereto lists the following information with respect to each of the holders of SIGA's twenty (20) largest unsecured claims, excluding claims of insiders: the creditor's name, address, and telephone number; the name(s) of persons(s) familiar with SIGA's accounts, the approximate amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

54.     Pursuant to Local Rule 1007-2(a)(5), Schedule 3 hereto provides the following information with respect to each of the holders of the five (5) largest secured claims against SIGA: the creditor's name, address, and telephone number; the approximate amount of the claim; a brief description of the collateral securing the claim; an estimate of the value of the collateral, and whether the claim or lien is disputed.

55.     Pursuant to Local Rule 1007-2(a)(6), Schedule 4 hereto provides a summary of SIGA's assets and liabilities.

56.     Pursuant to Local Rule 1007-2(a)(7), Schedule 5 hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of SIGA that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of SIGA that are held by SIGA's directors and officers, and the amounts so held.

57.     Pursuant to Local Rule 1007-2(a)(8), Schedule 6 hereto provides a list of all of SIGA's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

WEIL:\95075834\15\99980.0219

58.     Pursuant to Local Rule 1007-2(a)(9), Schedule 7 hereto provides a list of the premises owned, leased, or held under other arrangement from which SIGA operates its business.

59.     Pursuant to Local Rule 1007-2(a)(10), Schedule 8 hereto provides the location of SIGA's substantial assets, the location of its books and records, and the nature, location, and value of any assets held by SIGA outside the territorial limits of the United States.

60.     Pursuant to Local Rule 1007-2(a)(11), Schedule 9 hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against SIGA or its property where a judgment against SIGA or a seizure of its property may be imminent.

61.     Pursuant to Local Rule 1007-2(a)(12), Schedule 10 hereto provides a list of the names of the individuals who comprise SIGA's existing senior management, their tenure with SIGA, and a brief summary of their relevant responsibilities and experience.

62.     Pursuant to Local Rule 1007-2(b)(1)-(2)(A), Schedule 11 hereto provides the estimated amount of weekly payroll to SIGA's employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by SIGA for the thirty (30) day period following the Commencement Date as SIGA intends to continue to operate its business.

63.     Pursuant to Local Rule 1007-2(b)(3), Schedule 12 hereto provides, for the thirty (30) day period following the Commencement Date, a schedule of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

22

## V.

### Conclusion

64.     The above sets forth the factors that precipitated the commencement of

SIGA's chapter 11 case.  The provisions of chapter 11 will assist in enabling SIGA to achieve its

objective of preserving itself as a viable economic enterprise able to compete in its marketplace

and perform under the BARDA Contract for the benefit of not only its economic stakeholders

and employees, but also for the benefit of the health and welfare of the United States and its

citizens.

65.     The foregoing is true and correct to the best of my knowledge,

information, and belief.

/s/ Eric A. Rose
Eric A. Rose
Chief Executive Officer and
Chairman of the Board of
SIGA Technologies, Inc.

Sworn to and subscribed before me, a notary public for the State of New York,
County of New York, this 16th day of September, 2014.

/s/ Kathleen A. Lee
Notary Public, State of New York
No. 01LE6119251
Qualified in New York County
Commission Expires November 29, 2016

23

**<u>Schedule 1</u>**

**Committees**

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtor's knowledge and belief, no committee has been organized prior to the Commencement Date.

**<u>Schedule 2</u>**

**List of 20 Largest Unsecured Claims (Excluding Insiders)[1]**

      Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of September 15, 2014, the twenty (20) largest unsecured claims against the Debtor, excluding claims of insiders as defined in 11 U.S.C. § 101.

