PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
Martin J. Bienenstock
Scott K. Rutsky
Ehud Barak

*Proposed Attorneys for the Statutory Creditors'*
*Committee of SIGA Technologies, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
*In re*                                                              :    Chapter 11
                                                                          :
**SIGA TECHNOLOGIES, INC.,**                        :    Case No. 14-12623 (SHL)
                                                                          :
                                              Debtor.              :    **Hearing Date and Time:**
                                                                          :    **October 22, 2014, at 3:00 p.m. (ET)**
------------------------------------------------------------x

**OMNIBUS RESPONSE OF STATUTORY CREDITORS'**
**COMMITTEE OF SIGA TECHNOLOGIES, INC. TO ITS FIRST DAY**
**MOTIONS, INCLUDING CONDITIONAL OBJECTIONS TO THE**
**CRITICAL VENDOR MOTION AND CASH COLLATERAL STIPULATION**

The statutory creditors' committee of SIGA Technologies, Inc. (the "Committee" of the "Debtor" or "SIGA," respectively), respectfully submits this omnibus response (the "Response") to the first day motions (the "First Day Motions")[1] of SIGA, including conditional objections (the "Objections") to the (a) *Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) (i) Authorizing, But Not Directing, Debtor to Pay Prepetition Obligations of Critical Vendors, (ii) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers, and (iii) Scheduling Final Hearing* (the "Critical Vendor Motion"), filed on September 16, 2014 (Docket No. 9), and approved on an interim basis on

---

[1] Certain of the motions referred to as First Day Motions were not filed on SIGA's petition date, September 16, 2014, but are motions that are customarily filed before the second-day hearing.

September 17, 2014 (Docket No. 27), and (b) *Stipulation and Interim Order Regarding Use of Cash Collateral and Adequate Protection* (the "Cash Collateral Stipulation"), dated September 17, 2014 (Docket No. 25), and so ordered on an interim basis on September 17, 2014 (Docket No. 25).

### A. Procedural History

1. Case Commencement. SIGA commenced its chapter 11 case by filing its chapter 11 petition with the United States Bankruptcy Court for the Southern District of New York (the "Court") on September 16, 2014.

2. Initial Hearings on First Day Motions. On September 17, 2014, the Court held hearings on the First Day Motions and granted them, in the main, on an interim basis.

3. Committee Appointment. The United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee on October 7, 2014.[2]

4. Attorney Selection. On the evening of October 8, 2014 the Committee selected Proskauer Rose LLP ("Proskauer") as its proposed attorneys.

5. Mediation. Because it was clear the entire chapter 11 case would not exist but for the dispute between SIGA and PharmAthene, Proskauer's first act as proposed Committee attorneys on October 8, 2014 was to request SIGA and PharmAthene to mediate PharmAthene's claim and the treatment of its claim in the chapter 11 case or upon its dismissal. That led to discussions urging each party to mediate, and the Committee is pleased that SIGA and PharmAthene have agreed to mediate voluntarily those issues and submitted a stipulation and proposed order to that effect to the Court on October 15, 2014 (Docket No. 73).

---

[2] The Committee's members are PharmAthene, Inc. ("PharmAthene") and Albemarle Corporation. Initially, Catalent Pharma Solutions was also appointed as a Committee member, but it resigned on October 13, 2014.

2

6. <u>Diligence on SIGA's First Day Motions</u>. On October 9, 2014, Proskauer met with SIGA's attorneys to discuss its mediation suggestion and the First Day Motions. Since then, Proskauer has propounded to SIGA's attorneys multiple requests for information concerning such motions, as the Court anticipated when the First Day Motions were considered on an interim basis before the Committee had been appointed.[3]

