Stephen Karotkin
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                            :
In re                                       :        **Chapter 11 Case No.**
                                            :
**SIGA TECHNOLOGIES, INC.,**                :        **14-12623 (SHL)**
                                            :
                        **Debtor.**         :
                                            :
-------------------------------------------------------------x

**OBJECTION OF DEBTOR TO MOTION OF STATUTORY CREDITORS'**
**COMMITTEE FOR ORDER PURSUANT TO BANKRUPTCY RULE 2004**
**AUTHORIZING DISCOVERY FROM DEBTOR AND CERTAIN THIRD PARTIES**

TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:

            SIGA Technologies, Inc., as debtor and debtor in possession in the above-

captioned chapter 11 case ("**SIGA**" or the "**Debtor**"), for its objection to the Motion of Statutory

Creditors' Committee for Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery From

Debtor and Certain Third Parties, dated April 8, 2015 (ECF No. 342) (the "**2004 Motion**"),

respectfully represents:

**Preliminary Statement**

            1.        With complete disregard for maximizing value for all of SIGA's economic

stakeholders, the statutory creditors' committee (the "**Committee**"), at the direction of

PharmAthene, Inc. ("**PharmAthene**") (its only member with a stake in this chapter 11 case),

seeks authority to commence burdensome and admittedly "time consuming and expensive" (ECF No. 386, ¶ 11) broad-range discovery consisting of the production of documents by and the depositions of SIGA, its current and former officers and directors, MacAndrews & Forbes Incorporated (SIGA's largest shareholder), and certain of its current and former officers, directors, and employees.[1]

2.      The discovery sought is neither appropriate nor can it be fruitful.  It is predicated on specious claims that, among other things, would advance only PharmAthene's parochial interests; relate to the same facts and issues that SIGA and PharmAthene have litigated in Delaware for the past eight (8) years, and for which there exists an extensive discovery and a comprehensive trial record; are time barred under applicable law; and will not in any way benefit the Debtor's estate.

3.      Since the inception of this case, PharmAthene — acting independently or through its dominance of the Committee — has sought to advance its own litigation interests with no concern for maximizing the value of the Debtor's business enterprise.  This became patently obvious in PharmAthene's recent objection to SIGA's assumption of its key contracts with the Biomedical Advanced Research and Development Authority ("**BARDA**"), SIGA's only revenue producing asset, and is once again evident in the 2004 Motion.

4.      The 2004 Motion distorts and is antithetical to the purpose of Rule 2004 of the Federal Rules of Bankruptcy Procedure ("**Rule 2004**").  It is nothing more than another leverage ploy by PharmAthene that will burden the Debtor's estate with unnecessary and "time consuming and expensive" discovery, and distract management from operating the business and

---

[1] And now the Committee seeks to retain two additional law firms to engage in this venture.  Contemporaneously herewith, the Debtor has filed its Objection to the Application of Statutory Creditors' Committee for an Order Authorizing Employment and Retention of Susman Godfrey L.L.P. and Ressler & Ressler as Special Litigation Co-Counsel (ECF No. 386), and incorporates such Objection herein by reference.

maximizing value for all of SIGA's economic stakeholders, including its more than 5,500 public shareholders, an objective PharmAthene does not share. If PharmAthene truly believed in the merits of its claim and that its judgment will be sustained by the Delaware Supreme Court on appeal, then PharmAthene should have an interest in maximizing the value of the business enterprise that it believes it owns. Instead, PharmAthene's behavior only serves to drain value from the Debtor's estate. It also is counterproductive to the parties' ongoing constructive negotiations with respect to a consensual plan of reorganization.

5.    As demonstrated more fully below, a simple analysis of the four "Examination Topics" and "potential claims" for which the 2004 Motion seeks discovery reveals the pointless and harassing nature of the exercise, the gross imposition and excessive costs it will inflict on SIGA's estate and its economic stakeholders, and the real underlying motivation for the filing of the 2004 Motion.

6.    The Committee concedes in the 2004 Motion that any potential claims relating to SIGA's accounting for deferred revenues (one of the four "Examination Topics") would be for the sole benefit of PharmAthene, not the Debtor's estate. The Committee admits it wishes to pursue such discovery to determine whether SIGA's accounting treatment was meant to frustrate PharmAthene's ability to collect an initial damage award in the Delaware Litigation (as hereinafter defined) that, in any event, has since been overturned and vacated by the Delaware Supreme Court. Additionally, the propriety of SIGA's accounting treatment was fully raised by PharmAthene in the Delaware Litigation and was fully considered by the Delaware Court of Chancery (the "**Court of Chancery**"). The Committee cannot use Rule 2004 to pursue claims for the sole benefit of PharmAthene. This abuse is compounded when the allegations were raised and addressed in the Delaware Litigation. Furthermore, it should be noted that as a

3

public company, SIGA's accounting has been audited for many years by
PricewaterhouseCoopers LLP, an internationally recognized independent auditor, without issue
regarding the accounting for deferred revenues.

7.        The other Examination Topics and potential claims fare no better.
Allegations as to SIGA's "misrepresentation" in 2009 of its small business status in connection
with its bid on the contract with BARDA are meritless.  The incontrovertible facts show that
*after* it was determined that SIGA was not a small business (despite its completely bona fide
assertion that it was) it nevertheless was awarded substantially the *same* contract.  The size of
that contract was thereafter reduced only because of a protest by Chimerix, Inc. ("**Chimerix**"), a
competitor, which had nothing to do with SIGA's small business status, but rather was based on
challenges to the "sole source" nature of BARDA's bidding process.  In addition, such claims are
time barred because they are subject to Delaware's three-year limitations period for breach of
fiduciary duty claims.

8.        Likewise, potential breach of fiduciary duty claims premised on the
involvement of SIGA's officers and directors, and those of its largest shareholder, in the
negotiations giving rise to SIGA's liability to PharmAthene in the Delaware Litigation are based
on conduct that occurred in 2006.  Such claims also are time barred under Delaware's three-year
statute of limitations.  But in addition, what possible need could there be for any additional
discovery?  As the Committee repeatedly mentions in virtually every pleading it files in this case,
SIGA was found by the Court of Chancery to have breached its obligation to negotiate in good
faith in 2006 and there is a comprehensive record in the Delaware Litigation with respect to all
matters relevant to this finding.  What further discovery could be relevant or warranted to
determine whether claims against SIGA's officers and directors, and those of its largest

4

shareholder, exist with respect to this conduct, which claims would be time barred in any event? There is none.

9.    Lastly, any potential claims relating to alleged improper insider stock trades in 2011 (even if there were some factual basis, which there is not) are similarly time barred by the applicable two-year statute of limitations under applicable law.

10.    The Committee has not sustained its burden.  The 2004 Motion is an abuse of process that will be costly, burdensome, and has no legitimate basis on which to proceed. Further, granting the relief will only serve to polarize the parties while constructive plan negotiations are taking place.  At the very least, this "time consuming," and "expensive," and distracting endeavor should be deferred, particularly when doing so will in no way prejudice the Committee, PharmAthene, or any other party in interest.

## Background

### I.    The Debtor's Chapter 11 Case

11.    On September 16, 2014 (the "**Commencement Date**"), the Debtor commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the "**Bankruptcy Code**").  The Debtor is authorized to continue to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.    Information regarding the Debtor's business, capital structure, and the circumstances leading to the commencement of this chapter 11 case is set forth in the Affidavit of Eric A. Rose Pursuant to Local Bankruptcy Rule 1007-2, sworn to on September 16, 2014 (ECF No. 3) (the "**Rose Affidavit**").

13.    On October 7, 2014, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed PharmAthene, Abemarle Corporation ("**Albemarle**"),

5

and Catalent Pharma Solutions ("**Catalent**") to the Committee pursuant to section 1102 of the

Bankruptcy Code (ECF No. 61).  On October 13, 2014, Catalent withdrew from the Committee.

Thereafter, by Order, dated April 27, 2015, SIGA was authorized to assume its executory

contract, as amended, with Albemarle and, as required by section 365 of the Bankruptcy Code,

cure all defaults thereunder (ECF No. 382).  As a consequence thereof, and pursuant to such

Order, all prepetition claims owing to Albemarle were paid and, on May 1, 2015, Albemarle

resigned from the Committee, leaving PharmAthene as the sole member.  On April 29, 2015, the

Debtor filed its Motion to Disband the Committee (ECF No. 384).  On May 1, 2015, the U.S.

Trustee appointed Patheon Manufacturing Services, LLC ("**Patheon**") as a second member of

the Committee.

> 14.    Patheon, however, is not a prepetition unsecured creditor of SIGA and

never will be.  Patheon is one of the Debtor's service providers whose services are fully

reimbursed by BARDA, and all of its prepetition claims have been satisfied in full in accordance

with the Order Pursuant to 11 U.S.C. §§ 105(a) and 1107(a) Authorizing But Not Directing,

Debtor to Pay Reimbursable Prepetition Obligations to Certain Service Providers (ECF No. 99).

Furthermore, the contract between Patheon and the Debtor is terminable at will.  Therefore,

Patheon cannot incur any rejection damages in the remote event that the Debtor ever would seek

to reject the contract.  Accordingly, Patheon never can hold a prepetition unsecured claim and

should not sit on the Committee.

## II.    The Delaware Litigation

> 15.    As the Court is aware, the Debtor's chapter 11 case was precipitated by an

action commenced by PharmAthene against the Debtor in December 2006 in the Court of

Chancery alleging breach of contract and other related claims, including a breach of the

obligation to negotiate in good faith, styled *PharmAthene, Inc. v. SIGA Technologies, Inc.*, Civ.