---

[1]    The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.   All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

Moreover, this list excludes any creditors that may have claims on the basis of payroll, benefits, or accrued vacation.

| Name of Creditor | Name, telephone number, and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2] | Estimated amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| ALBEMARLE CORPORATION | Albemarle Corporation<br>Attn.: Julie Risdon<br>1421 Kalamazoo Street<br>South Haven, MI 49090<br>Tel:  (269) 639-0113<br>Fax: (269) 637-8410<br>E-mail: julie.risdon@albemarle.com | Trade Claim | | $2,762,753.35 |
| COOLEY LLP | Cooley LLP<br>Attn.: William Schwartz<br>1114 Avenue of the Americas<br>New York, NY 10036-7798<br>Tel:  (212) 479-6290<br>Fax: (212) 479-6275<br>E-mail: wschwartz@cooley.com<br>     kguernsey@cooley.com | Legal Services | | $158,902.53 |
| BINGHAM MCCUTCHEN LLP | Bingham McCutchen<br>Attn.: Alphonso Tsinijinni<br>       David O. Johanson<br>One Federal Street<br>Boston, MA 02110-1726<br>Tel:  (617) 951-8161; (617) 951-8304<br>Fax: (617)-951-8736; (617) 951-8736<br>E-mail: al.tsinijinni@bingham.com<br>     david.johanson@bingham.com | Legal Services | | $54,009.24 |
| CATALENT PHARMA SOLUTIONS | Catalent Pharma Solutions<br>Attn.: Jaspreet Jabbal<br>       Lisa Marsicano<br>14 Schoolhouse Road<br>Somerset, NJ 08873<br>Tel:  (859) 745-2200<br>     (877) 321-9388 Ext. 4694<br>Fax:  (859) 745-6636<br>E-mail:  jaspreet.jabbal@catalent.com<br>     lisa.marsicano@catalent-ssc.com | Trade Claim | | $52,426.00 |
| PATHEON MANUFACTURING SERVICES, LLC | Patheon Manufacturing Services, LLC<br>Attn.:   Kaye Byrd<br>5900 Martin Luther King Jr. Hwy.<br>Greenville, NC 27834<br>Tel: (866) 458-9336<br>Fax: (919) 474-2269<br>E-mail: sfsc.usa@dsm.com<br>     kaye.byrd@Patheon.com | Trade Claim | | $40,700.00 |

---

[2]  All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

2

| Name of Creditor | Name, telephone number, and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2] | Estimated amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| SENOPSYS LLC | Senopsys LLC<br>Attn.: Jeff Worthington<br>800 West Cumming Park, Suite 1500<br>Woburn, MA 01801<br>Tel:   (781) 935-7450<br>E-mail: jeff.worthington@senopsys.com | Trade Claim | | $28,275.00 |
| COVANCE LABS | Covance Labs<br>Attn.: Judy Bieri<br>3301 Kinsman Blvd.<br>Madison, WI 53704<br>Tel:  (608) 241-7201<br>Fax: (608) 242-7942<br>E-mail: judy.bieri@covance.com | Trade Claim | | $19,452.00 |
| KCSA STRATEGIC COMMUNICATIONS | KCSA Strategic Communications<br>Attn.: Joseph Septon<br>        Christopher Harrison<br>880 Third Avenue – 6th Floor<br>New York, NY 10022<br>Tel:   (212) 682-6300<br>Fax: (212) 697-0910<br>E-mail: jsepton@kcsa.com<br>        charrison@kcsa.com | Consulting Services | | $14,153.72 |
| JENNER & BLOCK LLP | Jenner & Block LLP<br>Attn.: Jay DeVecchio<br>1099 New York Avenue, NW<br>Suite 900<br>Washington, D.C. 20001<br>Tel: (202) 639-6893<br>Fax: (202) 639-6000<br>E-mail: jdevecchio@jenner.com | Legal Services | | $12,759.62 |
| POLIT BUREAU | Polit Bureau<br>Attn.: Peter Tulkens<br>Diamant Building<br>80, A. Reyerslaan<br>1030 Brussels<br>Belgium<br>Tel:   +32 (0) 2 706 81 77<br>Fax:   +32 1168 3616<br>E-mail: peter.tulkens@politbureau.be | Consulting Services | | $12,000.00 |
| M.L. CORRADO CONSULTING | M.L. Corrado MD<br>Attn.: Michael Corrado<br>1309 Seven Corner Road<br>Perkasie, PA 18944<br>Tel:   (267) 373-7471<br>E-mail: mlcorrado4444@yahoo.com | Consulting Services | | $10,281.41 |