7. As a result of oral and documentary information SIGA's attorneys provided, certain representations SIGA's attorneys made (as specified below), and information from other sources, the Committee takes the following respective positions on the First Day Motions:

a. The Committee has no objection to the following First Day Motions:

   i. *Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. §§ 105(a), 342(a), and 521(a)(1), Fed. R. Bankr. P. 1007(a) and 2002(a), (f), and (l), and Local Bankruptcy Rules 1007-1 and 5075-1 (i) Waiving Requirement to File List Of Creditors and (ii) Granting Debtor Authority to Establish Procedures For Notifying Creditors of Commencement of Debtor's Chapter 11 Case* (Docket No. 4);

   ii. *Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 521, Fed. R. Bankr. P. 1007(c) and 2002(d), and Local Bankruptcy Rule 1007-1 (i) Extending Time to File Schedules of Assets and Liabilities, Schedule of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs; and (ii) Waiving Requirement to File List of Equity Security Holders and Provide Notice to Equity Security Holders* (Docket No. 5);

   iii. *Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. §§ 363(c)(1) and 503(b)(1)(A) Granting Administrative Expense Status to Undisputed Obligations Arising from Postpetition Delivery of Goods and Services*

---

[3] In respect of the Cash Collateral Stipulation, the Court observed:

> […] I think Mr. Morrissey's comments strike the right tone which is that it's hard to imagine something that's more modest so I don't expect it'll be an issue **but it does always help but I think a committee always appreciates the ability to look at things and I think it leads to less problems in the future**.

First Day Hr'g Tr. 55:13–18 Sept. 17, 2014 (emphasis added).

  *Ordered Prepetition and Authorizing Debtor to Pay Such Obligations in Ordinary Course of Business* (Docket No. 6);

 iv. *Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(c), and 364(a) and Fed. R. Bankr. P. 6003 and 6004 (a) Authorizing Debtor to (i) Continue Using Existing Cash Management System, (ii) Honor Certain Prepetition Obligations Related to the Use Thereof, and (Iii) Maintain Existing Bank Accounts and Business Forms; and (b) Scheduling a Final Hearing* (Docket No. 7);

 v. *Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 503(b)(9) Establishing Procedures for Assertion, Resolution, and Satisfaction of Claims Asserted Pursuant to 11 U.S.C. § 503(b)(9)* (Docket No. 11);

 vi. *Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), and 503(b) (i) Authorizing, But Not Directing, Debtor to (a) Continue Its Insurance Programs and (b) Pay All Insurance Obligations, (ii) Modifying Automatic Stay With Respect to Workers' Compensation Claims, and (iii) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers* (Docket No. 12);

 vii. *Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), and 541 (i) Authorizing, But Not Directing, Debtor to Pay Prepetition Taxes and Assessments and (ii) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers* (Docket No. 13);

 viii. *Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 366 (i) Approving Debtor's Proposed Form of Adequate Assurance of Payment to Utilities, (ii) Establishing Procedures for Resolving Objections by Utility Companies, and (iii) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service* (Docket No. 14);

 ix. *Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement Of Expenses of Professionals* (Docket No. 50);

 x. *Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 1107(a) Authorizing, But Not Directing, Debtor to Pay Reimbursable Prepetition Obligations to Certain Service Providers* (Docket No. 51);

 xi. *Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. §§ 105(a), 327, 328, and 330 Authorizing the Debtor to Employ Certain Professionals Used in the Ordinary Course of Business Nunc Pro Tunc to the Commencement Date* (Docket No. 53).

    b. Based on SIGA's attorneys' representation that—(i) no employee will receive a payment in excess of his or her statutory priority claim, (ii) none of the employee benefit plans it asked to continue are outside the ordinary course of business and will cause payment of amounts in excess of any employee's statutory priority claim, and (iii) no insider (as defined in section 101(31) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")) is due any severance payments or any payments out of the ordinary course, and to the extent the Debtor attempts to make such payments to insiders it will fully comply with section 503(c) of the Bankruptcy Code—the Committee has no objection to the:

        i. *Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing (i) Payment of Prepetition Wages, Salaries, and Other Compensation and Benefits, (ii) Maintenance of Employee Benefits Programs and Payment of Related Administrative Obligations, and (iii) Applicable Banks and Other Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests* (Docket No. 8);

    c. For the reasons explained below, the Committee objects to:

        i. The Critical Vendor Motion, unless it is revised to provide SIGA shall not make payments the Committee does not consent to, without further Court approval after a hearing on notice to the Committee; and

        ii. The Cash Collateral Stipulation, unless it is revised to provide for the payoff of the General Electric Capital Corporation ("GE") secured claim.