6

Action No. 2627-VCP (the "**Delaware Litigation**").  A detailed description of the Delaware

Litigation is set forth in the Rose Affidavit, which is incorporated herein by reference.

16.    On January 15, 2015, the Court of Chancery entered a final order and

judgment, awarding PharmAthene expectation damages, prejudgment interest, and legal fees and

expenses in the amount of $194,649,041.74, plus post-judgment interest in the amount of

$30,663.89 per day (subject to periodic adjustments to reflect the applicable legal rate) for the

period of January 15, 2015 through the date of payment.  On January 16, 2015, SIGA filed its

notice of appeal before the Delaware Supreme Court.  The appeal will be fully briefed by May

11, 2015.  Oral argument likely will take place over this summer and a decision is expected in

the fall of this year.

### III.    Plan Negotiations

17.    Despite the pending appeal of the Delaware Litigation and the certainty

that a decision by the Delaware Supreme Court will bring to the chapter 11 plan process, to the

proper allocation of value among SIGA's creditors and public shareholders, and to the ability of

SIGA to fully exploit the potential of its only commercialized and revenue-producing product,

the smallpox antiviral Tecovirimat, SIGA has been engaged in substantive plan negotiations with

the Committee.  These negotiations have focused on whether an appropriate plan can be

proposed that would permit SIGA to emerge from chapter 11 before the Delaware Supreme

Court rules on the appeal, continue to pursue the Delaware Litigation without posting a bond,

and continue to have the flexibility to operate and manage its business so as to maximize value

and its long-term viability.

18.    These negotiations are ongoing and plan term sheets have been exchanged

and are being negotiated.  Although this process still remains in its early stage, it has been

constructive and SIGA is committed to continuing the effort to achieve a consensual plan.

WEIL:\95298559\13\74193.0003

## IV.    The 2004 Motion

19.    On April 8, 2015, the Committee filed the 2004 Motion, requesting authorization to issue subpoenas for the production of documents and for depositions.  The purported justification for the 2004 Motion is the Committee's desire to seek to uncover potential estate causes of action against SIGA's present and former officers and directors, and those of its largest shareholder in connection with four matters (the so-called "**Examination Topics**") (2004 Motion ¶ 10–18).  A brief summary of each of the Examination Topics and the purported claims to be investigated is as follows:

- **Revenue Deferral Accounting**:  The Committee alleges that SIGA's publicly-reported deferred recognition of revenue from its procurement contract with BARDA included in its audited financial statements prepared in accordance with GAAP, raises, in the Committee's words, "serious concerns" as to whether such accounting treatment may have been adopted to frustrate *PharmAthene's* initial damage award in the Delaware Litigation, thereby giving rise to potential causes of action that, by definition, could benefit only PharmAthene.  (2004 Motion ¶¶ 16–18).

- **Representation as to Small Business Status**:  The Committee alleges that SIGA misrepresented its status as a "small business" to qualify for a small business contract solicited by BARDA in 2009, and that the alleged misrepresentation caused SIGA to lose the opportunity to obtain a more lucrative contract with BARDA in 2011.  On this basis, the Committee asserts that the estate may have claims against the Debtor's officers and

8

directors, and those of its largest shareholder, for breach of fiduciary duty

with respect to the alleged misrepresentation.  (2004 Motion ¶¶ 13–14).

- **PharmAthene Negotiations in 2006**:  The Committee alleges that the

  estate may have causes of action for breach of fiduciary duty against

  SIGA's officers and directors, or those of its largest shareholder, who

  were involved in the negotiations with PharmAthene in 2006 that gave rise

  to the Delaware Litigation.  (2004 Motion ¶¶ 10–12).

- **Stock Trades**:  Finally, the Committee asserts that the estate may have

  breach of fiduciary duty claims against certain officers and directors of

  SIGA who allegedly engaged in improper insider trading in May or June

  2011, prior to SIGA announcing that the value of its contract with

  BARDA had been reduced.  (2004 Motion ¶ 15).

### The Relief Requested in the 2004 Motion Should Be Denied

20.      Bankruptcy Rule 2004 provides that "[o]n motion of any party in interest,

the court *may* order the examination of any entity."  Fed. R. Bankr. P. 2004(a) (emphasis added).

21.      Rule 2004 is designed to assist a party in interest in determining the nature

and extent of the bankruptcy estate, revealing assets, examining the transactions, and assessing

whether wrongdoing has occurred.  *In re Bennett Funding Group, Inc.,* 203 B.R. 24, 28 (Bankr.

N.D.N.Y. 1996).  The party seeking Rule 2004 discovery, however, has the burden to show that

good cause exists for the requested examination, and the Court has discretion over whether to

grant relief and the scope of any such relief.  *SIPC v. Bernard L. Madoff Inv. Secs. LLC (In re

Madoff)*, Adv. Pro. No. 08-01789, 2014 WL 5486279 at *2 (Bankr. S.D.N.Y. Oct. 30, 2014);  *see

also In re ePlus, Inc. v. Katz (In re Metiom, Inc.)*, 318 B.R. 263, 268 (S.D.N.Y. 2004) ("The

9

Bankruptcy Court was required to make a finding of good cause in order to uphold its Rule 2004 order."). To demonstrate good cause, the movant must prove that the examination sought is necessary to the movant's asserted claim, or that denial of such request would cause the examiner undue hardship or injustice. *Id.*

22.    In determining whether good cause exists, a court must "balance the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991). Thus, "the examination should not be so broad as to be more disruptive and costly to the debtor than beneficial to the creditor." *In re Texaco Inc.*, 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987); *In re Express One Int'l, Inc.*, 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998) (same).

23.    Furthermore, there are well established limits to discovery under Rule 2004 that apply here. *In re Duratech Indus., Inc.*, 241 B.R. 291, 296 (Bankr. E.D.N.Y. 1999), *aff'd*, *In re Duratech Indus., Inc.*, 241 B.R. 283 (E.D.N.Y 1999). "Despite the breadth of Bankruptcy Rule 2004, it must *first* be determined that the examination is proper" *In re Enron Corp.*, 281 B.R. 836, 842 (Bankr. S.D.N.Y. 2002) (internal citations omitted). Bankruptcy Rule 2004 examinations should not be used — as it is here — for abuse or harassment purposes. *In re MF Global Inc.*, Ch. 11 Case No. 11-02790, 2013 WL 74580 at *1 (Bankr. S.D.N.Y. Jan. 8, 2013) (unpublished); *see also Duratech Indus., Inc.*, 241 B.R. at 289 (E.D.N.Y. 1999) (same); *In re Coffee Cupboard, Inc.,* 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) (stating that Rule 2004 examinations may not be used to "annoy, embarrass, or oppress the party being examined.").

24.    In addition, Rule 2004 cannot be used to gain information that is relevant to an action pending in another court — in this case, the pending Delaware Litigation. *See*

*Enron Corp.*, 281 B.R. at 842 (Bankr. S.D.N.Y. 2002) (holding that Rule 2004 cannot be invoked "where the party requesting the Rule 2004 examination could benefit their pending litigation outside of the bankruptcy court against the proposed Rule 2004 examinee."); *Coffee Cupboard*, 128 B.R. at 516 (Bankr. E.D.N.Y. 1991) ("Rule 2004 examinations should not be used to obtain information for use in an unrelated case or proceeding."); *Snyder v. Soc'y Bank*, 181 B.R. 40, 42 (S.D. Tex. 1994) (affirming bankruptcy court's denial of motion for Rule 2004 examination where primary motive for examination was for use in a separate, state court action and characterizing the use of Rule 2004 to further a state court action as an abuse of Rule 2004), *aff'd Snyder v. Soc'y Bank of Ann Arbor ( In re Snyder)*, 52 F.3d 1067 (5th Cir. 1995).

25.    Here, the Committee has not satisfied and cannot satisfy its burden of showing that good cause exists for the 2004 Motion, and the balance of interests clearly weighs in favor of denying the 2004 Motion, certainly at this time.  As demonstrated below, (a) the discovery sought with respect to accounting for deferred revenues is for the exclusive benefit of PharmAthene and is totally improper, (b) the Examination Topics relate to meritless claims as to which the statute of limitations has expired, and (c) the 2004 Motion seeks discovery that is irrelevant and not necessary to a determination of whether any potential claims exist, even if they are not time barred.

26.    The 2004 Motion is a transparent attempt to harass and burden the Debtor in a clear leverage ploy.  It is one more effort by PharmAthene to use the auspices of the Committee and estate assets to further its own interests, while at the same time imposing significant costs and disruptions on the Debtor and its management which will be value destructive to the detriment and prejudice of all other parties in interest.  The Court should exercise its discretion to deny this relief.

11

A.     **Revenue Deferral Accounting**

27.     Despite the fact that SIGA's balance sheet treatment of revenues received from BARDA (a) are prepared in accordance with GAAP, (b) are contained in financial statements audited by PricewaterhouseCoopers LLP, (c) have been publicly disclosed for years, and (d) was raised by PharmAthene in the Court of Chancery, the Committee itself categorically pronounces, without any basis whatsoever, that this balance sheet treatment "raises serious concerns." (2004 Motion ¶ 18).  The Committee's conclusion that is totally devoid of any substance whatsoever exposes the complete lack of justification for the 2004 Motion and the needless costs, expenses, and disruption involved.