3

| Name of Creditor | Name, telephone number, and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2] | Estimated amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| FISHNET SECURITY, INC. | Fishnet Security, Inc.<br>Attn.: Janet Ashcraft<br>3701 Solutions Center<br>Chicago, IL 60677-3007<br>Tel:   (816) 421-6611<br>         (816) 556-3501<br>Fax: (816) 421-6677<br>E-mail: janet.ashcraft@fishnetsecurity.com | Trade Claim | | $7,487.50 |
| MARION WEINREB & ASSOCIATES, INC. | Marion Weinreb & Associates, Inc.<br>Attn.: Marion Weinreb<br>58 Vista Del Sol<br>Mill Valley, CA 94941<br>Tel:   (415) 388-1695<br>Fax: (415) 634-1767<br>E-mail: marion@gxpsrus.com | Consulting Services | | $7,000.00 |
| FORMUREX INC. | Formurex Inc.<br>Attn.: Sunny Sun<br>2470 North Wilcox Road<br>Stockton, CA 95215<br>Tel:   (209) 931-2040<br>Fax: (209) 931-2177<br>E-mail: ssun@formurex.com | Trade Claim | | $6,752.20 |
| CONTROL SOLUTIONS INTL. | Control Solutions Intl.<br>Attn.: Kathi Loftus<br>Attn: Accounts Receivable<br>P.O. Box 75343<br>Chicago, IL 60675-5343<br>Tel:   (888) 902-8348 Ext. 8064<br>Fax:   (781) 998-0214<br>E-mail: kloftus@controlsolutions.com | Consulting Services | | $6,600.00 |
| JEFFREY HINCKS | Jeffrey R. Hincks<br>Attn.: Jeffrey R. Hincks<br>230 Balmoral Court<br>Chester Springs, PA 19425<br>Tel:   (610) 216-2407<br>E-mail: hincksj@aol.com | Consulting Services | | $6,480.00 |
| RICERCA BIOSCIENCES, LLC | Ricerca Biosciences, LLC<br>Attn.: Lori Sedilko<br>7528 Auburn Road<br>Concord, Ohio 44077<br>Tel: (440) 357-3512<br>        (888) 742-3722<br>Fax: (440) 354-6276<br>E-mail: lori.sedilko@ricerca.com | Trade Claim | | $5,910.00 |

4

| Name of Creditor | Name, telephone number, and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2] | Estimated amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| BEND RESEARCH | Bend Research<br>Attn.: Mary Heller<br>64550 Research Road<br>Bend, OR 97701<br>Tel:   (541) 382-4100<br>        (541) 706-8309<br>Fax: (541) 382-2713<br>E-mail: mary.heller@bendresearch.com | Trade Claim | | $5,500.00 |
| COMPENSATION ADVISORY PARTNERS, LLC | Compensation Advisory Partners, LLC<br>Attn: Ilana Kanzas<br>1133 Avenue of the Americas, 36th Floor<br>New York, NY 10036<br>Tel: (212)-921-9361<br>Fax: (212)-921-9227<br>E-mail: ilana.kanzas@capartners.com | Consulting Services | | $4,737.50 |
| PHARMATHENE, INC. | PharmAthene, Inc.<br>Attn.: Linda L. Chang<br>One Park Place, Suite #450<br>Annapolis, MD 21401<br>Tel:   (410) 269-2600<br>Fax: (410) 269-2601<br>E-mail: linda.chang@pharmathene.com | Litigation | Unliquidated and Disputed | Unliquidated |

WEIL:\95077289\10\99980.0025

**<u>Schedule 3</u>**

**List of Holders of 5 Largest Secured Claims**

  Pursuant to Local Rule 1007-2(a)(5), the following lists the creditors holding, as of the Commencement Date, the five largest secured, noncontingent claims against the Debtor, excluding claims of insiders as defined in 11 U.S.C. § 101.