**B. Objection to Critical Vendor Motion**

    8. <u>Conditional Objection</u>. The Committee agrees SIGA should continue as a viable going concern, and if that requires payments to critical vendors, the payments should be authorized, but only upon either the Committee's consent or Court approval after the facts are proven.

5

9. <u>The Bankruptcy Court May Not Delegate to SIGA its Article I Powers, Let Alone a Power the Court Does Not Have, Namely to Make Legal and Factual Determinations Not Subject to Review</u>. In its Critical Vendor Motion, SIGA requests authority to pay in full in cash whatever general unsecured prepetition claims SIGA believes should be paid to avoid jeopardizing its business, up to approximately $900,000, constituting 27% of its trade claims it estimates at $3.3 million. First Day Hr'g Tr. 12:17–18 Sept. 17, 2014. SIGA has informed the Committee that approximately $400,000 of the $900,000 may be paid as part of its subsequent motion that requests authority to pay prepetition claims, for which it will obtain reimbursement of at least 106% under its contract with BARDA (as defined in the First Day Motions). The Committee does not object to the subsequent motion because it clearly enlarges the SIGA estate. The remaining $500,000[4] constitutes approximately 14% of SIGA's total trade claims.

10. Conversely, $2.4 million of trade claims and PharmAthene's claim that SIGA concedes could exceed $232 million plus interest,[5] may or may not be paid (a) in full, (b) in cash, and/or (c) in a lump sum or over time.

11. The Committee agrees that notwithstanding that critical vendor payments violate the Congressional priority scheme in the Bankruptcy Code, are susceptible to abuse, and create the appearance of unfairness, such payments may be made with Court approval under Bankruptcy Code section 363(b) when they save or create more value than they cost. This is consistent with *In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004), *reh'g denied,* 2004 U.S. App. LEXIS 9050 (7th Cir. May 6, 2004), *cert. denied*, 541 U.S. 978 (2004).

---

[4] We are further advised SIGA may lower the amount.
[5] See Affidavit of Eric A. Rose Pursuant to Local Bankruptcy Rule 1007, filed on September 16, 2014 (Docket No. 3) at ¶ 3.

6

12. The Committee completely disagrees, however, that SIGA can be or should be delegated an unreviewable Article I power to decide for itself, in secret, when it can violate the Congressional priority scheme.

13. For starters, it is the Court's exclusive function to determine when a debtor should be authorized to violate the Congressional priority scheme, especially now after Congress addressed the critical vendor issue by enacting Bankruptcy Code section 503(b)(9) in 2005 granting administrative status to claims for goods delivered within 20 days of bankruptcy in the ordinary course of the debtor's business. *See* H.R. Rep. No. 109-31, pt. 1, at 146 (2005). In 2004, prior to enactment of section 503(b)(9), the Court of Appeals for the Seventh Circuit had reversed an order authorizing critical vendor payments because the court had not made certain findings:

> "**[T]he bankruptcy court did not explore** the possibility of using a letter of credit to assure vendors of payment. **The court did not find** that any firm would have ceased doing business with Kmart if not paid for pre-petition deliveries, . . . . **The court did not find** that discrimination among unsecured creditors was the only way to facilitate a reorganization. **It did not find** that the disfavored creditors were at least as well off as they would have been had the critical vendors order not been entered."

*In re Kmart Corp.*, 359 F.3d at 873-74 (emphasis supplied).

14. SIGA's Critical Vendor Motion requests that SIGA make all the determinations by itself and make the payments without the Court or any party in interest knowing what it did or why it did it. As a statutory committee having the powers and duties specified in Bankruptcy Code section 1103, especially the power to investigate the liabilities and conduct of the debtor's business pursuant to section 1103(c)(2), **the Committee needs**

7

**information in advance about any payment that will prefer some claims over other claims within its constituency**.  If after receiving such information the Committee consents, then SIGA can make the payment without further order.  If the Committee does not consent, then SIGA can request a hearing to obtain Court approval.