28.     Moreover, the 2004 Motion admits that the requested investigation into this matter is for the sole benefit of PharmAthene individually, a total perversion of a creditors' committee's role and Bankruptcy Rule 2004:

> SIGA's deferred revenue raises serious concerns as to whether SIGA's accounting policy may have been adopted to frustrate an award in SIGA's net profits that the Chancery Court granted to ***PharmAthene*** in its initial judgment on damages . . . or any subsequent interest in net profits that may be awarded to ***PharmAthene*** following SIGA's appeal of the Chancery Court's recent lump sum award of expectation damages. (emphasis added). (2004 Motion ¶ 18).

29.     It is also important to note that the Committee's baseless "serious concerns" can only be relevant to the Court of Chancery's "initial judgment on damages" that was premised on SIGA's net profits.  That damage award was overturned and vacated by the Delaware Supreme Court on appeal, and on remand, was replaced with a lump sum damage award (the subject of SIGA's pending appeal), thereby rendering the Committee's "serious concerns" about revenue deferral totally irrelevant in any event.  Under these circumstances, a

WEIL:\95298559\13\74193.0003

broad-based and admittedly "time consuming and expensive" fishing expedition cannot be justified, particularly where the only possible beneficiary is PharmAthene.

30.    Additionally, PharmAthene raised SIGA's accounting treatment of BARDA revenues in the Delaware Litigation.  Before the Court of Chancery, PharmAthene "vigorously" disputed the propriety of SIGA's revenue deferral accounting, and evidence (including expert testimony) was presented by PharmAthene and SIGA as to the appropriateness of SIGA's accounting practices.  The Court of Chancery made no finding that SIGA's accounting treatment was in any way improper or inappropriate.  *PharmAthene, Inc. v. SIGA Tech., Inc.*, No. 2627-VCP, 2014 WL 3974167 at *6 n. 31 (Del. Ch. Aug. 8, 2014).  And PharmAthene did not appeal the Court of Chancery's handling of the issue.  There is no justification to revisit this issue now, particularly at the expense of all of SIGA's other economic stakeholders.

## B.    Representation as to Small Business Status

### (a)    The Incontrovertible Facts Show There Is No Basis for Any Claim Related to SIGA's Small Business Representation

31.    There can be no cognizable claim based on SIGA's small business representation.  As the Committee notes in its 2004 Motion and as demonstrated by the exhibits attached thereto, SIGA submitted its initial bid in response to BARDA's March 11, 2009 solicitation for the advanced development and acquisition of a smallpox antiviral drug (the "**2009 Solicitation**") on May 7, 2009.  Information regarding the solicitation, protest, review, and decision process with respect to the 2009 Solicitation is publicly available in the redacted sworn Contracting Officer's Statement of Facts, signed by Darrick A. Early, a contracting officer with the Department of Health and Human Services ("**HHS**") who had oversight of the relevant

WEIL:\95298559\13\74193.0003

BARDA's contracts, a copy of which is annexed hereto as **Exhibit "A"** (the "**BARDA Statement**").

32.    The incontrovertible facts (indeed, recognized by the Committee in the 2004 Motion) conclusively demonstrate that SIGA's failure to qualify as a small business had nothing whatsoever to do with the size of the contract ultimately awarded to SIGA by BARDA.

- The initial proposed award (the "**Initial Award**") to SIGA in October 2010 on the basis of its small business status was for 1.7 million treatment courses, with options for an additional 12 million courses.  *See* BARDA Statement ¶ 3 (solicitation), ¶ 13 (award).

- In November 2010, it was determined that SIGA did not qualify as a small business.  *Id.* ¶ 13.  This determination was based on the number of shares of SIGA held by certain minority shareholders.

- Thereafter, BARDA solicited from SIGA a proposal as a "sole source" supplier for an essentially identical contract to the Initial Award, including the same quantity of smallpox antiviral as the Initial Award.  *Id.* ¶ 19 (seeking 1.7 million treatment courses with options for an additional 12 million courses), ¶ 25 (same), ¶¶ 32–38 (same).

- In May 2011, as a result of this "sole source" solicitation by BARDA, SIGA was awarded a contract (the "**Second Award**") on a sole source basis for the same quantities as the Initial Award. *Id.* ¶¶ 34–36, 60-61 (explaining that the award to SIGA after the small business protest included a base amount of 1.7 million treatment courses and options for up to 12 million additional courses).  As part of customary contract

14

negotiations to finalize the terms of the award, SIGA agreed that an

additional 300,000 treatment courses would be delivered at no cost to

BARDA.  *Id.* ¶ 63.

- *After* the Second Award was granted to SIGA, Chimerix, a competitor of

  SIGA, protested the Second Award based on the fact that it was solicited

  on a "sole source" basis — the protest had nothing to do with whether

  SIGA qualified as a small business for the Initial Award.  *Id.* ¶ 45–48, 59.

- Although no decision had been reached on the "sole source" protest,

  BARDA exercised its unilateral authority and chose to settle Chimerix's

  "sole source" protest by removing the optional 12 million doses from the

  contract and leaving the base 1.7 million course award in place.  *See* Letter

  from Chimerix to G. Wolcott, dated June 27, 2011, a redacted copy of

  which is annexed hereto as **Exhibit "B"** (the "**Chimerix Letter**").

33.    Accordingly, it is absolutely clear that, even if SIGA had misrepresented

its status as a small business in connection with the 2009 Solicitation (which it did not), it had no

impact on the size of the ultimate contract awarded to SIGA or the eventual reduction of the

award.  As its own statements make clear, BARDA made substantially the same award to SIGA

for the Initial Award and for the Second Award.

34.    Underscoring the lack of basis for the Committee's desired 2004

investigation in this area is the fact that there could be no damages in any event.  BARDA's 2009

Solicitation required that bidders be a small business.  If SIGA did not qualify as a small

business, it would not have submitted a bid for the 2009 Solicitation in the first instance.  Under

those circumstances, SIGA never even would have had the opportunity, as the Committee

15

alleges, to have "won the initial, substantially more lucrative contract." (2004 Motion ¶ 14).

Further, the additional 12 million treatment courses that were eventually removed from SIGA's

award were quantity options that were exercisable at the Government's option and in its sole

discretion. There was never any guarantee, under either award, that such options would be

exercised.

35.    The Committee's suppositions and innuendos are not a substitute for the

acknowledged facts. No investigation is warranted under any circumstance.

> **(b)    Any Possible Cause of Action Relating to SIGA's Small
> Business Representation Is Time Barred**

36.    In addition to being entirely meritless, any potential estate cause of action

for breach of fiduciary duty stemming from the Committee's unfounded and unsupported

accusation that SIGA misrepresented its status as a small business is time barred. The statute of

limitations for a breach of fiduciary duty in Delaware is three (3) years from the time of the

alleged wrongdoing, and thus expired in 2012. *See e.g.*, *In re Am. Intern. Group, Inc.*, 965 A.2d

763, 811–12 (Del. Ch. 2009) ("Under Delaware law, a cause of action normally accrues at the

moment of the alleged harmful act. Even though this is a court of equity, equity follows the law,

and this court will apply statutes of limitations by analogy. For a breach of fiduciary duty or

fraud claim, the statute of limitation is three years."); *Albert* v. *Alex Brown Mgmt. Servs., Inc.*,

Case No. Civ.A. 762-N, 2005 WL 1594085, at *18 (Del. Ch. June 29, 2005) (unpublished)

(finding that plaintiffs' claims for breach of fiduciary duty were time barred three years

following the alleged wrongful investment activity and holding that under Delaware law, a claim

accrues as soon as the alleged wrongful act occurs).

37.    It was in its initial bid in response to the 2009 Solicitation, on May 7,

2009, that SIGA represented that it qualified as a small business, and this constitutes the "alleged

harmful act" on which any potential estate cause of action could be premised. Under the applicable three-year statute of limitations, any estate cause of action against SIGA's officers and directors, and those of its largest shareholder with respect to this representation has long expired.[2]

## C.    The PharmAthene Negotiations in 2006

### (a)    Discovery Is Unnecessary Because All Relevant Information Already Is Available

38.    The Committee has failed to show and cannot show that the discovery it is seeking relating to SIGA's negotiations with PharmAthene nearly a decade ago, in 2006 (the "**PharmAthene Negotiations**") with all of the attendant costs, expenses, and management distraction, is in any way necessary or productive. All information relevant to the PharmAthene Negotiations already is available. As set forth above, Rule 2004 is a pre-litigation device to assist a party in interest in determining whether wrongdoing has occurred. Courts routinely have denied motions for discovery pursuant to Rule 2004, however, where the information sought by the movant already is available. *See e.g.*, *Duratech Indus.*, 241 B.R. at 297-98 (Bankr. E.D.N.Y. 1991), *aff'd*, *In re Duratech Indus., Inc.*, 241 B.R. 283 (E.D.N.Y. 1999); *Coffee Cupboard*, 128 B.R. at 516 (Bankr. E.D.N.Y. 1991) (denying certain information requests where information requested could be "obtained just as easily by examining the records filed with [the] Court").

39.    The PharmAthene Negotiations are precisely the subject of the Delaware Litigation, which has been pending since 2006. Thus, there already exists a comprehensive record relating to all matters pertinent to the Committee's requested investigation, which includes:

---

[2] Even a fraud claim — which has not been alleged — has a three-year limitations period under Delaware law. *Am. Intern. Group, Inc.*, 965 A.2d at 812 (Del. Ch. 2009)

WEIL:\95298559\13\74193.0003

- Over 40,000 pages of document discovery from SIGA and thousands of additional pages from third-parties.

- Internal and external emails, documents, and written correspondence produced by SIGA regarding the PharmAthene Negotiations.