| Creditor[1] | Mailing Address & Phone Number | Amount of Claim (in millions) | Type of Collateral | Value of Collateral | Disputed | As of |
|---|---|---|---|---|---|---|
| General Electric Capital Corporation | General Electric Capital Corporation c/o GE Healthcare Financial Services, Inc. Two Bethesda Metro Center, Suite 600 Bethesda, Maryland 20814 Attn: Senior Vice President of Risk – Life Science Finance or Sandy Kwon Phone: (301) 961-1640 Fax: (301)-664-9855 Email: Sandy.Kwon@ge.com | $2.50 | The term loan and revolving facility are secured by a first priority lien on all of the Debtor's existing and after acquired property (including deposit accounts), other than certain excluded assets, which include (i) the final drug product under the brand names Arestvyr™ or ST-246®, (ii) the final drug product whose active ingredient has the United States Adopted Name ("**USAN**") designation tecovirimat, (iii) any final drug product chemically derived from the active ingredient that has the USAN designation tecovirimat, (iv) any other orthopox related small molecule therapeutic product derived from the same family of tricyclononenes from which Tecovirimat was derived, and (v) intellectual property related to the foregoing. | Undetermined | | Commencement Date |

---

[1]     The information set forth herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.

## Schedule 4

### Condensed Consolidated Balance Sheet (Unaudited)[1]
### as of June 30, 2014 and December 31, 2013

| | | June 30, 2014 | | December 31, 2013 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | $ | 99,029,327 | $ | 91,309,754 |
| Accounts receivable | | 742,709 | | 982,023 |
| Inventory | | 16,845,607 | | 20,515,349 |
| Prepaid expenses and other current assets | | 1,358,018 | | 750,808 |
| Deferred tax assets | | 11,758,810 | | 10,383,908 |
| **Total current assets** | | 129,734,471 | | 123,941,842 |
| | | | | |
| Property, plant and equipment, net | | 1,000,542 | | 1,382,073 |
| Deferred costs | | 30,097,583 | | 22,583,202 |
| Goodwill | | 898,334 | | 898,334 |
| Other assets | | 1,999,431 | | 2,078,159 |
| Deferred tax assets, net | | 45,741,228 | | 42,940,624 |
| **Total assets** | $ | 209,471,589 | $ | 193,824,234 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **Current liabilities** | | | | |
| Accounts payable | $ | 1,628,237 | $ | 5,064,380 |
| Accrued expenses and other current liabilities | | 4,777,869 | | 4,842,393 |
| Common stock warrants | | 11,532 | | 313,425 |
| Current portion of long term debt | | 1,979,231 | | 1,968,826 |
| **Total current liabilities** | | 8,396,869 | | 12,189,024 |
| | | | | |
| Deferred revenue | | 188,081,857 | | 162,222,189 |
| Long term debt | | 997,693 | | 1,989,948 |
| Other liabilities | | 426,465 | | 447,605 |
| **Total liabilities** | | 197,902,884 | | 176,848,766 |
| Commitments and contingencies | | | | |
| **Stockholders' equity** | | | | |
| Common stock ($.0001 par value, 100,000,000 shares authorized, 53,504,296 and 53,108,844 issued and outstanding at June 30, 2014, and December 31, 2013, respectively) | | 5,350 | | 5,310 |
| Additional paid-in capital | | 174,421,347 | | 173,498,028 |
| Accumulated deficit | | (162,857,992) | | (156,527,870) |
| **Total stockholders' equity** | | 11,568,705 | | 16,975,468 |
| **Total liabilities and stockholders' equity** | $ | 209,471,589 | $ | 193,824,234 |

---

[1]  The unaudited consolidated balance sheet includes the Debtor and its non-debtor wholly-owned subsidiary SIGA (Europe).