15.     Consent Makes A Big Difference.  The Committee understands that the procedures and relief requested by SIGA have been approved in other cases.  To our knowledge, this was on consent.  Certainly, we have not found any reported opinion holding a debtor is entitled to the relief SIGA requests over a statutory committee's objection.  To accommodate SIGA's stated concerns about expense and confidentiality, the Committee asked SIGA to be advised in advance[6] of each proposed critical vendor payment and of its rationale.  Then, SIGA could make the payment unless the Committee objected, in which event the matter would be left to the Court to decide.  To date, SIGA has rebuffed the Committee, consistent with SIGA's position that the Committee should primarily focus on SIGA's appeal (see below).

16.     Revealing, in advance, the reasons the Debtor deems a creditor critical and the proposed payments to such critical vendor will help abrogate any suspicion that SIGA may simply favor certain prepetition claims over others.  As put eloquently by Justice Brandeis, "[s]unlight is said to be the best of disinfectants; electric light the most efficient policeman." Brandeis, *Other People's Money* 62 (Nat'l Home Library Found. Ed. 1933).  Indeed, courts view requests to pay critical vendors with circumspection because such payments result in disparate treatment of unsecured claims.  *See Osborne v. Howell Electric Motors (In re Fultonville Metal Prods. Co.)*, 330 B.R. 305, 313 (Bankr. M.D. Fla. 2005).

---

[6] The Debtor offered to provide the Committee—after the payments and upon request—a matrix summarizing (i) the name of each Critical Vendor paid, (ii) the amount paid, and (iii) the type of goods or services provided.  Critical Vendor Motion (Docket No. 9), at ¶ 16.

17.    The Committee, pursuant to section 1103(c)(2) of the Bankruptcy Code,[7] is required to investigate and monitor the case, and it can only do so if the Debtor provides the Committee with the relevant information. *In re Johns-Manville Corp.*, 26 B.R. 919, 925 (Bankr. S.D.N.Y. 1983) ("[Reorganization committees] provide supervision of the debtor and execute an oversight function in protecting their constituent's interest. . . ." (citations omitted)). *See also In re MF Global Holdings Ltd.*, 2012 Bankr. LEXIS 898, at *13 (Bankr. S.D.N.Y. 2012):

> "An official committee of creditors plays a pivotal role in the bankruptcy process. The function of an official creditors committee is to aid, assist and **monitor the debtor to ensure that the unsecured creditors' views are heard and their interests promoted and protected**." Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 514 (S.D.N.Y. 1994). In order to fulfill that role, committee members owe a fiduciary duty to their constituents—and, in the case of an official committee of unsecured creditors, **its duty extends to all of the debtor's unsecured creditors**. *In re Refco*, 336 B.R. at 195 (citing cases).

(emphasis added)

18.    <u>There is No Support in the Bankruptcy Code to Pay Prepetition Amounts Owed to Critical Vendors Without Consent or an Evidentiary Record</u>.    SIGA's motion has neither identified critical vendors nor the reasons for paying them as described in *Kmart*, *supra*. Rather, SIGA simply listed various potential reasons to pay unspecified vendors without showing the reasons actually apply to any vendors. In short, SIGA has failed to plead a *prima facie* case for any individual vendor.

---

[7] 11 U.S.C. § 1103(c)(2) provides:

[A committee appointed under section 1102 of this title may] **investigate the acts, conduct, assets, liabilities, and financial condition of the debtor**, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan. (emphasis added).

    19. <u>The Business Judgment Rule Does Not Replace the Business Justification Requirement under Bankruptcy Code Section 363</u>.  The law in this circuit is that:

> ". . . there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under *section 363(b)*."

*Committee of Equity Security Holders v. Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (emphasis added).  SIGA, citing *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992), contends the courts uphold board decisions attributable to "any rational business purpose," as long as the directors acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.  Critical Vendor Motion ¶ 19.  If SIGA is correct, then why bother having confirmation hearings if the debtor-plan proponent need only prove its directors had a rational business purpose for determining on an informed basis in good faith how and how much creditors should be paid under a plan?