- Minutes from meetings of SIGA's Board of Directors and Audit Committee during the relevant time period.

- Financial projections and calculations concerning the potential value and/or market for Tecovirimat.

- Deposition testimony by at least eight (8) current and/or former officers and directors of SIGA (a number of whom were deposed on multiple occasions) and additional deposition testimony by SIGA's representatives, consultants, and expert witnesses.

40.    In addition, the Delaware Litigation encompassed an 11-day trial focused on the very *same* questions of SIGA's conduct that the Committee now raises.  The trial was followed by an initial appeal to the Delaware Supreme Court, remand proceedings with additional, comprehensive discovery, and a second, pending appeal to the Delaware Supreme Court.  All of the facts that could be remotely pertinent to potential causes of action relating to SIGA's breach of its obligation to negotiate in good faith or otherwise have been fully discovered and presented.  Simply put, there is no need for additional discovery and the substantial costs and distraction attendant thereto.

41.    It also should be noted that had there even been a remote basis for investigating and prosecuting potential breach of fiduciary duty claims in connection with the PharmAthene Negotiations, SIGA's thousands of public shareholders and the plaintiffs' bar certainly would have pursued such claims and sought such discovery long ago.  Notably, that did not occur.

**(b)    Any Potential Causes of Action Relating to the PharmAthene Negotiations are Time Barred.**

42.    The Committee's attempt to explain why the estate may have potential claims against SIGA's officers and directors, and those of its largest shareholder for breach of fiduciary duties in connection with the PharmAthene Negotiations, also ignores one inescapable fact. As set forth above, any potential estate cause of action for such a breach (even if the facts supported bringing claims, which they do not, as demonstrated above) also would be barred by the applicable three-year limitations period under Delaware law.

43.    The PharmAthene Negotiations that the Committee suggests may give rise to breach of fiduciary duty claims all took place in 2006. In fact, all of the "alleged harmful acts" and "alleged wrongful…activity" was fully known at the very latest when PharmAthene initiated the Delaware Litigation in December 2006, nearly eight (8) years prior to the commencement of SIGA's chapter 11 case.

44.    Under these circumstances, even if colorable breach of fiduciary duty claims existed, which they do not, they are well-beyond the applicable limitations period. Accordingly, any investigation would be an unwarranted and pointless exercise.

**D.    The Stock Trades**

45.    Any cause of action related to the sale of stock by officers and directors in 2011, even if supportable, also would be barred by the applicable statutes of limitations. The alleged improper trades referred to in the 2004 Motion that the Committee asserts may give rise to breach of fiduciary duty claims took place in May through June of 2011. As required by Section 16 of the Securities Exchange Act of 1934 (the "**Securities Exchange Act**"), all trades made by SIGA's officers or directors were publicly disclosed through the timely filing of a Form 4. Indeed, the Committee references these public filings in the 2004 Motion (2004 Motion ¶ 15,

n. 18).  Additionally, as noted in the 2004 Motion, SIGA publicly announced the modification of

the contract with BARDA on June 27, 2011.  Accordingly, for the reasons set forth above, any

estate cause of action for breach of fiduciary duty based on this conduct would be time barred by

the three-year limitations period.

46.    Similarly, although not raised by the Committee, any potential estate

causes of action for insider trading under Section 10(b) of the Securities Exchange Act and Rule

10b-5 promulgated thereunder, also would be time barred.  A private right of action for violation

of the Securities Exchange Act may be brought no later than *the earlier of* (a) two (2) years after

the discovery of the facts constituting the violation, or (b) five (5) years after such violation.  28

U.S.C. § 1658.  The two-year limitations period begins to run when the facts constituting the

violation are actually discovered or would have been discovered by a "reasonably diligent

plaintiff."  *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010) (holding that the statute of

limitations period begins to run only after "a reasonably diligent plaintiff would have discovered

the facts constituting the violation, including scienter—irrespective of whether the actual

plaintiff undertook a reasonably diligent investigation"); *City of Pontiac Gen. Employees' Ret.

Sys. V. MBIA, Inc.* 637 F.3d 169, 174 (2d Cir. 2011) (noting that the limitations period

commences "when such a reasonable investor conducting a timely investigation would have

uncovered the facts constituting a violation.").

47.    At the very least, all facts "constituting the violation" were fully disclosed

and available by the time the Form 4s relating to the trades the Committee seeks to investigate

were filed — at the latest, June 30, 2011, and the issuance of the June 27, 2011 press release.

The two (2) year statute of limitations has long expired.  Accordingly, any potential claims under

Section 10(b) of the Securities Exchange Act or Rule 10b-5, despite the fact that no basis exists

therefor in any case, similarly would be time barred, and any further investigation would be futile.

**E.      The Requested Discovery Will Be Unduly Burdensome, Costly, and Value Destructive**

48.      As the Committee openly acknowledges in its recent motion to retain two law firms as special litigation counsel (ECF No. 386, ¶ 11), the proposed discovery will be "time consuming and expensive."  It will impose a significant burden on the Debtor and its limited personnel, entail substantial fees, costs, and expenses  to be borne by the Debtor's other economic stakeholders, and distract management from its most important task of managing its business enterprise to enhance value for all parties in interest — not to mention the adverse effect it will have on ongoing plan negotiations.

49.      The proposed discovery is incredibly broad in scope, going back nine (9) years, and would require the Debtor to search and review thousands upon thousands of documents, much less electronic communications.  And that would only be the beginning.  A host of depositions undoubtedly would ensue, draining the estate of additional resources and compounding the diversion of management.  The Court should not permit this scenario to unfold where, as demonstrated above, nothing productive can be gained.

**Conclusion**

50.      The 2004 Motion has confirmed that the Committee is dominated and controlled by PharmAthene and is being utilized by PharmAthene to fund its litigation expenses to promote its individual agenda, all at the expense of SIGA's other creditors and thousands of public stockholders.

51.    The requested discovery is unnecessary, burdensome, expensive, distracting, and value destructive.  Moreover, it is a fruitless exercise — no cognizable or viable claims exist or, indeed, can exist with respect to the matters the Committee seeks to investigate.

52.    As stated above, the Debtor, the Committee, and PharmAthene are engaged in substantive and constructive negotiations with respect to a consensual plan of reorganization.  At the very least, the 2004 Motion should be deferred so that these negotiations can proceed in the most favorable circumstances and without the chilling effect that inevitably will occur if the requested fishing expedition is permitted to proceed.

WHEREFORE the Debtor respectfully requests that the Court deny the 2004 Motion.

Dated:  New York, New York
        May 8, 2015

                                        /s/ Stephen Karotkin
                                        Stephen Karotkin

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Debtor
                                        and Debtor in Possession

22

## <u>EXHIBIT A</u>

**The BARDA Statement**

CONTRACTING OFFICER'S STATEMENT OF FACTS
GAO BID PROTEST B-405103

I am Darrick A. Early. I am a contracting officer and section chief in the Acquisition Management Contracts and Grants ("AMCG") Chemical Biological, Radiation and Nuclear ("CBRN") section of the Assistant Secretary for Preparedness and Response ("ASPR") located within the Department of Health and Human Services ("HHS"). I currently support contracts issued by the Biomedical Advanced Research and Development Authority ("BARDA") and ASPR. In June of 2009 I was promoted and assumed responsibility as the contracting officer for managing a number of BARDA contracts and ongoing procurements. In 2010 I became the contracting officer for BARDA Solicitation No. BARDA RFP No. 09-35 (the "2009 Solicitation"). The 2009 Solicitation sought competitive proposals for a contract for advanced development and procurement of an antiviral drug for combating small pox. I have also acted as contracting officer under a second BARDA Solicitation BARDA RFP 11-100-SOL-00007 (the 2011 Solicitation). BARDA issued the 2011 Solicitation to SIGA Technologies, Inc. ("SIGA") seeking a proposal for a sole source contract for advanced development and procurement of small pox antiviral drug. I am also the current contracting officer for the award to SIGA under the 2011 Solicitation.

I am offering this Statement of Facts for the Agency Report submitted in response to the above-referenced protest (the "Protest"). I will describe the history of the entire procurement and the background for the award of the contract at issue in the Protest. I will also describe the procedures that BARDA under took to justify the sole source award to SIGA. I will reference the specific documents and relevant information contained within those documents. I will also reference the May 24, 2011 Declaration prepared by the BARDA Project Officer, Dr. Joseph Larsen ("Larson Declaration'). In making this statement I have reviewed the Declaration, all documents referenced in both of those documents and all other documents referenced in my Statement of Facts. I can attest that all the facts asserted in my Statement of Facts are true and that, unless otherwise stated herein, I have personal knowledge of all facts asserted herein.

<u>The Prior Solicitation and Award Decision</u>

1. On March 11, 2009 BARDA issued the 2009 Solicitation for advanced development and acquisition of small pox antiviral ("Small Pox AV") drugs. BARDA issued both the 2009 Solicitation and the 2011 Solicitation discussed herein pursuant to the requirements under the Project Bioshield Act of 2004 (the "PBA"). The PBA established a special reserve fund ("SRF") to fund the procurement of national security countermeasures for the Strategic National Stockpile maintained by the Centers for Disease Control and Prevention (the "CDC/SNS"). The PBA limits the contracts to procure countermeasures for CDC/SNS to a five-year performance period, unless the HHS Secretary authorizes a

1

longer performance period of up to a limit of eight years. Therefore the ability of the successful offeror to deliver FSA approved product, to the CDC/SNS, within five years of award is a paramount consideration in making an award under a PBA acquisition.