## Schedule 5

**Publicly Held Securities**

Pursuant to Local Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, and other securities of the Debtor that are publicly held ("**Securities**") and the number of holders thereof.   The Securities held by the Debtor's directors and officers are listed separately.

**SIGA Technologies, Inc. Common Stock**

| Type of Security | Approximate Number of Shares | Approximate Number of Record Holders | As of |
|---|---|---|---|
| Common stock $.0001 par value. | 53,500,000 shares outstanding | 7,600 | June 30, 2014 |

**SIGA Technologies, Inc. Common Stock Held by the Debtor's Non-Employee Directors**

| Name of Non-Employee Director | Approximate Number of Shares[1] | As of |
|---|---|---|
| James Antal | 111,000 | August 31, 2014 |
| Michael J. Bayer | 85,000 | August 31, 2014 |
| Thomas E. Constance | 245,000 | August 31, 2014 |
| Jeffrey B. Kindler | 40,000 | August 31, 2014 |
| Joseph W. Marshall III | 100,000 | August 31, 2014 |
| Paul G. Savas | 187,000 | August 31, 2014 |
| Bruce Slovin | 265,000 | August 31, 2014 |
| Andrew L. Stern | 67,000 | August 31, 2014 |

---

[1] Includes stock owned and vested options to purchase stock held by the director.

**SIGA Technologies, Inc. Common Stock Held by the Debtor's Executive Officers**

| Name of Executive Officer | Approximate Number of Shares[2] | As of |
|---|---|---|
| Eric A. Rose | 1,073,000 | August 31, 2014 |
| Daniel J. Luckshire | 213,000 | August 31, 2014 |
| Dennis E. Hruby | 398,000 | August 31, 2014 |
| William J. Haynes | 81,000 | August 31, 2014 |

---

[2] Includes stock owned, vested options to purchase stock, and maximum shares issuable under vested stock appreciation rights held by the executive officer.

2

## **Schedule 6**

**Debtor's Property Not in the Debtor's Possession**

Pursuant to Local Rule 1007-2(a)(8), none of the Debtor's property is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

## Schedule 7

       Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtor operates its business.

### Leased Property[1]

| Lease Reference | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Corporate Office | 660 Madison Avenue, Suite 1700 | New York | New York | 10065 | USA |
| Research and Development Office | 4575 SW Research Way, Suite 230 | Corvallis | Oregon | 97333 | USA |

---

[1] The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtor.

## Schedule 8

### Location of Debtor's Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtor's substantial assets, the location of its books and records, and the nature, location, and value of any assets held by the Debtor outside the territorial limits of the United States.

### Location of Debtor's Substantial Assets

The Debtor has substantial assets at its Corporate Headquarters located at 660 Madison Avenue, Suite 1700, New York, New York 10065 and at its Research and Development Office located at 4575 SW Research Way, Suite 230, Corvallis, Oregon 97333.

### Books and Records

The Debtor's books and records are located at its Corporate Headquarters located at 660 Madison Avenue, Suite 1700, New York, New York 10065 and at its Research and Development Office located at 4575 SW Research Way, Suite 230, Corvallis, Oregon 97333.

### Debtor's Assets Outside the United States

The Debtor's sole wholly-owned subsidiary, SIGA (Europe), is located in Europe and, as of August 31, 2014, is capitalized with approximately $2,000.

## Schedule 9

### Litigation

Pursuant to Local Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its properties where a judgment against the Debtor or a seizure of its property may be imminent.

| Action or Proceeding | Nature of Proceeding | Status of the Proceeding |
|---|---|---|
| PharmAthene, Inc. v. SIGA Technologies, Inc.; Court of Chancery of the State of Delaware (Civil Action No. 2627-VCP) | Breach of Contract | Pending |

## Schedule 10

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtor's existing senior management, a description of their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