    20. SIGA's legal argument fails in two places:  the facts of *Integrated Resources* show it refutes SIGA's position, and SIGA confuses the separate uses and purposes of the business judgment rule and section 363.  *Integrated Resources* involved the affirmance of the bankruptcy court's approval of a breakup fee for a lender sponsoring the chapter 11 plan.  First, unlike here, it did not involve the overriding of the Congressional priority scheme in chapter 11.  Second, unlike here, the debtor did not ask the Bankruptcy Court to approve the breakup fee on the sole ground that the debtor's directors had deliberated on an informed basis, in good faith.  Rather, there was a trial that covered at least three issues:  (i) whether the board had, in fact, made its decision on an informed basis, in good faith, (ii) whether the breakup fee hampered rather than encouraged bidding, and (iii) whether the amount of the breakup fee was

10

unreasonable. *Integrated Resources*, 147 B.R. at 657, 659, 662. Third, notwithstanding that the court found the board had deliberated without taint, the Bankruptcy Court caused the parties to lower the breakup fee before approving it. *Id.* at 662. Fourth, unlike here, there were no secrets. All the facts were known to the parties. Fifth, the Bankruptcy Court took comfort in the support of one of the creditors' committees. *Id.* at 657.

21. Unlike Bankruptcy Code section 363's requirement for a business justification, the business judgment rule is a "principle of non-review" that protects directors and officers from personal liability if they deliberated on an informed basis, in good faith, in the honest belief they were acting in the corporation's best interests. *Quadrant Structured Products Co., Ltd. V. Vertin*, C.A. No. 6990-VCL, slip op. at 33 (Del. Ch., Oct. 1, 2014).[8] Thus, according to former Chief Justice E. Norman Veasey of the Delaware Supreme Court, a board's decision can prove "stupid" without creating personal liability if the directors deliberated as required by the business judgment rule. E. Norman Veasey, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1425 (2005).[9] Clearly, Bankruptcy Code section 363 is not intended to provide approval to "stupid" uses of cash as long as the board deliberated properly, but that is what could happen if the Court does not require proof and instead gives SIGA *carte blanche* to violate the Congressional priority scheme simply because its board deliberated in good faith. The business judgment rule protects directors from liability even when they make a stupid

---

[8] Available at: http://courts.delaware.gov/opinions/download.aspx?ID=212670 (last checked October 16, 2014).
[9] "But directors may tend to be risk averse if they must assume a substantial degree of exposure to personal risk relating to ex post claims of liability for any resulting corporate loss occasioned by a business decision gone bad. they need not worry under Delaware law about mistakes of judgment—even "stupid" ones. They should not worry about liability if they exercise loyalty to the good faith pursuit of the best interests of the corporation." E. Norman Veasey, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1425 (2005).

11

decision in good faith.  Bankruptcy Code section 363 requires proof designed to protect the estate from stupid uses of its property.  They are two very different and independent doctrines.

22. Absent the Committee's consent, SIGA must show that "those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid." *In re Ionosphere Clubs, Inc*., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) (citing *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981)).  Further, "a movant would need to demonstrate that payment to a creditor confers a benefit to the estate and not merely to the payee." *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 856 (Bankr. S.D.N.Y. 1989).  By refusing to share information proving such circumstances with the Committee or the Court *before* such payments are made, SIGA does not meet the required standard.

23. The creditors' committee's input is considered in critical vendor motions. *See, e.g.*, *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 21–22 (Bankr. M.D. Fla. 2005) (the court approved the debtor's waiver of all avoidance causes of action against the critical vendors, but expressly found that "the terms of the critical vendor status were negotiated at arms-length by and between the parties, **including the Creditors' Committee**." (emphasis added)); *Final Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) (i) Authorizing, But Not Directing, Debtors to Pay Prepetition Obligations of Critical Vendors, and (ii) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers* at 3, *In re AMR Corp.*, No. 11-15463-SHL (Bankr. S.D.N.Y. 2011) (providing that the debtor is authorized to make payments to critical vendors in excess of the cap "upon either (a) **the written consent of the attorneys for the Committee**, or (b) further order of the Court . . ." (emphasis added)).

12

24. In this case in particular, the reasons why SIGA cannot and should not be granted the powers it requests are numerous:

a. <u>The Delaware Courts Determined SIGA Acted Dishonestly, with Furtive Design or Ill Will</u>. The Delaware courts have found and affirmed on a final basis that SIGA acted in bad faith, which the courts defined to mean:

> "'not simply bad judgment or negligence, but rather . . . the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.'"