2.  The purpose of the acquisition under the 2009 Solicitation and under the 2011 Solicitation was to protect the civilian population in the event of a national public emergency caused by small pox attack. (2009 Solicitation §§ B.1 and B.2; 2011 Solicitation §§ B.1.1.-B.2.2.) A BARDA contract awarded in response to the 2009 Solicitation would assure that the CDC/SNS contained a supply of Small Pox AV drugs for use as a post exposure prophylactic drug. The 2009 Solicitation was limited to small businesses.

3.  The terms of the 2009 Solicitation required a technical approach that demonstrated the offeror's ability to deliver 1.7 million treatment courses of an FDA approved Small Pox AV into the CDC/SNS within five (5) years of award. (2009 Solicitation §§ B.1, B.2, and C.1.1 through C. 1.5.) The 2009 Solicitation contained a series of objectives and requirements that addressed manufacturing, assay validation regulatory reviews, and project management. (2009 Solicitation-Sections C.2 through C.7). The terms of the 2009 Solicitation also requested that offerors provide a technical approach and pricing for an additional 12 million FDA approved Small Pox AV treatment courses. (2009 Solicitation §§. b.4-CLIN 0018 and C.8.5).

4.  Under the technical evaluation criteria in the 2009 Solicitation BARDA would evaluate the offeror's technical approach for obtaining FDA approval for and manufacturing of 1.7 Small Pox AV million treatment courses. (2009 Solicitation § M.2) The Technical evaluation criteria also stated that BARDA would evaluate the feasibility of the offerror's technical approach to assure approved product delivery to the CDC/SNS within the specified 5 year base period of contract performance. Id. The 2009 Solicitation included several mandatory criteria. Those criteria included the requirement that the offeror demonstrate that the effectiveness of its proposed product in an FDA approved non-human primate ("NHP") animal model. (2009 Solicitation Section M.1- Requirement 2). BARDA reserved the right to employ a cost-technical trade-off and make an award to a higher priced but technically superior offeror. (2009 Solicitation Section M.1.)

5.  On January 6, 2010 BARDA issued Modification No 8 to the 2009 Solicitation. (2009 Solicitation Modification No. 8 dated January 6, 2010. That modification deleted the mandatory requirement that the offeror demonstrate that the effectiveness of its proposed product in an FDA approved NHP animal model. Id.

6.  BARDA deleted that requirement in an effort to broaden competition under the 2009 Solicitation. The solicitation sought competitive proposals and ████████████████████ ████████████████████████████████████████████████████ Therefore, in

2

the interest ███████████████████████ BARDA decided to delete that mandatory requirement and modified the 2009 Solicitation accordingly. There was however a debate regarding this change since the BARDA program staff believed that the mandatory requirement regarding an approved NHP animal model furthered important and legitimate scientific and regulatory goals. Never-the-less BARDA deleted the mandatory requirement ███████████

7. Both SIGA and Chimerix submitted offers in response to the 2009 Solicitation. SIGA's technical proposal offered its ST-246 product as a potential Small Pox AV drug. Chimerix technical proposal offered its CMX-001 product.  BARDA's Technical Evaluation Panel ("TEP") reviewed both proposals, determined that both companies were in the competitive range, and documented the strengths and weaknesses of each proposal. (BARDA Technical Evaluation Report for Solicitation No. RFP-BARDA -09-35.)

8. On October 1, 2010 the Source Selection Authority ("SSA") decided to award a single contract to SIGA for the base quantity of 1.7 million Small Pox AV treatment courses. The SSA's decision was based upon a review of the scientific, technical, and cost data submitted by SIGA and Chimerix in conjunction with program objectives, product requirements, and budgetary considerations. (SSA Decision Memorandum dated October 1, 2010.) The SSA considered the TEP's findings regarding the companies' technical approaches for obtaining FDA approval for and manufacturing 1.7 mil treatment courses for the CDC/SNS within the five-year base period of contract performance. (SSA Decision pp. 2-3.)

9. With regard to technical approach, the SSA concluded ████████████████████
███████████████████████████████ (SSA Decision pp. 2-4)   The SSA and the TEP's conclusions were based upon the two companies' respective stages of product development, especially with regard to the demonstrated acceptable animal challenge models in two species, and development of validated manufacturing processes. Id.

10. With regard to scheduling, the SSA concluded that SIGA's anticipated eighteen month delivery schedule ██████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

11. The SSA concluded that award to SIGA at a higher price was justified by the technical superiority of SIGA's technical approach, an approach that demonstrated that SIGA's
████████████████████████████████████████████████████████████
██████████ (SSA Decision pp.1-2 and 5-6.)

3

████████████████████████████████████████████████
████████████████████████████████████████████████

12. In accordance with the SSA's determination BARDA decided to make an award to SIGA.

Cancellation of the 2009 Solicitation

13. In October 2010, BARDA decided to make an award to SIGA.  After public notification that SIGA was the successful offeror Chimerix filed a size protest at the Small Business Administration ("SBA").  BARDA stayed the proposed award to SIGA pending an SBA determination of SIGA's size status.  On November 5, 2010 the SBA determined that SIGA was not small business. (SBA Decision No. 1-SD-20111-005.)

14. On November 8, 2010 Chimerix's attorney sent me a letter requesting that BARDA make an award to Chimerix under the 2009 Solicitation.   (McKenna Long & Aldredge (Jay Carey) letter dated November 8, 2010)

15. BARDA was concerned ███████████████████████████████████████████████████████████████████████████ BARDA was also concerned about the lack of available companies, including small businesses, that could meet the agency's needs to procure a viable Small Pox AV drug for the CDC/SNS.

16. As a result of these concerns BARDA met with HHS's Office of Small and Disadvantaged Business Utilization (the "HHS OSDBU").  BARDA sought to explore cancellation of the 2009 Solicitation in order to procure Small Pox AV through an acquisition that was not limited to small businesses. The HHS OSDBU notified BARDA that the HHS OSDBU would not object to removing the Small Pox AV acquisition from a small business set-aside procurement providing BARDA first conducted market research to determine the existence of any other small businesses, beside Chimerix, that potentially could meet BARDA's needs.

17. Concurrently BARDA also began to consider restriction of a future Small Pox AV procurement to predetermined sources in order to maintain an industrial base that would be available to manufacture FDA approved Small Pox AV drugs in the event of a national emergency.  Despite conducting an acquisition for over twenty months BARDA still had not been able to make an award.   BARDA was concerned that the U.S. Government still lacked source in the industrial base from which HHS could procure Small Pox AV drugs to meet a national emergency.

18. In addition, ██████████████████████████████████████████████████ BARDA began to explore alternatives that could enable BARDA to assist Chimerix in improving its CMX-001 so that Chimerix could, in the future, become a viable source for providing Small Pox AV drugs to the CDC/SNS.

4

19. On November 17, 2010 BARDA posted a sources sought notice on FEDBIZ Ops seeking potential sources. (Sources Sought Notice dated November 17, 2010 (the "Special Notice").) BARDA posted the Special Notice to encourage maximum participation, determine other potential small businesses were available to meet BARDA's needs and abide by the previous direction provided by the HHS OSDBU. Id; (See also Memorandum from Contracting Specialist to HHS Office of Small and Disadvantaged Business Utilization dated December 3, 2010-p. 2 ¶ 2-Current Actions.) The Special Notice stated that BARDA was seeking sources with the capability of delivering 1.7 million FDA approved Small Pox AV treatment courses to the CDC/SNS within 5 years. (Sources Sought Notice dated November 17, 2010-pp. 1-5.) The Special Notice also stated that BARDA was considering options for possible future purchases of an additional 12 million Small Pox AV treatment courses. (Special Notice at p. 6 ¶A.6.5.i.)

20. In addition to the Special Notice BARDA also conducted other market research which included literature and internet searches by subject matter experts in the field of orthopox virology, interviews with DoD and NIH who were funding work on the development of antiviral drugs for orthopox viruses, and through regular TechWatch meetings held at BARDA. (December 6, 2010 Justification for Other than Full and Open Competition (the December JOFOC") ¶¶ 6, 8 and 10.) The results of that research established that SIGA and Chimerix were the only possible sources for a Small Pox AV drug. Id.

21. On November 24, 2010 Chimerix responded to the Special Notice and maintained that it had the ability to meet the agency's requirements. (Chimerix letter dated November 24, 2010.) No other small business responded to the special notice. Thereafter Chimerix however did not pursue an award under the 2009 Solicitation or complain to agency when BARDA cancelled the 2009 Solicitation. Instead on February 16, 2011 Chimerix accepted an award of a BARDA Research and Development ('R&D") contract for the continued development of its CMX-001 product. (Chimerix/BARDA Contract No. HHSO1000201100013C dated February 16, 2011.)

22. On December 3, 2010 the HHS OSDBU approved concurred with BARDA's request to remove the Small Pox AV procurement from the small business set-aside track. (HHS OSDBU Form 653 dated December 3, 2010.) On December 9, 2010 the SBA Procurement Center Representative concurred with that decision. Id.

23. On February 18, 2011 BARDA cancelled the 2009 solicitation. (FedBiz Ops Notice and Amendment 0009 to Solicitation No. BARDA RFP No. 09-35 dated February 18, 2011.)

5

The December 13, 2010 Justification for Other than Full and Open Competition

24. After completion of its market research BARDA decided to utilize FAR exception 6.302-3 to justify negotiation of a sole source contract with SIGA, and BARDA prepared a Justification for Other than Full and Open Competition ("JOFOC"). On December 13, 2010 HHS completed the review and approval process for a JOFOC under FAR Exemption 6.302-3 (December 2010 JOFOC.)