### Debtor's Senior Management

| Name / Position | Experience / Responsibilities |
|---|---|
| **Eric A. Rose, M.D.**<br>*Chairman of the Board of Directors*<br>*Chief Executive Officer* | Dr. Rose has served as Chairman of the Board of Directors and Chief Executive Officer of SIGA Technologies, Inc. ("**SIGA**" or the "**Company**"), since January 2007 and March 2007, respectively.<br><br>Dr. Rose served as a director from April 2001 to January 2007 and as Interim Chief Executive Officer from April to June 2001.   Dr. Rose chaired the Department of Health Evidence & Policy at the Mount Sinai School of Medicine from 2008 to 2012, which he now serves as co-chair and professor.   From 1994 through 2007, Dr. Rose served as Chairman of the Department of Surgery and Surgeon-in-Chief of the Columbia Presbyterian Center of New York Presbyterian Hospital.   Dr. Rose is a former director of public and private pharmaceutical and biotechnology companies.   In addition to his roles at SIGA, Dr. Rose holds a position as Executive Vice President – Life Sciences at MacAndrews & Forbes Holdings Inc. ("MacAndrews Holdings"), an affiliate of a SIGA shareholder. |
| **Daniel J. Luckshire**<br>*Executive Vice President*<br>*Chief Financial Officer* | Mr. Luckshire has served as Executive Vice President and Chief Financial Officer since February 2011.<br><br>Prior to joining the Company, Mr. Luckshire was a strategic advisor and private investor for a range of companies operating within specialized market segments.   Between 1998 and 2008, Mr. Luckshire was an investment banker at Merrill Lynch & Co., where he held various positions of increasing responsibility.   Prior to his employment with Merrill Lynch, Mr. Luckshire was a member of the management team that built USI Insurance Services into a national insurance brokerage and was a certified public accountant at Price Waterhouse LLP. |

| Name / Position | Experience / Responsibilities |
|---|---|
| **William J. Haynes**<br>*Executive Vice President*<br>*General Counsel* | Mr. Haynes has served as Executive Vice President and General Counsel since June 2012.<br><br>Mr. Haynes held a number of senior positions in the business world and the United States government, including Chief Corporate Counsel at Chevron Corporation from 2008 to 2012, General Counsel of the Department of Defense from 2001 to 2008, partner in the national law firm Jenner & Block from 1993 to 1996 and from 1999 to 2001, Vice President and Associate General Counsel of General Dynamics Corporation from 1996 to 1999, and General Counsel of the Department of the Army from 1989 to 1993. |
| **Dennis E. Hruby, Ph.D.**<br>*Vice President*<br>*Chief Scientific Officer* | Dr. Hruby has served as Vice President and Chief Scientific Officer since June 2000.   From April 1997 through June 2000, Dr. Hruby was Vice President of Research. From January 1996 through March 1997, Dr. Hruby served as a senior scientific advisor to the Company.   Dr. Hruby is an Adjunct Courtesy Professor of Microbiology at Oregon State University, a member of the American Society of Virology, the American Society for Microbiology, and a fellow of the American Academy of Microbiology. |

WEIL:\95077392\5\99980.0025

## Schedule 11

### Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtor's employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtor, for the 30-day period following the filing of the chapter 11 petition.

| | |
|---|---|
| **Estimated Payments to Employees (Not Including Officers, Directors, and Stockholders)** | $45,000 |
| **Estimated Payments to Officers, Stockholders, and Directors** | $303,000[1] |
| **Estimated Payments to Financial and Business Consultants** | $80,000[2] |

---

[1] Comprises approximately $269,000 of payroll for executive officers in the 30-day period following the filing, and approximately $34,000 for directors' fees for the same period.

[2] This does not include any payments to the Debtor's attorneys or auditors.

## Schedule 12

### Cash Receipts and Disbursements,
### Net Cash Gain or Loss, Unpaid Obligations and Receivables

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the approximate estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $340,000 |
| **Cash Disbursements** | $1,396,000 |
| **Net Cash Loss** | ($1,056,000) |
| **Unpaid Obligations** | $2,640,000 |
| **Unpaid Receivables** | $1,266,000 |