*PharmAthene, Inc. v. SIGA Techs., Inc.*, 2011 Del. Ch. LEXIS 136, at *72 (Sept. 22, 2011) (footnote omitted), *reh'g denied*, 2011 Del. Ch. LEXIS 189 (Dec. 16, 2011), *affirmed on liability, remanded for re-determination of damages* 67 A.3d 330, 346 (Del. 2013).

b. <u>SIGA is Managed Today by Four Directors Charged with Managing SIGA's Business and Affairs When it Engaged in Dishonest Conduct</u>. Delaware General Corporation Law section 141(a), in pertinent part, provides: "The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation." Of SIGA's current nine directors—including the board's chairman and chief executive officer—four were directors or officers in charge of SIGA's business at the time it engaged in dishonest conduct.

c. <u>SIGA's Actions and Omissions Suggest It Is Using Chapter 11 as a Sword and Not a Shield</u>.

13

    i. <u>SIGA Never Tried to Avoid Bankruptcy</u>. SIGA's CEO and Chairman of the Board, Eric Rose,[10] swore in paragraph 4 of his 'first day' affidavit filed on September 16, 2014 (Docket No. 3), that:

> ". . . In light of SIGA's inability to bond the judgment, only the automatic stay provisions under the Bankruptcy Code can prevent PharmAthene from immediately enforcing the Court of Chancery's judgment, executing on SIGA's assets, seizing its bank accounts, and effectively freezing SIGA's operations – thus depriving the nation of an important drug and depriving SIGA of the opportunity to pursue its appeal."

What Mr. Rose did not disclose is that SIGA never picked up the phone to ask PharmAthene whether they could agree on an arrangement that would allow SIGA to appeal without commencing a chapter 11 case. Likewise, Mr. Rose never explained why he believed PharmAthene would dismember the company it needs to pay its ultimate judgment. SIGA's deployment of horrible imaginings having no logical underpinning strongly suggests another motive.

    ii. <u>SIGA's Controlling Shareholder Promptly Bought More SIGA Stock</u>. The SEC Form 4 filed by SIGA's controlling shareholder, MacAndrews & Forbes Holdings Inc. ("<u>MacAndrews & Forbes</u>"), shows it purchased over 204,000 more SIGA shares on September 23, 2014, just seven days after commencing SIGA's chapter 11 case.[11]

d. <u>SIGA Has Exerted Considerable Effort to Avoid the Checks and Balances in Chapter 11</u>.

    i. SIGA sent letters to the U.S. Trustee (respectively dated September 29 and October 2, 2014) urging that "if" a creditors' committee is appointed, the committee's **activities and focus should be limited**, primarily to SIGA's appeal, and that PharmAthene should not be a committee member because its "interests are antithetical to those of general unsecured creditors." *Weil Gotshal Letter to U.S. Trustee*, dated September 29, 2014, at p. 2. Given that SIGA's liability to PharmAthene had been affirmed by the Delaware Supreme Court, and that under *any* damage theory PharmAthene's claim exceeds all SIGA's other debt, PharmAthene holds the bulk of all allowable unsecured claims against the SIGA estate and cannot be antithetical to it. Under SIGA's logic, the holders of a majority of a debtor's liability should not serve on a

---

[10] *See Affidavit of Eric A. Rose Pursuant to Local Bankruptcy Rule 1007*, filed on September 16, 2014 (Docket No. 3) ("Since 2007 I also have been the Executive Vice President for Life Sciences at MacAndrews & Forbes Holding Inc.").

[11] Available at: http://www.sec.gov/Archives/edgar/data/740740/000120919114059852/xslF345X03/doc4.xml (last checked October 15, 2014).

14

creditors' committee because their interest is purportedly antithetical to the holders of a minority of debt. To state the proposition is to refute it. Likewise, the U.S. Trustee did not grant either of SIGA's wishes: it did not restrict the activities or focus of the Committee and it appointed PharmAthene to the Committee.