25. The December 2010 JOFOC reflected and supported BARDA's determination to limit the current acquisition of Small Pox AV to SIGA in order to maintain SIGA as a supplier within the industrial with the capability to provide 1.7 million Small Pox AV treatment courses in the event of a national emergency. (December 2010 JOFOC §§ 2.a., 3.b, 5.b). BARDA also determined that it needed SIGA as a potential source in the industrial base for an option amount of 12 million additional Small Pox AV treatment courses. (December 2010 JOFOC § 3.b)

26. BARDA determined that the current industrial base available for Small Pox AV production was extremely limited with only SIGA and Chimerix having any capability to produce Small Pox AV drugs for the U.S. Government ("USG"). (December JOFOC § 5.b. pp 6 and 7.) BARDA needed to maintain an industrial base capable of producing Small Pox AV since, given the limited commercial requirements for that drug, the USG represented the only potential market for that drug. (December JOFOC § 5.b. p. 7). These factors dictated that BARDA support the maintenance of an industrial base that could provide a source of Small Pox AV treatment courses in the event of a national emergency. Id.

27. BARDA determined that the ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████ (December JOFOC § 5.b. pp. 6-7 and § 10.) ████████ SIGA's ST-246 product was potentially capable of meeting BARDA's national emergency and industrial mobilization needs to supply Small Pox AV to the CDC/SNS within a five year time frame. (December JOFOC § 5.b. p. 6.)

28. The USG also needed a source in the industrial base that could potentially provide an additional 12 million treatment courses of Small Pox AV through option quantities (December JOFOC § 3.b. p.3). BARDA determined that it might eventually require the additional option quantities as an important secondary prophylaxis that could treat an estimated 4% of the population that might have an uncertain immune response to smallpox. Id.

6

29. Finally, BARDA determined that in an effort to enhance future competition and further expand the industrial base BARDA intended to pursue a separate R&D contract with Chimerix. (December JOFOC § 11.)   That contract would assist Chimerix in development of its CMX-001 product as a competing Small Pox AV drug that could potentially be available for the SNS. Id.

## The R&D Award to Chimerix

30. BARDA began negotiations with Chimerix towards a R&D contract for continued development of Chimerix's CMX-001 product. BARDA took that action in an effort to expand the industrial base and enhance competition for Small Pox AV, per BARDA's stated intent in the December 2010 JOFOC.

31. On February 16, 2011 BARDA awarded Chimerix BARDA Contract No. HHSO1000201100013C (the "Chimerix/BARDA R&D Contract"). The Chimerix/BARDA R&D Contract is a cost reimbursement R&D contract in the amount of $24,819,527 for continued development of Chimerix's CMX-001 product. (BARDA Contract No. HHSO1000201100013C.)   That contract includes a one year base performance period and four option periods. Id.

## The 2011 Solicitation

32. On February 18, 2011 issued BARDA Solicitation No. RFP-11-100-SOL 00007 on a sole source basis to SIGA (the "2011 Solicitation"). The purpose of the acquisition under the under the 2011 Solicitation was to protect the civilian population in the event of a national public emergency caused by small pox attack. (BARDA Solicitation No. RFP-11-100-SOL 00007 §§ B.1.1 –B.2.1).

33. The terms of the 2011 Solicitation required a technical approach that demonstrated the SIGA's ability to deliver 1.7 million treatment courses of an FDA approved Small Pox AV into the CDC/SNS within five (5) years of award. (2011 Solicitation §§ B.2.2, and C.1.1 through C. 1.5.)   The 2011 Solicitation contained a series of objectives and requirements that addressed manufacturing, assay validation regulatory reviews, and project management. (2011 Solicitation-Sections C.2. C.4, through C.6). The terms of the 2009 Solicitation also requested that SIGA provide a technical approach and pricing for an additional 12 million FDA approved Small Pox AV treatment courses.  Under the solicitation terms BARDA was not required to exercise the option for the additional quantities within any specific time frames.   Those terms were designed to assure that BARDA has an available source in the industrial base in the event that BARDA requires

7

additional quantities to deal with a national emergency. (2011 Solicitation §§. b.5-CLIN 0014 and C.7.5)

34. The terms of the 2011 Solicitation were almost identical to the terms of the earlier 2009 Solicitation with two primary changes.

35. BARDA eliminated the earlier requirement in the 2009 Solicitation that a new award would be limited to small businesses. BARDA made this change as a result of the earlier SBA determination regarding SIGA's size status.

36. The other change concerned mandatory criteria. Section M.1 of the 2011 Solicitation included mandatory criteria that required that SIGA demonstrate that the effectiveness of its proposed product in an FDA approved non-human primate ("NHP") animal model. (2011 Solicitation p. 132 ¶ M.1.3.; Larsen Declaration ¶ 4; ) As noted above, BARDA originally had included that specific mandatory criteria in the 2009 Solicitation. In an effort to enhance competition BARDA subsequently removed that mandatory requirement under Amendment 0008 to the 2009 Solicitation. (See Paragraphs 5 and 6 above; compare 2009 solicitation Section M.1 Requirement 2 with 2011 Solicitation p. 132 ¶ M.1.3.)

37. BARDA's program believed that this mandatory requirement under Section M.1 offers significant scientific and regulatory benefits toward the treatment of small pox. BARDA included that specific mandatory requirement in the 2011 Solicitation due to the absence of definitive FDA guidance to industry on the suitability of animal models for the treatment of smallpox. BARDA knew that in late 2011 a FDA advisory committee is planning to address the lack of definitive guidance on the suitability of animal models for the treatment of small pox. BARDA wants to provide the FDA with as much data as possible, and assist the FDA in determining the suitability of animal models. Id. Therefore BARDA determined that data should be generated in as many published models as possible. The scientific goal is to provide a preponderance of data in a number of animal models of orthopox disease to demonstrate antiviral treatment efficacy, since no one animal model will likely recapitulate all aspects of human small pox disease. Inclusion of the mandatory provision in the 2011 Solicitation furthered that goal.

38. In addition the competition considerations that influenced BARDA's earlier decision to delete this mandatory requirement provision from the 2009 Solicitation were not present in the 2011 Solicitation since that solicitation was applicable to a sole source award. (See Paragraphs 5 and 6 above.).

Evaluation of SIGA's Proposal

39. On February 25, 2011 SIGA submitted a technical proposal in response to the 2011

8

Solicitation. (SIGA Technical Proposal dated February 25, 2011.)  On April 29, 2011 SIGA submitted a revised technical proposal. (SIGA Technical Proposal V.2 dated April 29, 2011.)  SIGA's technical proposal repeated much of the technical submission in its earlier proposal submitted in response to the 2009 Solicitation, but SIGA updated some of its program management materials, its Integrated Master Schedule and other time sensitive components in its technical approach. Id.

40. On March 4, 2011, BARDA concluded that SIGA's February 28th proposal had addressed the Mandatory Eligibility Criteria specified under Section M.1 of the 2011 Solicitation. (BARDA Source Selection Memorandum dated March 4, 2011). BARDA, through its Technical Evaluation Panel ("TEP") Chairman then executed a new Source Selection Memorandum that reflected that determination. Id.

41. On March 4, 2011 BARDA reconvened its TEP and evaluated SIGA's proposal against the evaluation criteria under Section M.1 of the 2011 Solicitation. (TEP Proposal Review Memorandum dated March 4, 2011; Technical Evaluation Report ("TER") dated March 8, 2011).  All members of the TEP concluded that SIGA's proposal was acceptable when compared against the evaluation criteria in the solicitation. Id.

Negotiation of SIGA's Contract Award

42. In March 2011 BARDA began its review of SIGA's technical and business proposals.  In connection with negotiations BARDA requested that SIGA submit price and cost data per FAR subpart 15.4. SIGA submitted that data and the parties continued price negotiations. The parties completed final negotiations or about May 2, 2011.

Chimerix's Agency Protest

43. On March 14, 2011 Chimerix's counsel forwarded a letter to BARDA counsel notifying BARDA of Chimerix's intention to protest a sole source award to SIGA. (BARDA Request for Dismissal dated May 24, 2011-Exhibit 4- Carey letter dated March 14, 2011.)

44. The letter referenced a February 22, 2011 email from Chimerix's representative, John Clerici, to BARDA. (BARDA Request for Dismissal-Exhibit 3-Clerici email dated February 22, 2011 with SIGA press release.)  The letter also referenced topics discussed during a February 28, 2011 telephone discussion between Chimerix's counsel and BARDA's counsel. Id.  Mr. Clerici's February 22 email included a copy of a SIGA press release in which SIGA stated that BARDA had notified SIGA that it was issuing a sole source RFP to procure 1.7 million doses of Small Pox AV with an option to procure additional option quantities of up to 12 million doses. (BARDA Request for Dismissal-Exhibit 3.)

9

45. Chimerix counsel's March 14 letter admitted that, in his February 28 discussion with agency counsel, agency counsel had confirmed that BARDA had forwarded a sole source RFP to SIGA. (BARDA Request for Dismissal-Exhibit 4 pg. 2.) During that discussion agency counsel also told Chimerix's counsel that the agency did not intend to publish a pre-award solicitation, and that BARDA intended to only publish a pre-award notice of BARDA's intent to issue a sole source contract. Id.

46. On March 21, 2011 Chimerix filed an agency protest (the "Agency Protest"). (Chimerix Agency Protest dated March 21, 2011.) Chimerix alleged that BARDA intended to award a contract to SIGA for 13.7 million courses of Small Pox AV including a base quantity of 1.7 million treatment courses and options for an additional 12 million treatment courses. Id.