25. By letters dated October 3 and 8, 2014, SIGA also wrote to the U.S. Trustee opposing the request of Esopus Creek Value Series Fund – Series A ("Esopus") for the creation of a statutory shareholders' committee.[12] Esopus asserted that the SIGA estate has a potentially significant asset in the form of a cause of action against its present and former directors and officers who presided over the dishonesty that the Delaware courts found. While the Committee can investigate that cause of action, SIGA's opposition to the shareholders' committee formation is consistent with SIGA's effort to eliminate meaningful checks and balances.

26. As aforesaid, the Committee tried to accommodate SIGA by asking for prior notice of critical vendor payments and other basic information that support such payments, but SIGA refused.

27. Based on the facts set forth above, the Committee cannot and should not, within its statutory framework, support giving SIGA the unilateral power to prefer certain creditors while refusing to share basic information for confidential review; nor can the Committee consent to any payments otherwise barred by the Bankruptcy Code without a prior showing of a good business reason. SIGA simply does not propound a meritorious case by requiring parties in interest to "trust" its judgment—especially in view of the determinations of the Delaware courts.

---

[12] Although the letters are written by Weil, Gotshal & Manges LLP ("WGM") purportedly on behalf of SIGA, for some reason WGM's October 8 letter warns Esopus' attorneys, Munger Tolles & Olson LLP, not to use information from Munger's representation of MacAndrews & Forbes in connection with its representation of Esopus. We trust WGM is representing SIGA and not MacAndrews & Forbes in this matter.

15

### C. Objection to Cash Collateral Stipulation

28. The Committee has advised SIGA that the GE loan should (subject to confirmation that GE's liens are valid) be repaid in full, and we believe SIGA is willing to pay it off. If so, there is no dispute.

29. Conversely, if SIGA desires to go forward with its proposed stipulation, the Committee objects for the following reasons:

   a. SIGA contends the GE loan of $2.5 million is secured (subject to confirmation that GE's lien is valid) by approximately $100 million of collateral value, much or all of it very liquid. Given that no new money is being requested of GE, there is no legitimate reason for further adequate protection beyond GE's collateral cushion. *Orix Credit Alliance, Inc. v. Delta Res., Inc.*, 54 F.3d 722 (11th Cir. 1995).

   b. The stipulation provides GE retains its claim for default interest. There is especially no reason to pay GE currently and then have to contend with a claim for default interest.

   c. *In re DBSD N. Am., Inc.*, 419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd*, 2010 U.S. Dist. LEXIS 33253 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other grounds sub nom*, 634 F.3d 79 (2d Cir. 2011), Bankruptcy Judge Gerber ruled the creditor secured by spectrum licenses having a liquidation value approximately twice the loan amount, and a going concern value approximately eight times the loan amount, could be given a 4-year non-performing note as the indubitable equivalent of the claim. The District Court affirmed, *In re DBSD N. Am. Inc.*, 2010 U.S. Dist. LEXIS 33253 (S.D.N.Y. Mar. 24, 2010), and was reversed on other

16

grounds by the Second Circuit. Here, GE is over-collateralized by approximately 25-times by superior collateral.

d. Because SIGA is not required to pay interest during its chapter 11 case to GE, SIGA is in an excellent position to negotiate a good payoff number with GE.

e. Because the interest rate on the GE loan is higher than SIGA can earn with its cash, SIGA is better off repaying the loan in full, than continuing to pay interest and other fees.

WHEREFORE the Committee requests the Court to (a) direct SIGA to provide the Committee advance notice of the critical vendors, the proposed amounts, and the bases for such payments, and not to pay them without subsequent court approval if the Committee does not consent, (b) deny approval of the Cash Collateral Stipulation unless it is changed to provide for the payoff of the GE secured claim, and (c) grant the Committee such other and further relief as is just.

Dated: October 16, 2014
New York, New York

**PROSKAUER ROSE LLP**

By: /s/ Martin J. Bienenstock

Martin J. Bienenstock
Scott K. Rutsky
Ehud Barak
Eleven Times Square
New York, New York 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Proposed Attorneys for the Statutory Creditors' Committee of SIGA Technologies, Inc.*

17