47. Chimerix presented a lengthy technical argument regarding the development status of SIGA's ST-246 product and alleged that it was also a potential source for the Small Pox AV (Agency Protest at pp. 4-14.) Chimerix speculated that BARDA intended to justify a sole source award to SIGA under FAR § 6.302-1. (Agency Protest at pp. 15 and 16.) Chimerix alleged that BARDA lacked sufficient justification for a sole source award under that FAR provision. Chimerix also alleged that BARDA had violated FAR subpart 5.2 by not publishing a pre-solicitation notice. (Agency Protest at pp. 19-20.)

48. On May 5, 2011 BARDA denied the Agency Protest. (BARDA Agency Protest Response dated May 5, 2011.) BARDA determined that the Agency Protest was untimely since the Chimerix knew the basis of protest no later than February 28 and had waited more than ten days to file the agency protest. Id.

The May 2011 Supplement to the December 2011 JOFOC

49. On May 3, 2011 HHS, prior to making an award to SIGA, BARDA executed a Supplement to the December 6, 2010 JOFOC (BARDA JOFOC Supplement dated May 3, 2011 (the "May 2011 JOFOC Supplement").) HHS prepared the May 2011 JOFOC Supplement to address two events that had transpired since the preparation of the December 2011 JOFOC. Both of those events supported BARDA's decision to award a contract to SIGA under FAR § 6.302-3.

50. One event was ████████████████████████████████████ the industrial base in the event of a national emergency (May 2011 JOFOC Supplement pp. 6-7).



52. The other event was BARDA's February 16, 2011 award of the Chimerix/BARDA R&D Contract. (May 2011 JOFOC Supplement §11.) BARDA awarded the Chimerix/BARDA R&D Contract to potentially expand the industrial base, in the future ,with Chimerix as a potential second source for Small Pox AV drugs. Id. A second source would enable BARDA and the USG to ensure surge capacity, mitigate the threat of the threat of naturally acquired or engineered drug resistance and protect individuals who would be affected by a specific antiviral. Id. The Chimerix/BARDA R&D Contract supported BARDA's intent to enhance future competition. That intention was referenced in the earlier December JOFOC, especially in the event that BARDA subsequently determined to procure an additional 12 million treatment courses of Small Pox AV Id. Depending upon Chimerix's success in the R&D contract, Chimerix could act as a potential source for the option quantities.

53. The May 2011 JOFOC Supplement stated that while the proposed contract to SIGA would include an option for an additional 12 million Small Pox AV treatment courses, BARDA did not intend to exercise that option at the time of award. Id. BARDA included the options quantities in the 2011 Solicitation to enable BARDA to purchase additional treatment courses based upon four factors;

- Alteration in existing requirements based upon anticipated issuance of a Material Threat Assessment by Department of Homeland Security;
- Expansion of requirement to cover post-exposure prophylaxis (PEP).
- Ability to replenish expiring treatment courses.
- Maintenance of surge capacity in the event of a small pox outbreak

(May 2011 JOFOC Supplement § 3.b.)

54. BARDA also included the options due to the uncertainty of future competitions and the inherent risks of gaining FDA approval. (May 2011 JOFOC Supplement § 11).

55. The May 2011 JOFOC Supplement specifically referenced BARDA's intention BARDA to review Chimerix's performance under the Chimerix/BARDA R&D Contract in connection with market research required under FAR § 17.207 (d). (May 2011 JOFOC

11

Supplement § 11.). BARDA intended to specifically follow that required FAR procedure procedure prior to executing any option in the SIGA contract. Id. Based upon that market research, and Chimerix's progress on the Chimerix/BARDA R&D contract, BARDA would consider a new competitive solicitation prior to executing any option to purchase additional quantities of Small Pox AV from SIGA. Id.

56. The May 2011 JOFOC Supplement contained a revised estimate of the contract amount which reflected the negotiations that had occurred between SIGA and BARDA and SIGA's submission of cost and pricing data during those negotiations. (compare December 2010 JOFOC §§ 3.c. and 7 with May 2011 JOFOC Supplement §3.g. and §7-p. 9.)

57. The May 2011 JOFOC Supplement also referenced the fact that BARDA's prior market research also had included a review of large businesses that could potentially meet the agency's needs. (May 2011 JOFOC Supplement §6; February 22, 2011 email from Dr. Joseph Larson to Andre Early with attached technical proposal submitted by Inhibikase.)

The Notice of Award

58. On May 3, 2011 BARDA published a Special Notice in Fed BIZ Ops stating BARDA's intent to award a sole source contract to SIGA under FAR § 6.302-3. (BARDA Special Notice dated May 3, 2011.)   The Special Notice specified that it was only for informational purposes, that BARDA was not seeking competitive proposals, and that no award would be made in response to offers submitted in response to the Special Notice. Id.

59. Chimerix responded to the Special Notice on May 10, 2011 and simply reiterated a summation of the same technical arguments it had made in its March 21, 2011 agency protest regarding the development status of Chimerix's CMX-001 product and SIGA's ST-246 product. (Agency Request for Dismissal- Exhibit 8-Chimerix email.)

The SIGA Award

60. On May 13, 2011 BARDA awarded SIGA Contract No. HHSO10201100001C in the amount of $432,885,825 to purchase 1.7 million treatment courses of Small Pox AV treatment courses. (BARDA/SIGA Contract No. HHSO10201100001C dated May 13, 2011 (the "SIGA/BARDA Contract") pg. 1 and § B.5 pp.5-6.)

61. The contract included Firm Fixed Price ("FFP") contract line items ("CLINs") that totaled ██████████ and cost plus fixed fee ("CPFF") CLINs that totaled ██████ (BARDA/SIGA Contract § B.5 pp.5-6)  The FFP CLINS included a unit price ███████

12

for 1.7 million treatment courses of Small Pox AV under CLIN 001. Id. The FFP CLINS also included an advanced payment and a series of milestone payments. Id. The FFP CLINS also included a unit price ▇▇▇▇▇▇ for 1.7 million treatment courses of Small Pox AV payable upon the FDA approval of SIGA's New Drug Application. Id.

62. The SIGA/BARDA Contract also contained a series of options. (BARDA/SIGA Contract § B.5 pp. 6-7.)  The Options included a FFP CLIN, CLIN 0014 that included a unit price ▇▇▇▇▇▇ applicable to an option purchase of up to 12 million additional treatment courses of Small Pox AV. (BARDA/SIGA Contract § B.5 pp. 6-7; §C 7.5.)  CLIN 0014 did not contain any unit quantity. Id. None of the options, including the option under CLIN 0014 were executed at the time of award.

63. The SIGA/BARDA Contract also specified that, in addition to the 1.7 million Small Pox AV treatment courses purchased at the unit price under CLIN 0001, SIGA would also deliver another 300,000 treatment courses of Small Pox AV to the CDC/SNS at no additional cost to the USG.  (SIGA/BARDA Contract § B.5-CLIN 0022 and C.1.1.1.)  Those treatment courses were not separately priced, they were not included in the 1.7 million treatment courses purchased under the terms of the SIGA/BARDA Contract, and they were not included in the award amount.

64. The terms of the SIGA/BARDA Contract required that SIGA deliver 1.7 million treatment courses to the CDC/SNS within the 5 year base period of performance. (BARDA/SIGA Contract §§ C.1.1)  The contract terms required FDA approval for all treatment courses delivered to the CDC/SNS (BARDA/SIGA Contract §§ C.1.1 and C.1.4).  FDA approval was required for SIGA's manufacturing and control procedures and SIGA's clinical and non-clinical. studies. (BARDA/SIGA Contract §§ C.2.1-C2.5, C.4.1-C.4.6.)  The contract terms requiring FDA approval assure stability, safety and efficacy of any Small Pox AV treatment courses delivered to the CDC/SNS. (BARDA/SIGA Contract §§ C.1.1 and C.1.4, C.2.1-C2.5, C.4.1-C.4.6.)

65. The terms of the SIGA/BARDA Contract required submission of a security plan and specifically incorporated portions of SIGA security plan from SIGA's technical proposal. (BARDA/SIGA Contract pp. 101-110).  All Small Pox AV treatment courses that BARDA intended to purchase under the terms of the contract had to be developed and manufactured in accordance with the security requirements specified in the SIGA/BARDA Contract.

Publication of the JOFOCs

66. On May 25, 2011 BARDA published redacted copies of both the December 2010 JOFOC and the May 2011 JOFOC Supplement in Fed BIZ ops. (May 25, 2011 Fed BIZ Ops Notice with redacted JOFOC and Redacted JOFOC Supplement.).  BARDA published the redacted documents within fourteen days after award of the SIGA/BARDA

Contract in accordance with the requirements under FAR § 6.305(a) and redacted proprietary and confidential information per FAR § 6.305(e).

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ___ day of June 2011.

Darrick A. Early

## Exhibit B

**The Chimerix Letter**

## McKenna Long
## & Aldridge LLP
Attorneys at Law

Albany
Atlanta
Brussels
Denver
Los Angeles

New York
Philadelphia
San Diego
San Francisco
Washington, DC

1900 K Street, NW • Washington, DC 20006
Tel: 202.496.7500 • Fax: 202.496.7756
www.mckennalong.com

JASON A. CAREY
(202) 496-7711

EMAIL ADDRESS
jcarey@mckennalong.com

June 27, 2011



***BY E-MAIL TO PROTESTS@GAO.GOV***

Glenn Wolcott, Esq.
Procurement Law Control Group
Government Accountability Office
441 G Street, NW
Washington, DC 20548

Re:    Protest of Chimerix, Inc; B-405103; Settlement and Withdrawal

Dear Mr. Wolcott:

Chimerix, Inc. ("Chimerix") and the Department of Health and Human Services
("HHS") have reached a settlement agreement resolving the above referenced protest
challenging the sole source contract issued to SIGA Technologies, Inc. ("SIGA").

Under the settlement agreement, HHS has executed a modification to SIGA's
contract that deleted the option for 12 million additional courses of smallpox antiviral.
HHS also has agreed not to modify SIGA's contract in the future to add any additional
courses beyond the original base amount.  In return, Chimerix has agreed to withdraw its
protest.  A copy of the settlement agreement, and the modification deleting the 12 million
in options are attached hereto as Exhibits A and B.

Glenn Wolcott, Esq.
June 27, 2011
Page 2


     In reliance on the settlement agreement and HHS's modification deleting the option for 12 million additional courses from SIGA's contract, Chimerix hereby withdraws its protest.

          Sincerely,


              /s/
          Jason A. Carey
          Erin B. Sheppard
          John W. Sorrenti

          *Counsel for Chimerix, Inc.*


cc:    Mr. Chris Johnson, Esq. (via e-mail)
       Mr. Jay DeVecchio, Esq. (via e-mail)

# EXHIBIT A

## Settlement Agreement

WHEREAS, the Department of Health and Human Services ("HHS"), through its Biomedical Advanced Research and Development Agency ("BARDA"), has awarded Contract No. HHSO2011000001C to SIGA Technologies, Inc. ("SIGA") on a sole source basis;

WHEREAS, SIGA's Contract No. HHSO102011000001C ("SIGA/BARDA Contract") is for the development and delivery of smallpox antiviral to the Strategic National Stockpile ("SNS"), and currently includes a base amount of 1.7 million courses and an optional amount of up to 12 million courses;

WHEREAS, HHS and BARDA wish to have two sources for delivery of smallpox antiviral to the SNS;

WHEREAS, Chimerix, Inc. ("Chimerix"), in collaboration with BARDA under Contract No. HHSO100201100013C, is currently developing a smallpox antiviral, CMX001, with the goal of delivering it to the SNS under a future contract with BARDA;

WHEREAS, on May 13, 2011, Chimerix filed at the U.S. Government Accountability Office ("GAO") a protest of the sole source award of the SIGA/BARDA Contract, docket No. B-405103 ("Protest");

WHEREAS, without admitting any wrongdoing or liability and to avoid the expense, risk and inconvenience of litigation, the HHS and Chimerix (collectively, "the Parties") desire to dismiss and resolve all claims that have been or could have been asserted with respect to the Protest as of the date of this Agreement.

NOW, THEREFORE, in consideration of promises and other things described herein, and intending to be legally bound, the Parties agree as follows:

1.    HHS agrees to modify the SIGA/BARDA Contract to remove any option or other provision that would allow the government to purchase more than base amount of courses. HHS's modification of the SIGA/BARDA Contract will include the deletion of CLIN 0014, section C.7.5, and any and all other provisions related to the option to purchase up to 12 million courses. HHS further agrees it will not modify the SIGA/BARDA contract in the future to add additional courses of treatment above the current base amount. HHS agrees to provide a copy of the executed modification to the SIGA/BARDA Contract accomplishing these changes.

2.    Chimerix agrees to withdraw the Protest within one day of receiving an executed modification to the SIGA/BARDA Contract that complies with the preceding paragraph.

3.    Within three business days of the execution of this agreement, the parties shall make their best efforts to jointly agree on the text of any joint press release to be issued regarding this Agreement and the resolution of the Protest. Either party is free to publish its own press release, provided that neither party will disparage the other. The failure of the parties to agree to the text of a joint press release and/or the text of an individual press release issued by either party

shall not constitute grounds for initiation of an action at either the Government Accountability Office ("GAO") or the U.S. Court of Federal Claims ("USCFC") regarding the SIGA/BARDA Contract.

4.   HHS, its agents, assigns, legal representatives, and predecessors and successors in interest, does hereby release, acquit, discharge and covenant to hold harmless Chimerix, as well as its agents, assigns, legal representatives, and predecessors and successors in interest from all currently existing claims, demands, actions, causes of action or suits at law or equity, whether known or unknown, related to the SIGA/BARDA Contract except as necessary to enforce the terms of this agreement. This full release specifically covers actions at either the Government Accountability Office ("GAO") or the U.S. Court of Federal Claims ("USCFC") regarding the SIGA/BARDA Contract.

5.   Chimerix, its agents, assigns, legal representatives, and predecessors and successors in interest, does hereby release, acquit, discharge and covenant to hold harmless HHS, as well as its agents, assigns, legal representatives, and predecessors and successors in interest from all currently existing claims, demands, actions, causes of action or suits at law or equity, whether known or unknown, related to the SIGA/BARDA Contract except as necessary to enforce the terms of this agreement. This full release specifically covers actions at either the Government Accountability Office ("GAO") or the U.S. Court of Federal Claims ("USCFC") regarding the SIGA/BARDA Contract.

6.   The Parties further acknowledge that execution of this Agreement is not to be construed as an admission of liability on the part of either HHS or Chimerix.

7.   This Agreement may be executed in two (2) counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same original.

8.   This Agreement sets forth the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all prior agreements, and understandings, written or oral, between the Parties. It may not be changed, renewed, or terminated, nor may any of its provisions be waived except by a writing signed by both Parties.

9.   No representation, promise or inducement has been made by either party that is not embodied in this Agreement.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date set forth below.

U.S. Department of Health and Human Services
By [INSERT]

Signed: _____

*Brian K. Goeppes*

Chimerix, Inc.
By [INSERT]

Signed:

Dated: 6/24/2011

Dated: 6/24/11

# EXHIBIT B

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| | | 1. CONTRACT ID CODE | | PAGE | OF PAGES |
|---|---|---|---|---|---|
| | | N/A | | 1 | 2 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| Modification 0001 | See Block 16 C | N/A | N/A |

| 6. ISSUED BY | CODE | N/A | 7. ADMINISTERED BY (If other than Item 6) | CODE | N/A |
|---|---|---|---|---|---|

DHHS/ASPR/AMCG

330 Independence Avenue, SW,

Room G640,

Washington, DC 20201

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code) | | X | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|---|

SIGA TECHNOLOGIES, INC.

35 E 62nd Street

New York, NY 10065

9B. DATED (SEE ITEM 11)

| | X | 10A. MODIFICATION OF CONTRACT: ORDER NO. |
|---|---|---|
| | | HHSO100201100001C |

10B. DATED (SEE ITEM 13)

05/13/2011

| CODE  N/A | FACILITY CODE  N/A | |
|---|---|---|

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment, you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required) N/A

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (✓) | A | THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
|---|---|---|
| X | | FAR 52 243-1 Changes – Fixed Price (AUG 1987) |
| | B | THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43 103(b). |
| | C | THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF FAR 1.605-1  Mutual Agreement of all parties |
| | D | OTHER (Specify type of modification and authority) |

E. IMPORTANT:  Contractor [X] is not, [] is required to sign this document and return _0_ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible)

PURPOSE: The purpose of this modification is to delete Contract Line Item (CLIN) 14. The Price Schedule is revised as noted on the continuation sheet.

| FUNDS ALLOTED PRIOR TO MOD #10 | $432,885,825.00 | |
|---|---|---|
| FUNDS ALLOTTED WITH MOD #10 | $         0.00 | |
| TOTAL FUNDS ALLOTED TO DATE | $432,885,825.00 | (Unchanged) |
| EXPIRATION DATE | May 12, 2016 | (Unchanged) |
| CONTRACT FUNDED THROUGH: | May 12, 2016 | (Unchanged) |

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|---|
| | | Brian K Goodger, Contracting Officer |
| | | DHHS/ASPR/AMCG |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| | | BY  *Brian K. Goodger* | 6/24/2011 |
| (Signature of person authorized to sign) | | (Signature of Contracting Officer) | |

NSN 7540-01-152-8070  OMB No. 0990—0115

STANDARD FORM 30 (REV. 10-83)

| Contract No.<br>HHSO100201100001C<br>Modification No.1 | Continuation Sheet | Page 2 of 2 |
|---|---|---|

By effect of this Modification 0001, the Contract is revised as follows:

1. Contract Line Item 14 (as seen below) is deleted in entirety from the Contract.

| Option | | | | | | |
|---|---|---|---|---|---|---|
| CLIN# | Cost Type | Supply or Service | U/I | Qty | Unit Price | Extended Price |
| 0014 | FFP | Purchase of Additional Treatment Courses (Up to 12 Million). As described in Section C.7.5 | EA | TBD | | TBD |

2. The following requirements in Section C are deleted in their entirety:

C.7.5    BARDA may exercise optional CLINs to purchase additional antiviral treatment courses. (CLIN 0014)

C.7.5.1 The Contractor shall submit a plan and schedule for antiviral drug product manufacture and control at large-scale production and under cGMP compliance to deliver up to an additional 12 million treatment courses

C.7.5.2 The plan shall provide unit prices as well as cost and price data that support the unit prices (See Section B.8.) offered for the purchase of additional treatment courses using the following increments. The government shall evaluate the prices as well as the cost or price data as part of its best value analysis prior to award of Base Contract and prior to award of any option orders of treatment courses.

All other terms and conditions of Contract HHSO100201100001C remain unchanged

**END OF MODIFICATION 1 TO HHSO100201100001C**