**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                             :
In re                                                        :          **Chapter 11 Case No.**
                                                             :
**SIGA TECHNOLOGIES, INC.,**                                 :          **14-12623 (SHL)**
                                                             :
                                        **Debtor.**          :
                                                             :
-------------------------------------------------------------x


# <u>DEBTOR'S CHAPTER 11 PLAN</u>


WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Debtor and*
*Debtor in Possession*

Article I.    Definitions and Interpretation ...............................................................................1

1.1    Administrative Expenses ...................................................................................1

1.2    Allowed............................................................................................................1

1.3    Amended and Restated By-laws .......................................................................2

1.4    Amended and Restated Certificate of Incorporation .........................................2

1.5    Arbitration Agreement .....................................................................................2

1.6    Arbitrator..........................................................................................................2

1.7    Avoidance Action .............................................................................................2

1.8    Bankruptcy Code ..............................................................................................2

1.9    Bankruptcy Court ..............................................................................................2

1.10    Bankruptcy Rules .............................................................................................2

1.11    Board of Directors.............................................................................................2

1.12    Board Observer .................................................................................................3

1.13    Business Day.....................................................................................................3

1.14    Cash..................................................................................................................3

1.15    Cash Collateral .................................................................................................3

1.16    Causes of Action ..............................................................................................3

1.17    Chapter 11 Case ...............................................................................................3

1.18    Claim.................................................................................................................3

1.19    Class .................................................................................................................3

1.20    Collateral...........................................................................................................3

1.21    Commencement Date.........................................................................................3

1.22    Confirmation Date .............................................................................................3

1.23    Confirmation Hearing .......................................................................................4

1.24    Confirmation Order...........................................................................................4

1.25    Creditors' Committee.........................................................................................4

1.26    Cure..................................................................................................................4

1.27    Cure Dispute .....................................................................................................4

1.28    Debtor ...............................................................................................................4

1.29    Debtor in Possession .........................................................................................4

1.30    Delaware Chancery Court Decision...................................................................4

1.31    Disbursing Agent ..............................................................................................4

1.32   Disclosure Statement ...................................................................................4

1.33   Disputed ........................................................................................................5

1.34   Distribution Record Date ...............................................................................5

1.35   District Court .................................................................................................5

1.36   Effective Date ................................................................................................5

1.37   Entity ..............................................................................................................5

1.38   Equity Interest ................................................................................................5

1.39   Escrow Account ..............................................................................................5

1.40   Escrow Agent .................................................................................................5

1.41   Escrow Agreement ..........................................................................................5

1.42   Estimated Damages ........................................................................................6

1.43   Exculpated Parties ..........................................................................................6

1.44   Existing Common Stock ..................................................................................6

1.45   Final Order .....................................................................................................6

1.46   General Unsecured Claim ...............................................................................6

1.47   Insurance Plans ...............................................................................................6

1.48   Lien .................................................................................................................6

1.49   [Reserved] .......................................................................................................6

1.50   Monitor ...........................................................................................................6

1.51   New Common Stock ........................................................................................6

1.52   Notification Date ............................................................................................7

1.53   Person .............................................................................................................7

1.54   Petition for Certiorari .....................................................................................7

1.55   PharmAthene ..................................................................................................7

1.56   PharmAthene Action .......................................................................................7

1.57   PharmAthene Allowed Claim .........................................................................7

1.58   PharmAthene Allowed Claim Treatment Date ...............................................7

1.59   PharmAthene Claim ........................................................................................8

1.60   PharmAthene Final Order ...............................................................................8

1.61   PharmAthene Final Order Date .......................................................................8

1.62   Plan .................................................................................................................8

1.63   Plan Covenants ...............................................................................................8

1.64   Plan Covenant Event of Default .....................................................................8

WEIL:\95564956\3\74193.0003

1.65    Plan Covenant Termination Date..................................................................9

1.66    Plan Supplement ..........................................................................................9

1.67    Plan Supplement Filing Date ....................................................................10

1.68    Postpetition Interest Rate .........................................................................10

1.69    Prior Appeal Bond .....................................................................................10

1.70    Priority Non-Tax Claim ............................................................................10

1.71    Priority Tax Claim .....................................................................................10

1.72    Reconsideration Motion ............................................................................10

1.73    Released Parties .........................................................................................10

1.74    Reorganized Debtor ..................................................................................11

1.75    Schedules ...................................................................................................11

1.76    Schedule of Assumed Contracts and Leases.............................................11

1.77    Schedule of Rejected Contracts and Leases..............................................11

1.78    Schedule of Plan Covenants......................................................................11

1.79    Secured Claim ...........................................................................................11

1.80    SIGA Pharmaceuticals (Europe) Limited .................................................11

1.81    Subsidiary ..................................................................................................11

1.82    Transition Plan ..........................................................................................11

1.83    2004 Derivative Causes of Action ............................................................11

1.84    U.S. Trustee ...............................................................................................12

1.85    Voting Deadline .........................................................................................12

Article II.    Administrative Expenses and Priority Tax Claims...................................12

2.1    Administrative Expenses ...........................................................................12

2.2    Compensation and Reimbursement Claims ..............................................13

2.3    Priority Tax Claims....................................................................................13

Article III.    Classification of Claims and Interests.......................................................13

3.1    Summary ....................................................................................................13

3.2    Special Provision Governing Unimpaired Claims.....................................14

Article IV.    Treatment of Claims and Equity Interests .................................................14

4.1    Class 1 – Secured Claims...........................................................................14

4.2    Class 2 – Priority Non-Tax Claims............................................................14

4.3    Class 3 –  General Unsecured Claims ........................................................14

4.4    Class 4 – Equity Interests...........................................................................22

WEIL:\95564956\3\74193.0003

Article V.     Provisions Governing Distributions.......................................................................22

   5.1     Distribution Record Date ...........................................................................................22

   5.2     Date of Distributions.................................................................................................23

   5.3     Disbursing Agent .......................................................................................................23

   5.4     Delivery of Distributions and Undeliverable Distributions ...................................23

   5.5     Cash Payments ...........................................................................................................23

   5.6     Time Bar to Cash Payments......................................................................................23

   5.7     Distributions After Effective Date ...........................................................................24

   5.8     Allocation of Plan Distribution Between Principal and Interest............................24

   5.9     Setoff and Recoupment; Waiver of Avoidance Actions.........................................24

   5.10    Withholding and Reporting Requirements .............................................................24

Article VI.    Means for Implementation and Execution of the Plan.........................................25

   6.1     Establishment of Escrow Account ............................................................................25

   6.2     Tax Treatment of Escrow Account ...........................................................................25

   6.3     Compliance with the Plan Covenants .....................................................................25

   6.4     Termination of Plan Covenants ...............................................................................25

   6.5     Determination of Plan Covenants Event of Default ...............................................27

   6.6     Consequences of Plan Covenant Event of Default .................................................28

   6.7     Appointment of Board Observer...............................................................................29

   6.8     Cancellation of Existing Agreements and Instruments..........................................30

   6.9     Cancellation of Liens .................................................................................................30

   6.10    Reverse Stock Split ....................................................................................................30

   6.11    Authorization and Issuance of New Common Stock...............................................31

   6.12    Effectiveness of Transition Plan ..............................................................................31

   6.13    Section 1145 Exemption ............................................................................................31

   6.14    Equity Interests in Subsidiary ..................................................................................32

   6.15    Reorganized Debtor ...................................................................................................32

   6.16    Corporate Reorganization Actions, Effectuating Documents, and Further
       Transactions ...............................................................................................................33

   6.17    Nonconsensual Confirmation....................................................................................33

   6.18    Transactions on Business Days..................................................................................33

   6.19    Notice of Effective Date .............................................................................................33

WEIL:\95564956\3\74193.0003

Article VII.    Procedures for Disputed Claims ................................................................34

    7.1    Objections to Claims......................................................................................34

    7.2    Resolution of Disputed Administrative Expenses and Disputed Claims...............34

    7.3    No Distribution Pending Allowance ................................................................34

    7.4    Distributions After Allowance .......................................................................34

    7.5    Estimation ...................................................................................................34

Article VIII.    Executory Contracts and Unexpired Leases ......................................................35

    8.1    General Treatment of Executory Contracts and Unexpired Leases......................35

    8.2    Determination of Cure Disputes and Deemed Consent ......................................35

    8.3    Payments Related to Assumption or Assignment of Contracts and Leases...........36

    8.4    Rejection ....................................................................................................36

    8.5    Survival of the Debtor's Indemnification Obligations........................................36

    8.6    Compensation and Benefits ...........................................................................37

    8.7    Insurance Plans ...........................................................................................37

    8.8    Intellectual Property Licenses and Agreements.................................................37

    8.9    Assignment .................................................................................................37

    8.10    Approval of Assumption, Rejection, or Assignment of Executory
        Contracts and Unexpired Leases....................................................................38

    8.11    Modifications, Amendments, Supplements, Restatements, or Other
        Agreements .................................................................................................38

    8.12    Reservation of Rights....................................................................................38

Article IX.    Effectiveness of the Plan................................................................................39

    9.1    Conditions Precedent to Confirmation of Plan .................................................39

    9.2    Conditions Precedent to Effective Date...........................................................39

    9.3    Satisfaction and Waiver of Conditions ...........................................................39

    9.4    Effect of Non-Occurrence of Effective Date ...................................................40

Article X.    Effect of Confirmation...................................................................................40

    10.1    Claims of Subordination ...............................................................................40

    10.2    Vesting of Assets .........................................................................................40

    10.3    Discharge of Claims......................................................................................40

    10.4    Release and Discharge of Debtor....................................................................41

    10.5    Term of Injunctions or Stays..........................................................................41

    10.6    Injunction Against Interference with Plan ........................................................41

WEIL:\95564956\3\74193.0003

| | | |
|---|---|---|
| 10.7 | Injunction | 42 |
| 10.8 | Exculpation | 42 |
| 10.9 | Releases by the Debtor | 43 |
| 10.10 | Retention of Causes of Action/Reservation of Rights | 43 |
| 10.11 | Special Provisions for Governmental Units | 44 |
| 10.12 | Plan Supplement | 44 |
| Article XI. | Retention of Jurisdiction | 44 |
| 11.1 | Jurisdiction of Bankruptcy Court | 44 |
| Article XII. | Rights and Powers of Disbursing Agent | 46 |
| 12.1 | Exculpation | 46 |
| 12.2 | Powers of the Disbursing Agent | 47 |
| Article XIII. | Miscellaneous Provisions | 47 |
| 13.1 | Dissolution of Creditors' Committee | 47 |
| 13.2 | Substantial Consummation | 47 |
| 13.3 | Exemption from Transfer Taxes | 47 |
| 13.4 | Expedited Tax Determination | 47 |
| 13.5 | Payment of Statutory Fees | 47 |
| 13.6 | Plan Modifications and Amendments | 48 |
| 13.7 | Revocation or Withdrawal of Plan | 48 |
| 13.8 | Courts of Competent Jurisdiction | 48 |
| 13.9 | Severability | 48 |
| 13.10 | Governing Law | 49 |
| 13.11 | Exhibits and Schedules | 49 |
| 13.12 | Successors and Assigns | 49 |
| 13.13 | Time | 49 |
| 13.14 | Deemed Acts | 49 |
| 13.15 | Notices | 49 |

WEIL:\95564956\3\74193.0003

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x

| | |
|---|---|
| In re : | |
| : | |
| **SIGA TECHNOLOGIES, INC.,** : | **Chapter 11 Case No.** |
| : | |
| **Debtor.** : | **14-12623 (SHL)** |
| : | |

------------------------------------------------------------ x

## DEBTOR'S CHAPTER 11 PLAN

       SIGA Technologies Inc., the above-captioned debtor, proposes the following chapter 11 plan pursuant to section 1121(a) of title 11 of the United States Code:

## ARTICLE I.

### DEFINITIONS AND INTERPRETATION

**DEFINITIONS.**  The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

      **1.1**   **Administrative Expenses** means costs or expenses of administration of the Chapter 11 Case arising on or prior to the Effective Date and allowed under section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code that have not already been paid by the Debtor, including, without limitation, any actual and necessary costs and expenses of preserving the Debtor's estate and/or operating the Debtor's business, any indebtedness or obligations incurred or assumed by the Debtor, as Debtor in Possession, during the Chapter 11 Case, including, without limitation, for the acquisition or lease of property or an interest in property or the performance of services, any compensation and reimbursement of expenses to the extent allowed by Final Order under sections 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estate of the Debtor under section 1930 of chapter 123 of title 28 of the United States Code.

      **1.2**   **Allowed** means, (i) with reference to any Claim (other than the PharmAthene Claim) (a) any Claim against the Debtor that has been listed by the Debtor in the Schedules, as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (b) any Claim listed on the Schedules or included in a timely filed proof of Claim, as to which no objection to its allowance has been, or subsequently is, interposed in accordance with Section 7.1 hereof or prior to the expiration of such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if an objection to such Claim's allowance has been timely interposed, the allowed amount of such Claim as determined by a Final Order, or (c) any other Claim expressly allowed by a Final

Order, and (ii) with respect to the PharmAthene Claim, the PharmAthene Allowed Claim; *provided, however*, that after the fifth (5th) Business Day prior to the Voting Deadline, no claim of an Insider or Affiliate of the Debtor may be added to the Schedules and Allowed without the Creditors' Committee's written consent (or PharmAthene's written consent, if after the Effective Date), or a Bankruptcy Court order issued after notice to the Creditors' Committee and a hearing, or if after the Effective Date, notice to PharmAthene and a hearing.

      **1.3**    **Amended and Restated By-laws** means the by-laws of the Reorganized Debtor, to be amended and restated as of the Effective Date, in substantially the form included in the Plan Supplement, which shall be in form and substance reasonably acceptable to the Debtor and the Creditors' Committee.

      **1.4**    **Amended and Restated Certificate of Incorporation** means the certificate of incorporation of the Reorganized Debtor, to be amended and restated as of the Effective Date, in substantially the form included in the Plan Supplement, which shall be in form and substance reasonably acceptable to the Debtor and the Creditors' Committee.

      **1.5**    **Arbitration Agreement** means the arbitration agreement, which shall be substantially in the form filed in the Plan Supplement and which shall be in form and substance reasonably acceptable to the Debtor, the Creditors' Committee and PharmAthene, setting forth, among other things, the procedures for arbitration, if applicable, of the matters set forth in Section 6.4(b)(ii) and/or 6.4(a)(ii)(Z) hereof.  The Arbitration Agreement shall provide, among other things, that any decision shall be rendered by the Arbitrator within sixty (60) days of its submission to the Arbitrator, unless otherwise agreed to in writing by the Reorganized Debtor and PharmAthene.

      **1.6**    **Arbitrator** means the arbitrator identified in the Arbitration Agreement (or any successor thereto appointed pursuant to the Arbitration Agreement).

      **1.7**    **Avoidance Action** means any and all avoidance, equitable subordination or recovery Causes of Action arising under or in connection with chapter 5 of the Bankruptcy Code.

      **1.8**    **Bankruptcy Code** means title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Case.

      **1.9**    **Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York, having subject matter jurisdiction over the Chapter 11 Case and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court having subject matter jurisdiction over the Chapter 11 Case.

      **1.10**    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and the Local Bankruptcy Rules for the Southern District of New York, in each case as amended from time to time and applicable to the Chapter 11 Case.

      **1.11**    **Board of Directors** means the Board of Directors of the Debtor or Reorganized Debtor, as it may exist from time to time.

WEIL:\95564956\3\74193.0003

**1.12    Board Observer** means a person designated by PharmAthene (or any successor thereto) who shall act as an observer of the Reorganized Debtor's Board of Directors as provided in Section 6.7 of the Plan.  The initial Board Observer shall be Jeffrey Steinberg.

**1.13    Business Day** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

**1.14    Cash** means legal tender of the United States of America.

**1.15    Cash Collateral** means "Cash Collateral" as such term is defined in Section 6.4(b) of the Plan.

**1.16    Causes of Action** means, without limitation, any and all actions, proceedings, causes of action, controversies, liabilities, obligations, rights, rights of setoff, recoupment rights, suits, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, franchises, claims, counterclaims, cross-claims, affirmative defenses, and demands of any kind or character whatsoever, whether known or unknown, asserted or unasserted, reduced to judgment or otherwise, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in contract or in tort, in law or in equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Case, including through the Effective Date.  Without limiting the generality of the foregoing, when referring to Causes of Action of the Debtor or its estate, Causes of Action shall include (i) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law or equity, (ii) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code, and (iii) claims and defenses such as fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

**1.17    Chapter 11 Case** means the case under chapter 11 of the Bankruptcy Code commenced by the Debtor on the Commencement Date in the Bankruptcy Court and currently styled *In re SIGA Technologies, Inc.*, Case No. 14-12623 (SHL).

**1.18    Claim** means "claim," as defined in section 101(5) of the Bankruptcy Code.

**1.19    Class** means any group of Claims or Equity Interests classified herein pursuant to section 1123(a)(1) of the Bankruptcy Code.

**1.20    Collateral** means any property or interest in property of the estate of the Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not avoided under the Bankruptcy Code.

**1.21    Commencement Date** means September 16, 2014, the date on which the Debtor commenced the Chapter 11 Case.

**1.22    Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

3

**1.23    Confirmation Hearing** means the hearing held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**1.24    Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Debtor and the Creditors' Committee, except for any provisions that alter (i) the Plan in a manner that materially and adversely affects any holder of a Claim, or (ii) the Plan Covenants, which provisions must be acceptable to each of the Debtor and the Creditors' Committee in their absolute discretion.

**1.25    Creditors' Committee** means the statutory committee of unsecured claimholders appointed by the U.S. Trustee in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code, as same may be constituted from time to time.

**1.26    Cure** means the payment of Cash by the Debtor, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to permit the Debtor to assume or, if applicable, assume and assign, such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**1.27    Cure Dispute** means a pending objection regarding assumption, assignment, Cure, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or other issues relating to assumption of a contract or lease pursuant to section 365 of the Bankruptcy Code.

**1.28    Debtor** means SIGA Technologies, Inc., a Delaware corporation.

**1.29    Debtor in Possession** means the Debtor in its capacity as debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

**1.30    Delaware Chancery Court Decision** means any or all of (i) the August 15, 2013, Bench Ruling issued by the Delaware Court of Chancery in the PharmAthene Action, (ii) the August 8, 2014, Memorandum Opinion (*PharmAthene, Inc. v. SIGA Techs., Inc.*, 2014 WL 3974167, Case No. 2627-VCP (Del. Ch. Aug. 8, 2014)) and Order regarding, *inter alia*, the method for calculating damages in the PharmAthene Action, (iii) the January 7, 2015, Letter Opinion issued by the Delaware Court of Chancery in the PharmAthene Action, and (iv) the January 15, 2015, Final Order and Judgment, determining, *inter alia*, the amount of damages awarded to PharmAthene in the PharmAthene Action.

**1.31    Disbursing Agent** means the Reorganized Debtor (or such other Entity designated by the Debtor or the Reorganized Debtor in its sole discretion and without the need for any further order of the Bankruptcy Court) in its capacity as a disbursing agent pursuant to Section 5.3 hereof.

**1.32    Disclosure Statement** means the disclosure statement relating to the Plan, including, without limitation, all exhibits thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

**1.33** __Disputed__ means a Claim or Administrative Expense (as applicable) to the extent the allowance of such Claim or Administrative Expense is the subject of a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Confirmation Order, or is otherwise disputed by the Debtor in accordance with applicable law, and which objection, request for estimation, or dispute has not been withdrawn, with prejudice, or determined by a Final Order.  For the avoidance of doubt, if no proof of Claim or Administrative Expense has been filed by the applicable deadline and the Claim or Administrative Expense is not listed on the Schedules or has been or hereafter is listed on the Schedules as $0, disputed, contingent, or unliquidated, such Claim or Administrative Expense, as applicable, shall be disallowed and not Disputed, and shall be disregarded for all purposes.

**1.34** __Distribution Record Date__ means, except with respect to public securities, the Effective Date.

**1.35** __District Court__ means the United States District Court for the Southern District of New York having subject matter jurisdiction over the Chapter 11 Case.

**1.36** __Effective Date__ means a Business Day selected by the Debtor and the Creditors' Committee that is on or after the later of (a) the Confirmation Date, and (b) the date on which the conditions to the effectiveness of the Plan specified in Section 9.2 have been satisfied or waived.

**1.37** __Entity__ means an individual, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government or any political subdivision thereof, or other Person or entity.

**1.38** __Equity Interest__ means the interest (or any proxy related thereto) in the Debtor, represented by any issued and outstanding shares of common or preferred stock, including the Existing Common Stock (and including Existing Common Stock after giving effect to the Reverse Stock Split), stock appreciation rights or any other instrument evidencing a present ownership interest, inchoate or otherwise, in the Debtor, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest (including, without limitation, any right to receive any such shares issued or issuable under any plans for the benefit of employees or directors of the Debtor in effect on the Commencement Date, and unvested restricted stock), whether in existence prior or subsequent to the Effective Date; *provided*, *however*, for the avoidance of doubt, the term "Equity Interest" shall not include or pertain to any New Common Stock in the event New Common Stock is issued to PharmAthene pursuant to the Plan.

**1.39** __Escrow Account__ means the escrow account opened by the Debtor or the Reorganized Debtor, as applicable, which shall be governed by the terms and conditions of the Escrow Agreement and the Plan.

**1.40** __Escrow Agent__ means the escrow agent identified in the Escrow Agreement.

**1.41** __Escrow Agreement__ means that certain Escrow Agreement setting forth the terms and conditions of the Escrow Account, which shall be substantially in the form filed in the Plan Supplement and which shall be in form and substance reasonably acceptable to the Debtor and the Creditors' Committee.

**1.42** **Estimated Damages** means "Estimated Damages" as defined in Section 6.4(b) of the Plan.

**1.43** **Exculpated Parties** means the Debtor, the Debtor's officers and directors who served at any time on or after the Commencement Date, the Creditors' Committee, each of its current or former members in their capacity as members of the Creditors' Committee, and each of the respective retained professionals of any of the foregoing.

**1.44** **Existing Common Stock** means the issued and outstanding shares of common stock of the Debtor, with a par value of $0.0001, as the same is reduced pursuant to the terms of Section 6.10 hereof.

**1.45** **Final Order** means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Case (or the docket of such other court) which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided, however*, that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure has been or may be filed with respect to such order or judgment. The susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code shall not render a Final Order not a Final Order.

**1.46** **General Unsecured Claim** means any Claim against the Debtor's estate that is not an Administrative Expense, Priority Tax Claim, Secured Claim, or Priority Non-Tax Claim. For the avoidance of doubt, the PharmAthene Claim is a General Unsecured Claim under the Plan.

**1.47** **Insurance Plans** means the Debtor's insurance policies and any agreements, documents, or instruments relating thereto.

**1.48** **Lien** means "Lien" as defined in section 101(37) of the Bankruptcy Code.

**1.49** [Reserved]

**1.50** **Monitor** means a person designated by PharmAthene as provided in Section 6.6(c) of the Plan.

**1.51** **New Common Stock** means the common stock of the Reorganized Debtor that will be issued by the Reorganized Debtor to PharmAthene, simultaneously with the cancellation of the then existing Equity Interests in the Debtor, in the circumstances set forth in Section

4.3(b)(i)(C) or 4.3(b)(ii) of the Plan, if the treatment set forth in either such section of the Plan becomes applicable.

     **1.52**    **Notification Date** means ten (10) calendar days prior to the date that is 120 days after the PharmAthene Final Order Date.

     **1.53**    **Person** means "person" as defined in section 101(41) of the Bankruptcy Code.

     **1.54**    **Petition for Certiorari** means a petition for writ of certiorari to the United States Supreme Court.

     **1.55**    **PharmAthene** means PharmAthene, Inc., a Delaware corporation.

     **1.56**    **PharmAthene Action** means the action commenced in the Delaware Court of Chancery styled *PharmAthene, Inc. v. SIGA Technologies, Inc.*, Civ. Action No. 2627-VCP, including, without limitation, all appeals and remands.

     **1.57**    **PharmAthene Allowed Claim** means the judgment and/or other award or relief, if any, granted in favor of PharmAthene with respect to the PharmAthene Claim as determined by the PharmAthene Final Order, including, without limitation, any attorneys' fees and expenses, and interest that may be granted and/or payable as provided in such order; *provided, however,* that notwithstanding anything to the contrary contained in the Plan, the PharmAthene Allowed Claim shall not in any circumstance be subject to any right of setoff, recoupment, subordination, avoidance, objection, reduction, or any other challenge.

     **1.58**    **PharmAthene Allowed Claim Treatment Date** means the date that is one hundred twenty (120) days after the PharmAthene Final Order Date (such date, the **"120th Day"**); *provided, however*, that such date shall be automatically extended, one time only, for ninety (90) days to and including the date that is two hundred ten (210) days after the PharmAthene Final Order Date (such date, the **"210th Day"** and such 90 day extension period, if in effect, the "**Extension Period**"), if, and only, if (i) the Debtor or Reorganized Debtor, as applicable, has notified PharmAthene of its intention to satisfy the PharmAthene Allowed Claim pursuant to Option 1 as provided in Section 4.3(b)(i)(A) hereof, and (ii) on or before the Notification Date, the Debtor or Reorganized Debtor, as applicable, has paid to PharmAthene Twenty Million Dollars ($20,000,000), with such payment to be treated as provided in Section 4.3(b)(iv)(C) hereof.

Notwithstanding the immediately preceding sentence if (i) the Debtor or Reorganized Debtor, as applicable, has notified PharmAthene of its intention to satisfy the PharmAthene Allowed Claim pursuant to Option 1 as provided in Section 4.3(b)(i)(A) hereof, and (ii) solely if the PharmAthene Final Order provides that the Lump Sum Payment Award (as defined in Section 4.3(b)(i)(A) hereof) granted to PharmAthene pursuant to such order is due on a date that is later than the 120th Day (such later due date, the **"Order Payment Date"**) then:

     (X) solely in the circumstance where the Order Payment Date is a date that is on or before the 210th Day, and the Debtor or Reorganized Debtor, as applicable, on or before the Notification Date, has not paid to PharmAthene Twenty Million Dollars

WEIL:\95564956\3\74193.0003

($20,000,000) (and therefore the Extension Period is <u>not</u> effective), the PharmAthene Allowed Claim Treatment Date shall instead mean the Order Payment Date;

(Y)  solely in the circumstance where the Order Payment Date is a date that is on or before the 210th Day, and the Debtor or Reorganized Debtor, as applicable, on or before the Notification Date, has paid to PharmAthene Twenty Million Dollars ($20,000,000) (and therefore the Extension Period is effective), the PharmAthene Allowed Claim Treatment Date shall instead mean the 210th Day; or

(Z) solely in the circumstance where the Order Payment Date is a date that is after the 210th Day, the PharmAthene Allowed Claim Treatment Date shall instead mean the Order Payment Date.

**1.59    PharmAthene Claim** means all Claims of PharmAthene asserted in and/or arising with respect to the PharmAthene Action, including all Claims asserted in the proof of claim filed by PharmAthene, Claim No. 17 on the official claims docket maintained in the Chapter 11 Case (as such claims docket may be amended or modified).

**1.60    PharmAthene Final Order** means an order or judgment entered in the PharmAthene Action which finally resolves the PharmAthene Action, and which has not been reversed, vacated, or stayed, except by this Plan after the Effective Date and by section 362(a) of the Bankruptcy Code prior to the Effective Date, and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, reconsideration, or rehearing shall then be pending or (ii) if an appeal, writ of certiorari, new trial, reargument, reconsideration, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a PharmAthene Final Order solely because of the possibility that a motion under Rules 59 or 60 of the Rules of the Court of Chancery of the State of Delaware or equivalent provision has been or may be filed.

**1.61    PharmAthene Final Order Date** means the date on which the order or judgment entered in the PharmAthene Action becomes the PharmAthene Final Order.

**1.62    Plan** means this chapter 11 plan, including the schedules and exhibits hereto and the Plan Supplement, as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

**1.63    Plan Covenants** means the covenants set forth in the Schedule of Plan Covenants, as the same may be amended solely as provided therein, and which shall become effective on the Effective Date and remain in full force and effect through the Plan Covenant Termination Date.

**1.64    Plan Covenant Event of Default** means, subject to Section 6.5 hereof:

WEIL:\95564956\3\74193.0003

(X)  a breach by the Reorganized Debtor of -

    (1) one or more of the following Plan Covenants:  (iii), (iv), (v), (vi), (vii), (viii), (ix), (x), (xi), (xiv) (except for those subclauses specified in Section 1.64(Y) below), (xv), (xvi); (xvii), (xxi), (xxii), (xxiii), (xxiv) a, (xxiv) c, (xxiv) d, (xxv), (xxvii), (xxviii), (xxix), (xxx), (xxxi), (xxxii) or (xxxiii); or

    (2) any other Plan Covenant that by its terms is expressly modified by a materiality qualifier or otherwise tied to the occurrence of a Material Adverse Effect (as such term is defined in the Plan Covenants); or

    (3) any other Plan Covenant not otherwise included in clauses (1) or (2) above that specifies a dollar or percentage cap; *provided, however*, that notwithstanding the foregoing, to the extent the Reorganized Debtor exceeds the specified dollar or percentage cap for any Plan Covenant (inclusive of any Plan Covenants that contain a specified dollar or percentage cap referred to in this clause (3) and in the immediately preceding clauses (1) and (2) (hereinafter, a "**Specified Basket**" and any excess above the Specified Basket, an "**Overage**"), the Reorganized Debtor shall have available, in any fiscal year, an additional general basket of Five Hundred Thousand ($500,000) (a "**Supplemental Basket**") which shall be automatically utilized to increase the cap contained in such Specified Basket by an amount equal to the lesser of the Overage and the remaining balance available in the Supplemental Basket (with all amounts so utilized automatically reducing the amount of the Supplemental Basket dollar for dollar); *provided, further, however*, that (i) the Supplemental Basket cannot be used to increase the amount of any Specified Basket by more than one hundred percent (100%); (ii) any unused portion of the Supplemental Basket in one fiscal year may not be carried forward or backward to any other fiscal year; and (iii) once the Supplemental Basket has been fully utilized in any fiscal year, any subsequent Overage in any Specified Basket in such fiscal year shall constitute a breach of the Plan Covenant in which such Specified Basket is contained (which breach, for the avoidance of doubt, shall be subject to Section 6.5 hereof); or

(Y) a material breach of one or more of clauses (xiv) b, (xiv) c, (xiv) f, (xiv) h, (xiv) i, (xiv) m, (xiv) n, (xiv) o, (xiv) p, or (xiv) q of the Plan Covenants, or of any other Plan Covenant not included in clause (X) above.

In addition to the foregoing, to the extent it is asserted that a breach of a Plan Covenant has occurred based on an alleged action being outside the Ordinary Course of Business (as defined in the Plan Covenants), any such alleged breach must be material, *provided*, *however*, that in any litigation relating to such alleged breach, the Reorganized Debtor shall have the burden of proof with respect to both Ordinary Course of Business and materiality.

    **1.65    Plan Covenant Termination Date** means the date on which the Plan Covenants terminate in accordance with Section 6.4 hereof.

    **1.66    Plan Supplement** means a supplemental appendix to the Plan, which shall contain, among other things, substantially final forms of the Amended and Restated By-Laws,

Amended and Restated Certificate of Incorporation (and the amendment to same described in clause (ii) in the last sentence of Section 4.4 hereof), Escrow Agreement, Transition Plan, Arbitration Agreement, confidentiality agreements contemplated pursuant to Section 6.7(c) hereof, Schedule of Assumed Contracts and Leases, Schedule of Rejected Contracts and Leases, and to the extent known, with respect to members of the Board of Directors, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code.  All documents, schedules and other information contained in the Plan Supplement shall only be effective if they are in form and substance reasonably acceptable to the Debtor and the Creditors' Committee and, where applicable, PharmAthene; *provided*, *however*, that through the Effective Date, the Debtor, with the consent of the Creditors' Committee (and, with respect to those documents requiring PharmAthene's consent, PharmAthene), shall have the right to amend documents contained in, and exhibits to, the Plan Supplement.  The Plan Supplement shall be filed with the Bankruptcy Court no later than the Plan Supplement Filing Date.

      **1.67**    **Plan Supplement Filing Date** means five (5) Business Days before the Voting Deadline.

      **1.68**    **Postpetition Interest Rate** means with respect to all General Unsecured Claims other than the PharmAthene Claim, the interest rate prescribed by any contract, lease, or judgment applicable thereto, or in the absence of any such contract, lease, or judgment, or if no rate is prescribed therein, the federal judgment rate pursuant to 28 U.S.C. § 1961.

      **1.69**    **Prior Appeal Bond** means the appeal bond posted in favor of PharmAthene in connection with the PharmAthene Action by Westchester Fire Insurance Company, dated June 25, 2012, in the amount of $2,695,912.41.

      **1.70**    **Priority Non-Tax Claim** means any Claim, other than an Administrative Expense or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(4), (5), or (7) of the Bankruptcy Code.

      **1.71**    **Priority Tax Claim** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

      **1.72**    **Reconsideration Motion** means a motion for reconsideration filed with the Delaware Supreme Court in connection with the appeal before such Court of the Delaware Chancery Court Decision.

      **1.73**    **Released Parties** means (i) all present and former directors and officers of the Debtor who were directors and/or officers at any time on or after the Commencement Date, and any other Persons who serve or served as members of management of the Debtor at any time on or after the Commencement Date, (ii) MacAndrews & Forbes Incorporated and all present and former directors and officers of MacAndrews & Forbes Incorporated who were directors and/or officers at any time after the Commencement Date, and any other Persons who serve or served as members of management of MacAndrews & Forbes Incorporated any time after the Commencement Date; (iii) all post-Commencement Date advisors, consultants, agents, counsel, or other professionals of or to the Debtor or the Creditors' Committee, and (iv) all current and former members (solely in their capacity as members) of the Creditors' Committee, and their

respective officers, directors, agents, and employees (including, without limitation, attorneys, advisors, consultants and other professionals engaged by individual members of the Creditors' Committee).

**1.74    Reorganized Debtor** means the Debtor as reorganized on the Effective Date in accordance herewith.

**1.75    Schedules** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtor pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended through the fifth (5th) Business Day prior to the Voting Deadline.

**1.76    Schedule of Assumed Contracts and Leases** means the schedule of executory contracts and unexpired leases to be assumed, and, if applicable, assigned, by the Debtor, to be filed as part of the Plan Supplement.

**1.77    Schedule of Rejected Contracts and Leases** means the schedule of executory contracts and unexpired leases to be rejected by the Debtor, to be filed as part of the Plan Supplement.

**1.78    Schedule of Plan Covenants** means the schedule setting forth the Plan Covenants, annexed hereto as Exhibit "A."

**1.79    Secured Claim** means a Claim (i) secured by Collateral, to the extent of the value of such Collateral (a) as agreed to by the holder of such Claim, the Debtor and the Creditors' Committee, or (b) as determined by a Final Order in accordance with section 506 of the Bankruptcy Code or (ii) secured by the amount of any valid rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

**1.80    SIGA Pharmaceuticals (Europe) Limited** means the wholly-owned subsidiary of the Debtor, which is a private limited company incorporated under the laws of England and Wales.

**1.81    Subsidiary** means SIGA Pharmaceuticals (Europe) Limited, and any hereafter direct or indirect subsidiary of SIGA Technologies, Inc.

**1.82    Transition Plan** means the transition plan, in substantially the form included in the Plan Supplement and which shall be in form and substance reasonably acceptable to the Debtor and PharmAthene, to facilitate the orderly transition of ownership of the equity of the Reorganized Debtor to PharmAthene, if the PharmAthene Allowed Claim is treated in accordance with Sections 4.3(b)(i)(C) or 4.3(b)(ii) of the Plan.

**1.83    2004 Derivative Causes of Action** means, to the extent any such Causes of Action exist, those potential Causes of Action sought to be investigated by the Creditors' Committee pursuant to the Motion of Statutory Creditors' Committee for Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery From Debtor and Certain Third Parties (ECF No. 342), Motion of Statutory Creditors' Committee for Order Pursuant to Bankruptcy Rule 2004

Authorizing Further Discovery From Debtor and Certain Third Parties (ECF No. 554), or any other motion, seeking a similar type of relief.

**1.84** **U.S. Trustee** means the United States Trustee for the Southern District of New York.

**1.85** **Voting Deadline** means the date set by the Bankruptcy Court by which all Persons entitled to vote on the Plan must vote to accept or reject the Plan.

## INTERPRETATION; APPLICATION OF DEFINITIONS AND RULES OF CONSTRUCTION.

The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as may be amended, waived, or modified from time to time; (3) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (4) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

## CONTROLLING DOCUMENT

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document). The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

## ARTICLE II.

## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**2.1** **Administrative Expenses.** Except to the extent that a holder of an Allowed Administrative Expense agrees to a different treatment of such Allowed Administrative Expense, on the Effective Date, or as soon thereafter as is reasonably practicable, the Debtor shall pay to each holder of an Allowed Administrative Expense, in full satisfaction of such Allowed

WEIL:\95564956\3\74193.0003

Administrative Expense, an amount in Cash equal to the Allowed amount of such Administrative Expense; *provided, however*, that Allowed Administrative Expenses representing liabilities incurred in the ordinary course by the Debtor, as Debtor in Possession, may be paid by the Debtor or the Reorganized Debtor, as the case may be, in the ordinary course, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

2.2     **Compensation and Reimbursement Claims.**  Each Entity seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3) and 503(b)(4) of the Bankruptcy Code shall (i) file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is sixty (60) days after the Confirmation Date or such later date as may be otherwise provided in the Confirmation Order and (ii) be paid in full in Cash in such amounts as are allowed by the Bankruptcy Court (A) on the date on which the order of the Bankruptcy Court relating to such application is entered on the Bankruptcy Court's docket, or as soon thereafter as reasonably practicable, or (B) upon such other terms as may be mutually agreed upon between such Entity and the Debtor, or, if on or after the Effective Date, the Reorganized Debtor.  The Debtor and the Reorganized Debtor, as applicable, are authorized to pay compensation to professionals retained by the Debtor and the Creditors' Committee for services rendered or reimbursement of expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

2.3     **Priority Tax Claims.**  Except to the extent that the Debtor and a holder of an Allowed Priority Tax Claim agree to a different treatment of such Claim, the Debtor shall pay to each holder of an Allowed Priority Tax Claim, in full satisfaction of such Claim, Cash in an amount in equal to such Allowed Priority Tax Claim.  The Debtor shall make such payment on or as soon as reasonably practicable following the later to occur of (a) the Effective Date and (b) the date on which such Claim becomes an Allowed Priority Tax Claim.  All Allowed Priority Tax Claims against the Debtor that are not due and payable on or before the Effective Date shall be paid in the ordinary course as such obligations become due.

## ARTICLE III.

### CLASSIFICATION OF CLAIMS AND INTERESTS

3.1     **Summary.**  The following table designates the Classes of Claims against and Equity Interests in the Debtor and specifies which of those Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan pursuant to 1126 of the Bankruptcy Code.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Equity Interests set forth in this Article III.

13

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Secured Claims | Unimpaired | No (deemed to accept) |
| 2 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4 | Equity Interests | Impaired | No (deemed to reject) |

**3.2** **Special Provision Governing Unimpaired Claims.** Except as otherwise provided in the Plan, nothing in the Plan shall affect the rights of the Reorganized Debtor in respect of any unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such unimpaired Claims.

## ARTICLE IV.

### TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.1** **Class 1 – Secured Claims.** Except to the extent that a holder of an Allowed Secured Claim agrees to a different treatment of such Claim, each holder of an Allowed Secured Claim shall receive, in full satisfaction of such Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date such Secured Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the Debtor and the holder of such Allowed Secured Claim, at the option of the Debtor either (a) Cash in an amount equal to such Allowed Secured Claim, (b) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Claim, net of the costs of disposition of such Collateral, (c) the Collateral securing such Allowed Secured Claim, or (d) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Claim is entitled.

**4.2** **Class 2 – Priority Non-Tax Claims.** Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment of such Claim, each holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction of such Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date such Priority Non-Tax Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the Debtor and the holder of such Allowed Priority Non-Tax Claim, Cash in an amount equal to such Allowed Priority Non-Tax Claim.

**4.3** **Class 3 – General Unsecured Claims.**

**(a)** **Allowed General Unsecured Claims.** On or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such General Unsecured Claim becomes Allowed, each holder of an Allowed General Unsecured Claim shall receive Cash in an amount equal to such Allowed General Unsecured Claim up to Five Million Dollars ($5,000,000), plus postpetition interest at the Postpetition Interest Rate accrued from the Commencement Date to the Effective Date. To the extent any such Allowed General Unsecured Claim is Five Million Dollars ($5,000,000) or less, such treatment shall be in full settlement and

14

satisfaction of such Claim.  The PharmAthene Claim shall be deemed allowed to the extent of Five Million Dollars ($5,000,000) on the Effective Date, if not otherwise Allowed in a greater amount on such date.  In the event that the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(A) or Section 4.3(b)(i)(B), such Cash shall be credited dollar for dollar against the payments to be made by the Reorganized Debtor pursuant to such treatment (and in the case of Section 4.3(b)(i)(B), as such payments become due).  Notwithstanding anything to the contrary contained in the Plan, including, without limitation, Sections 5.9, 7.3, 10.3, 10.4, 10.6, 10.7, and 10.10, such Five Million Dollars ($5,000,000) Cash payment shall be retained by PharmAthene and shall not be refundable to the Reorganized Debtor under any circumstance, including if the payments required to be made pursuant to either Section 4.3(b)(i)(A) or Section 4.3(b)(i)(B), as applicable, are less than Five Million Dollars ($5,000,000).  If the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim under Section 4.3(b)(i)(C) or Section 4.3(b)(i)(D), or the PharmAthene Allowed Claim is to be treated as set forth in Section 4.3(b)(ii), such Cash payment shall be retained by PharmAthene and shall not be refundable under any circumstance.

**(b)** **Treatment of Portions of Claims in Excess of Five Million Dollars.** The only potential holder of an Allowed General Unsecured Claim in excess of Five Million Dollars ($5,000,000) is PharmAthene.  PharmAthene shall receive in respect of the portion, if any, of the PharmAthene Allowed Claim in excess of Five Million Dollars ($5,000,000), in full settlement and satisfaction of such Claim, the following:

**(i)** Treatment on PharmAthene Allowed Claim Treatment Date.  On the PharmAthene Allowed Claim Treatment Date, treatment in accordance with one of the following options, which option shall be determined by the Debtor or Reorganized Debtor, as applicable, in its sole and absolute discretion:

(A) **Option 1:** Payment in full in Cash of the unpaid balance of the PharmAthene Allowed Claim.  Option 1 shall only be available if the PharmAthene Final Order provides for a single lump sum payment (but not periodic royalty payments or other periodic or installment payments), together with any interest, fees and expenses included in such PharmAthene Final Order, to be paid to PharmAthene (such payment award pursuant to the PharmAthene Final Order, a "**Lump Sum Payment Award**");

(B) **Option 2:** Treatment of the PharmAthene Allowed Claim pursuant to and in compliance with the provisions of the PharmAthene Final Order if, and only if, such order provides for something other than a single lump sum payment (plus any interest, fees and expenses included in such PharmAthene Final Order) to be paid to PharmAthene (such as an award of periodic royalty payments or other periodic or installment payments, or an award of specific performance) (any such award pursuant to the PharmAthene Final Order, an "**Alternative Award**"). Notwithstanding the foregoing, if the PharmAthene Final Order provides for a single lump sum payment to be paid to PharmAthene and such lump

sum payment is conditioned on the Reorganized Debtor's achievement of a performance metric, contract milestone or condition, or other future event other than the mere passage of time, then such payment award shall be deemed to be an Alternative Award subject to treatment under Option 2, not Option 1;

(C)    **Option 3:**  Delivery to PharmAthene of one hundred percent (100%) of the New Common Stock of the Reorganized Debtor; or

(D)    **Option 4:**  Such other treatment as may be mutually agreed to in writing by the Debtor or Reorganized Debtor, as applicable, and PharmAthene.

The Debtor or the Reorganized Debtor, as applicable, shall notify PharmAthene in writing of which of the foregoing options it selects by no later than the Notification Date.  For the avoidance of doubt, the Debtor or the Reorganized Debtor, as applicable, shall not be obligated to seek or obtain funding to satisfy the PharmAthene Allowed Claim.

If the Debtor or the Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim under Option 1 or 2 above, the Debtor or the Reorganized Debtor, as applicable, shall have the authority (exercisable, in its sole discretion, no later than the PharmAthene Allowed Claim Treatment Date) to issue additional shares of capital stock of the Reorganized Debtor for Cash in an amount up to the full amount of the payment(s) under such provision plus any issuance expenses, without the need for any further notice, Bankruptcy Court approval, shareholder vote or other approvals; *provided, however*, that the foregoing (i) shall be subject to the Plan Covenants included under the headings "Transfer and Issuance of Equity or Debt" and "Transactions with Affiliates" (but excluding, solely for purposes of this paragraph, compliance with clause (xxv)(c)(i) of the Plan Covenants under the heading "Transactions with Affiliates"), and (ii) shall not in any way alter the manner of treatment of the PharmAthene Allowed Claim, or the deadlines applicable thereto, as set forth in the Plan.

**(ii)**    Treatment If No Election; Failure to Consummate Election.
Without in any manner limiting the provisions of Section 4.3(b)(i) above, if the Debtor or Reorganized Debtor, as applicable, shall fail to elect any of the forgoing treatment Options with respect to the PharmAthene Allowed Claim on or before the Notification Date, or if the Debtor or Reorganized Debtor, as applicable, shall have timely elected either treatment Option 1 or 3 but shall have failed to consummate such elected treatment Option as provided in the Plan on or before three (3) Business Days following the PharmAthene Allowed Claim Treatment Date, then

16

(A) PharmAthene shall receive, pursuant to the treatment set forth in Option 3 above, one hundred percent (100%) of the New Common Stock in full settlement and satisfaction of the PharmAthene Allowed Claim, on the expiration of such three (3) Business Day period;

(B) all Equity Interests shall be automatically cancelled consistent with Sections 4.4 and 6.15(b)(iii) of the Plan; and

(C) the amendment to the Amended and Restated Certificate of Incorporation described in clause (ii) in the last sentence of Section 4.4 of the Plan shall be filed with the Secretary of State of the State of Delaware.

If the Reorganized Debtor fails to comply fully with the provisions of this Section 4.3(b)(ii), PharmAthene can seek entry of an order of the Bankruptcy Court, on two (2) Business Days' notice to the Reorganized Debtor, compelling specific performance by the Reorganized Debtor of the terms of this Section 4.3(b)(ii). In any such action for specific performance, the sole issue to be determined by the Bankruptcy Court is whether the Reorganized Debtor failed to comply fully with the terms of this Section 4.3(b)(ii); no other issue or defense may be raised before the Bankruptcy Court, including any defense relating to the value of the common stock of the Reorganized Debtor.

(iii)    PharmAthene Stay.  From and after the Effective Date, and continuing through the PharmAthene Allowed Claim Treatment Date, PharmAthene shall continue to be stayed and enjoined from taking any action to (A) enforce against the Debtor or the Reorganized Debtor or against any property of the Debtor or Reorganized Debtor any judgment or other relief granted in the PharmAthene Action; and (B) create, perfect, or enforce any lien against any property of the Debtor or Reorganized Debtor, it being understood that the PharmAthene Allowed Claim shall be treated and fully satisfied as provided in the Plan; *provided*, *however*, that nothing in the Plan or the Confirmation Order shall prevent or enjoin PharmAthene from prosecuting the PharmAthene Action to the point of the entry of the PharmAthene Final Order, or from pursuing any right, claim or remedy arising under the Plan or under applicable law with respect to a default by the Debtor or the Reorganized Debtor, as applicable, (1) in the treatment of the PharmAthene Allowed Claim pursuant to the Plan, or (2) with respect to a Plan Covenant Event of Default.

(iv)    Additional Provisions Regarding PharmAthene Allowed Claim.

(A)    **Petition for Certiorari**.  Upon and subject to the occurrence of both of the following events:

(1)    Either the Delaware Supreme Court in the appeal of the PharmAthene Action (Case No. 20, 2015) (x) affirms the Delaware Chancery Court Decision in all respects; or (y) affirms the Delaware Chancery Court Decision but remands solely with

17

respect to non-substantive, residual, and incidental issues (*e.g.*, the calculation of attorneys' fees); *and*

(2)     The Debtor or Reorganized Debtor files a Petition for Certiorari with respect to either of the rulings set forth in the immediately preceding Section 4.3(b)(iv)(A)(1),

then, on the date of the filing of the Petition for Certiorari, the Reorganized Debtor shall pay to PharmAthene Cash in the amount of Twenty Million Dollars ($20,000,000).  In the event the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(A) or Section 4.3(b)(i)(B), such Cash shall be credited dollar for dollar against the payments to be made by the Reorganized Debtor pursuant to such treatment (in the case of Section 4.3(b)(i)(B), as such payments become due).  Notwithstanding anything to the contrary contained in the Plan, including, without limitation, Sections 5.9, 7.3, 10.3, 10.4, 10.6, 10.7, and 10.10, such Cash payment shall be retained by PharmAthene and shall not be refundable to the Reorganized Debtor under any circumstance, including if the payments required to be made pursuant to either Section 4.3(b)(i)(A) or Section 4.3(b)(i)(B), as applicable, are less than Twenty Million Dollars ($20,000,000).  If the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim under Section 4.3(b)(i)(C) or Section 4.3(b)(i)(D), or the PharmAthene Allowed Claim is to be treated as set forth in Section 4.3(b)(ii), such Cash payment shall be retained by PharmAthene and shall not be refundable under any circumstance.

(B)     **Reconsideration Motion**.  Upon and subject to the occurrence of both of the following events:

(1)     Either the Delaware Supreme Court in the appeal of the PharmAthene Action (Case No. 20, 2015) (x) affirms the Delaware Chancery Court Decision in all respects; or (y) affirms the Delaware Chancery Court Decision but remands solely with respect to non-substantive residual, and incidental issues (*e.g.*, the calculation of attorneys' fees); *and*

(2)     the Debtor or Reorganized Debtor files a Reconsideration Motion with respect to either of the rulings set forth in the immediately preceding Section 4.3(b)(iv)(B)(1),

then, on the date of the filing of the Reconsideration Motion, the Reorganized Debtor shall deposit into the Escrow Account Twenty Million Dollars ($20,000,000) in Cash.  The Escrow Agreement shall provide that if the Reconsideration Motion thereafter is denied, such Cash shall be promptly paid to PharmAthene, and in the event the Debtor or

Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(A) or Section 4.3(b)(i)(B), such Cash shall be credited dollar for dollar against the payments to be made by the Reorganized Debtor pursuant to such treatment (in the case of Section 4.3(b)(i)(B), as such payments become due). Notwithstanding anything to the contrary contained in the Plan, including, without limitation, Sections 5.9, 7.3, 10.3, 10.4, 10.6, 10.7, and 10.10, in such circumstances, such Cash payment shall be retained by PharmAthene and shall not be refundable to the Reorganized Debtor under any circumstance, including if the payments required to be made pursuant to either Section 4.3(b)(i)(A) or Section 4.3(b)(i)(B), as applicable, are less than Twenty Million Dollars ($20,000,000). If the Reconsideration Motion is thereafter denied and if the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim under Section 4.3(b)(i)(C) or Section 4.3(b)(i)(D), or the PharmAthene Allowed Claim is to be treated as set forth in Section 4.3(b)(ii), such Cash payment shall be retained by PharmAthene and shall not be refundable under any circumstance. The Escrow Agreement shall further provide that if the Reconsideration Motion thereafter is granted, the Twenty Million Dollars ($20,000,000) deposited into the Escrow Account shall be promptly returned to the Debtor or the Reorganized Debtor, as applicable. If the Reconsideration Motion is not decided by the Delaware Supreme Court on or before the sixtieth (60th) day after it is filed, and thereafter the Reconsideration Motion is denied, the 120 day or 210 day period, as applicable, provided for in Section 1.58 hereof shall be reduced by the number of days in excess of thirty (30) from the date the Reconsideration Motion is filed to the date the Reconsideration Motion is decided by the Delaware Supreme Court.

(C)    **Extension of PharmAthene Allowed Claim Treatment Date**. If the Extension Period pursuant to Section 1.58 hereof is in effect, the Twenty Million Dollar ($20,000,000) payment referenced in section 1.58 shall be treated as follows:

(1)    In the event the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(A) or Section 4.3(b)(i)(B), such Cash shall be credited dollar for dollar against the payments to be made by the Reorganized Debtor pursuant to such treatment (in the case of Section 4.3(b)(i)(B), as such payments become due). Notwithstanding anything to the contrary contained in the Plan, including, without limitation, Sections 5.9, 7.3, 10.3, 10.4, 10.6, 10.7, and 10.10, such Cash payment shall be retained by PharmAthene and shall not be refundable to the Reorganized Debtor under any circumstance, including if the payments required to be made pursuant to either Section 4.3(b)(i)(A) or Section 4.3(b)(i)(B), as applicable, are less than Twenty Million Dollars

19

($20,000,000).  If the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim under Section 4.3(b)(i)(C) or Section 4.3(b)(i)(D), or the PharmAthene Allowed Claim is to be treated as set forth in Section 4.3(b)(ii), such Cash payment shall be retained by PharmAthene and shall not be refundable under any circumstance.

(D)    **Interest**.

(1)    If the PharmAthene Final Order provides for a Lump Sum Payment Award to be paid to PharmAthene, pre- and post-judgment interest shall accrue and be payable as follows:

(x)    during the period to and including the day prior to the Effective Date, interest shall accrue at a per annum rate equal to the Delaware judgment rate and shall be treated under Section 4.3(b)(i) of the Plan as part of the PharmAthene Allowed Claim;

(y)    from and after the Effective Date, interest shall accrue at the rate of 8.75% per annum.  If the Effective Date occurs prior to the PharmAthene Final Order Date, then five (5) Business Days after the PharmAthene Final Order Date, the Reorganized Debtor shall pay in Cash all interest accrued as provided in this subclause (y) for the period from the Effective Date through and including the PharmAthene Final Order Date.  Interest accruing for the period after the PharmAthene Final Order Date shall be paid by the Reorganized Debtor to PharmAthene in Cash in arrears at the rate of 8.75% per annum on a monthly basis commencing on the first day of the month immediately following the PharmAthene Final Order Date and continuing thereafter on the first day of each month until the PharmAthene Allowed Claim Treatment Date; *provided, however*, that if the PharmAthene Allowed Claim is treated under Option 1 above, such interest shall be paid through the date on which the PharmAthene Allowed Claim is paid in full pursuant to such Option.  If the Effective Date occurs after the PharmAthene Final Order Date, then interest accruing after the Effective Date shall be paid by the Reorganized Debtor to PharmAthene in Cash in arrears at the rate of 8.75% per annum on a monthly basis commencing on the first day of the month immediately following the Effective Date and continuing thereafter on the first day of each month until the PharmAthene Allowed Claim Treatment Date; *provided, however*, that if the PharmAthene Allowed Claim is treated under Option 1

20

above, such interest shall be paid through the date on which the PharmAthene Allowed Claim is paid in full pursuant to such Option.

Notwithstanding anything to contrary in clauses (x) and (y) immediately above, solely for purposes of this Section 4.3(b)(iv)(D)(1), and solely in the circumstance where the Order Payment Date is a date later than the 120th Day, interest for the period after the 120th Day and through the Order Payment Date shall accrue at a per annum rate equal to the Delaware judgment rate.

(2)    If the PharmAthene Final Order provides for an Alternative Award, interest payable, if any, shall be determined and payable as follows:

(x)    to the extent such PharmAthene Final Order provides for the payment of any amounts that otherwise would have been due and payable under the terms of such PharmAthene Final Order prior to and including the Effective Date, interest, at a per annum rate equal to the Delaware judgment rate, shall accrue on such past due and unpaid amounts commencing from the date such amounts otherwise would have been due and payable under the PharmAthene Final Order through the Effective Date and shall be treated under the Plan as part of the PharmAthene Allowed Claim;

(y)    during the period commencing from and after the Effective Date, to the extent such PharmAthene Final Order provides for the payment of any amounts that otherwise would have been due and payable under the terms of such PharmAthene Final Order prior to the PharmAthene Allowed Claim Treatment Date, interest shall accrue on any such past due and unpaid amounts at the rate of 8.75% per annum;

(z)    if the PharmAthene Allowed Claim is treated under Option 2 above, all of the accrued interest as provided in the immediately preceding subclauses (x) and (y), if any, shall continue to accrue at the respective rates set forth therein through, and shall be paid in full in Cash on, the date any such past due amounts described in such subclauses (x) and (y) shall have been paid in full in Cash.

In addition, it is understood that if the PharmAthene Allowed Claim is treated under Option 2 above, any and all payments that,

21

pursuant to the terms of such PharmAthene Final Order, first become due and payable on a date occurring after the PharmAthene Allowed Claim Treatment Date shall not be subject to this Section 4.3(b)(iv)(D)(2), but shall be paid in accordance with the terms of such PharmAthene Final Order.

(E)   **No Impact on Prior Appeal Bond**.  Nothing in the Plan or the Confirmation Order shall discharge, release, enjoin, stay, impact or otherwise impair PharmAthene's rights with respect to, the Prior Appeal Bond, which bond is not property of the estate.  If the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(A) or Section 4.3(b)(i)(B), amounts paid to PharmAthene from the Prior Appeal Bond shall be credited dollar for dollar against the payments to be made by the Reorganized Debtor pursuant to such treatment (in the case of Section 4.3(b)(i)(B), as such payments become due).

**4.4**    **Class 4 – Equity Interests.**  On the Effective Date, Equity Interests shall be reinstated and remain unaltered by the Plan except as provided for in Section 6.10 and the last sentence of Section 6.15(b) hereof; *provided, however*, that if the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(C) of the Plan, or the PharmAthene Allowed Claim is to be treated as set forth in Section 4.3(b)(ii) of the Plan, then the following shall occur automatically without further order or action by the Bankruptcy Court or any other Entity and without the need for any notice, approval, authorization, stockholder vote, action by the Board of Directors, or consent:  on the PharmAthene Allowed Claim Treatment Date (i) one hundred percent (100%) of the New Common Stock shall be delivered to PharmAthene, (ii) all Equity Interests shall be (and shall be deemed to be) immediately cancelled and be of no further force and effect and the holders of such Equity Interests shall receive no distribution or consideration in respect thereof, and (iii) the Reorganized Debtor shall be authorized to file, and shall duly execute and file, a certificate of amendment to its Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware to effectuate and evidence such cancellation.

## ARTICLE V.

### PROVISIONS GOVERNING DISTRIBUTIONS

**5.1**    **Distribution Record Date.**  As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtor or its agents shall be deemed closed and there shall be no further changes in the record holders of any of such Claims.  The Debtor or the Reorganized Debtor, as applicable, shall (i) have no obligation to recognize any transfer of such Claims occurring on or after the Distribution Record Date, and (ii) be entitled to recognize and deal for all purposes hereunder only with those record holders of Claims stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

WEIL:\95564956\3\74193.0003

**5.2    Date of Distributions.**  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**5.3    Disbursing Agent.**  All distributions hereunder shall be made by the Disbursing Agent, as provided herein, without compensation.

**5.4    Delivery of Distributions and Undeliverable Distributions.**  Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made by the Disbursing Agent at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor or its agents or in a letter of transmittal unless the Debtor or its agents have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different from the address reflected on the Schedules for such holder.  If any distribution to any holder is returned as undeliverable, no further distributions to such holder shall be made unless and until such distributions are claimed, at which time all missed distributions shall be made to such holder, without any interest for the period during which such distributions were undeliverable.  Nothing herein shall require the Disbursing Agent to attempt to locate holders of undeliverable distributions and, if located, assist such holders in complying with Section 5.10.  Undeliverable distributions shall remain in the possession of the Disbursing Agent until such time as a distribution becomes deliverable or such distribution reverts back to the Reorganized Debtor, as provided herein.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three hundred sixty (360) days from the date of distribution.  After such date, all such unclaimed distributions shall revert to the Reorganized Debtor, and all Claims of any Entity to such distributions shall be discharged and forever barred from assertion against the Debtor, the Reorganized Debtor, and their respective property, notwithstanding any federal or state escheat laws to the contrary.

**5.5    Cash Payments.**  At the option of the Debtor or the Reorganized Debtor, as applicable, any Cash payment to be made hereunder may be made by check or wire transfer of immediately available funds or as otherwise required or provided in applicable agreements.  All cash payments to be made to PharmAthene pursuant to the Plan shall be made by wire transfer of immediately available funds pursuant to written instructions to be delivered by PharmAthene to the Debtor or Reorganized Debtor, as applicable, on or before the Effective Date (and thereafter such instructions can be modified from time to time by PharmAthene in a writing delivered by PharmAthene to the Reorganized Debtor).

**5.6    Time Bar to Cash Payments.**  Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within three hundred sixty (360) days after the date of issuance thereof.  Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check originally was issued. Any Claim in respect of such a voided check shall be made on or before thirty (30) days after the expiration of the three hundred sixty (360) day period following the date of issuance of such check.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtor, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**5.7** **Distributions After Effective Date.** Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

**5.8** **Allocation of Plan Distribution Between Principal and Interest.** Except as otherwise required by law (as reasonably determined by the Debtor or Reorganized Debtor), distributions with respect to an Allowed General Unsecured Claim shall be allocated first to the interest portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

**5.9** **Setoff and Recoupment; Waiver of Avoidance Actions.** Except with respect to the PharmAthene Allowed Claim, and any other payments or distributions to be made to PharmAthene pursuant to this Plan, the Debtor and the Reorganized Debtor, as applicable, may, but shall not be required to, set off or recoup against any Allowed Claim, and any distribution to be made on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature that the Debtor or Reorganized Debtor may have against the holder of such Allowed Claim pursuant to the Bankruptcy Code or applicable nonbankruptcy law; *provided, however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver, abandonment, or release by the Debtor or the Reorganized Debtor, as applicable, of any such claims, rights, and Causes of Action that the Debtor or the Reorganized Debtor, as applicable, may have against the holder of such Claim. On the Effective Date, all Avoidance Actions shall be deemed waived and released.

**5.10** **Withholding and Reporting Requirements.**

(a) In connection with the Plan and all instruments issued in connection herewith and distributed hereunder, any party issuing any instrument or making any distribution described herein shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state, or local taxing authority, and all distributions pursuant to the Plan shall be subject to any such withholding or reporting requirements. In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property on behalf of the party entitled to receive such property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax) or (ii) pay the withholding tax using its own funds and retain such withheld property. Any Cash or property withheld pursuant to this paragraph shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each Entity that receives a distribution pursuant to the Plan shall have the sole and exclusive responsibility for satisfaction of any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution to a holder of an Allowed Claim or Equity Interest until such holding has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligation. If any Person making any distribution under the Plan fails to withhold with respect to any holder's distribution, and is later held liable for the amount of such withholding, such holder shall reimburse such Person.

24

**(b)** The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder to receive such distribution complete and deliver to the Disbursing Agent (or such other Person designated by the Disbursing Agent) the appropriate Form W-8 or Form W-9, as applicable to such holder. If the holder fails to comply with such requirement within twelve (12) months of such request, such distribution shall irrevocably revert to the Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against the Reorganized Debtor or its property.

## ARTICLE VI.

### MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

**6.1     Establishment of Escrow Account.** On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor shall open the Escrow Account in accordance with the Plan and the terms and conditions set forth in the Escrow Agreement. The Escrow Account shall have its situs, and all of the assets of the Escrow Account shall be located, within the United States.

**6.2     Tax Treatment of Escrow Account.** To protect against the Escrow Account being treated as a "qualified settlement fund" for U.S. federal income tax purposes, (i) the Reorganized Debtor shall make a "grantor trust election" with respect to the Escrow Account in accordance with U.S. Treasury Regulation section 1.468B-1(k), and (ii) the Escrow Agreement shall provide that (a) the Escrow Agent shall be the "administrator" of the Escrow Account as such term is used in such section, (b) the Reorganized Debtor and the Escrow Agent shall comply with the respective provisions of such section, and (c) the Escrow Agent shall use one of the reporting methods set forth in U.S. Treasury Regulation section 1.671-4(b)(2) with respect to the Escrow Account. To the extent permitted by applicable law, the parties shall report consistent therewith for state and local income tax purposes. Accordingly, in furtherance of the foregoing, the Reorganized Debtor shall file an applicable election statement as an attachment to its timely filed income tax return for the taxable year in which the Escrow Account is established, and provide the escrow agent with an executed IRS Form W-9 or acceptable substitute Form W-9.

**6.3     Compliance with the Plan Covenants.** From the Effective Date through and including the Plan Covenant Termination Date, the Reorganized Debtor shall and shall cause any Subsidiary to comply with the Plan Covenants.

**6.4     Termination of Plan Covenants.**

**(a)** The Plan Covenants shall terminate on the earliest to occur of the following: (i) if the Debtor or the Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(A), the date on which PharmAthene receives payment in full in Cash as provided therein; (ii) if the Debtor or the Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(B), upon the earliest to occur of (X) the date the Reorganized Debtor makes the first payment to PharmAthene as required pursuant to and in accordance with the PharmAthene Final Order (the amount of such payment, the "**Option 2 First Payment**

Amount"); (Y) the twelve (12) month anniversary of the PharmAthene Final Order Date; *provided, however*, that clauses (xxii), (xxviii), (xxix), (xxx), and (xxxi) of the Plan Covenants shall remain in full force and effect through the date the Option 2 First Payment Amount shall have been made to PharmAthene; and (Z) the date on which the Reorganized Debtor cash collateralizes the Option 2 First Payment Amount (the "**Option 2 Cash Collateral**") in an amount estimated by an arbitrator, jointly selected by the Debtor and PharmAthene and identified in the Plan Supplement, to equal the Option 2 First Payment Amount (inclusive of all accrued and accruing interest, costs and fees, if any) (such estimated amount, the "**Option 2 Estimated First Payment Amount**"); *provided that* if the arbitrator finds the Option 2 Estimated First Payment Amount to be in a range of reasonable amounts, the Option 2 Estimated First Payment Amount shall be the maximum amount in such range; (iii) if the Debtor or the Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(C), or the PharmAthene Allowed Claim is to be treated as set forth in Section 4.3(b)(ii), the date on which PharmAthene receives the New Common Stock as provided therein; (iv) if the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(D), the date agreed to by the Debtor or Reorganized Debtor, as applicable, and PharmAthene; and (v) such other date as may be agreed upon by PharmAthene and the Reorganized Debtor.

       (b)      The Plan Covenants shall also terminate:

       (i)      If the Delaware Supreme Court reverses or vacates the Delaware Chancery Court Decision without remanding the case to the Delaware Court of Chancery for a determination of damages and the Debtor or Reorganized Debtor, as applicable, pays to PharmAthene in Cash the amount, if any, provided for in the order of the Delaware Supreme Court; or

       (ii)      If (A) the Delaware Supreme Court remands the PharmAthene Action to the Delaware Court of Chancery for a determination of damages, and (B) one arbitrator, jointly selected by the Debtor and PharmAthene and identified in the Plan Supplement, estimates the reasonable amount of the Debtor's liability to PharmAthene based on such remand (inclusive of all accrued and accruing interest, costs, and fees) (the "**Estimated Damages**") pursuant to the Arbitration Agreement, and the Debtor or Reorganized Debtor, as applicable, cash collateralizes (the "**Cash Collateral**") such amount for the benefit of PharmAthene.  If the arbitrator finds the Estimated Damages to be a range of reasonable amounts, then the amount of the Cash Collateral shall be the maximum amount in such range.  The Cash Collateral shall be applied as follows:

       (A)      If the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(A) hereof, the Cash Collateral shall be applied dollar for dollar to the payments due thereunder, with any excess remaining after full payment of the PharmAthene Allowed Claim as provided in such section being transferred to the Reorganized Debtor; or

(B)    If the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(B) hereof, the Cash Collateral shall be credited against any payments the Reorganized Debtor is required, pursuant to the terms of the PharmAthene Final Order, to make to PharmAthene within ninety (90) calendar days following the PharmAthene Final Order Date, if any, with any excess remaining after any such required payments to PharmAthene have been made in full being transferred to the Reorganized Debtor; or

(C)    If the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(C) hereof, the Cash Collateral shall be transferred to the Reorganized Debtor promptly upon PharmAthene's receipt of one hundred percent (100%) of the New Common Stock pursuant to Section 4.3(b)(i)(C) or 4.3(b)(ii) hereof, as applicable; or

(D)    If the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(D) hereof, the Cash Collateral shall be distributed as provided in the mutual agreement referred to in such Section.

(c)    To the extent the Reorganized Debtor cash collateralizes the Option 2 First Payment Amount in accordance with Section 6.4(a)(ii)(Z) above, such Option 2 Cash Collateral shall be released to the Reorganized Debtor on the date that the Reorganized Debtor pays to PharmAthene, in full, the actual Option 2 First Payment Amount.

(d)    Upon termination of the Plan Covenants, the Plan Covenants shall be of no force or effect.

## 6.5    Determination of Plan Covenants Event of Default.

(a)    Within three (3) Business Days after the occurrence and during the continuation of a Plan Covenant Event of Default, the Debtor shall provide PharmAthene written notice thereof containing a description in reasonable detail of the circumstances of such default.

(b)    Except for any continuing Plan Covenant Event of Default for which PharmAthene receives notice pursuant to Section 6.5(a), promptly after PharmAthene becomes aware of the occurrence of an alleged Plan Covenant Event of Default, PharmAthene shall notify the Reorganized Debtor in writing of such alleged event of default, setting forth in reasonable detail the nature of the alleged event of default.  No Plan Covenant Event of Default shall be deemed to have occurred until such time, if any, as either (a) the Reorganized Debtor has acknowledged in writing that a Plan Covenant Event of Default has occurred and is continuing, or (b) the Bankruptcy Court shall have entered an order (upon notice of a motion filed by PharmAthene) determining that a Plan Covenant Event of Default has occurred and is continuing.  PharmAthene shall be entitled to (and the Reorganized Debtor shall not object to) an expedited hearing before the Bankruptcy Court on not less than five (5) Business Days' notice for a determination as to whether a Plan Covenant Event of Default has occurred and is

27

continuing.  If PharmAthene seeks a determination from the Bankruptcy Court that a Plan Covenant Event of Default has occurred and is continuing and prevails with respect thereto, in addition to the remedies available to PharmAthene pursuant to Section 6.6 of the Plan, the Reorganized Debtor shall pay the reasonable legal fees and expenses incurred by PharmAthene in connection with such proceeding before the Bankruptcy Court.  The sole issue to be determined by the Bankruptcy Court with respect to any motion filed by PharmAthene pursuant to this Section 6.5 shall be whether a Plan Covenant Event of Default has occurred and is continuing.

      **6.6**   **Consequences of Plan Covenant Event of Default.**  Upon the occurrence and continuation of a Plan Covenant Event of Default as determined in accordance with Section 6.5(b), the Reorganized Debtor shall:

      **(a)**   Within five (5) Business Days of such determination deposit in the Escrow Account all Cash and Cash equivalents then held by the Reorganized Debtor in excess of Fifty Million Dollars ($50,000,000).  Thereafter on the fifteenth (15th) day of each month commencing with the month next succeeding the month, if any, in which the foregoing deposit is made, the Reorganized Debtor shall provide to PharmAthene and to the Escrow Agent a certification signed by an executive officer certifying the amount of Cash and Cash equivalents held by the Reorganized Debtor (exclusive of any Cash in the Escrow Account) on the last day of the immediately preceding month.  If such certification reflects Cash and Cash equivalents on hand less than Fifty Million Dollars ($50,000,000), the Escrow Agent shall promptly transfer to the Reorganized Debtor (without any further notice or instructions) funds from the Escrow Account in an amount necessary to restore the Reorganized Debtor's Cash and Cash equivalents on hand to Fifty Million Dollars ($50,000,000).  If such certification reflects Cash and Cash equivalents on hand in excess of Fifty Million Dollars ($50,000,000), the Reorganized Debtor shall promptly transfer to the Escrow Account such excess;

      **(b)**   Grant holders of Allowed General Unsecured Claims whose claims have not been satisfied in full as of such date, including PharmAthene, a perfected Lien against the Escrow Account and substantially all assets of the Reorganized Debtor to secure the Reorganized Debtor's obligations under the Plan with respect to such claims; *provided, however*, that nothing contained herein shall require the granting of any Lien on any assets that may not be pledged as collateral security pursuant to any existing agreement or applicable law;

      **(c)**   Retain, at the Reorganized Debtor's expense, the Monitor to have reasonable access to the Reorganized Debtor's offices in both New York, New York and Corvallis, Oregon, and whose approval, which shall not be unreasonably withheld, be required with respect to any transaction or payment that the Reorganized Debtor seeks to enter into or make to the extent such transaction or payment is in excess of Twenty-Five Thousand Dollars ($25,000).  The Monitor shall be subject to a confidentiality agreement, the form and substance of which shall be reasonably acceptable to the Reorganized Debtor, but shall permit the Monitor to share all his findings with the Board Observer; and

      **(d)**   Reconstitute the Board of Directors of the Reorganized Debtor such that the reconstituted Board of Directors shall consist of a majority of directors designated by PharmAthene, with the remainder designated by the Reorganized Debtor.  Those directors

WEIL:\95564956\3\74193.0003

designated by PharmAthene shall be identified prior to the Confirmation Hearing; *provided, however*, that PharmAthene shall retain the right to alter such designation at any time prior to any reconstitution of the Board of Directors.  Notwithstanding the foregoing, the directors designated by PharmAthene shall be excluded from all meetings of the Board of Directors (including subcommittee meetings of the Board of Directors) relating solely to the PharmAthene Action or the treatment or potential treatment of the PharmAthene Allowed Claim under the Plan, and shall not receive or be furnished any documents solely with respect to such matters. The directors designated by PharmAthene also shall not be permitted to vote as members of the Board of Directors with respect to the matters described in the preceding sentence.

Upon the date on which PharmAthene receives the entirety of the treatment required under the Plan in respect of the PharmAthene Allowed Claim (or solely in the event the treatment set forth in Section 4.3(b)(i)(B) hereof is applicable, upon the date the Plan Covenants terminate pursuant to Section 6.4(a)(ii) hereof), (i) all Cash held in the Escrow Account shall immediately be paid to the Reorganized Debtor; (ii) any and all Liens granted pursuant to Section 6.6(b) hereof shall be automatically released, terminated, and extinguished; (iii) the Monitor shall be released and discharged of and from all further authority, duties, responsibilities, and obligations, and shall no longer have any authority hereunder or otherwise; and (iv) the Reorganized Debtor shall be permitted to reconstitute the Board of Directors in accordance with the Reorganized Debtor's Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws.

### 6.7    **Appointment of Board Observer.**

(a)    As of the Effective Date through and including the Plan Covenant Termination Date, PharmAthene shall be entitled to the Board Observer.

(b)    Subject to execution of the confidentiality agreement provided for in Section 6.7(c), the Board Observer shall (i) receive all notices of meetings of the Reorganized Debtor's Board of Directors (whether such meetings are by telephone, video conference or in person) or of actions to be taken by such Board of Directors by consent, whether regular, special, or subcommittee meetings, and all documents provided by the Reorganized Debtor to members of its Board of Directors; (ii) be entitled to attend and observe all meetings of the Reorganized Debtor's Board of Directors (including all meetings of every subcommittee of such Board of Directors), and (iii) be provided with a copy of all resolutions adopted by the Reorganized Debtor's Board of Directors subsequent to the Effective Date (including of actions approved by consent of the Board of Directors).  Notwithstanding the foregoing, the Board Observer shall be excluded from those portions of such meetings solely concerning the PharmAthene Action or treatment or potential treatment of the PharmAthene Allowed Claim under the Plan (such matters, the "**Excluded Matters**"), and shall not receive any documents provided to members of the Board of Directors solely with respect to such matters; *provided, however*, if any such documents pertain to matters concerning both Excluded Matters and non-Excluded Matters, such documents shall be provided to the Board Observer redacted solely with respect to any portion thereof that concerns Excluded Matters.

(c)    The Board Observer shall be subject to a confidentiality agreement, the form and substance of which shall be reasonably acceptable to the Debtor and PharmAthene. The Board Observer may disclose to PharmAthene, PharmAthene's board of directors and legal

WEIL:\95564956\3\74193.0003

counsel all information obtained at meetings of the Board of Directors or any subcommittee thereof, or from any notices or documents provided to the Board Observer; *provided, however*, that the Board Observer shall not be allowed to disclose any information to PharmAthene that the Debtor or the Reorganized Debtor, as applicable, has designated as confidential unless the Board Observer reasonably believes that the Reorganized Debtor has committed or may imminently commit a Plan Covenant Event of Default and such information is necessary to determine the same.  PharmAthene, the members of its board of directors and its legal counsel shall be subject to a confidentiality agreement, the form and substance of which shall be reasonably acceptable to the Debtor or the Reorganized Debtor, as applicable, and which shall be executed and be in full force and effect prior to the Effective Date.

(d)     The Reorganized Debtor shall (i) pay the Board Observer an hourly fee not to exceed $500 per hour for services rendered in his capacity as Board Observer, and (ii) reimburse the Board Observer for (x) all reasonable out-of-pocket expenses incurred in connection with attending meetings of the Board of Directors upon presentation of invoices therefor; and (y) reasonable fees and expenses of any attorneys retained by the Board Observer to represent him in his capacity as such upon presentation of invoices therefor.  Any dispute regarding the reasonableness of any such fees and expenses shall be resolved by the Bankruptcy Court.

6.8     **Cancellation of Existing Agreements and Instruments.**  Except as otherwise expressly provided for in the Plan or with respect to executory contracts or unexpired leases that have been assumed by the Reorganized Debtor, as of the Effective Date, agreements and instruments evidencing debt of the Debtor shall be cancelled and deemed null and void and of no further force and effect, and the holders thereof shall have no rights, and such agreements and instruments shall evidence no rights, except the right to receive the distributions provided herein. For the avoidance of doubt, all Equity Interests in the Debtor shall not be cancelled and shall remain in full force and effect on and after the Effective Date, but shall be subject to the provisions of Sections 4.4 and 6.10 hereof.

6.9     **Cancellation of Liens.**  Except as otherwise specifically provided herein, upon the occurrence of the Effective Date, any and all Liens securing any Secured Claims shall be deemed released, and the holders of such Secured Claims shall be authorized and directed to release any and all Collateral or other property of the Debtor (including, without limitation, any cash collateral) held by each such holders and to take such actions as may be requested by the Reorganized Debtor to evidence the release of such Liens, including, without limitation, the execution, delivery, and filing or recording of such releases as may be requested by the Reorganized Debtor.  For the avoidance of doubt, the provisions of the foregoing sentence shall not apply to any Liens in Collateral (including any Cash Collateral) that may be granted pursuant to Section 6.6(b) of the Plan.

6.10    **Reverse Stock Split.**

(a)     Upon and subject to the occurrence of the Effective Date, and without any further order of the Bankruptcy Court, stockholder action, or other corporate action, each [fifteen (15) shares] of Existing Common Stock shall automatically be combined into one (1) validly

WEIL:\95564956\3\74193.0003

issued, fully paid, and non-assessable share of Existing Common Stock (the "**Reverse Stock Split**").

**(b)**     The Reorganized Debtor shall not issue fractional shares of common stock or pay Cash in respect thereof in connection with the Reverse Stock Split but, in lieu thereof, the aggregate number of shares of Existing Common Stock issuable to each holder in connection with the Reverse Stock Split shall be rounded up or down to the nearest whole number of shares of Existing Common Stock with a half share rounded down.

**(c)**     Following the Reverse Stock Split, each certificate (or book-entry form of Existing Common Stock) that immediately prior to the Effective Date, represented shares of Existing Common Stock shall be thereafter deemed for all purposes, as a result of the Reverse Stock Split and without any action on the part of the holders thereof, to represent only that number of shares of Existing Common Stock into which the shares of the Existing Common Stock represented by the prior certificate shall have been combined pursuant to the Reverse Stock Split (subject to the treatment of fractional shares as set forth above).[1]  Holders of Existing Common Stock in certificate form shall receive a transmittal letter from the Debtor's transfer agent as soon as practicable after the Effective Date to exchange the old certificate for a new one reflecting the Reverse Stock Split.

**6.11**    **Authorization and Issuance of New Common Stock.**  The Debtor and the Reorganized Debtor, as applicable, are authorized and directed to authorize and issue the New Common Stock, to the extent required if the Debtor or the Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(C), or the PharmAthene Allowed Claim is to be treated as set forth in Section 4.3(b)(ii), without the need for any further corporate action, Bankruptcy Court approval, shareholder vote or other approvals. In the event of such issuance of New Common Stock, the Debtor or the Reorganized Debtor, as applicable, shall file a notice of such issuance and the cancellation of the Existing Common Stock with the Bankruptcy Court and the United States Securities and Exchange Commission.

**6.12**    **Effectiveness of Transition Plan.**  The Transition Plan shall be executed and delivered by the Debtor or the Reorganized Debtor, as applicable, on the Effective Date, but shall become effective on (a) the Notification Date if the Debtor or the Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(C), or (b) on the date, if any, that it is determined that the PharmAthene Allowed Claim is to be treated as set forth in Section 4.3(b)(ii).

**6.13**    **Section 1145 Exemption.**  If the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(C), or the PharmAthene Allowed Claim is to be treated as set forth in Section 4.3(b)(ii), the issuance and distribution under the Plan of the New Common Stock, if applicable, shall be exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder, and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities.  Notwithstanding the foregoing, under such circumstances, PharmAthene shall be deemed a Section 1145 underwriter

---

[1] The Existing Common Stock, however, will be represented by a new securities identification number (i.e. CUSIP).

such that the New Common Stock issued to it shall be subject to applicable restrictions on transfer, and the certificate evidencing the New Common Stock shall be appropriately legended to reflect such restrictions.

**6.14    Equity Interests in Subsidiary.**  The Debtor's equity interests in SIGA Pharmaceuticals (Europe) Limited shall be unaffected by the Plan, and the Reorganized Debtor shall continue to own and hold such equity interests from and after the Effective Date.

**6.15    Reorganized Debtor.**

**(a)    Continued Corporate Existence.**  The Debtor shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate Entity, with all the powers of a Delaware corporation, and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable state law, subject in all cases to the terms of the Plan Covenants.

**(b)    Amendment of Certificate of Incorporation.**  The Debtor's certificate of incorporation shall be amended and restated as of the Effective Date in substantially the form of the Amended and Restated Certificate of Incorporation, which certificate shall be filed with the Secretary of State of the State of Delaware.  The Amended and Restated Certificate of Incorporation shall, without limitation, (i) incorporate and adopt the Plan Covenants; (ii) incorporate provisions to effectuate the potential reconstitution of the Reorganized Debtor's Board of Directors if required by Section 6.6(d); (iii) authorize the Board of Directors to cancel existing Equity Interests and issue the New Common Stock without further stockholder approval, in the event that the Debtor or Reorganized Debtor, as applicable, elects to treat the PharmAthene Allowed Claim in accordance with Section 4.3(b)(i)(C) hereof, or the PharmAthene Allowed Claim is to be treated as set forth in Section 4.3(b)(ii) hereof, and (iv) prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  Prior to the PharmAthene Allowed Claim Treatment Date, the Amended and Restated Certificate of Incorporation shall not be further amended other than as provided for in the Plan Covenants.  The Debtor and the Reorganized Debtor, as applicable, reserve the right to include in the Amended and Restated Certificate of Incorporation transfer restrictions on the disposition and accumulation of stock of the Reorganized Debtor in order to preserve and/or maximize the amount of tax attributes and benefits.

**(c)    Amendment of By-Laws.**  The Debtor's by-laws shall be amended and restated as of the Effective Date in substantially the form of the Amended and Restated By-laws. Prior to the PharmAthene Allowed Claim Treatment Date, the Amended and Restated By-laws shall not be further amended other than as provided for in the Plan Covenants.

**(d)    Board of Directors of Reorganized Debtor.**  The initial members of the Board of Directors of the Reorganized Debtor, as well as the members of the Board of Directors who will be appointed in the event of a reconstitution of the Reorganized Debtor's Board of Directors in accordance with Section 6.6(d), will be identified by no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

WEIL:\95564956\3\74193.0003

(e) **Officers of the Reorganized Debtor**: To the extent applicable, the Board of Directors of the Reorganized Debtor shall elect officers of the Reorganized Debtor as of or after the Effective Date.

(f) **Employment Agreements.** On the Effective Date, the Reorganized Debtor shall enter into new employment contracts with those Persons set forth on Exhibit "B," which employment agreements shall be substantially in the form set forth in Exhibit "C" hereto and which shall become automatically effective on the Effective Date without any further authorization or approval.

**6.16    Corporate Reorganization Actions, Effectuating Documents, and Further Transactions.**

(a) On or as soon as practicable after the Effective Date, the Reorganized Debtor shall take such actions as may be or become necessary to effectuate the Plan and any transactions contemplated thereby, all of which shall be authorized and approved in all respects, in each case without further action being required under applicable law, regulation, order, or rule.

(b) Each officer of the Debtor is (and each officer of the Reorganized Debtor shall be) authorized and directed to execute, deliver, file, or record such contracts, instruments, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors of the Debtor or the Reorganized Debtor).

(c) All matters provided for herein involving the corporate structure of the Debtor or Reorganized Debtor, or any corporate or related action required by the Debtor or Reorganized Debtor in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders or directors of the Debtor or Reorganized Debtor or by any other stakeholder, and with like effect as though such action had been taken unanimously by the stockholders, directors, or officers, as applicable, of the Debtor or Reorganized Debtor.

**6.17    Nonconsensual Confirmation.** In the event any impaired class of Claims entitled to vote on the Plan does not accept the Plan by the requisite statutory majority under section 1126(c) of the Bankruptcy Code, then the Debtor reserves the right to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code. Because Class 4 (Equity Interests) is deemed to reject the Plan, the Debtor intends to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

**6.18    Transactions on Business Days.** If the Effective Date or any other date on which a transaction may occur hereunder shall occur on a day that is not a Business Day, the transaction contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**6.19    Notice of Effective Date**. As soon as practicable, but not later than two (2) Business Days following the Effective Date, the Debtor shall file a notice of the occurrence of

WEIL:\95564956\3\74193.0003

the Effective Date with the Bankruptcy Court and with the United States Securities and
Exchange Commission.

## ARTICLE VII.

### PROCEDURES FOR DISPUTED CLAIMS

**7.1** **Objections to Claims.** The Reorganized Debtor shall be entitled to object to
Claims and Administrative Expenses (other than the PharmAthene Claim, which shall be
resolved solely pursuant to the PharmAthene Action). All objections to Claims shall be served
and filed on or before the later of (i) one hundred eighty (180) days after the Effective Date and
(ii) such date as may be fixed by the Bankruptcy Court (as the same may be extended by the
Bankruptcy Court), whether fixed before or after the date specified in clause (i) above.

**7.2** **Resolution of Disputed Administrative Expenses and Disputed Claims.** On
and after the Effective Date, the Reorganized Debtor shall have the authority to compromise,
settle, otherwise resolve, or withdraw any objections to Administrative Expenses or Claims and
to compromise, settle, or otherwise resolve any disputed Administrative Expenses and Disputed
Claims without approval of the Bankruptcy Court, other than with respect to Administrative
Expenses relating to compensation of professionals.

**7.3** **No Distribution Pending Allowance.** Notwithstanding anything herein to the
contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided
hereunder shall be made on account of such Claim unless and until such Disputed Claim
becomes an Allowed Claim. The forgoing sentence shall not apply to any payments to be made
to PharmAthene prior to the PharmAthene Allowed Claim Treatment Date pursuant to Sections
4.3(a), 4.3(b), and 10.6(b) of the Plan.

**7.4** **Distributions After Allowance.** To the extent that a Disputed Claim ultimately
becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed
Claim in accordance with the provisions of the Plan as soon as reasonably practicable after the
date that such Disputed Claim becomes an Allowed Claim (whether by Final Order of the
Bankruptcy Court or otherwise). Holders of Disputed Claims that ultimately become Allowed
Claims shall not be entitled to payment of interest that accrued thereon from and after the
Effective Date unless otherwise expressly provided herein.

**7.5** **Estimation.** The Debtor and the Reorganized Debtor may at any time request
that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim (other than
the PharmAthene Claim) pursuant to section 502(c) of the Bankruptcy Code regardless of
whether the Debtor or the Reorganized Debtor previously objected to such Claim or whether the
Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain
jurisdiction to estimate any Claim at any time during litigation concerning any objection to any
Claim, including, without limitation, during the pendency of any appeal relating to any such
objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or
Disputed Claim, the amount estimated shall constitute either the Allowed amount of such Claim
or a maximum limitation of the amount of such Claim, as determined by the Bankruptcy Court.
If the estimated amount constitutes a maximum limitation of the amount of such Claim, the

Debtor or the Reorganized Debtor, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim; *provided, however*, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code.  The aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**ARTICLE VIII.**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**8.1**    **General Treatment of Executory Contracts and Unexpired Leases.**  As of the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed assumed, and, if applicable, assigned, except for an executory contract or unexpired lease that (a) has previously been assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court, (b) is specifically designated as a contract or unexpired lease to be rejected on the Schedule of Rejected Contracts and Leases, (c) is the subject of a rejection motion filed by the Debtor under section 365 of the Bankruptcy Code prior to the Confirmation Date with respect to which there is not yet a Final Order of the Bankruptcy Court, or (d) is the subject of a pending Cure Dispute.

**8.2**    **Determination of Cure Disputes and Deemed Consent.**

**(a)**    The Debtor shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts and Leases, which, if and where applicable, will indicate whether the executory contract is also being assigned and to whom, and shall simultaneously serve a notice on parties to executory contracts or unexpired leases to be assumed or, if applicable, assigned, reflecting the Debtor's intention to assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure amount (if any).

**(b)**    With respect to each executory contract or unexpired lease to be assumed or assumed and assigned by the Debtor, unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, the dollar amount required to Cure any defaults of the Debtor existing as of the Confirmation Date shall be the amount set forth on the Schedule of Assumed Contracts and Leases.

**(c)**    Counterparties to the contracts and leases included on the Schedule of Assumed Contracts and Leases may object to the Cure amounts set forth therein by filing and serving on the Debtor an objection within twenty-one (21) days of service of the Debtor's notice of intent to assume or assume and assign.  If there are any objections filed, Cure Disputes shall be scheduled for a hearing by the Bankruptcy Court.  Following resolution of a Cure Dispute by Final Order of the Bankruptcy Court, the applicable contract or lease shall be deemed assumed or assumed or assigned, as applicable, effective as of the Effective Date; *provided, however*, that the Debtor reserves the right to reject any contract or lease prior to or following entry of a Final Order of the Bankruptcy Court resolving the applicable Cure Dispute by filing a notice indicating such rejection within three (3) Business Days of the entry of such Final Order.

35

(d)    To the extent that an objection is not timely filed and properly served on the Debtor with respect to a proposed Cure, then the counterparty to the applicable contract or lease shall be deemed to have assented to (a) the Cure amount proposed by the Debtor and (b) the assumption or assumption and assignment, as applicable, of such contract or lease, notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease, or (ii) terminate or permit the termination of a contract as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or a change, if any, in the ownership or control to the extent contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtor or terminating or modifying such contract or lease on account of transactions contemplated by the Plan.

**8.3**    **Payments Related to Assumption or Assignment of Contracts and Leases.** Subject to resolution of any Cure Dispute, all Cures shall be satisfied by the Debtor or Reorganized Debtor, as the case may be, upon assumption or assumption and assignment, as applicable, of the underlying contracts and leases.  Assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure, whether monetary or nonmonetary, including, without limitation, defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption and/or assignment.  Any and all proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned, as applicable, shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Entity.

**8.4**    **Rejection.**  In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a timely filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor, or their respective estate, properties or interests in property, unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtor no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of the rejection of such executory contract or unexpired lease, as set forth on the Schedule of Rejected Contracts and Leases or order of the Bankruptcy Court.  The Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts identified in the Schedule of Rejected Contracts and Leases.

**8.5**    **Survival of the Debtor's Indemnification Obligations.**  The obligations of the Debtor to indemnify and reimburse persons who are or were directors, officers, or employees of the Debtor on the Commencement Date or at any time thereafter against and for any obligations (including, without limitation, reasonable fees and expenses incurred by the Board of Directors of the Debtor, or the members thereof, in connection with the Chapter 11 Case) pursuant to the certificate of incorporation, by-laws, applicable state law, or specific agreement, or any combination of the foregoing, will survive confirmation of the Plan, remain unaffected thereby, shall not be discharged, and shall be deemed and treated as executory contracts assumed under the Plan, irrespective of whether indemnification or reimbursement is owed in connection with

36

an event occurring before, on, or after the Commencement Date. In furtherance of the foregoing, but subject to compliance with the Plan Covenants, the Reorganized Debtor will maintain insurance for the benefit of such directors, officers, and employees at levels no less favorable than those existing as of the date of entry of the Confirmation Order for a period of no less than four (4) years following the Effective Date.

8.6    **Compensation and Benefits.**  As of the Effective Date, unless specifically rejected by a Final Order of the Bankruptcy Court or otherwise specifically provided for herein, all employment and severance policies, workers' compensation programs, and all compensation and benefit plans, policies, and programs of the Debtor applicable to its present and former employees, officers, and directors, including, without limitation, all health care plans, disability plans, severance benefit plans, and incentive plans, shall be deemed to be, and shall be treated as though they are, executory contracts that are deemed assumed under the Plan, and the Debtor's obligations under such plans, policies, and programs, shall be deemed assumed pursuant to section 365(a) of the Bankruptcy Code, survive confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code. Any defaults existing under any of such plans, policies, and programs shall be cured promptly after they become known by the Reorganized Debtor.

8.7    **Insurance Plans.**  All Insurance Plans pursuant to which the Debtor has any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Reorganized Debtor, subject to Sections 8.1–8.3, and shall continue in full force and effect. All other Insurance Plans shall revest in the Reorganized Debtor. The discharge and release of the Debtor as provided in this Plan, and the re-vesting of property in the Reorganized Debtor, shall not diminish nor impair the enforceability of any Insurance Plans.

8.8    **Intellectual Property Licenses and Agreements.**  All intellectual property contracts, licenses, royalties, and other similar agreements to which the Debtor has any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Reorganized Debtor, subject to Sections 8.1–8.3, and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected hereunder or pursuant to a Final Order, or is the subject of a separate rejection motion filed by the Reorganized Debtor. Unless otherwise provided herein, all intellectual property contracts, licenses, royalties, or other similar agreements shall revest in the Reorganized Debtor and the Reorganized Debtor may take all actions as may be necessary or appropriate to ensure such revesting as contemplated herein.

8.9    **Assignment.**  To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including, without limitation, those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that

37

terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable antiassignment provision and is void and of no force or effect.

**8.10    Approval of Assumption, Rejection, or Assignment of Executory Contracts and Unexpired Leases.**  Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the rejections, assumptions, and/or assignments contemplated hereunder pursuant to sections 365 and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease that is assumed hereunder shall vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms as of the Effective Date, except as modified by the provisions hereof or any order of the Bankruptcy Court authorizing or providing for its assumption.

**8.11    Modifications, Amendments, Supplements, Restatements, or Other Agreements.**  Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed, shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the Schedule of Assumed Contracts and Leases.

**8.12    Reservation of Rights.**

**(a)**    Neither the exclusion or inclusion of any contract or lease on any exhibit or schedule to the Plan, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtor that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtor or the Reorganized Debtor has any liability thereunder.

**(b)**    Nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtor and the Reorganized Debtor under any executory or non-executory contract or any unexpired or expired lease.

**(c)**    Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor or the Reorganized Debtor under any executory contract or any unexpired lease.

**(d)**    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor or Reorganized Debtor, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

38

# ARTICLE IX.

## EFFECTIVENESS OF THE PLAN

**9.1**     **Conditions Precedent to Confirmation of Plan.**  The following are conditions precedent to confirmation of the Plan:

(a)     The Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance reasonably satisfactory to the Debtor and the Creditors' Committee (and, with respect to any schedules, documents and exhibits contained in the Plan Supplement requiring PharmAthene's consent, PharmAthene); and

(b)     The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Debtor and the Creditors' Committee.

**9.2**     **Conditions Precedent to Effective Date.**  The following are conditions precedent to the Effective Date of the Plan:

(a)     The Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred, and the Confirmation Order shall be in full force and effect and not subject to any stay;

(b)     All actions, documents, and agreements necessary to implement and consummate the Plan, shall have been effected or executed;

(c)     The Amended and Restated Certificate of Incorporation for the Reorganized Debtor shall have been filed with the Secretary of State of Delaware; and

(d)     The Debtor shall have received any and all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement the Plan and/or are required by law, regulation, or order.

**9.3**     **Satisfaction and Waiver of Conditions.**  Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If, by no earlier than forty-five (45) days after the Confirmation Date, the Debtor determines that any of the conditions precedent set forth in Section 9.2 cannot be satisfied and the occurrence of such conditions is not waived by the Debtor or cannot be waived, then the Debtor, following consultation with the Creditors' Committee, shall file a notice of the failure of the Effective Date with the Bankruptcy Court.  Notwithstanding the foregoing, the Debtor reserves the right, with the consent of the Creditors' Committee, to waive the occurrence of any or all of the conditions precedent set forth in Section 9.2 hereof that can be waived or to modify any or all of such conditions precedent to the extent such conditions may be modified.  Any such waiver or modification of such condition precedents may be effected at any time, without notice or leave or order of the Bankruptcy Court, and without any other formal action other than proceeding to consummate the Plan.

WEIL:\95564956\3\74193.0003

**9.4**     **Effect of Non-Occurrence of Effective Date.**  If the conditions listed in Sections 9.1 and 9.2 of the Plan are not satisfied or waived in accordance with the Plan, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will (i) constitute a waiver or release of any Claims or any Equity Interests in the Debtor, or any claims by the Debtor, (ii) prejudice in any manner the rights of any Person or (iii) constitute an admission, acknowledgement, offer or undertaking by the Debtor or any other Person.

## ARTICLE X.

### EFFECT OF CONFIRMATION

**10.1**     **Claims of Subordination.**

(a)     The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

(b)     Except as specifically provided herein, to the fullest extent permitted by applicable law, on the latest to occur of (i) the Effective Date, and (ii) the entry of a Final Order resolving all Claims in the Chapter 11 Case, all Claims and Equity Interests, and all rights and claims between or among holders of Claims and Equity Interests relating in any manner whatsoever to Claims or Equity Interests, based upon any contractual, equitable, or legal subordination rights, will be terminated and discharged in the manner provided in this Plan, and all such Claims, Equity Interests, and rights so based, and all such contractual, equitable, and legal subordination rights to which any Entity may be entitled will be irrevocably waived.  To the fullest extent permitted by applicable law, the rights afforded and the distributions that are made in respect of any Claims or Equity Interests under this Plan will not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim or Equity Interest by reason of any contractual, equitable, or legal subordination rights, so that, notwithstanding any such contractual, equitable, or legal subordination rights, each holder of a Claim or Equity Interest shall have and receive the benefit of the rights and distributions set forth in this Plan.

**10.2**     **Vesting of Assets.**  Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtor shall vest in the Reorganized Debtor, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise provided herein.  The Reorganized Debtor may operate its business and use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.  Nothing in this Section 10.2 shall affect the Reorganized Debtor's obligations with respect to, or the limitations imposed on the Reorganized Debtor pursuant to, the Plan Covenants.

**10.3**     **Discharge of Claims.**  Except as otherwise provided herein or in the Confirmation Order, the rights afforded herein and the payments and distributions to be made hereunder shall, upon the Effective Date, discharge all existing debts and Claims of any kind,

WEIL:\95564956\3\74193.0003

nature, or description whatsoever against or in the Debtor or any of its assets or property. Except as otherwise provided herein, upon the Effective Date, all existing Claims against the Debtor shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims (and all representatives, trustees, or agents on behalf of each holder) shall be precluded and enjoined from asserting against the Reorganized Debtor, or any of its assets or property, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

**10.4    Release and Discharge of Debtor.** Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor of and from any and all Claims, rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, and except as expressly provided herein, all Persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against the Debtor.

**10.5    Term of Injunctions or Stays.** Unless otherwise provided herein or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

**10.6    Injunction Against Interference with Plan.**

(a)    Upon and subject to entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

(b)    Upon and subject to entry of the Confirmation Order, and except as otherwise provided herein, the Debtor and Reorganized Debtor, as applicable, and their Affiliates, shall be enjoined at all times from taking any actions to stay, change, impede, nullify, void, or otherwise override the PharmAthene Final Order or impede steps necessary to its coming into existence or the treatment of the PharmAthene Allowed Claim as provided in the Plan; *provided, however*, that nothing herein shall (i) prevent, enjoin, or in any way prejudice the Debtor or the Reorganized Debtor, as applicable, from prosecuting the PharmAthene Action in the Delaware State court system or by writ of *certiorari* in the United States Supreme Court to the point of the existence of the PharmAthene Final Order; or (ii) enjoin, prevent, or in any way prejudice any Person from prosecuting or otherwise pursuing any disputes that may arise with respect to the interpretation of the terms of such PharmAthene Final Order. If, however, the Debtor or Reorganized Debtor, as applicable, or their Affiliates take any such enjoined actions, in addition to all rights of PharmAthene to enforce such injunction, and upon and subject to entry of an order of the Bankruptcy Court finding that such enjoined actions were in fact taken, the Debtor or Reorganized Debtor, as applicable, shall (i) pay to PharmAthene Twenty-Five Million

Dollars ($25,000,000) in Cash, which payment shall be retained by PharmAthene and shall not be refundable under any circumstance, but shall be credited dollar for dollar against the payments to be made by the Reorganized Debtor to PharmAthene in accordance with Section 4.3(b)(i)(A) or 4.3(b)(i)(B) of the Plan, as applicable (in the case of Section 4.3(b)(i)(B), as such payments become due), and (ii) pay to PharmAthene all actual reasonable out-of-pocket expenses, including attorneys' fees, incurred by PharmAthene in connection with proceedings instituted by PharmAthene with respect to such enjoined actions.

**10.7     Injunction.  Except as otherwise expressly provided herein or in the Confirmation Order, upon the Effective Date, all Persons or Entities who have held, hold, or may hold Claims or Equity Interests and their successors and assigns, and all other parties in interest, along with their respective present or former employees, agents, professionals, officers, directors, principals, and affiliates, shall be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest against the Debtor or the Reorganized Debtor or property of the Debtor or the Reorganized Debtor other than actions to enforce the Plan, but only as provided herein and in the Confirmation Order, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order with respect to any such Claim or Equity Interest against the Debtor or the Reorganized Debtor or property of the Debtor or the Reorganized Debtor, (iii) creating, perfecting, or enforcing any encumbrance of any kind with respect to any such Claim or Equity Interest against the Debtor or the Reorganized Debtor or against property or interests in property of the Debtor or the Reorganized Debtor, (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtor or the Reorganized Debtor or against property or interests in property of the Debtor or the Reorganized Debtor, with respect to any such Claim or Equity Interest, (v) acting or proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or Confirmation Order, and (vi) commencing, continuing, or asserting in any manner any action or other proceeding of any kind with respect to any Claims or Equity Interests that are extinguished, released, or settled pursuant to the Plan; *provided, however,* that the foregoing injunction shall not preclude the Debtor, Reorganized Debtor, and PharmAthene from continuing to prosecute the PharmAthene Action (subject to the provisions of the Plan) to the point of obtaining the PharmAthene Final Order.  Such injunction shall extend to any successors of the Debtor and the Reorganized Debtor and their respective property and interests in property.**

**10.8     Exculpation.**  Upon the Effective Date, the Exculpated Parties shall not have or incur any liability to any Entity for any act or omission in connection with, related to, or arising out of the Chapter 11 Case; negotiations regarding or concerning the Plan; any settlement or any agreement in the Chapter 11 Case; the pursuit of confirmation of the Plan; the consummation of the Plan; the offer, issuance, and distribution of any securities issued or to be issued pursuant to the Plan, whether or not such distribution occurs following the Effective Date; the administration of the Plan or property to be distributed hereunder; or any transaction, decisions, actions and/or inactions contemplated by or relating to any of the foregoing, including without limitation, the determination by the Debtor or Reorganized Debtor of the treatment of the PharmAthene Allowed Claim as provided in Section 4.3(b)(i) hereof; except for actions found by Final Order

WEIL:\95564956\3\74193.0003

to constitute willful misconduct, gross negligence, fraud, criminal conduct, or *ultra vires* acts, but in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities hereunder.  Subject to the occurrence of the Effective Date, nothing in this Section 10.8 shall exculpate or release any Exculpated Party from complying fully with its obligations under the Plan and the Plan Covenants, including, without limitation, its obligations with respect to the treatment of the Allowed Claims pursuant to the Plan.

**10.9    Releases by the Debtor.**

(a)    As of the Effective Date, the Debtor releases the Released Parties, from any and all Causes of Action (including, without limitation, all 2004 Derivative Causes of Action) held by, assertable on behalf of, or derivative from the Debtor, in any way relating to the Debtor (both prior to and subsequent to the Commencement Date), the Chapter 11 Case, the Plan, the Plan Supplement, negotiations regarding or concerning the Plan, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor, and the ownership, management, and operation of the Debtor, (except for actions found by Final Order to be willful misconduct (including, without limitation, conduct that results in a personal profit at the expense of the Debtor's estate), gross negligence, fraud, malpractice, criminal conduct, or *ultra vires* acts), which Causes of Action are based on any act, event, or omission taking place before the Effective Date; *provided, however,* that the foregoing shall not limit the liability of any counsel to their respective clients contrary to Rule 1.8(h)(1) of the New York Rules of Professional Conduct.  The Reorganized Debtor shall be bound by all of the releases set forth above to the same extent that the Debtor is bound.

(b)    In addition, to the extent not included in subclause (a) above, as of the Effective Date, the Debtor releases (i) all present and former directors and officers of the Debtor who were directors and/or officers at any time after the Commencement Date, and any other Persons who serve or served as members of management of the Debtor at any time after the Commencement Date, and (ii) MacAndrews & Forbes Incorporated and all present and former directors and officers of MacAndrews & Forbes Incorporated who were directors and/or officers at any time after the Commencement Date, and any other Persons who serve or served as members of management of MacAndrews & Forbes Incorporated at any time after the Commencement Date, from any and all Causes of Action derivative from the Debtor (including, without limitation, the 2004 Derivative Causes of Action).  The Reorganized Debtor shall be bound by all of the releases set forth above to the same extent that the Debtor is bound.

**10.10    Retention of Causes of Action/Reservation of Rights.**

(a)    Except as otherwise provided in Section 10.9 hereof, nothing herein or in the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtor or the Reorganized Debtor may have or which the Reorganized Debtor may choose to assert on behalf of its estate under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtor, the Reorganized

WEIL:\95564956\3\74193.0003

Debtor, or their officers, directors, or representatives and (ii) for the turnover of any property of the Debtor's estate.

(b)        Except as otherwise provided herein, nothing herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action, right of setoff, or other legal or equitable defense that the Debtor had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan. The Reorganized Debtor shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that it had immediately prior to the Commencement Date fully as if the Chapter 11 Case had not been commenced, and all of the Reorganized Debtor's legal and equitable rights with respect to any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

10.11    **Special Provisions for Governmental Units.**  Solely with respect to "governmental units" (as defined in the Bankruptcy Code), nothing herein, including Sections 10.8 and 10.9 hereof, shall discharge, release, enjoin, or otherwise bar (i) any liability of the Debtor or the Reorganized Debtor to a "governmental unit" arising on or after the Effective Date with respect to events occurring on or after the Effective Date, (ii) any liability to a "governmental unit" that is not a Claim, (iii) any valid right of setoff or recoupment of a "governmental unit," (iv) any police or regulatory action by a "governmental unit," (v) any environmental liability to a "governmental unit" that the Debtor, the Reorganized Debtor, any successors thereto, or any other Person or Entity may have as an owner or operator of real property after the Effective Date, and (vi) any liability to a "governmental unit" on the part of any Persons or Entities other than the Debtor or the Reorganized Debtor; *provided, however*, that nothing in this Section 10.11 shall affect the exculpation and releases in Section 10.8 and 10.9 hereof.

10.12    **Plan Supplement.**  The Plan Supplement shall be filed with the Bankruptcy Court by no later than the Plan Supplement Filing Date.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents to be included in the Plan Supplement will be posted at https://cases.primeclerk.com/siga/

## ARTICLE XI.

### RETENTION OF JURISDICTION

11.1    **Jurisdiction of Bankruptcy Court.**  On and after the Effective Date, the Bankruptcy Court shall retain all exclusive jurisdiction it has of all matters arising under, arising out of, or related to the Chapter 11 Case and the Plan, pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)        To hear and determine motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

WEIL:\95564956\3\74193.0003

(b)      To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on the Effective Date or that, pursuant to the Plan, may be commenced by the Debtor or the Reorganized Debtor or PharmAthene after the Effective Date, including, without limitation, any proceeding with respect to a Cause of Action or Avoidance Action;

(c)      To ensure that distributions to holders of Allowed Claims and Equity Interests are accomplished as provided herein (including, if applicable, to enforce the cancellation of Equity Interests if such cancellation becomes applicable under the Plan);

(d)      To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)      To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)      To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan (including to enforce, or enjoin non-compliance with, the Plan Covenants), the Confirmation Order, or any other order of the Bankruptcy Court;

(g)      To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code and to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)      To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i)      To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated herein, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)      To hear and determine disputes arising in connection with or related to the Plan Covenants, including, without limitation, determining whether a Plan Covenant Event of Default has occurred and is continuing.

(k)      To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

(l)      To recover all assets of the Debtor and property of the Debtor's estate, wherever located;

WEIL:\95564956\3\74193.0003

(m)      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)      To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(o)      To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)      To determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, the Escrow Agreement or any contract, instrument, release, or other agreement or document related to the Plan, the Disclosure Statement, or the Confirmation Order;

(q)      To hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge;

(r)      To hear and determine any rights, claims, or Causes of Action held by or accruing to the Debtor or the Reorganized Debtor pursuant to the Bankruptcy Code or any federal or state statute or legal theory;

(s)      To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings granted or entered pursuant to the Plan or in connection with the Chapter 11 Case;

(t)      To hear any other matter not inconsistent with the Bankruptcy Code; and

(u)      To enter a final decree closing the Chapter 11 Case.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the forgoing matters, the reference to the "Bankruptcy Court" in this Article XI shall be deemed to be replaced by the "District Court."  Nothing in this Article XI shall expand the exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law.

## ARTICLE XII.

### RIGHTS AND POWERS OF DISBURSING AGENT

**12.1    Exculpation.**  From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims and Equity Interests and other parties in interest, from any and all claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.  No holder of a

WEIL:\95564956\3\74193.0003

Claim or an Equity Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making payments in accordance with the Plan or for implementing provisions of the Plan.

**12.2    Powers of the Disbursing Agent**.  Except as may be provided otherwise hereunder, the Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all distributions contemplated hereby, and (c) exercise such other powers as may be vested in a Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Disbursing Agent to be necessary and proper to implement the provisions hereof.

## ARTICLE XIII.

### MISCELLANEOUS PROVISIONS

**13.1    Dissolution of Creditors' Committee.**  On the Effective Date, the Creditors' Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case, and, except for the limited purposes of participating in any and all appeals or other requests to review or amend the Confirmation Order and all other orders issued in connection with confirmation, and prosecuting final applications for allowances of fees and expenses of the Creditors' Committee and its professionals, the Creditors' Committee shall be deemed dissolved.

**13.2    Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**13.3    Exemption from Transfer Taxes.**  Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents hereunder or in connection with the transactions contemplated hereby, including the issuance and delivery of the New Common Stock pursuant to Sections 4.3(b)(i)(C) or 4.3(b)(ii) hereof, if applicable, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

**13.4    Expedited Tax Determination.**  The Reorganized Debtor may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Debtor or the Reorganized Debtor for all taxable periods through the Effective Date.

**13.5    Payment of Statutory Fees.**  On the Effective Date, and thereafter as may be required, the Debtor shall (i) pay all the respective fees payable pursuant to section 1930 of

WEIL:\95564956\3\74193.0003

chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code, until the earliest to occur of the entry of (a) a final decree closing the Chapter 11 Case, (b) a Final Order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (c) a Final Order dismissing the Chapter 11 Case, and (ii) be responsible for the filing of consolidated postconfirmation quarterly status reports with the Bankruptcy Court in accordance with Rule 3021-1 of the Southern District of New York Local Bankruptcy Rules, which status reports shall include reports on the disbursements made by the Disbursing Agent.

**13.6** **Plan Modifications and Amendments.** The Plan may be amended, modified, or supplemented by the Debtor or the Reorganized Debtor, as applicable, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment or rights of holders of Claims or Equity Interests hereunder, the Debtor, in consultation with the Creditors' Committee, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan. Prior to the Effective Date, the Debtor may, upon not less than five (5) Business Days' notice to the attorneys for the Creditors' Committee, make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided, however,* that such technical adjustments and modifications do not materially and adversely affect the treatment or rights of holders of Claims or Equity Interests as they existed hereunder prior to any such proposed technical adjustments or modifications.

**13.7** **Revocation or Withdrawal of Plan.** The Debtor reserves the right, with the consent of the Creditors' Committee, to revoke, withdraw, or delay consideration of the Plan prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan in its entirety, the Plan shall be deemed null and void. In such event, nothing herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtor, or any other Person or to prejudice in any manner the rights of the Debtor or any other Person in any further proceedings involving the Debtor.

**13.8** **Courts of Competent Jurisdiction.** If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**13.9** **Severability.** If, prior to entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding the foregoing, in such case, the Plan only may be confirmed without such term or provision at the request of the Debtor but with the consent of the Creditors' Committee. Notwithstanding any

such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**13.10    Governing Law.**  Except to the extent the Bankruptcy Code or other U.S. federal law is applicable, or to the extent an Exhibit or Schedule hereto, or a document in the Plan Supplement, expressly provides otherwise, the rights, duties, and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof to the extent they would result in the application of the laws of any other jurisdiction.

**13.11    Exhibits and Schedules.**  The Exhibits and Schedules to the Plan (including, without limitation, the Plan Covenants) are incorporated into, and are part of, the Plan as if set forth herein.

**13.12    Successors and Assigns.**  All the rights, benefits, and obligations of any Person named or referred to herein shall be binding on, and inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Person.

**13.13    Time.**  In computing any period of time prescribed or allowed herein, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**13.14    Deemed Acts**.  Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

**13.15    Notices.**  To be effective, all notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, the Creditors' Committee or PharmAthene, shall be in writing (including by facsimile or electronic transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, or in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtor, to:

SIGA Technologies, Inc.
600 Madison Avenue, Suite 1700
New York, New York  10965
Attn:            William J. Haynes II, Esq.; and Daniel Luckshire
Telephone:    (212) 672-9100
Facsimile:     (212) 697-9999
E-mail:         Whaynes@siga.com; Dluckshire@siga.com

-and-

WEIL\95564956\3\74193.0003

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:            Stephen Karotkin, Esq.
Telephone:    (212) 310-8000
Facsimile:     (212) 310-8007
E-mail:          stephen.karotkin@weil.com

If to the Creditors' Committee, to:

Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
Attn:            Martin J. Bienenstock, Esq.
                     Scott K. Rutsky, Esq.
Telephone:    (212) 969-3000
Facsimile:     (212) 969-2900
E-mail:          mbienenstock@proskauer.com
                     srutsky@proskauer.com

If to PharmAthene, to:

PharmAthene, Inc.
One Park Place, Suite #450
Annapolis, MD 21401
Attn:            Jeffrey Steinberg
Phone:          (410) 269-2600
Fax:              (410) 269-2601
E-mail:          jeffrey.steinberg@pharmathene.com

WEIL:\95564956\3\74193.0003

With a copy (which shall not constitute notice) to:

K&L Gates LLP
State Street Financial Center, One Lincoln Street
Boston, MA 02111-2950
Attn:        Chad Dale
Phone:      (617) 261-3112
Fax:         (617) 261-3175
E-mail:     chad.dale@klgates.com

Dated: New York, New York
        December 15, 2015

Respectfully submitted,

SIGA TECHNOLOGIES, INC.
By:      /s/ Daniel J. Luckshire
Name:  Daniel J. Luckshire
Title:  Executive Vice President and Chief Financial Officer

51

**<u>Exhibit A</u>**

**Plan Covenants**

# CERTAIN DEFINED TERMS

As used in these Plan Covenants (Exhibit A) the terms set forth below shall have the following meanings. Other capitalized terms used but not defined in these Plan Covenants shall have the meanings ascribed to such terms in the Plan, except that "SIGA" or the "Company" shall mean SIGA Technologies, Inc., a Delaware corporation, before and/or after the Effective Date as the context requires.

| | |
|---|---|
| "Adjusted Research and Development Expenses" | SIGA's research and development expenses less (without duplication):<br><br>(a) non-cash equity compensation expenses incurred in connection with SIGA's compensation plans as authorized by the Board,<br><br>(b) depreciation expenses and amortization expenses,<br><br>(c) inventory write-off expenses, to the extent included as a research and development expense in the Company's financial statements,<br><br>(d) expenses related to any estimate changes to an accrual or expenses related to prior period activity,<br><br>(e) write-offs of capitalized assets,<br><br>(f) any non-cash items (not otherwise noted in this definition) to the extent included as a research and development expense in the Company's financial statements,<br><br>(g) Reimbursable BARDA Expenses to the extent included as a research and development expense in the Company's financial statements,<br><br>(h) Other expenses (not covered by clause (g) above) incurred as part of a grant or contract with a U.S. government entity (such as the National Institutes of Health or the Department of Defense) which were authorized to be reimbursed to SIGA by such entity under such grant or contract, but only to the extent included as research and development expenses in the Company's financial statements; and<br><br>(i) litigation expenses incurred in connection with the PharmAthene litigation to the extent included as a research and development expense in the Company's financial statements.<br><br>For purposes of the Plan Covenants, SIGA's Adjusted Research and Development Expenses (and any components thereof) shall be calculated based on amounts disclosed in financial statements filed with the SEC for the applicable period(s); provided, that, if no such financial statements are filed with the SEC, such expenses shall be calculated as disclosed in SIGA's audited financial statements for the applicable period(s) if available, and if not available, as disclosed in SIGA's internal financial statements (which internal financial statements shall be certified as true and correct by SIGA's CFO). Nothing in this provision shall alter or waive SIGA's reporting obligations pursuant to the Plan Covenants or applicable law. |

| | |
|---|---|
| "Adjusted SG&A Expenses" | SIGA's selling, general and administrative expenses less (without duplication):<br><br>(a) any expenses directly incurred in connection with the Plan or designated as reorganization expenses in SIGA's financial statements filed with the SEC,<br><br>(b) non-cash equity compensation expenses incurred in connection with SIGA's compensation plans as authorized by the Board,<br><br>(c) depreciation expenses and amortization expenses,<br><br>(d) expenses related to any estimate changes to an accrual or expenses related to prior period activity,<br><br>(e) write-offs of capitalized assets,<br><br>(f) any non-cash items (not otherwise noted in this definition) to the extent included as a selling, general and administrative expense in the Company's financial statements ,<br><br>(g) litigation expenses incurred in connection with the PharmAthene litigation to the extent included as a selling, general and administrative expense in the Company's financial statements,<br><br>(h) inventory write-off expenses to the extent included as a selling, general and administrative expense in the Company's financial statements,<br><br>(i) Reimbursable BARDA Expenses to the extent included as a selling, general and administrative expense in the Company's financial statements, and<br><br>(j) Other expenses (not covered by clause (i) above) incurred as part of a grant or contract with a U.S. Government entity (such as the National Institutes of Health or the Department of Defense) which were authorized to be reimbursed to SIGA by such entity under such grant or contract, but only to the extent included as selling, general and administrative expenses in the Company's financial statements.<br><br>For purposes of the Plan Covenants, SIGA's Adjusted SG&A Expenses (and any components thereof) shall be calculated based on amounts disclosed in financial statements filed with the SEC for the applicable period(s); provided, that, if no such financial statements are filed with the SEC, such expenses shall be calculated as disclosed in SIGA's audited financial statements for the applicable period(s) if available, and if not available, as disclosed in SIGA's internal financial statements statements (which internal financial statements shall be certified as true and correct by SIGA's CFO.  Nothing in this provision shall in any manner alter or waive SIGA's reporting obligations pursuant to the Plan Covenants or applicable law. |
| "BARDA" | Biomedical Advanced Research and Development Authority. |
| "BARDA Contracts" | The procurement contract between BARDA and the Debtor (HHSO100201100001C) and the research and development contract between BARDA and the Debtor (HHSO100201100023C), both as have been amended from time to time. |

| | |
|---|---|
| "Material Adverse Effect" | Any change, circumstance, effect, event, or fact, occurring after the Effective Date (other than fraud or willful misconduct by SIGA, which shall not be limited to acts occurring after the Effective Date and shall apply regardless of when any such acts occurred), that has or is reasonably likely to have a material and adverse effect on the business, assets, properties, financial condition, or results of operations of the Reorganized Debtor, taken as a whole; provided, however, that (a) the PharmAthene Litigation (and the circumstances giving rise to such litigation), (b) the filing of the Chapter 11 Case, (c) the facts alleged in paragraphs 25–43 of the Affidavit, dated September 16, 2014, of Eric A. Rose Pursuant to Local Bankruptcy Rule 1007-2 filed in the Chapter 11 Case [ECF No. 3], or [(d) any matters disclosed in Schedule [*] hereto], shall not constitute or give rise to a Material Adverse Effect.  Notwithstanding anything herein to the contrary, the termination or cancellation of the BARDA Contracts (or a suspension of the BARDA Contracts that has the effect of termination or cancellation) for any reason shall constitute a Material Adverse Effect. |
| "Key Contract" | (1)    Each contract or agreement between SIGA and any officer, director, or employee; <br><br> (2)    each contract or agreement  existing as of the Effective Date (or replacements of same containing  terms materially no less favorable to SIGA than under such existing contracts or agreements) having scheduled or projected  annual payments by SIGA during any fiscal year in excess of $100,000 individually or in the aggregate for all contracts or agreements between SIGA and any one Person (or such Person's affiliates); <br><br> (3)    each contract or agreement not existing as of the Effective Date (other than replacements of existing contracts or agreements referred to in clause (2) above) having scheduled or projected  annual payments by SIGA during any fiscal year in excess of $20,000 individually or in the aggregate for all contracts between SIGA and any one Person (or such Person's affiliates); <br><br> (4)    each contract or agreement containing covenants limiting, in any material respect, SIGA's ability to conduct business in any area or territory or line of business, to buy or sell particular goods or services, to buy or sell goods or services from any other person, or to solicit customers, employees, or other service providers; <br><br> (5)    each contract or agreement with any affiliate of SIGA, other than as set forth in standard form purchase orders or confirmations for goods sold by SIGA; <br><br> (6)    each lease (as lessor, lessee, sublessor, or sublessee) of any real property; <br><br> (7)    each lease existing as of the Effective Date (as lessor, lessee, sublessor, or sublessee), or replacements of such leases containing terms materially no less favorable to SIGA than under the existing lease, of any tangible personal property with annual payments of at least $75,000 individually or in the aggregate for all contracts between SIGA and any Person (or such Person's affiliates); or each new lease (as lessor, lessee, sublessor, or sublessee) of any tangible personal property with annual payments of at least $20,000 individually or in the aggregate for all leases between SIGA and any one Person (or such Person's affiliates); <br><br> (8)    each license (as licensor, licensee, sublicensor, or sublicensee) of any intellectual property excluding (i) licenses of commercially available, "packaged, off the shelf," shrink-wrap or click-through software and (ii) licenses existing as of the Effective Date (or replacements of such licenses containing terms materially no less favorable to SIGA than under the existing license) for products or services utilized or being performed in the Ordinary Course of Business and which require annual payments of less than $50,000 individually or in the aggregate for all licenses between SIGA and any one Person (or such Person's affiliate); <br><br> (9)    each contract or agreement under which any money has been or may be borrowed or loaned by SIGA, or any note, bond, factoring agreement, indenture, or other |

| | |
|---|---|
| | evidence of Debt that has been issued or assumed by SIGA, and each guaranty by SIGA (including "take-or-pay" and "keepwell" agreements) of any evidence of Debt (other than any insurance premium finance agreements or trade payables), in each case incurred in the Ordinary Course of Business and which involves liabilities or payments in excess of $25,000 individually or in the aggregate for all contracts or agreements between SIGA and any one Person (or such Person's affiliate); |
| | (10)    each mortgage, deed of trust, security agreement, purchase money agreement, conditional sales contract, or capital lease, in each case securing or involving an obligation or liability in excess of $75,000 individually or in the aggregate for all such agreements between SIGA and any one Person (or such Person's affiliate); |
| | (11)    each partnership, joint venture agreement, or similar agreement providing for the joint performance of work or services and for which SIGA has or is expected to have obligations in excess of $75,000 per year individually or in the aggregate for all such agreements between SIGA and any one Person (or such Person's affiliate); |
| | (12)    each contract or agreement relating to securities of SIGA, including stockholder or other equity holder agreements, voting agreements, and any agreements granting preferential rights to acquire securities of SIGA or containing restrictions with respect to transfers of, or the payment of dividends or other distributions with respect to, SIGA's capital stock or securities; |
| | (13)    each agreement or other arrangement pursuant to which SIGA is obligated to accept returned merchandise or grant credit for unsold merchandise, other than as set forth in standard form purchase orders or confirmations or in the BARDA Contracts; |
| | (14)    each agreement that obligates SIGA to indemnify a third party, other than such agreements entered into the Ordinary Course of Business or that do not have the primary purpose of indemnifying a third party; |
| | (15)    each employment contract or professional retention agreement entered into with respect to any potential financing or strategic transaction; |
| | (16)    SIGA's bylaws and charter; and |
| | (17)    each other contract or agreement (or group of substantially related contracts or agreements) not listed above, the termination or suspension of which could reasonably be expected to cause a Material Adverse Effect. |
| "Ordinary Course of Business" | An action taken by a person or entity shall be deemed to have been taken in the "Ordinary Course of Business" if such action is consistent with the past practices of such person or entity and is taken in the ordinary course of the normal day to day operations of such person or entity. |
| "Reimbursable BARDA Expense" | Any cost or expense incurred by SIGA in connection with the BARDA Contracts which was authorized by BARDA to be reimbursed under the BARDA Contracts. |
| "Subsidiary" | Any now or hereafter existing direct or indirect subsidiary of SIGA. |

## Exhibit A

| **Covenants** |
|---|
| Subsequent to the Plan Effective Date and prior to the Plan Covenant Termination Date, unless (a) PharmAthene shall otherwise consent, in writing, following at least 10 days' prior written notice provided by SIGA (which consent may be granted or withheld by PharmAthene in its sole discretion for any reason or no reason) or (b) in any case where PharmAthene declines to grant such consent, as otherwise ordered by the Bankruptcy Court (except that in no circumstance shall SIGA be permitted to seek such an order from the Bankruptcy Court (or any other court) with respect to the Plan Covenants contained in clauses (iv), (vi), (xi),  (xvi), (xxii), (xxvii), (xxviii), (xxix), (xxx), (xxxi), (xxxii), or (xxxiii)),[1] SIGA shall not, and shall not cause or permit any Subsidiary, to: |

**Transfer and Issuance of Equity or Debt**

Except as expressly contemplated under the Plan to pay holders of Allowed Claims in full, and in cash:

(i)     Pledge, transfer, or encumber any shares of capital stock of any class or other equity interests.  For the avoidance of doubt, SIGA shall be permitted to issue shares of capital stock (including stock issuable with respect to outstanding RSUs and options) or securities convertible or exchangeable into capital stock.

(ii)    Reclassify its outstanding shares of capital stock or debt securities.

(iii)   Redeem, purchase or otherwise acquire, directly or indirectly, any of its capital stock or debt securities, or securities convertible into or exchangeable for capital stock or debt securities, or options, warrants, calls, commitments or rights of any kind to acquire capital stock or debt securities (collectively, any and all such convertible securities, options, warrants, calls, commitments or rights to acquire capital stock or debt securities, hereinafter "Securities Rights") unless shares are to be repurchased as part of a net share settlement in connection with the vesting of employee RSUs and such repurchases in the aggregate do not exceed $500,000 in any fiscal year.[2]

---

[1]  In any action (such action, a "Covenant Relief Action") in which SIGA (to the extent permitted pursuant to the Plan Covenants) requests relief from the Plan Covenants (other than a termination of the Plan Covenants pursuant to Section 6.4 of the Plan), SIGA shall have the burden of proof to demonstrate that such relief is justified pursuant to Section 363(b) of the Bankruptcy Code as if estate property were at issue.  In connection with the foregoing, the court shall consider the impact of the relief sought on the enterprise value of the Reorganized Debtor and the potential prejudice, if any, that may be suffered by PharmAthene if the relief sought were approved.  If the potential prejudice to PharmAthene is material, the court shall not grant the relief requested by SIGA.  For the avoidance of doubt, in any Covenant Relief Action, SIGA shall only be entitled to seek prospective relief from the Plan Covenants (and cannot under any circumstances seek retroactive relief or a waiver from any court of any Plan Covenant Event of Default).

[2]  Unless otherwise expressly specified in the Plan Covenants, dollar baskets (limitations) contained in the Plan Covenants that relate to a specific period of time (*e.g.*, fiscal year, etc.) cannot be applied, or carried forward or backward, to a different period of time.

Notwithstanding anything to the contrary in these Plan Covenants, all capital stock of SIGA and all Securities Rights pertaining to capital stock, whether in existence or created prior or subsequent to the Effective Date, shall be subject to all of the terms and conditions of the Plan, including, without limitation, the cancellation thereof to the extent provided in the Plan.

**Indebtedness, Investments, Material Transactions**

(iv)     Incur any indebtedness for borrowed money or issue debt securities or assume, guarantee or endorse, or otherwise as an accommodation become responsible for, the obligations of any Person for borrowed money other than:

   a.   Indebtedness expressly permitted pursuant to  the Plan, including to pay holders of Allowed Claims as provided in the Plan;

   b.   Trade payables arising in the Ordinary Course of Business;

   c.   Indebtedness in respect of capital leases and purchase money indebtedness in an aggregate amount not to exceed $25,000 at any time outstanding, and permitted refinancings thereof (on terms materially no less favorable to SIGA than under the Indebtedness being refinanced);

   d.   Indebtedness existing as of the date of entry of the Confirmation Order to be listed on a schedule attached to the Plan and permitted refinancings thereof (such refinancings not to exceed more than 105% of the principal amount of the indebtedness being refinanced); and

   e.   Indebtedness in connection with the financing of insurance premiums consistent with the Ordinary Course of Business and provided that the Company shall exercise commercially reasonable best efforts to obtain the most competitive financing terms available; *provided, however,* that in connection with the financing of insurance premiums for Directors' and Officers' insurance, the amount financed shall not exceed $250,000 (subject to an annual inflationary increase of 10%).

(v)      Make any loans, advances or capital contributions to, or investments in, any person or entity in excess of $50,000 in the aggregate at any time outstanding.

(vi)     Enter into any new lines of business, research and development of new products, or new product lines.  The foregoing shall not apply to (a) new formulations or indications of Tecovirimat (*e.g.*, pediatric indications or intravenous formulations of Tecovirimat) developed or to be developed in connection with any contracts with BARDA or any U.S. government entity (*e.g.*, the National Institute of Health or the Department of Defense), or (b) research and development of SIGA's drug candidate for dengue fever pursuant to (and to the extent of) SIGA's grant from the National Institutes of Health.

**Limitation on Liens**

(vii)    Except as expressly permitted pursuant to the Plan to pay holders of Allowed Claims as provided in the Plan, create, incur, assume or suffer to exist any lien or encumbrance upon any of its property or assets (including, without limitation, its cash, revenues and receivables), other than:

6

a.   Liens with respect to any indebtedness permitted under clauses (iv)(a), (c), (d) and (e) of the Plan Covenants;

b.   Liens for taxes, fees, assessments or other governmental charges or levies (i) which are not overdue for a period of more than 30 days or (ii) which are being contested in good faith by appropriate proceedings and for which adequate reserves if required in accordance with GAAP are being maintained;

c.   Statutory liens of landlords, carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other similar liens imposed by operation of law (i) for amounts not yet overdue, (ii) for amounts that are overdue and that are being contested in good faith by appropriate proceedings, so long as reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts, or (iii) the non-payment of which would not reasonably be expected to result in a Material Adverse Effect.

d.   Liens (other than any lien imposed by ERISA securing any material amount of liabilities), (i) imposed by requirements of law incurred in the Ordinary Course of Business and not securing indebtedness for borrowed money; or (ii) consisting of pledges or deposits required by appropriate in the Ordinary Course of Business, in the case of clause (i) and clause (ii), solely in connection with workers' compensation, employment insurance and other social security legislation or to secure the performance of or obligations with respect to, statutory obligations, surety, customs, stay or appeal bonds (and with respect to stay or appeal bonds, subject to the limitation contained in clause (vii)(o)), governmental contracts, performance and return of money bonds, completion guarantees and other similar obligations (exclusive of obligations for the payment of Indebtedness for borrowed money) or to secure liability to insurance carriers;

e.   Liens arising out of consignment, conditional sale, title retention or similar arrangements for the sale of goods in the Ordinary Course of Business and not to exceed $100,000 in the aggregate at any time outstanding;

f.   Real property easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of SIGA or result in a Material Adverse Effect;

g.   Real property survey exceptions and title exceptions, easements, encroachments, protrusions, rights of way, zoning and other restrictions, minor defects or other irregularities in title, and other similar encumbrances which do not interfere in any material respect with the ordinary conduct of the business of SIGA or result in a Material Adverse Effect;

h.   With respect solely to real property, any interest or title of a lessor or sublessor, licensor or sublicensor under any lease, sublease, license or sublicense and all encumbrances and liens on the title of any such lessor or sublessor or licensor or sublicensor;

i.   Liens with respect to any lease, license, sublease or sublicense not otherwise prohibited pursuant to these Plan Covenants; provided, however, that the Liens subject to such financing statements are limited solely to the specific property covered by such lease, license, sublease or sublicense (and the proceeds of such property);

j.   Liens (including the right of set-off) in favor of a bank or other depository institution (i) arising as a matter of applicable requirements of law or pursuant to customary account agreements and other similar agreements, in each case, encumbering deposits, (ii) on cash deposits to secure ACH/EDI transactions in the ordinary course of business and (iii) relating to pooled deposit or sweep accounts to permit satisfaction

7

of overdraft or similar obligations incurred in the Ordinary Course of Business, in each case which are within the general parameters customary in the banking industry;

k.   Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the Ordinary Course of Business;

l.   Zoning, building, entitlement, and other land use regulations by governmental authorities;

m.   Outbound licenses of patents, copyrights, trademarks and other intellectual property rights granted in the Ordinary Course of Business that do not exceed $100,000 in the aggregate and that do not (i) interfere in any material respect with the ordinary conduct of SIGA's business, or (ii) result in a Material Adverse Effect.

n.   Liens existing on the Effective Date and set forth on a schedule to the Plan and modifications, replacements, renewals and extensions thereof; *provided, that* such modified, replacement, renewal or extension lien does not extend to any additional property other than (a) after-acquired property that is affixed or incorporated into the property covered by such lien and (b) proceeds and products thereof;

o.   Liens consisting of judgment or judicial attachment liens (other than for payment of taxes, assessments or other governmental charges) so long as the judgment(s) secured by such Liens do not exceed $2,500,000 in the aggregate in any fiscal year;

p.   Liens securing capital lease obligations to the extent permitted under the Plan Covenants; *provided, that* in each case, such liens attach solely to the property subject to the applicable capital lease, the contract rights related to such capital lease, and the proceeds thereof;

q.   Liens on insurance proceeds and the unearned portion of insurance premiums incurred in the Ordinary Course of Business in connection with the financing of insurance premiums to the extent permitted pursuant to the Plan Covenants; and

r.   Other liens and encumbrances in an aggregate amount not to exceed $75,000 at any time outstanding.

For purposes of Section 1.64 of the Plan, if SIGA or any Subsidiary shall suffer to exist or incur (as opposed to create, grant or voluntarily assume) any lien or encumbrance in violation of this clause (vii), such violation shall be governed by the material breach standard contained in Section

1.64(Y) of the Plan.

## Financial Covenants[3]

(viii)    Incur more than $12,000,000 in any fiscal year, or more than $4,500,000 in the three months ended March 31 in any fiscal year, or more than $7,000,000 in the six months ended June 30 in any fiscal year or more than $9,500,000 for the nine months ended September 30 in any fiscal year, of Adjusted SG&A Expenses.

(ix)    Incur more than $8,000,000 in any fiscal year, or more than $3,000,000 in the three months ended March 31 in any fiscal year, or more than $5,000,000 for the six months ended June 30 in any fiscal year, or more than $6,500,000 for the nine months ended September 30 in any fiscal year, of Adjusted Research and Development Expenses.

(x)    Make or incur capital expenditures in excess of $30,000 in the aggregate in any four (4) consecutive fiscal quarters (and subject to an annual inflationary increase of 3%), other than costs budgeted for information technology activities and other than purchases of capital equipment necessary for the performance of the BARDA Contracts, such BARDA-related purchases not to exceed $750,000 in the aggregate in any four (4) consecutive fiscal quarters.

## Dividends

(xi)    Declare, set aside or pay any dividend or other distribution (whether in cash, securities or property) with respect to its capital stock or other equity interests or rights, other than as set forth in employment agreements and/or a MIP that is agreed to by the Committee under the Plan.

## Insurance

(xii)    Cancel, terminate, fail to maintain or permit to lapse any current insurance or reinsurance policies insuring material risks or assets unless simultaneously with such cancellation, termination, or lapse, to the extent reasonably practicable and subject to market conditions, replacement policies providing substantially similar coverage to the coverage cancelled, terminated, or lapsed are in full force.  For purposes of clarity, the Debtor is not required to obtain any replacement insurance policy unless comparable coverage is commercially available at less than 150% of prior year pricing; provided, that, if the failure to obtain such replacement coverage (a) would result in a default under the BARDA Contracts or under contracts that are necessary to the fulfillment of the BARDA Contracts, or (b) would render SIGA unable to operate in the Ordinary

---

[3]  For purposes of the Plan Covenants, any newly created expense classification in SIGA's financial statements that, consistent with past practice, would otherwise qualify as (i) selling, general and administrative expenses or (ii) research and development expenses, shall be included as either Adjusted Research and Development Expenses or Adjusted Selling, General & Administrative Expenses for purposes of calculating SIGA's compliance with these Financial Covenants. All such newly created expenses classifications shall be determined by the Company's CFO consistent with the Company's recordkeeping practices; provided, however, that once such expense has been classified, such classification shall not be changed.  For the avoidance of doubt, the purpose of this note is to capture expenses that, consistent with SIGA's past practice, would be recorded in SIGA's financial statements as either selling, general & administrative expenses, or research and development expenses; as such, this note is not intended to capture expenses that, consistent with SIGA's past practice, are (or are expected to be) classified separate from selling, general & administrative expenses, or research and development expenses.

9

Course of Business, or (c) would subject SIGA to a risk of material loss in value of its assets or operations, then SIGA shall use best efforts to obtain replacement coverage on the most favorable terms available.

**Intellectual Property**

(xiii)   Dispose of or permit to lapse any right to the use of any material intellectual property, or license any material  intellectual property except in the Ordinary Course of Business and except as otherwise provided in the Plan Covenants.

**Key Contracts, Etc.**

(xiv)   Enter into, renew, amend, modify, terminate, suspend, cancel, retire, sell, assign or extend any Key Contract with customers, suppliers, service providers, contract manufacturing organizations ("CMOs"), contract research organizations ("CROs"), or similar entities, other than:

a.   enter into, renew, amend, modify, terminate, suspend, cancel, retire, or extend contracts relating to the performance of the BARDA Contracts which involve a Reimbursable BARDA Expense in which the reimbursement by BARDA shall not be less than 80% of such expenses,

b.   enter into, renew, amend, modify, terminate, suspend, cancel, retire, or extend contracts relating to the performance of any grant or development contract (for example, the current dengue grant with the National Institutes of Health) in which costs are reimbursed by a third party,

c.   replacements, renewals, amendments, modifications, terminations, suspensions, cancellations, retirements, or extensions of existing contracts in the Ordinary Course of Business,

d.   changes to any contract with a CMO that are either required under the terms of the existing contract or that do not change the financial terms of the existing contract that would result in a Material Adverse Effect.

e.   replacements, amendments, modifications, terminations, suspensions, or cancellations of an existing CMO contract if (i) there is a material and adverse performance issue on the part of the CMO, (ii) there is a material default or failure in performance by the CMO under the contract, or (iii) there is a change of majority ownership at the CMO that SIGA determines will materially and adversely impair the ability of the CMO to perform under the contract,

f.   any contracts with independent public auditors of SIGA in relation to auditing or related services,

g.   enter into, renew, amend, modify, terminate, suspend, cancel, retire, or extend insurance contracts in the Ordinary Course of Business,

h.   enter into, renew, amend, modify, terminate, suspend, cancel, retire,  or extend contracts with consultants to promote the regulatory process relating to Tecovirimat or for the performance of the BARDA Contracts,

i.   enter into new Tecovirimat procurement or development contracts with customers or governmental entities; provided, however, that if any such contract results in the incurrence of commitments or liabilities by SIGA which exceed $1,000,000 in any fiscal year,  SIGA shall provide PharmAthene with (i) prompt (but no less than 15 days) prior written notice of SIGA's intention  to enter into such contract and (ii) at least 10 days to review and comment on a draft of the contract prior to its execution by SIGA,

10

j.   enter into market employment agreements  with new employees who will not be replacing or otherwise be given responsibilities commensurate with the CEO, CFO, General Counsel or CSO or other equivalent officer, and who are otherwise not Insiders, and where (i) the cash and non-cash consideration to be paid by SIGA under any such agreement does not exceed $300,000 in any fiscal year and as to all such agreements does not increase overall compensation by more than $1,000,000 in any fiscal year, and (ii) the term of such agreement does not exceed two years from the date such agreement becomes effective,

k.   employment agreements relating to replacements for the CEO, CFO, General Counsel and CSO positions, or any equivalent positions; *provided that* SIGA shall provide PharmAthene with prompt (but no less than 15 days) prior written notice of SIGA's intention to enter into such an agreement, and further provided that (i) the aggregate cash consideration to be paid by SIGA under such agreements does not increase overall aggregate maximum cash compensation that may be payable with respect to all such positions by more than $2,500,000 in any fiscal year, and (ii) the term of any such agreement does not exceed two years from the date such agreement becomes effective,

l.   enter into contracts necessary to the performance of the BARDA Contracts,

m.   enter into, renew, amend, modify, terminate, suspend, cancel, retire, sell, assign or extend contracts (not otherwise permitted by these covenants) in the Ordinary Course of Business so long as such contracts in the aggregate do not involve liabilities owing by SIGA in any fiscal year in excess of $100,000,

n.   enter into employment contracts or professional retention or consulting agreements with respect to any potential financing or strategic transaction, provided that SIGA shall provide PharmAthene with prompt notice of its intent to enter into such contracts or agreements and provide PharmAthene with a copy of such contracts or agreements promptly upon their execution,

o.   enter into contracts with non-legal professional service providers retained to provide litigation support in connection with the PharmAthene Litigation,

p.   enter into contracts for legal services,

q.   enter into contracts with employee search / recruitment companies, in which the recruiting firm would be compensated through a commercially reasonable and market based contingency fee, and

r.   enter into contracts for new information technology services with projected or expected  payments of no greater than $75,000 in the aggregate for all such contracts.

(xv)   Notwithstanding anything to the contrary contained herein, in no circumstances shall SIGA (i) terminate, cancel, sell, assign or suspend (which in the case of suspension has the effect of termination or cancellation) the BARDA Contracts; however, SIGA shall be allowed to modify or amend the BARDA Contracts in the Ordinary Course of Business; or (ii) terminate, cancel, retire, or suspend any other Key Contract if such action can be reasonably avoided and if, as a result of such action, SIGA shall be unable to perform or shall be in default of the BARDA Contracts, or there shall occur a Material Adverse Effect.

## Governance

(xvi)   Fail to provide PharmAthene a right to have one Board Observer at all SIGA Board meetings and meetings of each subcommittee of the Board as provided in the Plan.

11

(xvii)    Fail to pay, within ten (10) Business Days following the presentment of an invoice therefor, the reasonable compensation, fees and expenses of the Board Observer or its professionals as provided in the Plan.

(xviii)   Amend or modify its corporate charter, articles of incorporation, or bylaws.

**Tax Matters**

(xix)    Make any new material tax election, adopt any new tax method of accounting, or revoke or change a tax election or any tax method of accounting, in each case, to the extent such action would result in a Material Adverse Effect.

(xx)     Change its method of reporting income or deductions for tax purposes to the extent such change would result in a Material Adverse Effect.

(xxi)    Settle or compromise any tax liability or refund except for any such liability or refund that does not individually or in a series of related transactions exceed $2,500,000.

**Accounting**

(xxii)   Change any accounting principles or practices used by it unless required or permitted to do so by GAAP and applicable law; *provided*, *however*, that any such permitted change that is not required by GAAP and applicable law and which negatively or adversely affects, directly or indirectly, the calculation of any amounts payable by SIGA to PharmAthene in respect of the PharmAthene Allowed Claim shall be disregarded, and deemed to be null and void and of no force or effect, as such change relates to the calculation of any such amounts that may be payable to PharmAthene in respect of the PharmAthene Allowed Claim.

**Satisfaction of Liabilities and Settlements**

(xxiii)  Except with respect to obligations to and from BARDA arising under the BARDA Contracts and for the payment of Allowed Claims, including the PharmAthene Allowed Claim, as and to the extent provided in the Plan, pay, discharge, settle or satisfy any claims, liabilities, litigation or obligations (absolute, accrued, asserted, unasserted, contingent or otherwise), other than:

   a.   the payment, discharge, settlement or satisfaction of ordinary course liabilities and claims in the Ordinary Course of Business; and

   b.   settlements or compromises of any non-Ordinary Course of Business liabilities and claims or any threatened or actual litigation (other than the PharmAthene Litigation) where the amount paid by SIGA (after giving effect to insurance proceeds actually received by SIGA and/or the litigation counterparty, and provided that SIGA does not have any obligation to reimburse the insurance carrier(s) for any such insurance proceeds) does not exceed $2,500,000 in the aggregate for all such settlements or compromises in any fiscal year.

**Mergers, Acquisitions, Dispositions, Joint Ventures, Sale Leasebacks, Etc.**

(xxiv)   Other than a transaction upon the closing of which the PharmAthene Allowed Claim shall be paid in full, and in cash, as provided in the Plan and as otherwise permitted under the Plan Covenants:

12

a. Acquire (by merger, consolidation, or acquisition of stock or assets) any corporation, partnership or other business entity or division thereof, or enter into any joint venture or similar agreement other than (i) joint ventures or other similar agreements which do not involve the payment of cash by SIGA and/or the transfer of Tecovirimat-related property by SIGA, and with respect to which SIGA is not obligated to incur (and shall not incur) expenditures in excess of $50,000 in any fiscal year in connection with all such joint ventures or agreements or (ii) any such transaction that does not involve a transfer of assets by SIGA, or the incurrence of obligations by SIGA, in excess of $50,000 in the aggregate for all such transactions in any fiscal year (other than with respect to any such transaction solely involving SIGA's dengue fever assets);

b. Sell, transfer, lease, license, or otherwise dispose of, directly or indirectly, any tangible or intangible assets except for sales, transfers, leases, licenses, or dispositions:

    i. which are sales of inventory (*i.e.*, vaccines or medicines) in the Ordinary Course of Business,

    ii. which are transfers in the Ordinary Course of Business of drug product inventory for clinical or development purposes,

    iii. which involve obsolete assets or assets of no material value no longer useful or necessary in the business;

    iv. which are licenses, sales, transfers, dispositions or leases of intellectual property in the Ordinary Course of Business, or licenses, dispositions or sales of intellectual property involving drug candidates other than Tecovirimat (but including items provided for in the immediately preceding clause (iii) that may be related to Tecovirimat), or

    v. which are other dispositions in an amount not to exceed $50,000 in the aggregate for all such sales, transfers, leases, licenses, or other dispositions in any fiscal year.

c. Enter into, renew, or extend any sale and leaseback transaction with respect to any property (whether now or hereafter acquired); or

d. Dissolve or liquidate, other than a liquidation or dissolution of a Subsidiary resulting in the transfer of such entity's assets to SIGA or another Subsidiary.

**Transactions with Affiliates**

(xxv) Sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions (including, without limitation, loans and advances) with, any of its affiliates[4] other than:

---

[4] For purposes of the Plan Covenants, "affiliate" means, any Insider (as defined in the Bankruptcy Code) or any Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 20% or more of the equity securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise. Notwithstanding anything to the contrary, MacAndrews and Forbes Incorporated and all its affiliates thereof (together, "M&F"), shall be deemed to be an affiliate of SIGA for purposes of the Plan and the Plan Covenants.

13

    a.   Transactions and agreements existing as of the date of entry of the Confirmation Order and that are listed on a schedule to be attached to the Plan and as to which SIGA has provided to the Committee copies of all contracts or agreements respecting such transactions;[5]

    b.   Renewals or extensions of any transactions described in clause (a), provided that such renewals or extensions are (i) in the Ordinary Course of Business, (ii) are on terms and conditions consistent with prior practice, and (iii) are on terms and conditions not less favorable than could be obtained on an arm's-length basis; and

    c.   Transactions or agreements with any affiliate in connection with raising funds or implementing a transaction for the purpose of enabling SIGA to treat the PharmAthene Allowed Claim under Section 4.3(b)(i)(A) of the Plan (Option 1), provided that any such transaction or agreement is (i) on terms and conditions not less favorable than could be obtained on an arm's-length basis and (ii) is approved by SIGA's disinterested directors and provided further that a copy of any such agreement or transaction is provided to PharmAthene no later than five (5) Business Days prior to the effectiveness, *provided*, *howeve*r, that there will be no liability or payment obligation of SIGA to M&F prior to the consummation of the funding transaction and the payment in full of the PharmAthene Allowed Claim, other than reimbursement of fees (including commitment fees and professional fees and expenses) not to exceed $250,000 in the aggregate.

**Compensation, Benefits and Perquisites**

(xxvi)   Except as expressly contemplated under the Plan or to comply with any applicable governmental rules and regulations:

    a.   increase the compensation or perquisites payable to any officer or other employee , including by granting any stock related, performance or similar awards or bonuses; other than as provided in any employment contract that is effective on the Plan Effective Date and other than (i) customary increases or adjustments in the Ordinary Course of Business not to exceed 3% on an annual basis for the CEO, CFO, General Counsel and CSO and 5% on an annual basis for other employees, and (ii) for all employees (excluding the CEO, CFO, General Counsel and CSO), within the year in which a promotion becomes effective, 15% increases from the previous year as to any individual employee; and in any event, not to exceed $50,000 in the aggregate in any fiscal year for all such employees who are receiving promotions;

    b.   materially improve the health, life, dental or vision coverages (and any related health or welfare benefit coverages) that are available to all employees as part of the existing benefits program, unless there is no increased cost to SIGA involved;

    c.   Increase the compensation, benefits or perquisites payable or available to any director, on a per meeting basis, or change the compensation structure of the Company's directors;

    d.   grant any new severance or termination pay to (or amend any such existing arrangement or corporate program or policy with or governing) any director, officer, other employee or consultant, other than in the Ordinary Course of Business and (i) not to exceed  one week of pay per each year of service with SIGA, and in any event not to exceed a total of eight weeks pay unless an existing employment, severance or termination plan or agreement specifies other terms and (ii) in any event not to be less than two weeks' pay;

    e.   enter into any  deferred compensation, change of control or other similar agreement (or amend any such existing agreement) with any director, senior officer or other employee;

    f.   change severance or termination pay policies or programs other than in the Ordinary Course of Business.  Changes in the Ordinary Course

---

[5] Schedule 1 attached hereto lists all such contracts/transactions for which copies have already been provided to the Committee.

WEIL:\95565666\2\74193.0003

of Business shall not result in an increase in SIGA liabilities of more than $100,000 in the aggregate in any fiscal year;

g.    enter into, amend, or extend any collective bargaining or other labor agreement, except as required by law;

h.    adopt, amend, modify or terminate any benefit plan, policy or program other than adopting, amending, modifying or terminating any such programs that are available to all employees and which do not result in greater than $100,000 in the aggregate of additional liability to SIGA in any fiscal year;

i.    enter into any agreement for new outsourcing services relating to the benefit plans; or

j.    establish any new or fund any existing "rabbi" or similar trust.

## Maintenance of Business and Assets

(xxvii)    Except as otherwise provided in the Plan Covenants:

a.    Fail to act in the Ordinary Course of Business to (i) preserve substantially intact its present existence and business operations, and (iii) continue its marketing and selling activities relating to its business, operations, or affairs except to the extent the failure to do so would not result in a Material Adverse Effect; or

b.    Fail to use commercially reasonable efforts to maintain (i) its material tangible assets used or useful in its business in their current physical condition, except for ordinary wear and tear, (ii) its intangible assets used or useful in its business, including all material Tecovirimat-related intellectual property, and (iii) the goodwill of its business.

## Subsequent Insolvency

Prior to complete consummation of the Plan (including, without limitation, making all payments and distributions in full as required by the Plan, and the exercise of remedies if applicable):

(xxviii)    Voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect (any or all of the foregoing, "Insolvency Relief");

(xxix)    Consent to, or otherwise support or encourage, directly or indirectly, or fail to contest in a timely and appropriate manner, any involuntary proceeding or involuntary petition seeking (a) Insolvency Relief against it; or (b) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for it or for a substantial part of its assets or property;

(xxx)    Apply for the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for it or for a substantial part of its assets or property; or

(xxxi)    Make a general assignment for the benefit of creditors.

## Failure to Notify of Material Adverse Effect

(xxxii)    Fail to notify the Plan Monitor and PharmAthene of the occurrence of a Material Adverse Effect.

15

**No Impairment of Satisfaction of Allowed Claims**

(xxxiii)   Enter into any arrangement or transaction with any person or entity which may materially impair, hinder, prevent or delay SIGA's satisfaction of any and all Allowed Claims as required pursuant to the Plan, including, without limitation, by entering into any arrangement or transaction that would limit or eliminate SIGA's rights to incur any type of debt or sell equity in order to satisfy the PharmAthene Allowed Claim.

**Reporting**

SIGA shall provide PharmAthene with the following:

(xxxiv)   Within (a) 5 business days after each quarterly or annual report (as applicable) is required to be filed with the SEC, all financial reporting packages for the period then ended as are provided internally to SIGA's CEO and board of directors; <u>provided</u>, <u>however</u>, if any such quarterly or annual report is for any reason not required to be filed with the SEC, such financial reporting packages shall be provided by SIGA by no later than 45 days after the end of each fiscal quarter, and 75 days after the end of each fiscal year, as applicable. Each such report shall be accompanied by a schedule listing any amendments, renewals, suspensions or terminations, during the applicable period, of any Key Contract, together with an explanation, in reasonable detail, describing the action(s) taken and the reasons therefor. Such schedule and accompanying explanation shall only be required for actions that result in the suspension and/or termination of a Key Contract, or otherwise alter the total contract value by greater than $50,000;

(xxxv)   Within 10 business days after the end of each month, a report, substantially in the form attached hereto as <u>Schedule 2</u>, listing the beginning and ending cash balances for such month, and a detail listing of checks issued and wires sent during such month;

(xxxvi)   By no later than March 15th of each year, a copy of SIGA's annual budget for such year as approved by the audit committee of SIGA's board of directors. Such annual budgets shall be substantially in the form of, and shall contain the same level of detail as contained in, the 2015 annual budget provided by SIGA to the Committee's financial advisor;

(xxxvii)   Within (a) 5 business days after each quarterly or annual report (as applicable) is required to be filed with the SEC, a detailed calculation of SIGA's Adjusted SG&A Expenses and Adjusted Research and Development Expenses for the period then ended, in each case in a form substantially similar to that contained in <u>Schedules 3 and 4</u>, respectively; <u>provided</u>, <u>however</u>, if any such quarterly or annual report is for any reason not required to be filed with the SEC such calculations shall be provided by SIGA by no later than 45 days after the end of each fiscal quarter, and 75 days after the end of each fiscal year, as applicable; and

(xxxviii)   Reasonable access to other books and records of SIGA upon PharmAthene's request. At SIGA's discretion, such access may be given to the Board Observer (subject to SIGA paying for all reasonable fees and expenses of the Board Observer as provided in the Plan); and

(xxxix)   Within five (5) business days after each quarterly or annual report is required to be filed with the SEC, a certification, in a form substantially similar to that contained in <u>Schedule 5</u>, duly executed by SIGA's Chief Financial Officer, certifying that, to the best of his knowledge after due inquiry, no Plan Covenant Event of Default has occurred and is continuing during the period from the Effective Date through the date of such certification.

For purposes of Section 1.64 of the Plan, if SIGA fails to comply with its obligations specified in clauses (xxxiv), (xxxv), (xxxvi), (xxxvii), and/or (xxxix) hereof, such failure shall be governed by the material breach standard contained in Section 1.64(Y) of the Plan, provided that (X) a material default for purposes of each of clauses (xxxiv), (xxxv), (xxxvii) or (xxxix) shall mean the failure by SIGA to provide PharmAthene with the reports and/or other

16

information required by such clause by no later than the number of days that is 60% greater than the due date for the delivery thereof as specified in such clause, or (Y) a material default for purposes of clause (xxxvi) shall mean the failure of SIGA to provide PharmAthene with the report required by such clause within two (2) weeks following the due date for delivery thereof as specified in such clause.

17

## <u>SCHEDULE 1</u>

### <u>LIST OF ALL AFFILIATE CONTRACTS/TRANSACTIONS FOR WHICH COPIES HAVE ALREADY BEEN PROVIDED TO THE COMMITTEE</u>

**To Be Provided**

18

## SCHEDULE 2

## MONTHLY CASH BALANCES, CHECKS AND WIRES (FORM)

**To Be Provided**

WEIL:\95565666\2\74193.0003

## SCHEDULE 3

## ADJUSTED SG&A EXPENSES (FORM)

**To Be Provided**

WEIL:\95565666\2\74193.0003

## SCHEDULE 4

## QUARTERLY CERTIFICATION OF NO PLAN COVENANT EVENT OF DEFAULT (FORM)

**To Be Provided**

21

## SCHEDULE 5

## ADJUSTED RESEARCH AND DEVELOPMENT EXPENSES (FORM)

**To Be Provided**

**<u>Exhibit B</u>**

## **Parties to Employment Agreements**

Dr. Eric A. Rose, M.D.

Daniel J. Luckshire

William J. Haynes III

Dr. Dennis E. Hruby

**Exhibit C**

## Draft Employment Agreements

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

**THIS AMENDED AND RESTATED AGREEMENT** (the "Agreement"), made in New York, New York as of [_____], between SIGA Technologies, Inc., a Delaware corporation (the "Company"), and Dr. Eric A. Rose, M.D. ("Executive").

**WHEREAS**, the Company and Executive entered into an Employment Agreement effective as of March 1, 2007, as amended (the "Original Employment Agreement"), providing for Executive's employment by the Company and setting forth the terms and conditions of such employment;

**WHEREAS**, the parties hereto agree that the Original Employment Agreement should be amended and restated as set forth in this Agreement;

**WHEREAS**, the Company desires to continue to employ Executive as its Chief Executive Officer, and Executive desires to accept such employment on the terms and conditions hereinafter set forth;

**WHEREAS**, the Company has filed a plan for reorganization (the "Plan") under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in its pending case under the Bankruptcy Code; and

**WHEREAS**, this Agreement shall become effective upon and subject to the occurrence of the Effective Date (as defined in the Plan), provided that Executive continues to be employed by the Company immediately prior to the Effective Date, and at which time the Original Employment Agreement shall be superseded by this Agreement and of no further force or effect.

**NOW, THEREFORE, IN CONSIDERATION** of the mutual covenants and agreements hereinafter set forth, the Company and Executive agree as follows:

1.    <u>Term</u>.  Unless earlier terminated in accordance with Section 4 hereof, the term of Executive's employment under this Agreement shall be the one-year period commencing on the Effective Date and ending on the first anniversary of the Effective Date (the "Term" and each such year, a "Term Year").  In addition, unless either party hereto provides notice of its desire not to renew this Agreement thirty (30) days prior to the expiration of the Term, this Agreement shall automatically renew for additional one (1) year periods commencing upon the expiration of the initial Term (or any such subsequent Term), with each such additional year thereafter being made part of the Term and each such additional year, thereafter a Term Year.

2.    <u>Employment</u>.

(a)    <u>Employment by the Company</u>.  Executive agrees to be employed by the Company during the Term upon the terms and subject to the conditions set forth in this Agreement.  Executive shall serve as the Chief Executive Officer of the Company and shall report to the Board of Directors of the Company (the "Board").

(b)    <u>Performance of Duties</u>.  Throughout Executive's employment with the Company, Executive shall faithfully and diligently perform Executive's duties in conformity

with the lawful directions of the Company and serve the Company to the best of Executive's ability. Except as consented to by the Board of Directors of the Company, Executive shall devote Executive's full business time and best efforts to the business and affairs of the Company. In Executive's capacity as the Chief Executive Officer of the Company, Executive shall have such duties and responsibilities as Executive may be assigned by the Board of Directors or Chief Executive Officer not inconsistent with Executive's position as Chief Executive Officer. Executive will perform Executive's duties primarily from the Company's offices in New York City, New York, subject to reasonable travel requirements.   Notwithstanding anything in this Section 2(b) or Section 6(a) to the contrary, Executive shall be permitted to continue with his appointment as a faculty member of Mount Sinai School of Medicine, provided that such duties do not interfere with his duties as Chief Executive Officer of the Company and subject in all cases to the ongoing approval of the Board of Directors of the Company.

     3.    <u>Compensation and Benefits</u>.

     (a)    <u>Base Salary</u>. The Company agrees to pay to Executive a base salary ("Base Salary") with respect to the 2016 calendar year at the annual rate of $787,856 or such greater amount as determined by the Compensation Committee of the Board of Directors of the Company (the "Compensation Committee"). Effective as of January 1st of each subsequent calendar year, beginning with January 1, 2017, the Base Salary shall be automatically increased by at least three percent (3%) above the amount of Executive's Base Salary in effect at the end of the prior calendar year. Payments of the Base Salary shall be payable in equal installments in accordance with the Company's standard payroll practices.

     (b)    <u>Annual Bonus</u>. The Company shall pay to Executive an annual cash bonus as set forth below (the "Annual Bonus"):

     (i)    With respect to Executive's Annual Bonus for the 2014 calendar year, Executive shall be entitled to an Annual Bonus equal to $185,658, and such amount shall constitute a cost and expense of administration of the Company's chapter 11 case and shall be paid in cash, in full, on the Effective Date.

     (ii)    With respect to Executive's Annual Bonus for the 2015 calendar year, Executive shall be entitled to an Annual Bonus, subject to the discretion of the Compensation Committee, based upon a target bonus opportunity of $764,909, which represents one hundred percent (100%) of Executive's 2015 annual Base Salary, based upon the attainment of the applicable performance criteria and goals established by the Compensation Committee prior to the Effective Date, the achievement of which shall be determined consistent with the methodology and measurement standards established by the Compensation Committee prior to the Effective Date. Such Annual Bonus shall be paid no later than March 15, 2016.

     (iii)    With respect to Executive's Annual Bonus for the 2016 calendar year and each subsequent calendar year during the Term, the Company shall pay Executive an Annual Bonus, subject to the discretion of the Compensation Committee, based upon a target bonus opportunity of 100% of Executive's then current Base Salary, based upon the achievement of performance criteria and goals approved by the Compensation Committee. Such performance criteria and goals shall be materially consistent in nature and degree of difficulty with the

2

performance criteria established with respect to the Annual Bonus for the 2015 calendar year. Each such Annual Bonus shall be paid as soon as practicable but no later than March 15th of the year following the year to which the Annual Bonus relates.

(iv)    Notwithstanding anything herein to the contrary, in the event of a Change of Control of the Company, Executive shall receive an Annual Bonus for the year in which the Change of Control occurs equal to the greater of (i) the target Annual Bonus for such year or (ii) the Annual Bonus determined based upon the applicable performance criteria and goals for such year, provided that Executive remains employed on the last day of such calendar year, payable at the times set forth above.  If a Change of Control occurs in the 2016 calendar year prior to the time that the Annual Bonus for the 2015 calendar year has been paid, such Annual Bonus shall be paid to Executive on the effective date of the Change of Control.

(c)    Benefits and Perquisites.  Executive shall be entitled to participate in, to the extent Executive is otherwise eligible under the terms thereof, the benefit plans and programs, and receive the benefits and perquisites, generally provided by the Company from time to time to senior executives of the Company, including without limitation family medical insurance (subject to applicable employee contributions).  Executive shall be entitled to receive four weeks of vacation, in accordance with Company policy.

(d)    Business Expenses.  The Company agrees to reimburse Executive for all reasonable and necessary travel, business entertainment and other business expenses incurred by Executive in connection with the performance of Executive's duties under this Agreement.  Such reimbursements shall be made by the Company on a timely basis upon submission by Executive of vouchers in accordance with the Company's standard procedures.

(e)    Indemnification.  The Company shall indemnify Executive, to the fullest extent permitted by its certificate of incorporation or by-laws, for any and all liabilities to which Executive may be subject as a result of, in connection with or arising out of Executive's employment by the Company hereunder, as well as the costs and expenses (including reasonable attorneys' fees) of any legal action brought or threatened to be brought against Executive or the Company as a result of, in connection with or arising out of such employment or board service (such costs and expenses being advanced by the Company in accordance with the procedures set forth in the Company's by-laws).  Executive shall be entitled to the full protection of any insurance policies which the Company may elect to maintain generally for the benefit of its officers.

(f)    No Other Compensation or Benefits; Payment.  The compensation and benefits specified in this Section 3 and in Section 5 of this Agreement shall be in lieu of any and all other compensation and benefits.  Payment of all compensation and benefits to Executive specified in this Section 3 and in Section 5 of this Agreement (i) shall be made in accordance with the relevant Company policies in effect from time to time to the extent the same are consistently applied, including normal payroll practices, and (ii) shall be subject to all legally required and customary withholdings.

(g)    Cessation of Employment.  In the event Executive shall cease to be employed by the Company for any reason, Executive's compensation and benefits shall cease on

3

the date of such event, except as otherwise specifically provided herein or in any applicable employee benefit plan or program or as required by law.

4.    <u>Termination of Employment</u>.    Executive's employment hereunder may be terminated prior to the end of the Term under the following circumstances.

(a)    <u>Death</u>.    Executive's employment hereunder shall terminate upon Executive's death.

(b)    <u>Executive Becoming Totally Disabled</u>.    The Company may terminate Executive's employment hereunder at any time after Executive becomes "Totally Disabled."  For purposes of this Agreement, Executive shall be "Totally Disabled" in the event Executive is unable to perform the duties and responsibilities contemplated under this Agreement for a period of either (A) 120 consecutive days or (B) 6 months in any 12-month period due to physical or mental incapacity or impairment.  During any period that Executive fails to perform Executive's duties hereunder as a result of incapacity due to physical or mental illness (the "Disability Period"), Executive shall continue to receive the compensation and benefits provided by Section 3 of this Agreement until Executive's employment hereunder is terminated; provided, however, that the amount of base compensation and benefits received by Executive during the Disability Period shall be reduced by the aggregate amounts, if any, payable to Executive under any disability benefit plan or program provided to Executive by the Company.

(c)    <u>Termination by the Company for Cause</u>.    The Company may terminate Executive's employment hereunder for Cause at any time after providing written notice to Executive.  For purposes of this Agreement, the term "Cause" shall mean any of the following: (i) Executive's neglect or failure or refusal to perform Executive's duties under this Agreement (other than as a result of total or partial incapacity due to physical or mental illness); (ii) any act by or omission of Executive constituting gross negligence or willful misconduct in connection with the performance of Executive's duties that could reasonably be expected to materially injure the reputation, business or business relationships of the Company or any of its affiliates; (iii) perpetration of an intentional and knowing fraud against or affecting the Company or any of its affiliates or any customer, client, agent, or employee thereof; (iv) the commission by or indictment of Executive for (A) a felony or (B) any misdemeanor involving moral turpitude, deceit, dishonesty or fraud ("indictment," for these purposes, meaning a United States-based indictment, probable cause hearing or any other procedure pursuant to which an initial determination of probable or reasonable cause with respect to such offense is made); (v) the breach of a covenant set forth in Section 6; or (vi) any other material breach of this Agreement.

(d)    <u>Termination by the Company Without Cause</u>.    The Company may terminate Executive's employment hereunder at any time for any reason or no reason by giving Executive thirty (30) days prior written notice of the termination.  Following any such notice, the Company may reduce or remove any and all of Executive's duties, positions and titles with the Company.

(e)    <u>Termination by Executive for Good Reason</u>.    Executive may terminate Executive's employment hereunder for Good Reason at any time after providing written notice to the Company.  For purposes of this Agreement, the term "Good Reason" shall mean any of the

WEIL:\95565457\1\74193.0003

following: (i) the Company fails to pay the compensation described in Section 3 of this Agreement (in accordance with, and subject to, such provisions); (ii) Executive no longer holds the office of Chief Executive Officer or offices of equivalent stature, or Executive's functions, responsibilities and/or duties as Chief Executive Officer are materially diminished or (iii) Executive's job site is relocated to a location which is more than fifty (50) miles from New York City, unless the parties mutually agree to such relocation. In order to terminate Executive's employment for Good Reason, Executive shall provide the Company with a written notice detailing the specific circumstances alleged to constitute Good Reason within sixty (60) days after the first occurrence of such circumstances, and the Company shall have thirty (30) days following receipt of such notice to cure such circumstances in all material respects, provided, that, no termination for Good Reason shall occur after the 180th day following the first occurrence of any Good Reason event.

      (f)    <u>Termination Upon a Change in Control</u>. If (x) the Company terminates Executive's employment hereunder without Cause, (y) Executive terminates Executive's employment for Good Reason or (z) the Company delivers a notice of non-renewal, in each case in connection with or after the occurrence of the Change in Control, Executive shall be entitled to the payments provided for by Section 5(d). For purposes of this Agreement, a "Change in Control" shall be conclusively deemed to have occurred if any of the following shall have taken place:

      (i)    the consummation of a transaction or a series of related transactions pursuant to which any "person" (as such term is used in Sections 13(d) and 14(d)(2) of the Securities Exchange Act of 1934 ("Exchange Act"), other than Executive, Executive's designee(s) or "affiliate(s)" (as defined in Rule 12b-2 under the Exchange Act), or a Permitted Holder, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing forty percent (40%) or more of the combined voting power of the Company's then outstanding securities; or

      (ii)    stockholders of the Company approve a merger or consolidation of the Company with any other entity other than a Permitted Holder, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than eighty percent (80%) of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; or

      (iii)    the stockholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of, or the Company sells or disposes of, all or substantially all of the Company's assets other than to a Permitted Holder; or

      (iv)    the following individuals cease for any reason to constitute a majority of the number of directors then serving on the Board: individuals who, on the Effective Date, constitute the Board and any new director whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the Effective

Date or whose appointment, election or nomination for election was previously so approved or recommended, but excluding (i) any director whose initial assumption of office is in connection with an actual or threatened election contest (including, but not limited to, a consent or proxy solicitation, relating to the election of directors of the Company by or on behalf of a person (as defined above) other than the Board) and (ii) any director whose initial assumption of office is in connection with the Plan; or

(v)    the PharmAthene Allowed Claim (as such term is defined in the Plan) is treated under Section 4.3(b)(i)(C) of the Plan or the provisions of Section 6.6 of the Plan become applicable.

For purposes of this Section 4(f), a "Permitted Holder" shall mean MacAndrews & Forbes Holdings Inc. and its subsidiaries or affiliates.

(g)    Termination by Executive Without Good Reason.  Executive may terminate Executive's employment hereunder at any time for any reason or no reason by giving the Company thirty (30) days prior written notice of the termination.  Following any such notice, the Company may reduce or remove any and all of Executive's duties, positions and titles with the Company, and any such reduction or removal shall not constitute Good Reason.

5.    Compensation Following Termination.  In the event that Executive's employment hereunder is terminated, Executive shall be entitled only to the following compensation and benefits upon such termination:

(a)    General.  On any termination of Executive's employment prior to the end of the Term, Executive shall be entitled to the following (collectively, the "Standard Termination Payments"):

(i)    any accrued but unpaid Base Salary for services rendered through the date of termination; provided, however, that in the event Executive's employment is terminated pursuant to Section 4(b), the amount of Base Salary received by Executive during the Disability Period shall be reduced by the aggregate amounts, if any, payable to Executive under any disability benefit plan or program provided to Executive by the Company;

(ii)    any vacation accrued to the date of termination, in accordance with Company policy;

(iii)    any accrued but unpaid expenses through the date of termination required to be reimbursed in accordance with Section 3(d) of this Agreement; and

(iv)    any benefits to which Executive may be entitled upon termination pursuant to the plans, programs and grants referred to in Section 3(c) hereof in accordance with the terms of such plans, programs and grants.

(b)    Termination by Reason of Death or Executive Becoming Totally Disabled; Termination by the Company for Cause; Termination by Executive Without Good Reason.  In the event that Executive's employment is terminated prior to the expiration of the Term (i) by reason of Executive's death pursuant to Section 4(a) or Executive becoming Totally

6

Disabled pursuant to Section 4(b), (ii) by the Company for Cause pursuant to Section 4(c) or (iii) by Executive without Good Reason pursuant to Section 4(f), Executive (or Executive's estate, as the case may be) shall be entitled to the Standard Termination Payments and the payment of any accrued but unpaid Annual Bonuses with respect to the prior full calendar year as determined by the Compensation Committee in good faith and payable in cash at the time described in Section 3(b).

(c)    Termination by the Company Without Cause; Termination by Executive for Good Reason.  In the event that Executive's employment is terminated prior to the expiration of the Term by the Company without Cause pursuant to Section 4(d) or by Executive for Good Reason pursuant to Section 4(e), Executive shall be entitled only to the following:

(i)    the Standard Termination Payments;

(ii)    the continued payment of the Base Salary (as determined pursuant to Section 3(a)) for one (1) year (such sums to be paid at the times and in the amounts such Base Salary would have been paid had Executive's employment not terminated, with the first such payment commencing on the sixtieth (60th) day following the date of Executive's termination of employment which payment shall include all amounts that would have otherwise been payable prior thereto); and

(iii)    the payment of any accrued but unpaid Annual Bonuses with respect to the prior full calendar year as determined by the Compensation Committee in good faith and payable in cash on the later of (i) at the time described in Section 3(b) or (ii) sixty (60) days following the date of Executive's termination of employment (which, for the avoidance of doubt, will in all cases be paid in the year of termination of employment); and

(iv)    to have the Company take all such action as is necessary such that all outstanding equity grants, including any stock options and restricted stock grants, to Executive shall, immediately and irrevocably vest and, to the extent applicable, become exercisable as of the date of termination and shall remain exercisable for a period of not less than one (1) year from the date of termination, or, if earlier, the expiration of the term of such equity award.

(d)    Termination Upon a Change in Control.  In the event that Executive's employment is terminated prior to the expiration of the Term by the Company without Cause pursuant to Section 4(d) or by Executive for Good Reason pursuant to Section 4(e), in each case in connection with or after the occurrence of a Change in Control, in lieu of the benefits provided under Section 5(c) above, Executive shall be entitled only to the following:

(i)    the Standard Termination Payments;

(ii)    the continued payment of the Base Salary (as determined pursuant to Section 3(a)) for one (1) year (such sums to be paid at the times and in the amounts such Base Salary would have been paid had Executive's employment not terminated, with the first such payment commencing on the sixtieth (60th) day following the date of Executive's termination of employment which payment shall include all amounts that would have otherwise been payable prior thereto);

WEIL:\95565457\1\74193.0003

(iii)    the payment of any accrued but unpaid Annual Bonuses with respect to the prior full calendar year as determined by the Compensation Committee in good faith and payable in cash on the later of (i) at the time described in Section 3(b) or (ii) sixty (60) days following the date of Executive's termination of employment (which, for the avoidance of doubt, will in all cases be paid in the year of termination of employment);

(iv)    a pro rata portion of any Annual Bonus under Section 3(b) for the year of termination based on the number of days employed during such year, calculated based upon attainment of the full target level of achievement set forth in Section 3(b), and payable in cash sixty (60) days following the date of Executive's termination of employment; and

(v)    to have the Company take all such action as is necessary such that all outstanding equity grants, including any stock options and restricted stock grants, to Executive shall, immediately and irrevocably vest and, to the extent applicable, become exercisable as of the date of termination and shall remain exercisable for a period of not less than one (1) year from the date of termination, or, if earlier, the expiration of the term of such equity award.

(e)    Effect of Material Breach of Section 6 on Compensation and Benefits Following Termination of Employment.  If, at the time of termination of Executive's employment for any reason prior to the expiration of the Term or any time thereafter, Executive is in material breach of any covenant contained in Section 6 hereof, then, notwithstanding anything in this Section 5 to the contrary, Executive (or Executive's estate, as applicable) shall not be entitled to any payment (or if payments have commenced, any continued payment) other than the Standard Termination Payments.

(f)    No Further Liability; Release.  Payment made and performance by the Company in accordance with this Section 5 shall operate to fully discharge and release the Company and its directors, officers, employees, affiliates, stockholders, successors, assigns, agents and representatives from any further obligation or liability with respect to Executive's employment and termination of employment.  Other than providing the compensation and benefits provided for in accordance with this Section 5, the Company and its directors, officers, employees, affiliates, stockholders, successors, assigns, agents and representatives shall have no further obligation or liability to Executive or any other person under this Agreement or with respect to Executive's employment or the termination thereof, with the exception of indemnification obligations under Section 3(e) hereof.  The payment of any amounts pursuant to this Section 5 (other than payments required by law and the Standard Termination Payments) is expressly conditioned upon the timely delivery (and non-revocation) by Executive to the Company of a release in form and substance reasonably satisfactory to the Company of any and all claims Executive may have against the Company and its directors, officers, employees, affiliates, stockholders, successors, assigns, agents and representatives arising out of or related to Executive's employment by the Company and the termination of such employment and Executive's non-revocation of such release.  Such release must be returned to the Company in accordance with the term set forth in such release agreement but no later than forty-five (45) days after Executive's termination of employment and must become irrevocable at the expiration of any applicable revocation period.

WEIL:\95565457\1\74193.0003

6.    Exclusive Employment; Non-competition; Non-solicitation; Nondisclosure of Proprietary Information; Surrender of Records; Inventions and Patents; Code of Ethics.

(a)    No Conflict; No Other Employment.  During the period of Executive's employment with the Company, Executive shall not:  (i) engage in any activity which conflicts or interferes with or derogates from the performance of Executive's duties hereunder nor shall Executive engage in any other business activity, whether or not such business activity is pursued for gain or profit and including service as a director of any other company, except as approved in advance in writing by the Company; provided, however, that Executive shall be entitled to manage Executive's personal investments and otherwise attend to personal affairs, including charitable, social and political activities, in a manner that does not unreasonably interfere with Executive's responsibilities hereunder, or (ii) accept or engage in any other employment, whether as an employee or consultant or in any other capacity, and whether or not compensated therefor, except as approved in advance in writing by the Company and such approval will not be unreasonably withheld.

(b)    Non-competition; Non-solicitation.

(i)    Executive acknowledges and recognizes the highly competitive nature of the Company's business and that access to the Company's confidential records and proprietary information renders Executive special and unique within the Company's industry.  In consideration of the payment by the Company to Executive of amounts that may hereafter be paid to Executive pursuant to this Agreement (including, without limitation, pursuant to Sections 3 and 5 hereof) and other obligations undertaken by the Company hereunder, Executive agrees that during (i) Executive's employment with the Company and (ii) twelve (12) months thereafter (the "Covered Time"), Executive shall not, directly or indirectly, engage (as owner, investor, partner, stockholder, employer, employee, consultant, advisor, director or otherwise) in any Competing Business, provided that the provisions of this Section 6(b) will not be deemed breached merely because Executive owns less than 1% of the outstanding common stock of a publicly-traded company.  For purposes of this Agreement, "Competing Business" shall mean (i) any business in which the Company is currently engaged anywhere in the world relating to the biodefense industry or (ii) the business in which the Company's affiliates set forth on Schedule A hereto are currently engaged anywhere in the world to the extent that Executive is materially in involved with such business during the Term.

(ii)    In further consideration of the payment by the Company to Executive of amounts that may hereafter be paid to Executive pursuant to this Agreement (including, without limitation, pursuant to Sections 3 and 5 hereof) and other obligations undertaken by the Company hereunder, Executive agrees that during Executive's employment and the Covered Time, Executive shall not, directly or indirectly, (i) solicit, encourage or attempt to solicit or encourage any of the employees, agents, consultants or representatives of the Company or, to the extent that he has had material contact with such employees, agents, consultants or representatives, any of its affiliates to terminate his, her, or its relationship with the Company or such affiliate; (ii) solicit, encourage or attempt to solicit or encourage any of the employees, agents, consultants or representatives of the Company or, to the extent that he has had material contact with such employees, agents, consultants or representatives, any of its affiliates to become employees, agents, representatives or consultants of any other person or

9

entity; (iii) solicit or attempt to solicit any customer, vendor or distributor of the Company or, to the extent that he has had material contact with such customer, vendor or distributor, any of its affiliates with respect to any product or service being furnished, made, sold or leased by the Company or such affiliate; or (iv) persuade or seek to persuade any customer of the Company or, to the extent that he has had material contact with such customer, any affiliate to cease to do business or to reduce the amount of business which any customer has customarily done or contemplates doing with the Company or such affiliate, whether or not the relationship between the Company or its affiliate and such customer was originally established in whole or in part through Executive's efforts.  For purposes of this Section 6(b) only, the terms "customer," "vendor" and "distributor" shall mean a customer, vendor or distributor who has done business with the Company or any of its affiliates within twelve months preceding the termination of Executive's employment.

(iii)    During Executive's employment with the Company and during the Covered Time, Executive agrees that upon the earlier of Executive's (i) negotiating with any Competitor (as defined below) concerning the possible employment of Executive by the Competitor, (ii) receiving a written offer of employment from a Competitor, or (iii) becoming employed by a Competitor, Executive will (A) immediately provide notice to the Company of such circumstances and (B) provide copies of Section 6 of this Agreement to the Competitor. Executive further agrees that the Company may provide notice to a Competitor of Executive's obligations under this Agreement, including without limitation Executive's obligations pursuant to Section 6 hereof.  For purposes of this Agreement, "Competitor" shall mean any entity (other than the Company or any of its affiliates) that engages, directly or indirectly, in any Competing Business.

(iv)    Executive understands that the provisions of this Section 6(b) may limit Executive's ability to earn a livelihood in a Competing Business but nevertheless agrees and hereby acknowledges that the consideration provided under this Agreement, including any amounts or benefits provided under Sections 3 and 5 hereof and other obligations undertaken by the Company hereunder, is sufficient to justify the restrictions contained in such provisions.

(c)    Proprietary Information.  Executive acknowledges that, during the course of Executive's employment with the Company, Executive will necessarily have access to and make use of proprietary information and confidential records of the Company and its affiliates. Executive covenants that Executive shall not during the Term or at any time thereafter, directly or indirectly, use for Executive's own purpose or for the benefit of any person or entity other than the Company, nor otherwise disclose, any proprietary information to any individual or entity, unless such disclosure has been authorized in writing by the Company or is otherwise required by law.  Executive acknowledges and understands that the term "proprietary information" includes, but is not limited to:  (a) inventions, trade secrets, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, research, discoveries, developments, designs, and techniques regarding any of the foregoing utilized by the Company or any of its affiliates; (b) the name and/or address of any customer or vendor of the Company or any of its affiliates or any information concerning the transactions or relations of any customer or vendor of the Company or any of its affiliates with the Company or such affiliate or any of its or their partners, principals, directors, officers or agents; (c) any information concerning any product, technology, or procedure employed by the

10

Company or any of its affiliates but not generally known to its or their customers, vendors or competitors, or under development by or being tested by the Company or any of its affiliates but not at the time offered generally to customers or vendors; (d) any information relating to the pricing or marketing methods, sales margins, cost of goods, cost of material, capital structure, operating results, borrowing arrangements or business plans of the Company or any of its affiliates; (e) any information which is generally regarded as confidential or proprietary in any line of business engaged in by the Company or any of its affiliates; (f) any business plans, budgets, advertising or marketing plans; (g) any information contained in any of the written or oral policies and procedures or manuals of the Company or any of its affiliates; (h) any information belonging to customers or vendors of the Company or any of its affiliates or any other person or entity which the Company or any of its affiliates has agreed to hold in confidence; (i) any inventions, innovations or improvements covered by this Agreement; and (j) all written, graphic and other material relating to any of the foregoing.  Executive acknowledges and understands that information that is not novel or copyrighted or patented may nonetheless be proprietary information.  The term "proprietary information" shall not include information generally available to and known by the industry, was known by Executive prior to the commencement of his employment (or anticipated employment) with the Company, or information that is or becomes available to Executive on a non-confidential basis from a source other than the Company, any of its affiliates, or the directors, officers, employees, partners, principals or agents of the Company or any of its affiliates (other than as a result of a breach of any obligation of confidentiality).

(d)    <u>Confidentiality and Surrender of Records</u>.  Executive shall not during the Term or at any time thereafter (irrespective of the circumstances under which Executive's employment by the Company terminates), except as required by law, directly or indirectly publish, make known or in any fashion disclose any confidential records to, or permit any inspection or copying of confidential records by, any individual or entity other than in the course of such individual's or entity's employment or retention by the Company.  Upon termination of employment for any reason or upon request by the Company, Executive shall deliver promptly to the Company all property and records of the Company or any of its affiliates, including, without limitation, all confidential records.  For purposes hereof, "confidential records" means all correspondence, reports, memoranda, files, manuals, books, lists, financial, operating or marketing records, magnetic tape, or electronic or other media or equipment of any kind which may be in Executive's possession or under Executive's control or accessible to Executive which contain any proprietary information.  All property and records of the Company and any of its affiliates (including, without limitation, all confidential records) shall be and remain the sole property of the Company or such affiliate during the Term and thereafter.

(e)    <u>Inventions and Patents</u>.

(i)    Executive agrees that all processes, technologies and inventions, including new contributions, improvements, ideas and discoveries, whether patentable or not, conceived, developed, invented or made by Executive during the Term shall belong to the Company, provided that such inventions grew out of Executive's work with the Company or any of its subsidiaries or affiliates, are related in any manner to the business (commercial or experimental) of the Company or any of its subsidiaries or affiliates or are conceived or made on the Company's time or with the use of the Company's facilities or materials (collectively,

11

"Inventions"). Executive shall further: (a) promptly disclose such Inventions to the Company; (b) assign to the Company, without additional compensation, all patent and other rights to such Inventions for the United States and foreign countries; (c) sign all papers necessary to carry out the foregoing; and (d) give testimony in support of Executive's inventorship.

(ii)     If any Invention is described in a patent application or is disclosed to third parties, directly or indirectly, by Executive within two years after the termination of Executive's employment by the Company, it is to be presumed that the Invention was conceived or made during the Term.

(iii)     Executive agrees that Executive will not assert any rights to any Invention as having been made or acquired by Executive prior to the date of this Agreement, except for Inventions, if any, disclosed to the Company in writing prior to the date hereof.

(iv)     The Company shall be the sole owner of all the products and proceeds of Executive's services hereunder, including, but not limited to, all materials, ideas, concepts, formats, suggestions, developments, arrangements, packages, programs and other intellectual properties that Executive may acquire, obtain, develop or create in connection with and during the Term, free and clear of any claims by Executive (or anyone claiming under Executive) of any kind or character whatsoever (other than Executive's right to receive payments hereunder).  Executive shall, at the request of the Company, execute such assignments, certificates or other instruments as the Company may from time to time deem necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend its right, title or interest in or to any such properties.

(f)     Enforcement.  Executive acknowledges and agrees that, by virtue of Executive's position, Executive's services and access to and use of confidential records and proprietary information, any violation by Executive of any of the undertakings contained in this Section 6 would cause the Company and/or its affiliates immediate, substantial and irreparable injury for which it or they have no adequate remedy at law.  Accordingly, Executive agrees and consents to the entry of an injunction or other equitable relief by a court of competent jurisdiction restraining any violation or threatened violation of any undertaking contained in this Section 6.  Executive waives posting by the Company or its affiliates of any bond otherwise necessary to secure such injunction or other equitable relief.  Rights and remedies provided for in this Section 6 are cumulative and shall be in addition to rights and remedies otherwise available to the parties hereunder or under any other agreement or applicable law.

(g)     Code of Ethics.  Nothing in this Section 6 is intended to limit, modify or reduce Executive's obligations under the Company's Code of Ethics.  Executive's obligations under this Section 6 are in addition to, and not in lieu of, Executive's obligations under the Code of Ethics.  To the extent there is any inconsistency between this Section 6 and the Code of Ethics which would permit Executive to take any action or engage in any activity pursuant to this Section 6 which Executive would be barred from taking or engaging in under the Code of Ethics, the Code of Ethics shall control.

7.     Assignment and Transfer.

12

(a)    <u>Company</u>.  This Agreement shall inure to the benefit of and be enforceable by and binding upon, and may be assigned by the Company without Executive's consent to, any purchaser of all or substantially all of the Company's business or assets, or to any successor to the Company (whether direct or indirect, by purchase, merger, consolidation or otherwise).

(b)    <u>Executive</u>.  The parties hereto agree that Executive is obligated under this Agreement to render personal services during Executive's employment of a special, unique, unusual, extraordinary and intellectual character, thereby giving this Agreement special value. Executive's rights and obligations under this Agreement shall not be transferable by Executive by assignment or otherwise, and any purported assignment, transfer or delegation thereof shall be void; provided, however, that if Executive shall die, all amounts then payable to Executive hereunder shall be paid in accordance with the terms of this Agreement to Executive's estate.

8.    <u>Miscellaneous</u>.

(a)    <u>Cooperation</u>.  Following termination of employment with the Company for any reason, Executive shall cooperate with the Company, as requested by the Company upon reasonable notice and with due regard to Executive's obligations to a future employer, to effect a transition of Executive's responsibilities and to ensure that the Company is aware of all matters being handled by Executive.

(b)    <u>Mitigation; Offset</u>.  Executive shall not be required to mitigate damages or the amount of any payment provided to Executive under Section 5 of this Agreement by seeking other employment or otherwise, nor shall the amount of any payments provided to Executive under Section 5 be reduced by any compensation earned by Executive as the result of employment by another employer after the termination of Executive's employment or otherwise.

(c)    <u>Protection of Reputation</u>.  During the Term and thereafter, Executive agrees that Executive will take no action which is intended, or would reasonably be expected, to harm the Company or any of its affiliates or its or their reputation or which would reasonably be expected to lead to unwanted or unfavorable publicity to the Company or its affiliates.  Nothing herein shall prevent Executive from making any truthful statement in connection with any legal proceeding or investigation by the Company or any governmental authority.

(d)    <u>Governing Law; Consent to Jurisdiction</u>.  This Agreement shall be governed by and construed (both as to validity and performance) and enforced in accordance with the internal laws of the State of New York applicable to agreements made and to be performed wholly within such jurisdiction, without regard to the principles of conflicts of law or where the parties are located at the time a dispute arises.  In the event of any controversy or claim arising out of or relating to this Agreement or the breach or alleged breach hereof, each of the parties hereto irrevocably (a) consents to the jurisdiction of any state court sitting in the County of New York, State of New York, or federal court sitting in the County of New York, State of New York. (b) waives any objection which it may have at any time to the laying of venue of any action or proceeding brought in any such court and (c) waives any claim that such action or proceeding has been brought in an inconvenient forum.

13

(e)    <u>Injunctive Relief</u>.  Notwithstanding anything to the contrary contained herein, the Company and any affiliate of the Company (if applicable) shall have the right to seek injunctive or other equitable relief from a court of competent jurisdiction to enforce Section 6 of this Agreement without any obligation to post a bond.

(f)    <u>Entire Agreement</u>.  This Agreement (including the plans referenced in Section 3(c) of this Agreement) contains the entire agreement and understanding between the parties hereto in respect of Executive's employment from and after the date hereof and supersedes, cancels and annuls any prior or contemporaneous written or oral agreements, understandings, commitments and practices between them respecting Executive's employment from and after the date hereof, including the Original Employment Agreement and all other prior employment agreements or understandings between the Company and Executive.

(g)    <u>Amendment</u>.  This Agreement may be amended only by a writing which makes express reference to this Agreement as the subject of such amendment and which is signed by Executive and, on behalf of the Company, by its duly authorized officer.

(h)    <u>Severability</u>.  If any provision of this Agreement or the application of any such provision to any party or circumstances shall be determined by any court of competent jurisdiction or arbitration panel to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to such person or circumstances other than those to which it is so determined to be invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be enforced to the fullest extent permitted by law.  If any provision of this Agreement, or any part thereof, is held to be invalid or unenforceable because of the scope or duration of or the area covered by such provision, the parties hereto agree that the court or arbitration panel making such determination shall reduce the scope, duration and/or area of such provision (and shall substitute appropriate provisions for any such invalid or unenforceable provisions) in order to make such provision enforceable to the fullest extent permitted by law and/or shall delete specific words and phrases, and such modified provision shall then be enforceable and shall be enforced.  The parties hereto recognize that if, in any judicial or arbitral proceeding, a court or arbitration panel shall refuse to enforce any of the separate covenants contained in this Agreement, then that invalid or unenforceable covenant contained in this Agreement shall be deemed eliminated from these provisions to the extent necessary to permit the remaining separate covenants to be enforced.  In the event that any court or arbitration panel determines that the time period or the area, or both, are unreasonable and that any of the covenants is to that extent invalid or unenforceable, the parties hereto agree that such covenants will remain in full force and effect, first, for the greatest time period, and second, in the greatest geographical area that would not render them unenforceable.

(i)    <u>Construction</u>.  The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement.  The language in all parts of this Agreement shall be in all cases construed according to its fair meaning and not strictly for or against the Company or Executive.  As used herein, the words "day" or "days" shall mean a calendar day or days.

(j)    <u>Non-waiver</u>.  Neither any course of dealing nor any failure or neglect of either party hereto in any instance to exercise any right, power or privilege hereunder or under

WEIL:\95565457\1\74193.0003

law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.  All waivers by either party hereto must be contained in a written instrument signed by the party to be charged and, in the case of the Company, by its duly authorized officer.

        (k)    <u>Notices</u>.  Any notice required or permitted hereunder shall be in writing and shall be sufficiently given if personally delivered or if sent by registered or certified mail, postage prepaid, with return receipt requested, addressed:

        (i)    in the case of the Company, to:

SIGA Technologies, Inc.
35 East 62nd Street
New York, NY 10065
Attention:  Chief Executive Officer

        (ii)    in the case of Executive, to Executive's last known address as reflected in the Company's records, or to such other address as Executive shall designate by written notice to the Company.

Any notice given hereunder shall be deemed to have been given at the time of receipt thereof by the person to whom such notice is given if personally delivered or at the time of mailing if sent by registered or certified mail.

        (l)    <u>Assistance in Proceedings, Etc</u>.  Executive shall, without additional compensation, during and after the Term, upon reasonable notice and with due regard to Executive's obligations to a future employer, furnish such information and reasonable assistance to the Company as may reasonably be required by the Company in connection with any legal or quasi-legal proceeding, including any external or internal investigation, involving the Company or any of its affiliates.  The Company shall reimburse (or advance) Executive's expenses in connection with such assistance (including, without limitation, reasonable legal fees).

        (m)    <u>Survival</u>.  Cessation or termination of Executive's employment with the Company shall not result in termination of this Agreement.  The respective obligations of Executive and the Company as provided in Sections 5, 6, 7 and 8 of this Agreement shall survive cessation or termination of Executive's employment hereunder.

        (n)    <u>Section 409A of the Code</u>.

        (i)    The intent of the parties is that payments and benefits under this Agreement comply with, or be exempt from, Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder (collectively "Section 409<u>A of the Code</u>") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith.

        (ii)    A termination of employment shall not be deemed to have occurred for purposes of this Agreement providing for the payment of any amounts or benefits subject to Section 409A of the Code upon or following a termination of employment unless such

15

termination is also a "separation from service" within the meaning of Section 409A of the Code and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." ."  If Executive is deemed on the date of termination to be a "specified employee" within the meaning of that term under Code Section 409A(a)(2)(B), then with regard to any payment that is considered non-qualified deferred compensation under Section 409A of the Code payable on account of a "separation from service," such payment or benefit shall be made or provided at the date which is the earlier of (A) the day following the expiration of the six (6)-month period measured from the date of such "separation from service" of Executive, and (B) the date of Executive's death (the "Delay Period").  Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section 8(n) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to Executive in a lump sum, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

(iii)    (A) All expenses or other reimbursements provided herein shall be payable in accordance with the Company's policies in effect from time to time, but in any event shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by Executive, (B) no such reimbursement or expenses eligible for reimbursement in any taxable year shall in any way affect the expenses eligible for reimbursement in any other taxable year and (C) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchanged for another benefit.

(iv)    For purposes of Section 409A of the Code, Executive's right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.

(v)    Notwithstanding the foregoing, the Company makes no representations regarding the tax implications of the compensation and benefits to be paid to Executive under this Agreement, including, without limitation, under Section 409A of the Code. The parties agree that in the event a qualified tax advisor to the Company or to Executive (neither party being required to retain such advisor) reasonably advises that the terms hereof would result in Executive being subject to tax under Section 409A of the Code, Executive and the Company shall negotiate in good faith to amend this Agreement to the extent necessary to prevent the assessment of any such tax.

16

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed on its behalf by an individual thereunto duly authorized and Executive has duly executed this Agreement, all as of the date and year first written above.

**SIGA TECHNOLOGIES, INC.**

By: _____
       Name:
       Title:


_____
Dr. Eric A. Rose, M.D.

17

Schedule A

AM General, LLC
Deluxe Entertainment Services Group, Inc.
Flavors Holdings Incorporated
Harland Clarke
Harland Clarke Holding Corp.
Mafco Worldwide Corporation
Merisant Company
Revlon, Inc.
Scantron
Scientific Games Corporation
Valassis Communications, Inc.
vTv Therapeutics LLC

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

**THIS AMENDED AND RESTATED AGREEMENT** (the "Agreement"), made in New York, New York as of [_____], between SIGA Technologies, Inc., a Delaware corporation (the "Company"), and Daniel J. Luckshire ("Executive").

**WHEREAS**, the Company and Executive entered into an Employment Agreement dated February 10, 2011 (the "Original Employment Agreement"), providing for Executive's employment by the Company and setting forth the terms and conditions of such employment;

**WHEREAS**, the parties hereto agree that the Original Employment Agreement should be amended and restated as set forth in this Agreement;

**WHEREAS**, the Company desires to continue to employ Executive as its Executive Vice President and Chief Financial Officer, and Executive desires to accept such employment on the terms and conditions hereinafter set forth;

**WHEREAS**, the Company has filed a plan for reorganization (the "Plan") under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in its pending case under the Bankruptcy Code; and

**WHEREAS**, this Agreement shall become effective upon and subject to the occurrence of the Effective Date (as defined in the Plan), provided that Executive continues to be employed by the Company immediately prior to the Effective Date, and at which time the Original Employment Agreement shall be superseded by this Agreement and of no further force or effect.

**NOW, THEREFORE, IN CONSIDERATION** of the mutual covenants and agreements hereinafter set forth, the Company and Executive agree as follows:

1.    <u>Term</u>.  Unless earlier terminated in accordance with Section 4 hereof, the term of Executive's employment under this Agreement shall be the two-year period commencing on the Effective Date and ending on the second anniversary of the Effective Date (the "Term" and each such year, a "Term Year").  In addition, unless either party hereto provides notice of its desire not to renew this Agreement thirty (30) days prior to the expiration of the Term, this Agreement shall automatically renew for additional one (1) year periods commencing upon the expiration of the initial Term (or any such subsequent Term), with each such additional year thereafter being made part of the Term and each such additional year, thereafter a Term Year.

2.    <u>Employment</u>.

(a)    <u>Employment by the Company</u>.  Executive agrees to be employed by the Company during the Term upon the terms and subject to the conditions set forth in this Agreement.  Executive shall serve as the Executive Vice President and Chief Financial Officer of the Company and shall report to the Board of Directors of the Company (the "Board") and Chief Executive Officer of the Company.

(b)    <u>Performance of Duties</u>.  Throughout Executive's employment with the Company, Executive shall faithfully and diligently perform Executive's duties in conformity

with the lawful directions of the Company and serve the Company to the best of Executive's ability. Executive shall devote Executive's full business time and best efforts to the business and affairs of the Company. In Executive's capacity as the Executive Vice President and Chief Financial Officer of the Company, Executive shall have such duties and responsibilities as Executive may be assigned by the Board of Directors or Chief Executive Officer not inconsistent with Executive's position as Executive Vice President and Chief Financial Officer. Executive will perform Executive's duties primarily from the Company's offices in New York City, New York, subject to reasonable travel requirements.

   3. <u>Compensation and Benefits</u>.

    (a) <u>Base Salary</u>. The Company agrees to pay to Executive a base salary ("Base Salary") with respect to the 2016 calendar year at the annual rate of $506,480 or such greater amount as determined by the Compensation Committee of the Board of Directors of the Company (the "Compensation Committee"). Effective as of January 1st of each subsequent calendar year, beginning with January 1, 2017, the Base Salary shall be automatically increased by at least three percent (3%) above the amount of Executive's Base Salary in effect at the end of the prior calendar year. Payments of the Base Salary shall be payable in equal installments in accordance with the Company's standard payroll practices.

    (b) <u>Annual Bonus</u>. The Company shall pay to Executive an annual cash bonus as set forth below (the "Annual Bonus"):

     (i) With respect to Executive's Annual Bonus for the 2014 calendar year, Executive shall be entitled to an Annual Bonus equal to $109,273, and such amount shall constitute a cost and expense of administration of the Company's chapter 11 case and shall be paid in cash, in full, on the Effective Date.

     (ii) With respect to Executive's Annual Bonus for the 2015 calendar year, Executive shall be entitled to an Annual Bonus, subject to the discretion of the Compensation Committee, based upon a target bonus opportunity of $450,204, which represents one hundred percent (100%) of Executive's 2015 annual Base Salary, based upon the attainment of the applicable performance criteria and goals established by the Compensation Committee prior to the Effective Date, the achievement of which shall be determined consistent with the methodology and measurement standards established by the Compensation Committee prior to the Effective Date. Such Annual Bonus shall be paid no later than March 15, 2016.

     (iii) With respect to Executive's Annual Bonus for the 2016 calendar year and each subsequent calendar year during the Term, the Company shall pay Executive an Annual Bonus, subject to the discretion of the Compensation Committee, based upon a target bonus opportunity of 100% of Executive's then current Base Salary, based upon the achievement of performance criteria and goals approved by the Compensation Committee. Such performance criteria and goals shall be materially consistent in nature and degree of difficulty with the performance criteria established with respect to the Annual Bonus for the 2015 calendar year. Each such Annual Bonus shall be paid as soon as practicable but no later than March 15th of the year following the year to which the Annual Bonus relates.

2

(iv)     Notwithstanding anything herein to the contrary, in the event of a Change of Control of the Company, Executive shall receive an Annual Bonus for the year in which the Change of Control occurs equal to the greater of (i) the target Annual Bonus for such year or (ii) the Annual Bonus determined based upon the applicable performance criteria and goals for such year, provided that Executive remains employed on the last day of such calendar year, payable at the times set forth above.  If a Change of Control occurs in the 2016 calendar year prior to the time that the Annual Bonus for the 2015 calendar year has been paid, such Annual Bonus shall be paid to Executive on the effective date of the Change of Control.

(c)     <u>Benefits and Perquisites</u>.  Executive shall be entitled to participate in, to the extent Executive is otherwise eligible under the terms thereof, the benefit plans and programs, and receive the benefits and perquisites, generally provided by the Company from time to time to senior executives of the Company, including without limitation family medical insurance (subject to applicable employee contributions).  Executive shall be entitled to receive four weeks of vacation, in accordance with Company policy.

(d)     <u>Business Expenses</u>.  The Company agrees to reimburse Executive for all reasonable and necessary travel, business entertainment and other business expenses incurred by Executive in connection with the performance of Executive's duties under this Agreement.  Such reimbursements shall be made by the Company on a timely basis upon submission by Executive of vouchers in accordance with the Company's standard procedures.

(e)     <u>Indemnification</u>.  The Company shall indemnify Executive, to the fullest extent permitted by its certificate of incorporation or by-laws, for any and all liabilities to which Executive may be subject as a result of, in connection with or arising out of Executive's employment by the Company hereunder, as well as the costs and expenses (including reasonable attorneys' fees) of any legal action brought or threatened to be brought against Executive or the Company as a result of, in connection with or arising out of such employment or board service (such costs and expenses being advanced by the Company in accordance with the procedures set forth in the Company's by-laws).  Executive shall be entitled to the full protection of any insurance policies which the Company may elect to maintain generally for the benefit of its officers.

(f)     <u>No Other Compensation or Benefits; Payment</u>.  The compensation and benefits specified in this Section 3 and in Section 5 of this Agreement shall be in lieu of any and all other compensation and benefits.  Payment of all compensation and benefits to Executive specified in this Section 3 and in Section 5 of this Agreement (i) shall be made in accordance with the relevant Company policies in effect from time to time to the extent the same are consistently applied, including normal payroll practices, and (ii) shall be subject to all legally required and customary withholdings.

(g)     <u>Cessation of Employment</u>.  In the event Executive shall cease to be employed by the Company for any reason, Executive's compensation and benefits shall cease on the date of such event, except as otherwise specifically provided herein or in any applicable employee benefit plan or program or as required by law.

3

4.    <u>Termination of Employment</u>.  Executive's employment hereunder may be terminated prior to the end of the Term under the following circumstances.

(a)    <u>Death</u>.  Executive's employment hereunder shall terminate upon Executive's death.

(b)    <u>Executive Becoming Totally Disabled</u>.  The Company may terminate Executive's employment hereunder at any time after Executive becomes "Totally Disabled."  For purposes of this Agreement, Executive shall be "Totally Disabled" in the event Executive is unable to perform the duties and responsibilities contemplated under this Agreement for a period of either (A) 120 consecutive days or (B) 6 months in any 12-month period due to physical or mental incapacity or impairment.  During any period that Executive fails to perform Executive's duties hereunder as a result of incapacity due to physical or mental illness (the "Disability Period"), Executive shall continue to receive the compensation and benefits provided by Section 3 of this Agreement until Executive's employment hereunder is terminated; provided, however, that the amount of base compensation and benefits received by Executive during the Disability Period shall be reduced by the aggregate amounts, if any, payable to Executive under any disability benefit plan or program provided to Executive by the Company.

(c)    <u>Termination by the Company for Cause</u>.  The Company may terminate Executive's employment hereunder for Cause at any time after providing written notice to Executive.  For purposes of this Agreement, the term "Cause" shall mean any of the following: (i) Executive's neglect or failure or refusal to perform Executive's duties under this Agreement (other than as a result of total or partial incapacity due to physical or mental illness); (ii) any act by or omission of Executive constituting gross negligence or willful misconduct in connection with the performance of Executive's duties that could reasonably be expected to materially injure the reputation, business or business relationships of the Company or any of its affiliates; (iii) perpetration of an intentional and knowing fraud against or affecting the Company or any of its affiliates or any customer, client, agent, or employee thereof; (iv) the commission by or indictment of Executive for (A) a felony or (B) any misdemeanor involving moral turpitude, deceit, dishonesty or fraud ("indictment," for these purposes, meaning a United States-based indictment, probable cause hearing or any other procedure pursuant to which an initial determination of probable or reasonable cause with respect to such offense is made); (v) the breach of a covenant set forth in Section 6; or (vi) any other material breach of this Agreement.

(d)    <u>Termination by the Company Without Cause</u>.  The Company may terminate Executive's employment hereunder at any time for any reason or no reason by giving Executive thirty (30) days prior written notice of the termination.  Following any such notice, the Company may reduce or remove any and all of Executive's duties, positions and titles with the Company.

(e)    <u>Termination by Executive for Good Reason</u>.  Executive may terminate Executive's employment hereunder for Good Reason at any time after providing written notice to the Company.  For purposes of this Agreement, the term "Good Reason" shall mean any of the following:  (i) the Company fails to pay the compensation described in Section 3 of this Agreement (in accordance with, and subject to, such provisions); (ii) Executive no longer holds the office of Executive Vice President and Chief Financial Officer or offices of equivalent

4

stature, or Executive's functions, responsibilities and/or duties as Executive Vice President and Chief Financial Officer are materially diminished or (iii) Executive's job site is relocated to a location which is more than fifty (50) miles from New York City, unless the parties mutually agree to such relocation.  In order to terminate Executive's employment for Good Reason, Executive shall provide the Company with a written notice detailing the specific circumstances alleged to constitute Good Reason within sixty (60) days after the first occurrence of such circumstances, and the Company shall have thirty (30) days following receipt of such notice to cure such circumstances in all material respects, provided, that, no termination for Good Reason shall occur after the 180th day following the first occurrence of any Good Reason event.

(f)    <u>Termination Upon a Change in Control</u>.  If (x) the Company terminates Executive's employment hereunder without Cause, (y) Executive terminates Executive's employment for Good Reason or (z) the Company delivers a notice of non-renewal, in each case in connection with or after the occurrence of the Change in Control, Executive shall be entitled to the payments provided for by Section 5(d).  For purposes of this Agreement, a "Change in Control" shall be conclusively deemed to have occurred if any of the following shall have taken place:

(i)    the consummation of a transaction or a series of related transactions pursuant to which any "person" (as such term is used in Sections 13(d) and 14(d)(2) of the Securities Exchange Act of 1934 ("Exchange Act"), other than Executive, Executive's designee(s) or "affiliate(s)" (as defined in Rule 12b-2 under the Exchange Act), or a Permitted Holder, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing forty percent (40%) or more of the combined voting power of the Company's then outstanding securities; or

(ii)    stockholders of the Company approve a merger or consolidation of the Company with any other entity other than a Permitted Holder, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than eighty percent (80%) of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; or

(iii)    the stockholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of, or the Company sells or disposes of, all or substantially all of the Company's assets other than to a Permitted Holder; or

(iv)    the following individuals cease for any reason to constitute a majority of the number of directors then serving on the Board: individuals who, on the Effective Date, constitute the Board and any new director whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the Effective Date or whose appointment, election or nomination for election was previously so approved or recommended, but excluding (i) any director whose initial assumption of office is in connection with an actual or threatened election contest (including, but not limited to, a consent or proxy

5

solicitation, relating to the election of directors of the Company by or on behalf of a person (as defined above) other than the Board) and (ii) any director whose initial assumption of office is in connection with the Plan; or

(v)     the PharmAthene Allowed Claim (as such term is defined in the Plan) is treated under Section 4.3(b)(i)(C) of the Plan or the provisions of Section 6.6 of the Plan become applicable.

For purposes of this Section 4(f), a "Permitted Holder" shall mean MacAndrews & Forbes Holdings Inc. and its subsidiaries or affiliates.

(g)     Termination by Executive Without Good Reason.  Executive may terminate Executive's employment hereunder at any time for any reason or no reason by giving the Company thirty (30) days prior written notice of the termination.  Following any such notice, the Company may reduce or remove any and all of Executive's duties, positions and titles with the Company, and any such reduction or removal shall not constitute Good Reason.

5.     Compensation Following Termination.  In the event that Executive's employment hereunder is terminated, Executive shall be entitled only to the following compensation and benefits upon such termination:

(a)     General.  On any termination of Executive's employment, Executive shall be entitled to the following (collectively, the "Standard Termination Payments"):

(i)     any accrued but unpaid Base Salary for services rendered through the date of termination; provided, however, that in the event Executive's employment is terminated pursuant to Section 4(b), the amount of Base Salary received by Executive during the Disability Period shall be reduced by the aggregate amounts, if any, payable to Executive under any disability benefit plan or program provided to Executive by the Company;

(ii)     any vacation accrued to the date of termination, in accordance with Company policy;

(iii)     any accrued but unpaid expenses through the date of termination required to be reimbursed in accordance with Section 3(d) of this Agreement; and

(iv)     any benefits to which Executive may be entitled upon termination pursuant to the plans, programs and grants referred to in Section 3(c) hereof in accordance with the terms of such plans, programs and grants.

(b)     Termination by Reason of Death or Executive Becoming Totally Disabled; Termination by the Company for Cause; Termination by Executive Without Good Reason.  In the event that Executive's employment is terminated prior to the expiration of the Term (i) by reason of Executive's death pursuant to Section 4(a) or Executive becoming Totally Disabled pursuant to Section 4(b), (ii) by the Company for Cause pursuant to Section 4(c) or (iii) by Executive without Good Reason pursuant to Section 4(f), Executive (or Executive's estate, as the case may be) shall be entitled to the Standard Termination Payments and the payment of any accrued but unpaid Annual Bonuses with respect to the prior full calendar year as determined by

6

the Compensation Committee in good faith and payable in cash at the time described in Section 3(b).

(c)     Termination by the Company Without Cause; Termination by Executive for Good Reason.  In the event that Executive's employment is terminated (x) prior to the expiration of the Term by the Company without Cause pursuant to Section 4(d) or by Executive for Good Reason pursuant to Section 4(e) or (y) by either party upon the expiration of the Term following the Company delivering a notice of nonrenewal of this Agreement pursuant to Section 1, Executive shall be entitled only to the following:

(i)     the Standard Termination Payments;

(ii)     the continued payment of the Base Salary (as determined pursuant to Section 3(a)) for one (1) year (such sums to be paid at the times and in the amounts such Base Salary would have been paid had Executive's employment not terminated, with the first such payment commencing on the sixtieth (60th) day following the date of Executive's termination of employment which payment shall include all amounts that would have otherwise been payable prior thereto); and

(iii)     the payment of any accrued but unpaid Annual Bonuses with respect to the prior full calendar year as determined by the Compensation Committee in good faith and payable in cash on the later of (i) at the time described in Section 3(b) or (ii) sixty (60) days following the date of Executive's termination of employment (which, for the avoidance of doubt, will in all cases be paid in the year of termination of employment); and

(iv)     to have the Company take all such action as is necessary such that all outstanding equity grants, including any stock options and restricted stock grants, to Executive shall, immediately and irrevocably vest and, to the extent applicable, become exercisable as of the date of termination and shall remain exercisable for a period of not less than one (1) year from the date of termination, or, if earlier, the expiration of the term of such equity award.

(d)     Termination Upon a Change in Control.  In the event that Executive's employment is terminated (x) prior to the expiration of the Term by the Company without Cause pursuant to Section 4(d) or by Executive for Good Reason pursuant to Section 4(e) or (y) by either party upon the expiration of the Term following the Company delivering a notice of nonrenewal of this Agreement pursuant to Section 1, in each case in connection with or after the occurrence of a Change in Control, in lieu of the benefits provided under Section 5(c) above, Executive shall be entitled only to the following:

(i)     the Standard Termination Payments;

(ii)     the continued payment of the Base Salary (as determined pursuant to Section 3(a)) for one (1) year (such sums to be paid at the times and in the amounts such Base Salary would have been paid had Executive's employment not terminated, with the first such payment commencing on the sixtieth (60th) day following the date of Executive's termination of employment which payment shall include all amounts that would have otherwise been payable prior thereto);

7

        (iii)     the payment of any accrued but unpaid Annual Bonuses with respect to the prior full calendar year as determined by the Compensation Committee in good faith and payable in cash on the later of (i) at the time described in Section 3(b) or (ii) sixty (60) days following the date of Executive's termination of employment (which, for the avoidance of doubt, will in all cases be paid in the year of termination of employment);

        (iv)     a pro rata portion of any Annual Bonus under Section 3(b) for the year of termination based on the number of days employed during such year, calculated based upon attainment of the full target level of achievement set forth in Section 3(b), and payable in cash sixty (60) days following the date of Executive's termination of employment; and

        (v)     to have the Company take all such action as is necessary such that all outstanding equity grants, including any stock options and restricted stock grants, to Executive shall, immediately and irrevocably vest and, to the extent applicable, become exercisable as of the date of termination and shall remain exercisable for a period of not less than one (1) year from the date of termination, or, if earlier, the expiration of the term of such equity award.

        (e)     <u>Effect of Material Breach of Section 6 on Compensation and Benefits Following Termination of Employment</u>.  If, at the time of termination of Executive's employment for any reason prior to the expiration of the Term or any time thereafter, Executive is in material breach of any covenant contained in Section 6 hereof, then, notwithstanding anything in this Section 5 to the contrary, Executive (or Executive's estate, as applicable) shall not be entitled to any payment (or if payments have commenced, any continued payment) other than the Standard Termination Payments.

        (f)     <u>No Further Liability; Release</u>.  Payment made and performance by the Company in accordance with this Section 5 shall operate to fully discharge and release the Company and its directors, officers, employees, affiliates, stockholders, successors, assigns, agents and representatives from any further obligation or liability with respect to Executive's employment and termination of employment.  Other than providing the compensation and benefits provided for in accordance with this Section 5, the Company and its directors, officers, employees, affiliates, stockholders, successors, assigns, agents and representatives shall have no further obligation or liability to Executive or any other person under this Agreement or with respect to Executive's employment or the termination thereof, with the exception of indemnification obligations under Section 3(e) hereof.  The payment of any amounts pursuant to this Section 5 (other than payments required by law and the Standard Termination Payments) is expressly conditioned upon the timely delivery (and non-revocation) by Executive to the Company of a release in form and substance reasonably satisfactory to the Company of any and all claims Executive may have against the Company and its directors, officers, employees, affiliates, stockholders, successors, assigns, agents and representatives arising out of or related to Executive's employment by the Company and the termination of such employment and Executive's non-revocation of such release.  Such release must be returned to the Company in accordance with the term set forth in such release agreement but no later than forty-five (45) days after Executive's termination of employment and must become irrevocable at the expiration of any applicable revocation period.

WEIL:\95565461\1\74193.0003

6.      Exclusive Employment; Non-competition; Non-solicitation; Nondisclosure of Proprietary Information; Surrender of Records; Inventions and Patents; Code of Ethics.

(a)      No Conflict; No Other Employment.  During the period of Executive's employment with the Company, Executive shall not:  (i) engage in any activity which conflicts or interferes with or derogates from the performance of Executive's duties hereunder nor shall Executive engage in any other business activity, whether or not such business activity is pursued for gain or profit and including service as a director of any other company, except as approved in advance in writing by the Company; provided, however, that Executive shall be entitled to manage Executive's personal investments and otherwise attend to personal affairs, including charitable, social and political activities, in a manner that does not unreasonably interfere with Executive's responsibilities hereunder, or (ii) accept or engage in any other employment, whether as an employee or consultant or in any other capacity, and whether or not compensated therefor, except as approved in advance in writing by the Company and such approval will not be unreasonably withheld.

(b)      Non-competition; Non-solicitation.

(i)      Executive acknowledges and recognizes the highly competitive nature of the Company's business and that access to the Company's confidential records and proprietary information renders Executive special and unique within the Company's industry.  In consideration of the payment by the Company to Executive of amounts that may hereafter be paid to Executive pursuant to this Agreement (including, without limitation, pursuant to Sections 3 and 5 hereof) and other obligations undertaken by the Company hereunder, Executive agrees that during (i) Executive's employment with the Company and (ii) twelve (12) months thereafter (the "Covered Time"), Executive shall not, directly or indirectly, engage (as owner, investor, partner, stockholder, employer, employee, consultant, advisor, director or otherwise) in any Competing Business, provided that the provisions of this Section 6(b) will not be deemed breached merely because Executive owns less than 1% of the outstanding common stock of a publicly-traded company.  For purposes of this Agreement, "Competing Business" shall mean (i) any business in which the Company is currently engaged anywhere in the world relating to the biodefense industry or (ii) the business in which the Company's affiliates set forth on Schedule A hereto are currently engaged anywhere in the world to the extent that Executive is materially in involved with such business during the Term.

(ii)      In further consideration of the payment by the Company to Executive of amounts that may hereafter be paid to Executive pursuant to this Agreement (including, without limitation, pursuant to Sections 3 and 5 hereof) and other obligations undertaken by the Company hereunder, Executive agrees that during Executive's employment and the Covered Time, Executive shall not, directly or indirectly, (i) solicit, encourage or attempt to solicit or encourage any of the employees, agents, consultants or representatives of the Company or, to the extent that he has had material contact with such employees, agents, consultants or representatives, any of its affiliates to terminate his, her, or its relationship with the Company or such affiliate; (ii) solicit, encourage or attempt to solicit or encourage any of the employees, agents, consultants or representatives of the Company or, to the extent that he has had material contact with such employees, agents, consultants or representatives, any of its affiliates to become employees, agents, representatives or consultants of any other person or

entity; (iii) solicit or attempt to solicit any customer, vendor or distributor of the Company or, to the extent that he has had material contact with such customer, vendor or distributor, any of its affiliates with respect to any product or service being furnished, made, sold or leased by the Company or such affiliate; or (iv) persuade or seek to persuade any customer of the Company or, to the extent that he has had material contact with such customer, any affiliate to cease to do business or to reduce the amount of business which any customer has customarily done or contemplates doing with the Company or such affiliate, whether or not the relationship between the Company or its affiliate and such customer was originally established in whole or in part through Executive's efforts.  For purposes of this Section 6(b) only, the terms "customer," "vendor" and "distributor" shall mean a customer, vendor or distributor who has done business with the Company or any of its affiliates within twelve months preceding the termination of Executive's employment.

(iii)    During Executive's employment with the Company and during the Covered Time, Executive agrees that upon the earlier of Executive's (i) negotiating with any Competitor (as defined below) concerning the possible employment of Executive by the Competitor, (ii) receiving a written offer of employment from a Competitor, or (iii) becoming employed by a Competitor, Executive will (A) immediately provide notice to the Company of such circumstances and (B) provide copies of Section 6 of this Agreement to the Competitor. Executive further agrees that the Company may provide notice to a Competitor of Executive's obligations under this Agreement, including without limitation Executive's obligations pursuant to Section 6 hereof.  For purposes of this Agreement, "Competitor" shall mean any entity (other than the Company or any of its affiliates) that engages, directly or indirectly, in any Competing Business.

(iv)    Executive understands that the provisions of this Section 6(b) may limit Executive's ability to earn a livelihood in a Competing Business but nevertheless agrees and hereby acknowledges that the consideration provided under this Agreement, including any amounts or benefits provided under Sections 3 and 5 hereof and other obligations undertaken by the Company hereunder, is sufficient to justify the restrictions contained in such provisions.

(c)    Proprietary Information.  Executive acknowledges that, during the course of Executive's employment with the Company, Executive will necessarily have access to and make use of proprietary information and confidential records of the Company and its affiliates. Executive covenants that Executive shall not during the Term or at any time thereafter, directly or indirectly, use for Executive's own purpose or for the benefit of any person or entity other than the Company, nor otherwise disclose, any proprietary information to any individual or entity, unless such disclosure has been authorized in writing by the Company or is otherwise required by law.  Executive acknowledges and understands that the term "proprietary information" includes, but is not limited to:  (a) inventions, trade secrets, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, research, discoveries, developments, designs, and techniques regarding any of the foregoing utilized by the Company or any of its affiliates; (b) the name and/or address of any customer or vendor of the Company or any of its affiliates or any information concerning the transactions or relations of any customer or vendor of the Company or any of its affiliates with the Company or such affiliate or any of its or their partners, principals, directors, officers or agents; (c) any information concerning any product, technology, or procedure employed by the

10

Company or any of its affiliates but not generally known to its or their customers, vendors or competitors, or under development by or being tested by the Company or any of its affiliates but not at the time offered generally to customers or vendors; (d) any information relating to the pricing or marketing methods, sales margins, cost of goods, cost of material, capital structure, operating results, borrowing arrangements or business plans of the Company or any of its affiliates; (e) any information which is generally regarded as confidential or proprietary in any line of business engaged in by the Company or any of its affiliates; (f) any business plans, budgets, advertising or marketing plans; (g) any information contained in any of the written or oral policies and procedures or manuals of the Company or any of its affiliates; (h) any information belonging to customers or vendors of the Company or any of its affiliates or any other person or entity which the Company or any of its affiliates has agreed to hold in confidence; (i) any inventions, innovations or improvements covered by this Agreement; and (j) all written, graphic and other material relating to any of the foregoing.  Executive acknowledges and understands that information that is not novel or copyrighted or patented may nonetheless be proprietary information.  The term "proprietary information" shall not include information generally available to and known by the industry, was known by Executive prior to the commencement of his employment (or anticipated employment) with the Company, or information that is or becomes available to Executive on a non-confidential basis from a source other than the Company, any of its affiliates, or the directors, officers, employees, partners, principals or agents of the Company or any of its affiliates (other than as a result of a breach of any obligation of confidentiality).

(d)    <u>Confidentiality and Surrender of Records</u>.  Executive shall not during the Term or at any time thereafter (irrespective of the circumstances under which Executive's employment by the Company terminates), except as required by law, directly or indirectly publish, make known or in any fashion disclose any confidential records to, or permit any inspection or copying of confidential records by, any individual or entity other than in the course of such individual's or entity's employment or retention by the Company.  Upon termination of employment for any reason or upon request by the Company, Executive shall deliver promptly to the Company all property and records of the Company or any of its affiliates, including, without limitation, all confidential records.  For purposes hereof, "confidential records" means all correspondence, reports, memoranda, files, manuals, books, lists, financial, operating or marketing records, magnetic tape, or electronic or other media or equipment of any kind which may be in Executive's possession or under Executive's control or accessible to Executive which contain any proprietary information.  All property and records of the Company and any of its affiliates (including, without limitation, all confidential records) shall be and remain the sole property of the Company or such affiliate during the Term and thereafter.

(e)    <u>Inventions and Patents</u>.

(i)    Executive agrees that all processes, technologies and inventions, including new contributions, improvements, ideas and discoveries, whether patentable or not, conceived, developed, invented or made by Executive during the Term shall belong to the Company, provided that such inventions grew out of Executive's work with the Company or any of its subsidiaries or affiliates, are related in any manner to the business (commercial or experimental) of the Company or any of its subsidiaries or affiliates or are conceived or made on the Company's time or with the use of the Company's facilities or materials (collectively,

11

"Inventions"). Executive shall further:  (a) promptly disclose such Inventions to the Company; (b) assign to the Company, without additional compensation, all patent and other rights to such Inventions for the United States and foreign countries; (c) sign all papers necessary to carry out the foregoing; and (d) give testimony in support of Executive's inventorship.

(ii)    If any Invention is described in a patent application or is disclosed to third parties, directly or indirectly, by Executive within two years after the termination of Executive's employment by the Company, it is to be presumed that the Invention was conceived or made during the Term.

(iii)    Executive agrees that Executive will not assert any rights to any Invention as having been made or acquired by Executive prior to the date of this Agreement, except for Inventions, if any, disclosed to the Company in writing prior to the date hereof.

(iv)    The Company shall be the sole owner of all the products and proceeds of Executive's services hereunder, including, but not limited to, all materials, ideas, concepts, formats, suggestions, developments, arrangements, packages, programs and other intellectual properties that Executive may acquire, obtain, develop or create in connection with and during the Term, free and clear of any claims by Executive (or anyone claiming under Executive) of any kind or character whatsoever (other than Executive's right to receive payments hereunder).  Executive shall, at the request of the Company, execute such assignments, certificates or other instruments as the Company may from time to time deem necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend its right, title or interest in or to any such properties.

(f)    Enforcement.  Executive acknowledges and agrees that, by virtue of Executive's position, Executive's services and access to and use of confidential records and proprietary information, any violation by Executive of any of the undertakings contained in this Section 6 would cause the Company and/or its affiliates immediate, substantial and irreparable injury for which it or they have no adequate remedy at law.  Accordingly, Executive agrees and consents to the entry of an injunction or other equitable relief by a court of competent jurisdiction restraining any violation or threatened violation of any undertaking contained in this Section 6.  Executive waives posting by the Company or its affiliates of any bond otherwise necessary to secure such injunction or other equitable relief.  Rights and remedies provided for in this Section 6 are cumulative and shall be in addition to rights and remedies otherwise available to the parties hereunder or under any other agreement or applicable law.

(g)    Code of Ethics.  Nothing in this Section 6 is intended to limit, modify or reduce Executive's obligations under the Company's Code of Ethics.  Executive's obligations under this Section 6 are in addition to, and not in lieu of, Executive's obligations under the Code of Ethics.  To the extent there is any inconsistency between this Section 6 and the Code of Ethics which would permit Executive to take any action or engage in any activity pursuant to this Section 6 which Executive would be barred from taking or engaging in under the Code of Ethics, the Code of Ethics shall control.

7.    Assignment and Transfer.

WEIL:\95565461\1\74193.0003

(a)    Company.  This Agreement shall inure to the benefit of and be enforceable by and binding upon, and may be assigned by the Company without Executive's consent to, any purchaser of all or substantially all of the Company's business or assets, or to any successor to the Company (whether direct or indirect, by purchase, merger, consolidation or otherwise).

(b)    Executive.  The parties hereto agree that Executive is obligated under this Agreement to render personal services during Executive's employment of a special, unique, unusual, extraordinary and intellectual character, thereby giving this Agreement special value. Executive's rights and obligations under this Agreement shall not be transferable by Executive by assignment or otherwise, and any purported assignment, transfer or delegation thereof shall be void; provided, however, that if Executive shall die, all amounts then payable to Executive hereunder shall be paid in accordance with the terms of this Agreement to Executive's estate.

8.    Miscellaneous.

(a)    Cooperation.  Following termination of employment with the Company for any reason, Executive shall cooperate with the Company, as requested by the Company upon reasonable notice and with due regard to Executive's obligations to a future employer, to effect a transition of Executive's responsibilities and to ensure that the Company is aware of all matters being handled by Executive.

(b)    Mitigation; Offset.  Executive shall not be required to mitigate damages or the amount of any payment provided to Executive under Section 5 of this Agreement by seeking other employment or otherwise, nor shall the amount of any payments provided to Executive under Section 5 be reduced by any compensation earned by Executive as the result of employment by another employer after the termination of Executive's employment or otherwise.

(c)    Protection of Reputation.  During the Term and thereafter, Executive agrees that Executive will take no action which is intended, or would reasonably be expected, to harm the Company or any of its affiliates or its or their reputation or which would reasonably be expected to lead to unwanted or unfavorable publicity to the Company or its affiliates.  Nothing herein shall prevent Executive from making any truthful statement in connection with any legal proceeding or investigation by the Company or any governmental authority.

(d)    Governing Law; Consent to Jurisdiction.  This Agreement shall be governed by and construed (both as to validity and performance) and enforced in accordance with the internal laws of the State of New York applicable to agreements made and to be performed wholly within such jurisdiction, without regard to the principles of conflicts of law or where the parties are located at the time a dispute arises.  In the event of any controversy or claim arising out of or relating to this Agreement or the breach or alleged breach hereof, each of the parties hereto irrevocably (a) consents to the jurisdiction of any state court sitting in the County of New York, State of New York, or federal court sitting in the County of New York, State of New York. (b) waives any objection which it may have at any time to the laying of venue of any action or proceeding brought in any such court and (c) waives any claim that such action or proceeding has been brought in an inconvenient forum.

WEIL:\95565461\1\74193.0003

(e)    <u>Injunctive Relief</u>.  Notwithstanding anything to the contrary contained herein, the Company and any affiliate of the Company (if applicable) shall have the right to seek injunctive or other equitable relief from a court of competent jurisdiction to enforce Section 6 of this Agreement without any obligation to post a bond.

(f)    <u>Entire Agreement</u>.  This Agreement (including the plans referenced in Section 3(c) of this Agreement) contains the entire agreement and understanding between the parties hereto in respect of Executive's employment from and after the date hereof and supersedes, cancels and annuls any prior or contemporaneous written or oral agreements, understandings, commitments and practices between them respecting Executive's employment from and after the date hereof, including the Original Employment Agreement and all other prior employment agreements or understandings between the Company and Executive.

(g)    <u>Amendment</u>.  This Agreement may be amended only by a writing which makes express reference to this Agreement as the subject of such amendment and which is signed by Executive and, on behalf of the Company, by its duly authorized officer.

(h)    <u>Severability</u>.  If any provision of this Agreement or the application of any such provision to any party or circumstances shall be determined by any court of competent jurisdiction or arbitration panel to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to such person or circumstances other than those to which it is so determined to be invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be enforced to the fullest extent permitted by law.  If any provision of this Agreement, or any part thereof, is held to be invalid or unenforceable because of the scope or duration of or the area covered by such provision, the parties hereto agree that the court or arbitration panel making such determination shall reduce the scope, duration and/or area of such provision (and shall substitute appropriate provisions for any such invalid or unenforceable provisions) in order to make such provision enforceable to the fullest extent permitted by law and/or shall delete specific words and phrases, and such modified provision shall then be enforceable and shall be enforced.  The parties hereto recognize that if, in any judicial or arbitral proceeding, a court or arbitration panel shall refuse to enforce any of the separate covenants contained in this Agreement, then that invalid or unenforceable covenant contained in this Agreement shall be deemed eliminated from these provisions to the extent necessary to permit the remaining separate covenants to be enforced.  In the event that any court or arbitration panel determines that the time period or the area, or both, are unreasonable and that any of the covenants is to that extent invalid or unenforceable, the parties hereto agree that such covenants will remain in full force and effect, first, for the greatest time period, and second, in the greatest geographical area that would not render them unenforceable.

(i)    <u>Construction</u>.  The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement.  The language in all parts of this Agreement shall be in all cases construed according to its fair meaning and not strictly for or against the Company or Executive.  As used herein, the words "day" or "days" shall mean a calendar day or days.

(j)    <u>Non-waiver</u>.  Neither any course of dealing nor any failure or neglect of either party hereto in any instance to exercise any right, power or privilege hereunder or under

14

law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.  All waivers by either party hereto must be contained in a written instrument signed by the party to be charged and, in the case of the Company, by its duly authorized officer.

> (k)    <u>Notices</u>.  Any notice required or permitted hereunder shall be in writing and shall be sufficiently given if personally delivered or if sent by registered or certified mail, postage prepaid, with return receipt requested, addressed:

>> (i)    in the case of the Company, to:

>>> SIGA Technologies, Inc.
>>> 35 East 62nd Street
>>> New York, NY 10065
>>> Attention:  Chief Executive Officer

>> (ii)    in the case of Executive, to Executive's last known address as reflected in the Company's records, or to such other address as Executive shall designate by written notice to the Company.

Any notice given hereunder shall be deemed to have been given at the time of receipt thereof by the person to whom such notice is given if personally delivered or at the time of mailing if sent by registered or certified mail.

> (l)    <u>Assistance in Proceedings, Etc</u>.  Executive shall, without additional compensation, during and after the Term, upon reasonable notice and with due regard to Executive's obligations to a future employer, furnish such information and reasonable assistance to the Company as may reasonably be required by the Company in connection with any legal or quasi-legal proceeding, including any external or internal investigation, involving the Company or any of its affiliates.  The Company shall reimburse (or advance) Executive's expenses in connection with such assistance (including, without limitation, reasonable legal fees).

> (m)    <u>Survival</u>.  Cessation or termination of Executive's employment with the Company shall not result in termination of this Agreement.  The respective obligations of Executive and the Company as provided in Sections 5, 6, 7 and 8 of this Agreement shall survive cessation or termination of Executive's employment hereunder.

> (n)    <u>Section 409A of the Code</u>.

>> (i)    The intent of the parties is that payments and benefits under this Agreement comply with, or be exempt from, Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder (collectively "Section 409<u>A of the Code</u>") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith.

>> (ii)    A termination of employment shall not be deemed to have occurred for purposes of this Agreement providing for the payment of any amounts or benefits subject to Section 409A of the Code upon or following a termination of employment unless such

15

termination is also a "separation from service" within the meaning of Section 409A of the Code and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." ."  If Executive is deemed on the date of termination to be a "specified employee" within the meaning of that term under Code Section 409A(a)(2)(B), then with regard to any payment that is considered non-qualified deferred compensation under Section 409A of the Code payable on account of a "separation from service," such payment or benefit shall be made or provided at the date which is the earlier of (A) the day following the expiration of the six (6)-month period measured from the date of such "separation from service" of Executive, and (B) the date of Executive's death (the "Delay Period").  Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section 8(n) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to Executive in a lump sum, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

        (iii)    (A) All expenses or other reimbursements provided herein shall be payable in accordance with the Company's policies in effect from time to time, but in any event shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by Executive, (B) no such reimbursement or expenses eligible for reimbursement in any taxable year shall in any way affect the expenses eligible for reimbursement in any other taxable year and (C) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchanged for another benefit.

        (iv)    For purposes of Section 409A of the Code, Executive's right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.

        (v)    Notwithstanding the foregoing, the Company makes no representations regarding the tax implications of the compensation and benefits to be paid to Executive under this Agreement, including, without limitation, under Section 409A of the Code. The parties agree that in the event a qualified tax advisor to the Company or to Executive (neither party being required to retain such advisor) reasonably advises that the terms hereof would result in Executive being subject to tax under Section 409A of the Code, Executive and the Company shall negotiate in good faith to amend this Agreement to the extent necessary to prevent the assessment of any such tax.

WEIL:\95565461\1\74193.0003

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed on its behalf by an individual thereunto duly authorized and Executive has duly executed this Agreement, all as of the date and year first written above.

**SIGA TECHNOLOGIES, INC.**

By: _____
      Name:
      Title:


_____
Daniel J. Luckshire

17

<u>Schedule A</u>

AM General, LLC
Deluxe Entertainment Services Group, Inc.
Flavors Holdings Incorporated
Harland Clarke
Harland Clarke Holding Corp.
Mafco Worldwide Corporation
Merisant Company
Revlon, Inc.
Scantron
Scientific Games Corporation
Valassis Communications, Inc.
vTv Therapeutics LLC

DRAFT – 12/15/15

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

**THIS AMENDED AND RESTATED AGREEMENT** (the "Agreement"), made in New York, New York as of [_____], between SIGA Technologies, Inc., a Delaware corporation (the "Company"), and William J. Haynes III ("Executive").

**WHEREAS**, the Company and Executive entered into an Employment Agreement dated June 4, 2012 (the "Original Employment Agreement"), providing for Executive's employment by the Company and setting forth the terms and conditions of such employment;

**WHEREAS**, the parties hereto agree that the Original Employment Agreement should be amended and restated as set forth in this Agreement;

**WHEREAS**, the Company desires to continue to employ Executive as its Executive Vice President and General Counsel, and Executive desires to accept such employment on the terms and conditions hereinafter set forth;

**WHEREAS**, the Company has filed a plan for reorganization (the "Plan") under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in its pending case under the Bankruptcy Code; and

**WHEREAS**, this Agreement shall become effective upon and subject to the occurrence of the Effective Date (as defined in the Plan), provided that Executive continues to be employed by the Company immediately prior to the Effective Date, and at which time the Original Employment Agreement shall be superseded by this Agreement and of no further force or effect.

**NOW, THEREFORE, IN CONSIDERATION** of the mutual covenants and agreements hereinafter set forth, the Company and Executive agree as follows:

1.    Term.  Unless earlier terminated in accordance with Section 4 hereof, the term of Executive's employment under this Agreement shall be the two-year period commencing on the Effective Date and ending on the second anniversary of the Effective Date (the "Term" and each such year, a "Term Year").  In addition, unless either party hereto provides notice of its desire not to renew this Agreement thirty (30) days prior to the expiration of the Term, this Agreement shall automatically renew for additional one (1) year periods commencing upon the expiration of the initial Term (or any such subsequent Term), with each such additional year thereafter being made part of the Term and each such additional year, thereafter a Term Year.

2.    Employment.

(a)    Employment by the Company.  Executive agrees to be employed by the Company during the Term upon the terms and subject to the conditions set forth in this Agreement.  Executive shall serve as the Executive Vice President and General Counsel of the Company and shall report to the Board of Directors of the Company (the "Board") and Chief Executive Officer of the Company.

(b)    Performance of Duties.  Throughout Executive's employment with the Company, Executive shall faithfully and diligently perform Executive's duties in conformity

with the lawful directions of the Company and serve the Company to the best of Executive's ability.  Executive shall devote Executive's full business time and best efforts to the business and affairs of the Company.  In Executive's capacity as the Executive Vice President and General Counsel of the Company, Executive shall have such duties and responsibilities as Executive may be assigned by the Board of Directors or Chief Executive Officer not inconsistent with Executive's position as Executive Vice President and General Counsel.  Executive will perform Executive's duties primarily from the Company's offices in New York City, New York, subject to reasonable travel requirements.   Notwithstanding anything in this Section 2(b) or Section 6(a) to the contrary, Company expressly supports and approves of Executive's continued participation as Board Member of the U.S. Supreme Court Historical Society, as Board Member and Distinguished Fellow at the George Mason University School of Law Center for Infrastructure Protection and Homeland Security, and as a Senior Adviser to the American Legion.

     3.    <u>Compensation and Benefits</u>.

    (a)    <u>Base Salary</u>.  The Company agrees to pay to Executive a base salary ("Base Salary") with respect to the 2016 calendar year at the annual rate of $506,480 or such greater amount as determined by the Compensation Committee of the Board of Directors of the Company (the "Compensation Committee").  Effective as of January 1st of each subsequent calendar year, beginning with January 1, 2017, the Base Salary shall be automatically increased by at least three percent (3%) above the amount of Executive's Base Salary in effect at the end of the prior calendar year.  Payments of the Base Salary shall be payable in equal installments in accordance with the Company's standard payroll practices.

    (b)    <u>Annual Bonus</u>.  The Company shall pay to Executive an annual cash bonus as set forth below (the "Annual Bonus"):

    (i)    With respect to Executive's Annual Bonus for the 2014 calendar year, Executive shall be entitled to an Annual Bonus equal to $119,351, and such amount shall constitute a cost and expense of administration of the Company's chapter 11 case and shall be paid in cash, in full, on the Effective Date.

    (ii)    With respect to Executive's Annual Bonus for the 2015 calendar year, Executive shall be entitled to an Annual Bonus, subject to the discretion of the Compensation Committee, based upon a target bonus opportunity of $491,728, which represents one hundred percent (100%) of Executive's 2015 annual Base Salary, based upon the attainment of the applicable performance criteria and goals established by the Compensation Committee prior to the Effective Date, the achievement of which shall be determined consistent with the methodology and measurement standards established by the Compensation Committee prior to the Effective Date.  Such Annual Bonus shall be paid no later than March 15, 2016.

    (iii)    With respect to Executive's Annual Bonus for the 2016 calendar year and each subsequent calendar year during the Term, the Company shall pay Executive an Annual Bonus, subject to the discretion of the Compensation Committee, based upon a target bonus opportunity of 100% of Executive's then current Base Salary, based upon the achievement of performance criteria and goals approved by the Compensation Committee.  Such performance criteria and goals shall be materially consistent in nature and degree of difficulty with the

2

performance criteria established with respect to the Annual Bonus for the 2015 calendar year. Each such Annual Bonus shall be paid as soon as practicable but no later than March 15th of the year following the year to which the Annual Bonus relates.

(iv)    Notwithstanding anything herein to the contrary, in the event of a Change of Control of the Company, Executive shall receive an Annual Bonus for the year in which the Change of Control occurs equal to the greater of (i) the target Annual Bonus for such year or (ii) the Annual Bonus determined based upon the applicable performance criteria and goals for such year, provided that Executive remains employed on the last day of such calendar year, payable at the times set forth above.  If a Change of Control occurs in the 2016 calendar year prior to the time that the Annual Bonus for the 2015 calendar year has been paid, such Annual Bonus shall be paid to Executive on the effective date of the Change of Control.

(c)    <u>Benefits and Perquisites</u>.  Executive shall be entitled to participate in, to the extent Executive is otherwise eligible under the terms thereof, the benefit plans and programs, and receive the benefits and perquisites, generally provided by the Company from time to time to senior executives of the Company, including without limitation family medical insurance (subject to applicable employee contributions).  Executive shall be entitled to receive four weeks of vacation, in accordance with Company policy.

(d)    <u>Business Expenses</u>.  The Company agrees to reimburse Executive for all reasonable and necessary travel, business entertainment and other business expenses incurred by Executive in connection with the performance of Executive's duties under this Agreement.  Such reimbursements shall be made by the Company on a timely basis upon submission by Executive of vouchers in accordance with the Company's standard procedures.

(e)    <u>Indemnification</u>.  The Company shall indemnify Executive, to the fullest extent permitted by its certificate of incorporation or by-laws, for any and all liabilities to which Executive may be subject as a result of, in connection with or arising out of Executive's employment by the Company hereunder, as well as the costs and expenses (including reasonable attorneys' fees) of any legal action brought or threatened to be brought against Executive or the Company as a result of, in connection with or arising out of such employment or board service (such costs and expenses being advanced by the Company in accordance with the procedures set forth in the Company's by-laws).  Executive shall be entitled to the full protection of any insurance policies which the Company may elect to maintain generally for the benefit of its officers.

(f)    <u>No Other Compensation or Benefits; Payment</u>.  The compensation and benefits specified in this Section 3 and in Section 5 of this Agreement shall be in lieu of any and all other compensation and benefits.  Payment of all compensation and benefits to Executive specified in this Section 3 and in Section 5 of this Agreement (i) shall be made in accordance with the relevant Company policies in effect from time to time to the extent the same are consistently applied, including normal payroll practices, and (ii) shall be subject to all legally required and customary withholdings.

(g)    <u>Cessation of Employment</u>.  In the event Executive shall cease to be employed by the Company for any reason, Executive's compensation and benefits shall cease on

3

the date of such event, except as otherwise specifically provided herein or in any applicable employee benefit plan or program or as required by law.

    4.    <u>Termination of Employment</u>. Executive's employment hereunder may be terminated prior to the end of the Term under the following circumstances.

    (a)    <u>Death</u>. Executive's employment hereunder shall terminate upon Executive's death.

    (b)    <u>Executive Becoming Totally Disabled</u>. The Company may terminate Executive's employment hereunder at any time after Executive becomes "Totally Disabled." For purposes of this Agreement, Executive shall be "Totally Disabled" in the event Executive is unable to perform the duties and responsibilities contemplated under this Agreement for a period of either (A) 120 consecutive days or (B) 6 months in any 12-month period due to physical or mental incapacity or impairment. During any period that Executive fails to perform Executive's duties hereunder as a result of incapacity due to physical or mental illness (the "Disability Period"), Executive shall continue to receive the compensation and benefits provided by Section 3 of this Agreement until Executive's employment hereunder is terminated; provided, however, that the amount of base compensation and benefits received by Executive during the Disability Period shall be reduced by the aggregate amounts, if any, payable to Executive under any disability benefit plan or program provided to Executive by the Company.

    (c)    <u>Termination by the Company for Cause</u>. The Company may terminate Executive's employment hereunder for Cause at any time after providing written notice to Executive. For purposes of this Agreement, the term "Cause" shall mean any of the following: (i) Executive's neglect or failure or refusal to perform Executive's duties under this Agreement (other than as a result of total or partial incapacity due to physical or mental illness); (ii) any act by or omission of Executive constituting gross negligence or willful misconduct in connection with the performance of Executive's duties that could reasonably be expected to materially injure the reputation, business or business relationships of the Company or any of its affiliates; (iii) perpetration of an intentional and knowing fraud against or affecting the Company or any of its affiliates or any customer, client, agent, or employee thereof; (iv) the commission by or indictment of Executive for (A) a felony or (B) any misdemeanor involving moral turpitude, deceit, dishonesty or fraud ("indictment," for these purposes, meaning a United States-based indictment, probable cause hearing or any other procedure pursuant to which an initial determination of probable or reasonable cause with respect to such offense is made); (v) the breach of a covenant set forth in Section 6; or (vi) any other material breach of this Agreement.

    (d)    <u>Termination by the Company Without Cause</u>. The Company may terminate Executive's employment hereunder at any time for any reason or no reason by giving Executive thirty (30) days prior written notice of the termination. Following any such notice, the Company may reduce or remove any and all of Executive's duties, positions and titles with the Company.

    (e)    <u>Termination by Executive for Good Reason</u>. Executive may terminate Executive's employment hereunder for Good Reason at any time after providing written notice to the Company. For purposes of this Agreement, the term "Good Reason" shall mean any of the

4

following:  (i) the Company fails to pay the compensation described in Section 3 of this Agreement (in accordance with, and subject to, such provisions); (ii) Executive no longer holds the office of Executive Vice President and General Counsel or offices of equivalent stature, or Executive's functions, responsibilities and/or duties as Executive Vice President and General Counsel are materially diminished or (iii) Executive's job site is relocated to a location which is more than fifty (50) miles from New York City, unless the parties mutually agree to such relocation.  In order to terminate Executive's employment for Good Reason, Executive shall provide the Company with a written notice detailing the specific circumstances alleged to constitute Good Reason within sixty (60) days after the first occurrence of such circumstances, and the Company shall have thirty (30) days following receipt of such notice to cure such circumstances in all material respects, provided, that, no termination for Good Reason shall occur after the 180th day following the first occurrence of any Good Reason event.

(f)    Termination Upon a Change in Control.  If (x) the Company terminates Executive's employment hereunder without Cause, (y) Executive terminates Executive's employment for Good Reason or (z) the Company delivers a notice of non-renewal, in each case in connection with or after the occurrence of the Change in Control, Executive shall be entitled to the payments provided for by Section 5(d).  For purposes of this Agreement, a "Change in Control" shall be conclusively deemed to have occurred if any of the following shall have taken place:

(i)    the consummation of a transaction or a series of related transactions pursuant to which any "person" (as such term is used in Sections 13(d) and 14(d)(2) of the Securities Exchange Act of 1934 ("Exchange Act"), other than Executive, Executive's designee(s) or "affiliate(s)" (as defined in Rule 12b-2 under the Exchange Act), or a Permitted Holder, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing forty percent (40%) or more of the combined voting power of the Company's then outstanding securities; or

(ii)    stockholders of the Company approve a merger or consolidation of the Company with any other entity other than a Permitted Holder, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than eighty percent (80%) of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; or

(iii)    the stockholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of, or the Company sells or disposes of, all or substantially all of the Company's assets other than to a Permitted Holder; or

(iv)    the following individuals cease for any reason to constitute a majority of the number of directors then serving on the Board: individuals who, on the Effective Date, constitute the Board and any new director whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the Effective

WEIL:\95565464\1\74193.0003

Date or whose appointment, election or nomination for election was previously so approved or recommended, but excluding (i) any director whose initial assumption of office is in connection with an actual or threatened election contest (including, but not limited to, a consent or proxy solicitation, relating to the election of directors of the Company by or on behalf of a person (as defined above) other than the Board) and (ii) any director whose initial assumption of office is in connection with the Plan; or

    (v) the PharmAthene Allowed Claim (as such term is defined in the Plan) is treated under Section 4.3(b)(i)(C) of the Plan or the provisions of Section 6.6 of the Plan become applicable.

    For purposes of this Section 4(f), a "Permitted Holder" shall mean MacAndrews & Forbes Holdings Inc. and its subsidiaries or affiliates.

    (g) <u>Termination by Executive Without Good Reason</u>.  Executive may terminate Executive's employment hereunder at any time for any reason or no reason by giving the Company thirty (30) days prior written notice of the termination.  Following any such notice, the Company may reduce or remove any and all of Executive's duties, positions and titles with the Company, and any such reduction or removal shall not constitute Good Reason.

    5. <u>Compensation Following Termination</u>.  In the event that Executive's employment hereunder is terminated, Executive shall be entitled only to the following compensation and benefits upon such termination:

    (a) <u>General</u>.  On any termination of Executive's employment, Executive shall be entitled to the following (collectively, the "Standard Termination Payments"):

    (i) any accrued but unpaid Base Salary for services rendered through the date of termination; provided, however, that in the event Executive's employment is terminated pursuant to Section 4(b), the amount of Base Salary received by Executive during the Disability Period shall be reduced by the aggregate amounts, if any, payable to Executive under any disability benefit plan or program provided to Executive by the Company;

    (ii) any vacation accrued to the date of termination, in accordance with Company policy;

    (iii) any accrued but unpaid expenses through the date of termination required to be reimbursed in accordance with Section 3(d) of this Agreement; and

    (iv) any benefits to which Executive may be entitled upon termination pursuant to the plans, programs and grants referred to in Section 3(c) hereof in accordance with the terms of such plans, programs and grants.

    (b) <u>Termination by Reason of Death or Executive Becoming Totally Disabled; Termination by the Company for Cause; Termination by Executive Without Good Reason</u>.  In the event that Executive's employment is terminated prior to the expiration of the Term (i) by reason of Executive's death pursuant to Section 4(a) or Executive becoming Totally Disabled pursuant to Section 4(b), (ii) by the Company for Cause pursuant to Section 4(c) or (iii)

6

by Executive without Good Reason pursuant to Section 4(f), Executive (or Executive's estate, as the case may be) shall be entitled to the Standard Termination Payments and the payment of any accrued but unpaid Annual Bonuses with respect to the prior full calendar year as determined by the Compensation Committee in good faith and payable in cash at the time described in Section 3(b).

(c)    Termination by the Company Without Cause; Termination by Executive for Good Reason.  In the event that Executive's employment is terminated (x) prior to the expiration of the Term by the Company without Cause pursuant to Section 4(d) or by Executive for Good Reason pursuant to Section 4(e) or (y) by either party upon the expiration of the Term following the Company delivering a notice of nonrenewal of this Agreement pursuant to Section 1, Executive shall be entitled only to the following:

(i)    the Standard Termination Payments;

(ii)    the continued payment of the Base Salary (as determined pursuant to Section 3(a)) for one (1) year (such sums to be paid at the times and in the amounts such Base Salary would have been paid had Executive's employment not terminated, with the first such payment commencing on the sixtieth (60th) day following the date of Executive's termination of employment which payment shall include all amounts that would have otherwise been payable prior thereto); and

(iii)    the payment of any accrued but unpaid Annual Bonuses with respect to the prior full calendar year as determined by the Compensation Committee in good faith and payable in cash on the later of (i) at the time described in Section 3(b) or (ii) sixty (60) days following the date of Executive's termination of employment (which, for the avoidance of doubt, will in all cases be paid in the year of termination of employment); and

(iv)    to have the Company take all such action as is necessary such that all outstanding equity grants, including any stock options and restricted stock grants, to Executive shall, immediately and irrevocably vest and, to the extent applicable, become exercisable as of the date of termination and shall remain exercisable for a period of not less than one (1) year from the date of termination, or, if earlier, the expiration of the term of such equity award.

(d)    Termination Upon a Change in Control.  In the event that Executive's employment is terminated (x) prior to the expiration of the Term by the Company without Cause pursuant to Section 4(d) or by Executive for Good Reason pursuant to Section 4(e) or (y) by either party upon the expiration of the Term following the Company delivering a notice of nonrenewal of this Agreement pursuant to Section 1, in each case in connection with or after the occurrence of a Change in Control, in lieu of the benefits provided under Section 5(c) above, Executive shall be entitled only to the following:

(i)    the Standard Termination Payments;

(ii)    the continued payment of the Base Salary (as determined pursuant to Section 3(a)) for one (1) year (such sums to be paid at the times and in the amounts such Base Salary would have been paid had Executive's employment not terminated, with the first such

7

payment commencing on the sixtieth (60th) day following the date of Executive's termination of employment which payment shall include all amounts that would have otherwise been payable prior thereto);

(iii)    the payment of any accrued but unpaid Annual Bonuses with respect to the prior full calendar year as determined by the Compensation Committee in good faith and payable in cash on the later of (i) at the time described in Section 3(b) or (ii) sixty (60) days following the date of Executive's termination of employment (which, for the avoidance of doubt, will in all cases be paid in the year of termination of employment);

(iv)    a pro rata portion of any Annual Bonus under Section 3(b) for the year of termination based on the number of days employed during such year, calculated based upon attainment of the full target level of achievement set forth in Section 3(b), and payable in cash sixty (60) days following the date of Executive's termination of employment; and

(v)    to have the Company take all such action as is necessary such that all outstanding equity grants, including any stock options and restricted stock grants, to Executive shall, immediately and irrevocably vest and, to the extent applicable, become exercisable as of the date of termination and shall remain exercisable for a period of not less than one (1) year from the date of termination, or, if earlier, the expiration of the term of such equity award.

(e)    Effect of Material Breach of Section 6 on Compensation and Benefits Following Termination of Employment.  If, at the time of termination of Executive's employment for any reason prior to the expiration of the Term or any time thereafter, Executive is in material breach of any covenant contained in Section 6 hereof, then, notwithstanding anything in this Section 5 to the contrary, Executive (or Executive's estate, as applicable) shall not be entitled to any payment (or if payments have commenced, any continued payment) other than the Standard Termination Payments.

(f)    No Further Liability; Release.  Payment made and performance by the Company in accordance with this Section 5 shall operate to fully discharge and release the Company and its directors, officers, employees, affiliates, stockholders, successors, assigns, agents and representatives from any further obligation or liability with respect to Executive's employment and termination of employment.  Other than providing the compensation and benefits provided for in accordance with this Section 5, the Company and its directors, officers, employees, affiliates, stockholders, successors, assigns, agents and representatives shall have no further obligation or liability to Executive or any other person under this Agreement or with respect to Executive's employment or the termination thereof, with the exception of indemnification obligations under Section 3(e) hereof.  The payment of any amounts pursuant to this Section 5 (other than payments required by law and the Standard Termination Payments) is expressly conditioned upon the timely delivery (and non-revocation) by Executive to the Company of a release in form and substance reasonably satisfactory to the Company of any and all claims Executive may have against the Company and its directors, officers, employees, affiliates, stockholders, successors, assigns, agents and representatives arising out of or related to Executive's employment by the Company and the termination of such employment and Executive's non-revocation of such release.  Such release must be returned to the Company in

8

accordance with the term set forth in such release agreement but no later than forty-five (45) days after Executive's termination of employment and must become irrevocable at the expiration of any applicable revocation period.

6.     <u>Exclusive Employment; Non-competition; Non-solicitation; Nondisclosure of Proprietary Information; Surrender of Records; Inventions and Patents; Code of Ethics</u>.

(a)     <u>No Conflict; No Other Employment</u>.  During the period of Executive's employment with the Company, Executive shall not:  (i) engage in any activity which conflicts or interferes with or derogates from the performance of Executive's duties hereunder nor shall Executive engage in any other business activity, whether or not such business activity is pursued for gain or profit and including service as a director of any other company, except as approved in advance in writing by the Company; provided, however, that Executive shall be entitled to manage Executive's personal investments and otherwise attend to personal affairs, including charitable, social and political activities, in a manner that does not unreasonably interfere with Executive's responsibilities hereunder, or (ii) accept or engage in any other employment, whether as an employee or consultant or in any other capacity, and whether or not compensated therefor, except as approved in advance in writing by the Company and such approval will not be unreasonably withheld.

(b)     <u>Non-competition; Non-solicitation</u>.

(i)     Executive acknowledges and recognizes the highly competitive nature of the Company's business and that access to the Company's confidential records and proprietary information renders Executive special and unique within the Company's industry.  In consideration of the payment by the Company to Executive of amounts that may hereafter be paid to Executive pursuant to this Agreement (including, without limitation, pursuant to Sections 3 and 5 hereof) and other obligations undertaken by the Company hereunder, Executive agrees that during (i) Executive's employment with the Company and (ii) twelve (12) months thereafter (the "Covered Time"), Executive shall not, directly or indirectly, engage (as owner, investor, partner, stockholder, employer, employee, consultant, advisor, director or otherwise) in any Competing Business, provided that (x) the provisions of this Section 6(b) will not be deemed breached merely because Executive owns less than 1% of the outstanding common stock of a publicly-traded company and nothing in this Agreement is intended to, or shall be interpreted in any way that, conflicts with any ethical obligation that Executive may have as an attorney admitted to the bar of any court or under the New York Rules of Professional Conduct, including but not limited to Rules 1.6(a), 1.9(c) and 5.b(a), or expand the confidentiality duty of such provisions.  For purposes of this Agreement, "Competing Business" shall mean (i) any business in which the Company is currently engaged anywhere in the world relating to the biodefense industry or (ii) the business in which the Company's affiliates set forth on Schedule A hereto are currently engaged anywhere in the world to the extent that Executive is materially in involved with such business during the Term.

(ii)     In further consideration of the payment by the Company to Executive of amounts that may hereafter be paid to Executive pursuant to this Agreement (including, without limitation, pursuant to Sections 3 and 5 hereof) and other obligations undertaken by the Company hereunder, Executive agrees that during Executive's employment

9

and the Covered Time, Executive shall not, directly or indirectly, (i) solicit, encourage or attempt to solicit or encourage any of the employees, agents, consultants or representatives of the Company or, to the extent that he has had material contact with such employees, agents, consultants or representatives, any of its affiliates to terminate his, her, or its relationship with the Company or such affiliate; (ii) solicit, encourage or attempt to solicit or encourage any of the employees, agents, consultants or representatives of the Company or, to the extent that he has had material contact with such employees, agents, consultants or representatives, any of its affiliates to become employees, agents, representatives or consultants of any other person or entity; (iii) solicit or attempt to solicit any customer, vendor or distributor of the Company or, to the extent that he has had material contact with such customer, vendor or distributor, any of its affiliates with respect to any product or service being furnished, made, sold or leased by the Company or such affiliate; or (iv) persuade or seek to persuade any customer of the Company or, to the extent that he has had material contact with such customer, any affiliate to cease to do business or to reduce the amount of business which any customer has customarily done or contemplates doing with the Company or such affiliate, whether or not the relationship between the Company or its affiliate and such customer was originally established in whole or in part through Executive's efforts.  For purposes of this Section 6(b) only, the terms "customer," "vendor" and "distributor" shall mean a customer, vendor or distributor who has done business with the Company or any of its affiliates within twelve months preceding the termination of Executive's employment.

(iii)     During Executive's employment with the Company and during the Covered Time, Executive agrees that upon the earlier of Executive's (i) negotiating with any Competitor (as defined below) concerning the possible employment of Executive by the Competitor, (ii) receiving a written offer of employment from a Competitor, or (iii) becoming employed by a Competitor, Executive will (A) immediately provide notice to the Company of such circumstances and (B) provide copies of Section 6 of this Agreement to the Competitor. Executive further agrees that the Company may provide notice to a Competitor of Executive's obligations under this Agreement, including without limitation Executive's obligations pursuant to Section 6 hereof.  For purposes of this Agreement, "Competitor" shall mean any entity (other than the Company or any of its affiliates) that engages, directly or indirectly, in any Competing Business.

(iv)     Executive understands that the provisions of this Section 6(b) may limit Executive's ability to earn a livelihood in a Competing Business but nevertheless agrees and hereby acknowledges that the consideration provided under this Agreement, including any amounts or benefits provided under Sections 3 and 5 hereof and other obligations undertaken by the Company hereunder, is sufficient to justify the restrictions contained in such provisions.

(c)     Proprietary Information.  Executive acknowledges that, during the course of Executive's employment with the Company, Executive will necessarily have access to and make use of proprietary information and confidential records of the Company and its affiliates. Executive covenants that Executive shall not during the Term or at any time thereafter, directly or indirectly, use for Executive's own purpose or for the benefit of any person or entity other than the Company, nor otherwise disclose, any proprietary information to any individual or entity, unless such disclosure has been authorized in writing by the Company or is otherwise required by law.  Executive acknowledges and understands that the term "proprietary

WEIL:\95565464\1\74193.0003

information" includes, but is not limited to: (a) inventions, trade secrets, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, research, discoveries, developments, designs, and techniques regarding any of the foregoing utilized by the Company or any of its affiliates; (b) the name and/or address of any customer or vendor of the Company or any of its affiliates or any information concerning the transactions or relations of any customer or vendor of the Company or any of its affiliates with the Company or such affiliate or any of its or their partners, principals, directors, officers or agents; (c) any information concerning any product, technology, or procedure employed by the Company or any of its affiliates but not generally known to its or their customers, vendors or competitors, or under development by or being tested by the Company or any of its affiliates but not at the time offered generally to customers or vendors; (d) any information relating to the pricing or marketing methods, sales margins, cost of goods, cost of material, capital structure, operating results, borrowing arrangements or business plans of the Company or any of its affiliates; (e) any information which is generally regarded as confidential or proprietary in any line of business engaged in by the Company or any of its affiliates; (f) any business plans, budgets, advertising or marketing plans; (g) any information contained in any of the written or oral policies and procedures or manuals of the Company or any of its affiliates; (h) any information belonging to customers or vendors of the Company or any of its affiliates or any other person or entity which the Company or any of its affiliates has agreed to hold in confidence; (i) any inventions, innovations or improvements covered by this Agreement; and (j) all written, graphic and other material relating to any of the foregoing. Executive acknowledges and understands that information that is not novel or copyrighted or patented may nonetheless be proprietary information. The term "proprietary information" shall not include information generally available to and known by the industry, was known by Executive prior to the commencement of his employment (or anticipated employment) with the Company, or information that is or becomes available to Executive on a non-confidential basis from a source other than the Company, any of its affiliates, or the directors, officers, employees, partners, principals or agents of the Company or any of its affiliates (other than as a result of a breach of any obligation of confidentiality).

(d)    <u>Confidentiality and Surrender of Records</u>.  Executive shall not during the Term or at any time thereafter (irrespective of the circumstances under which Executive's employment by the Company terminates), except as required by law, directly or indirectly publish, make known or in any fashion disclose any confidential records to, or permit any inspection or copying of confidential records by, any individual or entity other than in the course of such individual's or entity's employment or retention by the Company.  Upon termination of employment for any reason or upon request by the Company, Executive shall deliver promptly to the Company all property and records of the Company or any of its affiliates, including, without limitation, all confidential records.  For purposes hereof, "confidential records" means all correspondence, reports, memoranda, files, manuals, books, lists, financial, operating or marketing records, magnetic tape, or electronic or other media or equipment of any kind which may be in Executive's possession or under Executive's control or accessible to Executive which contain any proprietary information.  All property and records of the Company and any of its affiliates (including, without limitation, all confidential records) shall be and remain the sole property of the Company or such affiliate during the Term and thereafter.

(e)    <u>Inventions and Patents</u>.

(i)       Executive agrees that all processes, technologies and inventions, including new contributions, improvements, ideas and discoveries, whether patentable or not, conceived, developed, invented or made by Executive during the Term shall belong to the Company, provided that such inventions grew out of Executive's work with the Company or any of its subsidiaries or affiliates, are related in any manner to the business (commercial or experimental) of the Company or any of its subsidiaries or affiliates or are conceived or made on the Company's time or with the use of the Company's facilities or materials (collectively, "Inventions").  Executive shall further:  (a) promptly disclose such Inventions to the Company; (b) assign to the Company, without additional compensation, all patent and other rights to such Inventions for the United States and foreign countries; (c) sign all papers necessary to carry out the foregoing; and (d) give testimony in support of Executive's inventorship.

(ii)      If any Invention is described in a patent application or is disclosed to third parties, directly or indirectly, by Executive within two years after the termination of Executive's employment by the Company, it is to be presumed that the Invention was conceived or made during the Term.

(iii)     Executive agrees that Executive will not assert any rights to any Invention as having been made or acquired by Executive prior to the date of this Agreement, except for Inventions, if any, disclosed to the Company in writing prior to the date hereof.

(iv)     The Company shall be the sole owner of all the products and proceeds of Executive's services hereunder, including, but not limited to, all materials, ideas, concepts, formats, suggestions, developments, arrangements, packages, programs and other intellectual properties that Executive may acquire, obtain, develop or create in connection with and during the Term, free and clear of any claims by Executive (or anyone claiming under Executive) of any kind or character whatsoever (other than Executive's right to receive payments hereunder).  Executive shall, at the request of the Company, execute such assignments, certificates or other instruments as the Company may from time to time deem necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend its right, title or interest in or to any such properties.

(f)       Enforcement.  Executive acknowledges and agrees that, by virtue of Executive's position, Executive's services and access to and use of confidential records and proprietary information, any violation by Executive of any of the undertakings contained in this Section 6 would cause the Company and/or its affiliates immediate, substantial and irreparable injury for which it or they have no adequate remedy at law.  Accordingly, Executive agrees and consents to the entry of an injunction or other equitable relief by a court of competent jurisdiction restraining any violation or threatened violation of any undertaking contained in this Section 6.  Executive waives posting by the Company or its affiliates of any bond otherwise necessary to secure such injunction or other equitable relief.  Rights and remedies provided for in this Section 6 are cumulative and shall be in addition to rights and remedies otherwise available to the parties hereunder or under any other agreement or applicable law.

(g)       Code of Ethics.  Nothing in this Section 6 is intended to limit, modify or reduce Executive's obligations under the Company's Code of Ethics.  Executive's obligations under this Section 6 are in addition to, and not in lieu of, Executive's obligations under the Code

WEIL:\95565464\1\74193.0003

of Ethics.  To the extent there is any inconsistency between this Section 6 and the Code of Ethics which would permit Executive to take any action or engage in any activity pursuant to this Section 6 which Executive would be barred from taking or engaging in under the Code of Ethics, the Code of Ethics shall control.

7.    <u>Assignment and Transfer</u>.

(a)    <u>Company</u>.  This Agreement shall inure to the benefit of and be enforceable by and binding upon, and may be assigned by the Company without Executive's consent to, any purchaser of all or substantially all of the Company's business or assets, or to any successor to the Company (whether direct or indirect, by purchase, merger, consolidation or otherwise).

(b)    <u>Executive</u>.  The parties hereto agree that Executive is obligated under this Agreement to render personal services during Executive's employment of a special, unique, unusual, extraordinary and intellectual character, thereby giving this Agreement special value. Executive's rights and obligations under this Agreement shall not be transferable by Executive by assignment or otherwise, and any purported assignment, transfer or delegation thereof shall be void; provided, however, that if Executive shall die, all amounts then payable to Executive hereunder shall be paid in accordance with the terms of this Agreement to Executive's estate.

8.    <u>Miscellaneous</u>.

(a)    <u>Cooperation</u>.  Following termination of employment with the Company for any reason, Executive shall cooperate with the Company, as requested by the Company upon reasonable notice and with due regard to Executive's obligations to a future employer, to effect a transition of Executive's responsibilities and to ensure that the Company is aware of all matters being handled by Executive.

(b)    <u>Mitigation; Offset</u>.  Executive shall not be required to mitigate damages or the amount of any payment provided to Executive under Section 5 of this Agreement by seeking other employment or otherwise, nor shall the amount of any payments provided to Executive under Section 5 be reduced by any compensation earned by Executive as the result of employment by another employer after the termination of Executive's employment or otherwise.

(c)    <u>Protection of Reputation</u>.  During the Term and thereafter, Executive agrees that Executive will take no action which is intended, or would reasonably be expected, to harm the Company or any of its affiliates or its or their reputation or which would reasonably be expected to lead to unwanted or unfavorable publicity to the Company or its affiliates.  Nothing herein shall prevent Executive from making any truthful statement in connection with any legal proceeding or investigation by the Company or any governmental authority.

(d)    <u>Governing Law; Consent to Jurisdiction</u>.  This Agreement shall be governed by and construed (both as to validity and performance) and enforced in accordance with the internal laws of the State of New York applicable to agreements made and to be performed wholly within such jurisdiction, without regard to the principles of conflicts of law or where the parties are located at the time a dispute arises.  In the event of any controversy or claim arising out of or relating to this Agreement or the breach or alleged breach hereof, each of the parties hereto irrevocably (a) consents to the jurisdiction of any state court sitting in the

13

County of New York, State of New York, or federal court sitting in the County of New York, State of New York. (b) waives any objection which it may have at any time to the laying of venue of any action or proceeding brought in any such court and (c) waives any claim that such action or proceeding has been brought in an inconvenient forum.

(e)     Injunctive Relief.  Notwithstanding anything to the contrary contained herein, the Company and any affiliate of the Company (if applicable) shall have the right to seek injunctive or other equitable relief from a court of competent jurisdiction to enforce Section 6 of this Agreement without any obligation to post a bond.

(f)     Entire Agreement.  This Agreement (including the plans referenced in Section 3(c) of this Agreement) contains the entire agreement and understanding between the parties hereto in respect of Executive's employment from and after the date hereof and supersedes, cancels and annuls any prior or contemporaneous written or oral agreements, understandings, commitments and practices between them respecting Executive's employment from and after the date hereof, including the Original Employment Agreement and all other prior employment agreements or understandings between the Company and Executive.

(g)     Amendment.  This Agreement may be amended only by a writing which makes express reference to this Agreement as the subject of such amendment and which is signed by Executive and, on behalf of the Company, by its duly authorized officer.

(h)     Severability.  If any provision of this Agreement or the application of any such provision to any party or circumstances shall be determined by any court of competent jurisdiction or arbitration panel to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to such person or circumstances other than those to which it is so determined to be invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be enforced to the fullest extent permitted by law.  If any provision of this Agreement, or any part thereof, is held to be invalid or unenforceable because of the scope or duration of or the area covered by such provision, the parties hereto agree that the court or arbitration panel making such determination shall reduce the scope, duration and/or area of such provision (and shall substitute appropriate provisions for any such invalid or unenforceable provisions) in order to make such provision enforceable to the fullest extent permitted by law and/or shall delete specific words and phrases, and such modified provision shall then be enforceable and shall be enforced.  The parties hereto recognize that if, in any judicial or arbitral proceeding, a court or arbitration panel shall refuse to enforce any of the separate covenants contained in this Agreement, then that invalid or unenforceable covenant contained in this Agreement shall be deemed eliminated from these provisions to the extent necessary to permit the remaining separate covenants to be enforced.  In the event that any court or arbitration panel determines that the time period or the area, or both, are unreasonable and that any of the covenants is to that extent invalid or unenforceable, the parties hereto agree that such covenants will remain in full force and effect, first, for the greatest time period, and second, in the greatest geographical area that would not render them unenforceable.

(i)     Construction.  The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement.  The language in all parts of this Agreement shall be in all cases construed according

to its fair meaning and not strictly for or against the Company or Executive.  As used herein, the words "day" or "days" shall mean a calendar day or days.

(j)    <u>Non-waiver</u>.  Neither any course of dealing nor any failure or neglect of either party hereto in any instance to exercise any right, power or privilege hereunder or under law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.  All waivers by either party hereto must be contained in a written instrument signed by the party to be charged and, in the case of the Company, by its duly authorized officer.

(k)    <u>Notices</u>.  Any notice required or permitted hereunder shall be in writing and shall be sufficiently given if personally delivered or if sent by registered or certified mail, postage prepaid, with return receipt requested, addressed:

(i)    in the case of the Company, to:

SIGA Technologies, Inc.
35 East 62nd Street
New York, NY 10065
Attention:  Chief Executive Officer

(ii)    in the case of Executive, to Executive's last known address as reflected in the Company's records, or to such other address as Executive shall designate by written notice to the Company.

Any notice given hereunder shall be deemed to have been given at the time of receipt thereof by the person to whom such notice is given if personally delivered or at the time of mailing if sent by registered or certified mail.

(l)    <u>Assistance in Proceedings, Etc</u>.  Executive shall, without additional compensation, during and after the Term, upon reasonable notice and with due regard to Executive's obligations to a future employer, furnish such information and reasonable assistance to the Company as may reasonably be required by the Company in connection with any legal or quasi-legal proceeding, including any external or internal investigation, involving the Company or any of its affiliates.  The Company shall reimburse (or advance) Executive's expenses in connection with such assistance (including, without limitation, reasonable legal fees).

(m)    <u>Survival</u>.  Cessation or termination of Executive's employment with the Company shall not result in termination of this Agreement.  The respective obligations of Executive and the Company as provided in Sections 5, 6, 7 and 8 of this Agreement shall survive cessation or termination of Executive's employment hereunder.

(n)    <u>Section 409A of the Code</u>.

(i)    The intent of the parties is that payments and benefits under this Agreement comply with, or be exempt from, Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder (collectively

"Section 409A of the Code") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith.

(ii)    A termination of employment shall not be deemed to have occurred for purposes of this Agreement providing for the payment of any amounts or benefits subject to Section 409A of the Code upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A of the Code and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." ."  If Executive is deemed on the date of termination to be a "specified employee" within the meaning of that term under Code Section 409A(a)(2)(B), then with regard to any payment that is considered non-qualified deferred compensation under Section 409A of the Code payable on account of a "separation from service," such payment or benefit shall be made or provided at the date which is the earlier of (A) the day following the expiration of the six (6)-month period measured from the date of such "separation from service" of Executive, and (B) the date of Executive's death (the "Delay Period").  Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section 8(n) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to Executive in a lump sum, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

(iii)    (A) All expenses or other reimbursements provided herein shall be payable in accordance with the Company's policies in effect from time to time, but in any event shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by Executive, (B) no such reimbursement or expenses eligible for reimbursement in any taxable year shall in any way affect the expenses eligible for reimbursement in any other taxable year and (C) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchanged for another benefit.

(iv)    For purposes of Section 409A of the Code, Executive's right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.

(v)    Notwithstanding the foregoing, the Company makes no representations regarding the tax implications of the compensation and benefits to be paid to Executive under this Agreement, including, without limitation, under Section 409A of the Code. The parties agree that in the event a qualified tax advisor to the Company or to Executive (neither party being required to retain such advisor) reasonably advises that the terms hereof would result in Executive being subject to tax under Section 409A of the Code, Executive and the Company shall negotiate in good faith to amend this Agreement to the extent necessary to prevent the assessment of any such tax.

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed on its behalf by an individual thereunto duly authorized and Executive has duly executed this Agreement, all as of the date and year first written above.

**SIGA TECHNOLOGIES, INC.**

By: _____

Name:

Title:

_____

William J. Haynes III

Schedule A

AM General, LLC
Deluxe Entertainment Services Group, Inc.
Flavors Holdings Incorporated
Harland Clarke
Harland Clarke Holding Corp.
Mafco Worldwide Corporation
Merisant Company
Revlon, Inc.
Scantron
Scientific Games Corporation
Valassis Communications, Inc.
vTv Therapeutics LLC

## SECOND AMENDED AND RESTATED EMPLOYMENT AGREEMENT

**THIS SECONDED AMENDED AND RESTATED AGREEMENT** (the "Agreement"), made in New York, New York as of [\_\_\_\_], between SIGA Technologies, Inc., a Delaware corporation (the "Company"), and Dr. Dennis E. Hruby ("Executive").

**WHEREAS**, the Company and Executive entered into an Employment Agreement dated January 22, 2007, as amended (the "Previous Employment Agreement"), providing for Executive's employment by the Company and setting forth the terms and conditions of such employment;

**WHEREAS**, the parties hereto agree that the Previous Employment Agreement should be amended and restated as set forth in this Agreement;

**WHEREAS**, the Company desires to continue to employ Executive as its Vice President and Chief Scientific Officer, and Executive desires to accept such employment on the terms and conditions hereinafter set forth;

**WHEREAS**, the Company has filed a plan for reorganization (the "Plan") under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in its pending case under the Bankruptcy Code; and

**WHEREAS**, this Agreement shall become effective upon and subject to the occurrence of the Effective Date (as defined in the Plan), provided that Executive continues to be employed by the Company immediately prior to the Effective Date, and at which time the Previous Employment Agreement shall be superseded by this Agreement and of no further force or effect.

**NOW, THEREFORE, IN CONSIDERATION** of the mutual covenants and agreements hereinafter set forth, the Company and Executive agree as follows:

1.     Term.  Unless earlier terminated in accordance with Section 4 hereof, the term of Executive's employment under this Agreement shall be the two-year period commencing on the Effective Date and ending on the second anniversary of the Effective Date (the "Term" and each such year, a "Term Year").  In addition, unless either party hereto provides notice of its desire not to renew this Agreement thirty (30) days prior to the expiration of the Term, this Agreement shall automatically renew for additional one (1) year periods commencing upon the expiration of the initial Term (or any such subsequent Term), with each such additional year thereafter being made part of the Term and each such additional year, thereafter a Term Year.

2.     Employment.

(a)     Employment by the Company.  Executive agrees to be employed by the Company during the Term upon the terms and subject to the conditions set forth in this Agreement.  Executive shall serve as the Vice President and Chief Scientific Officer of the Company and shall report to the Board of Directors of the Company (the "Board") and Chief Executive Officer of the Company.

(b)     Performance of Duties.  Throughout Executive's employment with the Company, Executive shall faithfully and diligently perform Executive's duties in conformity with the lawful directions of the Company and serve the Company to the best of Executive's ability.  Executive shall devote Executive's full business time and best efforts to the business and affairs of the Company.  In Executive's capacity as the Vice President and Chief Scientific Officer of the Company, Executive shall have such duties and responsibilities as Executive may be assigned by the Board of Directors or Chief Executive Officer not inconsistent with Executive's position as Vice President and Chief Scientific Officer.  Executive will perform Executive's duties primarily from the Company's offices in Corvallis, Oregon, subject to reasonable travel requirements.

3.     Compensation and Benefits.

(a)     Base Salary.  The Company agrees to pay to Executive a base salary ("Base Salary") with respect to the 2016 calendar year at the annual rate of $562,755 or such greater amount as determined by the Compensation Committee of the Board of Directors of the Company (the "Compensation Committee").  Effective as of January 1st of each subsequent calendar year, beginning with January 1, 2017, the Base Salary shall be automatically increased by at least three percent (3%) above the amount of Executive's Base Salary in effect at the end of the prior calendar year.  Payments of the Base Salary shall be payable in equal installments in accordance with the Company's standard payroll practices.

(b)     Annual Bonus.  The Company shall pay to Executive an annual cash bonus as set forth below (the "Annual Bonus"):

(i)     With respect to Executive's Annual Bonus for the 2014 calendar year, Executive shall be entitled to an Annual Bonus equal to $265,225 and such amount shall constitute a cost and expense of administration of the Company's chapter 11 case and shall be paid in cash, in full, on the Effective Date.

(ii)     With respect to Executive's Annual Bonus for the 2015 calendar year, Executive shall be entitled to an Annual Bonus, subject to the discretion of the Compensation Committee, based upon a target bonus opportunity of $546,364, which represents one hundred percent (100%) of Executive's 2015 annual Base Salary, based upon the attainment of the applicable performance criteria and goals established by the Compensation Committee prior to the Effective Date, the achievement of which shall be determined consistent with the methodology and measurement standards established by the Compensation Committee prior to the Effective Date.  Such Annual Bonus shall be paid no later than March 15, 2016.

(iii)     With respect to Executive's Annual Bonus for the 2016 calendar year and each subsequent calendar year during the Term, the Company shall pay Executive an Annual Bonus, subject to the discretion of the Compensation Committee, based upon a target bonus opportunity of 100% of Executive's then current Base Salary, based upon the achievement of performance criteria and goals approved by the Compensation Committee.  Such performance criteria and goals shall be materially consistent in nature and degree of difficulty with the performance criteria established with respect to the Annual Bonus for the 2015 calendar year.

Each such Annual Bonus shall be paid as soon as practicable but no later than March 15th of the year following the year to which the Annual Bonus relates.

(iv)    Notwithstanding anything herein to the contrary, in the event of a Change of Control of the Company, Executive shall receive an Annual Bonus for the year in which the Change of Control occurs equal to the greater of (i) the target Annual Bonus for such year or (ii) the Annual Bonus determined based upon the applicable performance criteria and goals for such year, provided that Executive remains employed on the last day of such calendar year, payable at the times set forth above.  If a Change of Control occurs in the 2016 calendar year prior to the time that the Annual Bonus for the 2015 calendar year has been paid, such Annual Bonus shall be paid to Executive on the effective date of the Change of Control.

(c)    <u>Benefits and Perquisites</u>.  Executive shall be entitled to participate in, to the extent Executive is otherwise eligible under the terms thereof, the benefit plans and programs, and receive the benefits and perquisites, generally provided by the Company from time to time to senior executives of the Company, including without limitation family medical insurance (subject to applicable employee contributions).  Executive shall be entitled to receive four weeks of vacation, in accordance with Company policy.

(d)    <u>Business Expenses</u>.  The Company agrees to reimburse Executive for all reasonable and necessary travel, business entertainment and other business expenses incurred by Executive in connection with the performance of Executive's duties under this Agreement.  Such reimbursements shall be made by the Company on a timely basis upon submission by Executive of vouchers in accordance with the Company's standard procedures.

(e)    <u>Indemnification</u>.  The Company shall indemnify Executive, to the fullest extent permitted by its certificate of incorporation or by-laws, for any and all liabilities to which Executive may be subject as a result of, in connection with or arising out of Executive's employment by the Company hereunder, as well as the costs and expenses (including reasonable attorneys' fees) of any legal action brought or threatened to be brought against Executive or the Company as a result of, in connection with or arising out of such employment or board service (such costs and expenses being advanced by the Company in accordance with the procedures set forth in the Company's by-laws).  Executive shall be entitled to the full protection of any insurance policies which the Company may elect to maintain generally for the benefit of its officers.

(f)    <u>No Other Compensation or Benefits; Payment</u>.  The compensation and benefits specified in this Section 3 and in Section 5 of this Agreement shall be in lieu of any and all other compensation and benefits.  Payment of all compensation and benefits to Executive specified in this Section 3 and in Section 5 of this Agreement (i) shall be made in accordance with the relevant Company policies in effect from time to time to the extent the same are consistently applied, including normal payroll practices, and (ii) shall be subject to all legally required and customary withholdings.

(g)    <u>Cessation of Employment</u>.  In the event Executive shall cease to be employed by the Company for any reason, Executive's compensation and benefits shall cease on

WEIL:\95565416\1\74193.0003

the date of such event, except as otherwise specifically provided herein or in any applicable employee benefit plan or program or as required by law.

4.    <u>Termination of Employment</u>.  Executive's employment hereunder may be terminated prior to the end of the Term under the following circumstances.

(a)    <u>Death</u>.  Executive's employment hereunder shall terminate upon Executive's death.

(b)    <u>Executive Becoming Totally Disabled</u>.  The Company may terminate Executive's employment hereunder at any time after Executive becomes "Totally Disabled."  For purposes of this Agreement, Executive shall be "Totally Disabled" in the event Executive is unable to perform the duties and responsibilities contemplated under this Agreement for a period of either (A) 120 consecutive days or (B) 6 months in any 12-month period due to physical or mental incapacity or impairment.  During any period that Executive fails to perform Executive's duties hereunder as a result of incapacity due to physical or mental illness (the "Disability Period"), Executive shall continue to receive the compensation and benefits provided by Section 3 of this Agreement until Executive's employment hereunder is terminated; provided, however, that the amount of base compensation and benefits received by Executive during the Disability Period shall be reduced by the aggregate amounts, if any, payable to Executive under any disability benefit plan or program provided to Executive by the Company.

(c)    <u>Termination by the Company for Cause</u>.  The Company may terminate Executive's employment hereunder for Cause at any time after providing written notice to Executive.  For purposes of this Agreement, the term "Cause" shall mean any of the following: (i) Executive's neglect or failure or refusal to perform Executive's duties under this Agreement (other than as a result of total or partial incapacity due to physical or mental illness); (ii) any act by or omission of Executive constituting gross negligence or willful misconduct in connection with the performance of Executive's duties that could reasonably be expected to materially injure the reputation, business or business relationships of the Company or any of its affiliates; (iii) perpetration of an intentional and knowing fraud against or affecting the Company or any of its affiliates or any customer, client, agent, or employee thereof; (iv) the commission by or indictment of Executive for (A) a felony or (B) any misdemeanor involving moral turpitude, deceit, dishonesty or fraud ("indictment," for these purposes, meaning a United States-based indictment, probable cause hearing or any other procedure pursuant to which an initial determination of probable or reasonable cause with respect to such offense is made); (v) the breach of a covenant set forth in Section 6; or (vi) any other material breach of this Agreement.

(d)    <u>Termination by the Company Without Cause</u>.  The Company may terminate Executive's employment hereunder at any time for any reason or no reason by giving Executive thirty (30) days prior written notice of the termination.  Following any such notice, the Company may reduce or remove any and all of Executive's duties, positions and titles with the Company.

(e)    <u>Termination by Executive for Good Reason</u>.  Executive may terminate Executive's employment hereunder for Good Reason at any time after providing written notice to the Company.  For purposes of this Agreement, the term "Good Reason" shall mean any of the

WEIL:\95565416\1\74193.0003

following:  (i) the Company fails to pay the compensation described in Section 3 of this Agreement (in accordance with, and subject to, such provisions); (ii) Executive no longer holds the office of Vice President and Chief Scientific Officer or offices of equivalent stature, or Executive's functions, responsibilities and/or duties as Vice President and Chief Scientific Officer are materially diminished or (iii) Executive's job site is relocated to a location which is more than fifty (50) miles from Corvallis, Oregon, unless the parties mutually agree to such relocation.  In order to terminate Executive's employment for Good Reason, Executive shall provide the Company with a written notice detailing the specific circumstances alleged to constitute Good Reason within sixty (60) days after the first occurrence of such circumstances, and the Company shall have thirty (30) days following receipt of such notice to cure such circumstances in all material respects, provided, that, no termination for Good Reason shall occur after the 180th day following the first occurrence of any Good Reason event.

(f)    Termination Upon a Change in Control.  If (x) the Company terminates Executive's employment hereunder without Cause, (y) Executive terminates Executive's employment for Good Reason or (z) the Company delivers a notice of non-renewal, in each case in connection with or after the occurrence of the Change in Control, Executive shall be entitled to the payments provided for by Section 5(d).  For purposes of this Agreement, a "Change in Control" shall be conclusively deemed to have occurred if any of the following shall have taken place:

(i)    the consummation of a transaction or a series of related transactions pursuant to which any "person" (as such term is used in Sections 13(d) and 14(d)(2) of the Securities Exchange Act of 1934 ("Exchange Act"), other than Executive, Executive's designee(s) or "affiliate(s)" (as defined in Rule 12b-2 under the Exchange Act), or a Permitted Holder, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing forty percent (40%) or more of the combined voting power of the Company's then outstanding securities; or

(ii)    stockholders of the Company approve a merger or consolidation of the Company with any other entity other than a Permitted Holder, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than eighty percent (80%) of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; or

(iii)    the stockholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of, or the Company sells or disposes of, all or substantially all of the Company's assets other than to a Permitted Holder; or

(iv)    the following individuals cease for any reason to constitute a majority of the number of directors then serving on the Board: individuals who, on the Effective Date, constitute the Board and any new director whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the Effective

Date or whose appointment, election or nomination for election was previously so approved or recommended, but excluding (i) any director whose initial assumption of office is in connection with an actual or threatened election contest (including, but not limited to, a consent or proxy solicitation, relating to the election of directors of the Company by or on behalf of a person (as defined above) other than the Board) and (ii) any director whose initial assumption of office is in connection with the Plan; or

(v)    the PharmAthene Allowed Claim (as such term is defined in the Plan) is treated under Section 4.3(b)(i)(C) of the Plan or the provisions of Section 6.6 of the Plan become applicable.

For purposes of this Section 4(f), a "Permitted Holder" shall mean MacAndrews & Forbes Holdings Inc. and its subsidiaries or affiliates.

(g)    <u>Termination by Executive Without Good Reason</u>.  Executive may terminate Executive's employment hereunder at any time for any reason or no reason by giving the Company thirty (30) days prior written notice of the termination.  Following any such notice, the Company may reduce or remove any and all of Executive's duties, positions and titles with the Company, and any such reduction or removal shall not constitute Good Reason.

5.    <u>Compensation Following Termination</u>.  In the event that Executive's employment hereunder is terminated, Executive shall be entitled only to the following compensation and benefits upon such termination:

(a)    <u>General</u>.  On any termination of Executive's employment, Executive shall be entitled to the following (collectively, the "Standard Termination Payments"):

(i)    any accrued but unpaid Base Salary for services rendered through the date of termination; provided, however, that in the event Executive's employment is terminated pursuant to Section 4(b), the amount of Base Salary received by Executive during the Disability Period shall be reduced by the aggregate amounts, if any, payable to Executive under any disability benefit plan or program provided to Executive by the Company;

(ii)    any vacation accrued to the date of termination, in accordance with Company policy;

(iii)    any accrued but unpaid expenses through the date of termination required to be reimbursed in accordance with Section 3(d) of this Agreement; and

(iv)    any benefits to which Executive may be entitled upon termination pursuant to the plans, programs and grants referred to in Section 3(c) hereof in accordance with the terms of such plans, programs and grants.

(b)    <u>Termination by Reason of Death or Executive Becoming Totally Disabled; Termination by the Company for Cause; Termination by Executive Without Good Reason</u>.  In the event that Executive's employment is terminated prior to the expiration of the Term (i) by reason of Executive's death pursuant to Section 4(a) or Executive becoming Totally Disabled pursuant to Section 4(b), (ii) by the Company for Cause pursuant to Section 4(c) or (iii)

6

by Executive without Good Reason pursuant to Section 4(f), Executive (or Executive's estate, as the case may be) shall be entitled to the Standard Termination Payments and the payment of any accrued but unpaid Annual Bonuses with respect to the prior full calendar year as determined by the Compensation Committee in good faith and payable in cash at the time described in Section 3(b).

(c)    Termination by the Company Without Cause; Termination by Executive for Good Reason.  In the event that Executive's employment is terminated (x) prior to the expiration of the Term by the Company without Cause pursuant to Section 4(d) or by Executive for Good Reason pursuant to Section 4(e) (collectively, an "Involuntary Termination") or (y) by either party upon the expiration of the Term following the Company delivering a notice of nonrenewal of this Agreement pursuant to Section 1 ("Nonrenewal by the Company"), Executive shall be entitled only to the following:

(i)    the Standard Termination Payments;

(ii)    the continued payment of the Base Salary (as determined pursuant to Section 3(a)) for two (2) years  if such termination is a result of an Involuntary Termination and one (1) year if such termination is a result of Nonrenewal by the Company (such sums to be paid at the times and in the amounts such Base Salary would have been paid had Executive's employment not terminated, with the first such payment commencing on the sixtieth (60th) day following the date of Executive's termination of employment which payment shall include all amounts that would have otherwise been payable prior thereto); and

(iii)    the payment of any accrued but unpaid Annual Bonuses with respect to the prior full calendar year as determined by the Compensation Committee in good faith and payable in cash on the later of (i) at the time described in Section 3(b) or (ii) sixty (60) days following the date of Executive's termination of employment (which, for the avoidance of doubt, will in all cases be paid in the year of termination of employment); and

(iv)    to have the Company take all such action as is necessary such that all outstanding equity grants, including any stock options and restricted stock grants, to Executive shall, immediately and irrevocably vest and, to the extent applicable, become exercisable as of the date of termination and shall remain exercisable for a period of not less than one (1) year from the date of termination, or, if earlier, the expiration of the term of such equity award.

(d)    Termination Upon a Change in Control.  In the event that Executive's employment is terminated (x) prior to the expiration of the Term by the Company without Cause pursuant to Section 4(d) or by Executive for Good Reason pursuant to Section 4(e) or (y) by either party upon the expiration of the Term following the Company delivering a notice of nonrenewal of this Agreement pursuant to Section 1, in each case in connection with or after the occurrence of a Change in Control, in lieu of the benefits provided under Section 5(c) above, Executive shall be entitled only to the following:

(i)    the Standard Termination Payments;

7

(ii)        (ii)        the continued payment of the Base Salary (as determined pursuant to Section 3(a)) for two (2) years (such sums to be paid at the times and in the amounts such Base Salary would have been paid had Executive's employment not terminated, with the first such payment commencing on the sixtieth (60th) day following the date of Executive's termination of employment which payment shall include all amounts that would have otherwise been payable prior thereto);

(iii)        the payment of any accrued but unpaid Annual Bonuses with respect to the prior full calendar year as determined by the Compensation Committee in good faith and payable in cash on the later of (i) at the time described in Section 3(b) or (ii) sixty (60) days following the date of Executive's termination of employment (which, for the avoidance of doubt, will in all cases be paid in the year of termination of employment);

(iv)        a pro rata portion of any Annual Bonus under Section 3(b) for the year of termination based on the number of days employed during such year, calculated based upon attainment of the full target level of achievement set forth in Section 3(b), and payable in cash sixty (60) days following the date of Executive's termination of employment; and

(v)        to have the Company take all such action as is necessary such that all outstanding equity grants, including any stock options and restricted stock grants, to Executive shall, immediately and irrevocably vest and, to the extent applicable, become exercisable as of the date of termination and shall remain exercisable for a period of not less than one (1) year from the date of termination, or, if earlier, the expiration of the term of such equity award.

(e)        Effect of Material Breach of Section 6 on Compensation and Benefits Following Termination of Employment.  If, at the time of termination of Executive's employment for any reason prior to the expiration of the Term or any time thereafter, Executive is in material breach of any covenant contained in Section 6 hereof, then, notwithstanding anything in this Section 5 to the contrary, Executive (or Executive's estate, as applicable) shall not be entitled to any payment (or if payments have commenced, any continued payment) other than the Standard Termination Payments.

(f)        No Further Liability; Release.  Payment made and performance by the Company in accordance with this Section 5 shall operate to fully discharge and release the Company and its directors, officers, employees, affiliates, stockholders, successors, assigns, agents and representatives from any further obligation or liability with respect to Executive's employment and termination of employment.  Other than providing the compensation and benefits provided for in accordance with this Section 5, the Company and its directors, officers, employees, affiliates, stockholders, successors, assigns, agents and representatives shall have no further obligation or liability to Executive or any other person under this Agreement or with respect to Executive's employment or the termination thereof, with the exception of indemnification obligations under Section 3(e) hereof.  The payment of any amounts pursuant to this Section 5 (other than payments required by law and the Standard Termination Payments) is expressly conditioned upon the timely delivery (and non-revocation) by Executive to the Company of a release in form and substance reasonably satisfactory to the Company of any and all claims Executive may have against the Company and its directors, officers, employees,

affiliates, stockholders, successors, assigns, agents and representatives arising out of or related to Executive's employment by the Company and the termination of such employment and Executive's non-revocation of such release.  Such release must be returned to the Company in accordance with the term set forth in such release agreement but no later than forty-five (45) days after Executive's termination of employment and must become irrevocable at the expiration of any applicable revocation period.

6.    Exclusive Employment; Non-competition; Non-solicitation; Nondisclosure of Proprietary Information; Surrender of Records; Inventions and Patents; Code of Ethics.

(a)    No Conflict; No Other Employment.  During the period of Executive's employment with the Company, Executive shall not:  (i) engage in any activity which conflicts or interferes with or derogates from the performance of Executive's duties hereunder nor shall Executive engage in any other business activity, whether or not such business activity is pursued for gain or profit and including service as a director of any other company, except as approved in advance in writing by the Company; provided, however, that Executive shall be entitled to manage Executive's personal investments and otherwise attend to personal affairs, including charitable, social and political activities, in a manner that does not unreasonably interfere with Executive's responsibilities hereunder, or (ii) accept or engage in any other employment, whether as an employee or consultant or in any other capacity, and whether or not compensated therefor, except as approved in advance in writing by the Company and such approval will not be unreasonably withheld.

(b)    Non-competition; Non-solicitation.

(i)    Executive acknowledges and recognizes the highly competitive nature of the Company's business and that access to the Company's confidential records and proprietary information renders Executive special and unique within the Company's industry.  In consideration of the payment by the Company to Executive of amounts that may hereafter be paid to Executive pursuant to this Agreement (including, without limitation, pursuant to Sections 3 and 5 hereof) and other obligations undertaken by the Company hereunder, Executive agrees that during (i) Executive's employment with the Company and (ii) twenty-four (24) months thereafter (the "Covered Time"), Executive shall not, directly or indirectly, engage (as owner, investor, partner, stockholder, employer, employee, consultant, advisor, director or otherwise) in any Competing Business, provided that the provisions of this Section 6(b) will not be deemed breached merely because Executive owns less than 1% of the outstanding common stock of a publicly-traded company.  For purposes of this Agreement, "Competing Business" shall mean (i) any business in which the Company is currently engaged anywhere in the world relating to the biodefense industry or (ii) the business in which the Company's affiliates set forth on Schedule A hereto are currently engaged anywhere in the world to the extent that Executive is materially in involved with such business during the Term.

(ii)    In further consideration of the payment by the Company to Executive of amounts that may hereafter be paid to Executive pursuant to this Agreement (including, without limitation, pursuant to Sections 3 and 5 hereof) and other obligations undertaken by the Company hereunder, Executive agrees that during Executive's employment and the Covered Time, Executive shall not, directly or indirectly, (i) solicit, encourage or attempt

9

to solicit or encourage any of the employees, agents, consultants or representatives of the Company or, to the extent that he has had material contact with such employees, agents, consultants or representatives, any of its affiliates to terminate his, her, or its relationship with the Company or such affiliate; (ii) solicit, encourage or attempt to solicit or encourage any of the employees, agents, consultants or representatives of the Company or, to the extent that he has had material contact with such employees, agents, consultants or representatives, any of its affiliates to become employees, agents, representatives or consultants of any other person or entity; (iii) solicit or attempt to solicit any customer, vendor or distributor of the Company or, to the extent that he has had material contact with such customer, vendor or distributor, any of its affiliates with respect to any product or service being furnished, made, sold or leased by the Company or such affiliate; or (iv) persuade or seek to persuade any customer of the Company or, to the extent that he has had material contact with such customer, any affiliate to cease to do business or to reduce the amount of business which any customer has customarily done or contemplates doing with the Company or such affiliate, whether or not the relationship between the Company or its affiliate and such customer was originally established in whole or in part through Executive's efforts. For purposes of this Section 6(b) only, the terms "customer," "vendor" and "distributor" shall mean a customer, vendor or distributor who has done business with the Company or any of its affiliates within twelve months preceding the termination of Executive's employment.

(iii)    During Executive's employment with the Company and during the Covered Time, Executive agrees that upon the earlier of Executive's (i) negotiating with any Competitor (as defined below) concerning the possible employment of Executive by the Competitor, (ii) receiving a written offer of employment from a Competitor, or (iii) becoming employed by a Competitor, Executive will (A) immediately provide notice to the Company of such circumstances and (B) provide copies of Section 6 of this Agreement to the Competitor. Executive further agrees that the Company may provide notice to a Competitor of Executive's obligations under this Agreement, including without limitation Executive's obligations pursuant to Section 6 hereof. For purposes of this Agreement, "Competitor" shall mean any entity (other than the Company or any of its affiliates) that engages, directly or indirectly, in any Competing Business.

(iv)    Executive understands that the provisions of this Section 6(b) may limit Executive's ability to earn a livelihood in a Competing Business but nevertheless agrees and hereby acknowledges that the consideration provided under this Agreement, including any amounts or benefits provided under Sections 3 and 5 hereof and other obligations undertaken by the Company hereunder, is sufficient to justify the restrictions contained in such provisions.

(c)    Proprietary Information. Executive acknowledges that, during the course of Executive's employment with the Company, Executive will necessarily have access to and make use of proprietary information and confidential records of the Company and its affiliates. Executive covenants that Executive shall not during the Term or at any time thereafter, directly or indirectly, use for Executive's own purpose or for the benefit of any person or entity other than the Company, nor otherwise disclose, any proprietary information to any individual or entity, unless such disclosure has been authorized in writing by the Company or is otherwise required by law. Executive acknowledges and understands that the term "proprietary information" includes, but is not limited to: (a) inventions, trade secrets, ideas, processes,

10

formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, research, discoveries, developments, designs, and techniques regarding any of the foregoing utilized by the Company or any of its affiliates; (b) the name and/or address of any customer or vendor of the Company or any of its affiliates or any information concerning the transactions or relations of any customer or vendor of the Company or any of its affiliates with the Company or such affiliate or any of its or their partners, principals, directors, officers or agents; (c) any information concerning any product, technology, or procedure employed by the Company or any of its affiliates but not generally known to its or their customers, vendors or competitors, or under development by or being tested by the Company or any of its affiliates but not at the time offered generally to customers or vendors; (d) any information relating to the pricing or marketing methods, sales margins, cost of goods, cost of material, capital structure, operating results, borrowing arrangements or business plans of the Company or any of its affiliates; (e) any information which is generally regarded as confidential or proprietary in any line of business engaged in by the Company or any of its affiliates; (f) any business plans, budgets, advertising or marketing plans; (g) any information contained in any of the written or oral policies and procedures or manuals of the Company or any of its affiliates; (h) any information belonging to customers or vendors of the Company or any of its affiliates or any other person or entity which the Company or any of its affiliates has agreed to hold in confidence; (i) any inventions, innovations or improvements covered by this Agreement; and (j) all written, graphic and other material relating to any of the foregoing.  Executive acknowledges and understands that information that is not novel or copyrighted or patented may nonetheless be proprietary information.  The term "proprietary information" shall not include information generally available to and known by the industry, was known by Executive prior to the commencement of his employment (or anticipated employment) with the Company, or information that is or becomes available to Executive on a non-confidential basis from a source other than the Company, any of its affiliates, or the directors, officers, employees, partners, principals or agents of the Company or any of its affiliates (other than as a result of a breach of any obligation of confidentiality).

(d)    <u>Confidentiality and Surrender of Records</u>.  Executive shall not during the Term or at any time thereafter (irrespective of the circumstances under which Executive's employment by the Company terminates), except as required by law, directly or indirectly publish, make known or in any fashion disclose any confidential records to, or permit any inspection or copying of confidential records by, any individual or entity other than in the course of such individual's or entity's employment or retention by the Company.  Upon termination of employment for any reason or upon request by the Company, Executive shall deliver promptly to the Company all property and records of the Company or any of its affiliates, including, without limitation, all confidential records.  For purposes hereof, "confidential records" means all correspondence, reports, memoranda, files, manuals, books, lists, financial, operating or marketing records, magnetic tape, or electronic or other media or equipment of any kind which may be in Executive's possession or under Executive's control or accessible to Executive which contain any proprietary information.  All property and records of the Company and any of its affiliates (including, without limitation, all confidential records) shall be and remain the sole property of the Company or such affiliate during the Term and thereafter.

(e)    <u>Inventions and Patents</u>.

(i)      Executive agrees that all processes, technologies and inventions, including new contributions, improvements, ideas and discoveries, whether patentable or not, conceived, developed, invented or made by Executive during the Term shall belong to the Company, provided that such inventions grew out of Executive's work with the Company or any of its subsidiaries or affiliates, are related in any manner to the business (commercial or experimental) of the Company or any of its subsidiaries or affiliates or are conceived or made on the Company's time or with the use of the Company's facilities or materials (collectively, "Inventions").  Executive shall further:  (a) promptly disclose such Inventions to the Company; (b) assign to the Company, without additional compensation, all patent and other rights to such Inventions for the United States and foreign countries; (c) sign all papers necessary to carry out the foregoing; and (d) give testimony in support of Executive's inventorship.

(ii)      If any Invention is described in a patent application or is disclosed to third parties, directly or indirectly, by Executive within two years after the termination of Executive's employment by the Company, it is to be presumed that the Invention was conceived or made during the Term.

(iii)      Executive agrees that Executive will not assert any rights to any Invention as having been made or acquired by Executive prior to the date of this Agreement, except for Inventions, if any, disclosed to the Company in writing prior to the date hereof.

(iv)      The Company shall be the sole owner of all the products and proceeds of Executive's services hereunder, including, but not limited to, all materials, ideas, concepts, formats, suggestions, developments, arrangements, packages, programs and other intellectual properties that Executive may acquire, obtain, develop or create in connection with and during the Term, free and clear of any claims by Executive (or anyone claiming under Executive) of any kind or character whatsoever (other than Executive's right to receive payments hereunder).  Executive shall, at the request of the Company, execute such assignments, certificates or other instruments as the Company may from time to time deem necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend its right, title or interest in or to any such properties.

(f)      <u>Enforcement</u>.  Executive acknowledges and agrees that, by virtue of Executive's position, Executive's services and access to and use of confidential records and proprietary information, any violation by Executive of any of the undertakings contained in this Section 6 would cause the Company and/or its affiliates immediate, substantial and irreparable injury for which it or they have no adequate remedy at law.  Accordingly, Executive agrees and consents to the entry of an injunction or other equitable relief by a court of competent jurisdiction restraining any violation or threatened violation of any undertaking contained in this Section 6.  Executive waives posting by the Company or its affiliates of any bond otherwise necessary to secure such injunction or other equitable relief.  Rights and remedies provided for in this Section 6 are cumulative and shall be in addition to rights and remedies otherwise available to the parties hereunder or under any other agreement or applicable law.

(g)      <u>Code of Ethics</u>.  Nothing in this Section 6 is intended to limit, modify or reduce Executive's obligations under the Company's Code of Ethics.  Executive's obligations under this Section 6 are in addition to, and not in lieu of, Executive's obligations under the Code

WEIL:\95565416\1\74193.0003

of Ethics.  To the extent there is any inconsistency between this Section 6 and the Code of Ethics which would permit Executive to take any action or engage in any activity pursuant to this Section 6 which Executive would be barred from taking or engaging in under the Code of Ethics, the Code of Ethics shall control.

7.    <u>Assignment and Transfer</u>.

(a)    <u>Company</u>.  This Agreement shall inure to the benefit of and be enforceable by and binding upon, and may be assigned by the Company without Executive's consent to, any purchaser of all or substantially all of the Company's business or assets, or to any successor to the Company (whether direct or indirect, by purchase, merger, consolidation or otherwise).

(b)    <u>Executive</u>.  The parties hereto agree that Executive is obligated under this Agreement to render personal services during Executive's employment of a special, unique, unusual, extraordinary and intellectual character, thereby giving this Agreement special value. Executive's rights and obligations under this Agreement shall not be transferable by Executive by assignment or otherwise, and any purported assignment, transfer or delegation thereof shall be void; provided, however, that if Executive shall die, all amounts then payable to Executive hereunder shall be paid in accordance with the terms of this Agreement to Executive's estate.

8.    <u>Miscellaneous</u>.

(a)    <u>Cooperation</u>.  Following termination of employment with the Company for any reason, Executive shall cooperate with the Company, as requested by the Company upon reasonable notice and with due regard to Executive's obligations to a future employer, to effect a transition of Executive's responsibilities and to ensure that the Company is aware of all matters being handled by Executive.

(b)    <u>Mitigation; Offset</u>.  Executive shall not be required to mitigate damages or the amount of any payment provided to Executive under Section 5 of this Agreement by seeking other employment or otherwise, nor shall the amount of any payments provided to Executive under Section 5 be reduced by any compensation earned by Executive as the result of employment by another employer after the termination of Executive's employment or otherwise.

(c)    <u>Protection of Reputation</u>.  During the Term and thereafter, Executive agrees that Executive will take no action which is intended, or would reasonably be expected, to harm the Company or any of its affiliates or its or their reputation or which would reasonably be expected to lead to unwanted or unfavorable publicity to the Company or its affiliates.  Nothing herein shall prevent Executive from making any truthful statement in connection with any legal proceeding or investigation by the Company or any governmental authority.

(d)    <u>Governing Law; Consent to Jurisdiction</u>.  This Agreement shall be governed by and construed (both as to validity and performance) and enforced in accordance with the internal laws of the State of New York applicable to agreements made and to be performed wholly within such jurisdiction, without regard to the principles of conflicts of law or where the parties are located at the time a dispute arises.  In the event of any controversy or claim arising out of or relating to this Agreement or the breach or alleged breach hereof, each of the parties hereto irrevocably (a) consents to the jurisdiction of any state court sitting in the

13

County of New York, State of New York, or federal court sitting in the County of New York, State of New York. (b) waives any objection which it may have at any time to the laying of venue of any action or proceeding brought in any such court and (c) waives any claim that such action or proceeding has been brought in an inconvenient forum.

(e)    _Injunctive Relief_.  Notwithstanding anything to the contrary contained herein, the Company and any affiliate of the Company (if applicable) shall have the right to seek injunctive or other equitable relief from a court of competent jurisdiction to enforce Section 6 of this Agreement without any obligation to post a bond.

(f)    _Entire Agreement_.  This Agreement (including the plans referenced in Section 3(c) of this Agreement) contains the entire agreement and understanding between the parties hereto in respect of Executive's employment from and after the date hereof and supersedes, cancels and annuls any prior or contemporaneous written or oral agreements, understandings, commitments and practices between them respecting Executive's employment from and after the date hereof, including the Previous Employment Agreement and all other prior employment agreements or understandings between the Company and Executive.

(g)    _Amendment_.  This Agreement may be amended only by a writing which makes express reference to this Agreement as the subject of such amendment and which is signed by Executive and, on behalf of the Company, by its duly authorized officer.

(h)    _Severability_.  If any provision of this Agreement or the application of any such provision to any party or circumstances shall be determined by any court of competent jurisdiction or arbitration panel to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to such person or circumstances other than those to which it is so determined to be invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be enforced to the fullest extent permitted by law.  If any provision of this Agreement, or any part thereof, is held to be invalid or unenforceable because of the scope or duration of or the area covered by such provision, the parties hereto agree that the court or arbitration panel making such determination shall reduce the scope, duration and/or area of such provision (and shall substitute appropriate provisions for any such invalid or unenforceable provisions) in order to make such provision enforceable to the fullest extent permitted by law and/or shall delete specific words and phrases, and such modified provision shall then be enforceable and shall be enforced.  The parties hereto recognize that if, in any judicial or arbitral proceeding, a court or arbitration panel shall refuse to enforce any of the separate covenants contained in this Agreement, then that invalid or unenforceable covenant contained in this Agreement shall be deemed eliminated from these provisions to the extent necessary to permit the remaining separate covenants to be enforced.  In the event that any court or arbitration panel determines that the time period or the area, or both, are unreasonable and that any of the covenants is to that extent invalid or unenforceable, the parties hereto agree that such covenants will remain in full force and effect, first, for the greatest time period, and second, in the greatest geographical area that would not render them unenforceable.

(i)    _Construction_.  The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement.  The language in all parts of this Agreement shall be in all cases construed according

to its fair meaning and not strictly for or against the Company or Executive.  As used herein, the words "day" or "days" shall mean a calendar day or days.

(j)    <u>Non-waiver</u>.  Neither any course of dealing nor any failure or neglect of either party hereto in any instance to exercise any right, power or privilege hereunder or under law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.  All waivers by either party hereto must be contained in a written instrument signed by the party to be charged and, in the case of the Company, by its duly authorized officer.

(k)    <u>Notices</u>.  Any notice required or permitted hereunder shall be in writing and shall be sufficiently given if personally delivered or if sent by registered or certified mail, postage prepaid, with return receipt requested, addressed:

(i)    in the case of the Company, to:

SIGA Technologies, Inc.
35 East 62nd Street
New York, NY 10065
Attention:  Chief Executive Officer

(ii)    in the case of Executive, to Executive's last known address as reflected in the Company's records, or to such other address as Executive shall designate by written notice to the Company.

Any notice given hereunder shall be deemed to have been given at the time of receipt thereof by the person to whom such notice is given if personally delivered or at the time of mailing if sent by registered or certified mail.

(l)    <u>Assistance in Proceedings, Etc</u>.  Executive shall, without additional compensation, during and after the Term, upon reasonable notice and with due regard to Executive's obligations to a future employer, furnish such information and reasonable assistance to the Company as may reasonably be required by the Company in connection with any legal or quasi-legal proceeding, including any external or internal investigation, involving the Company or any of its affiliates.  The Company shall reimburse (or advance) Executive's expenses in connection with such assistance (including, without limitation, reasonable legal fees).

(m)    <u>Survival</u>.  Cessation or termination of Executive's employment with the Company shall not result in termination of this Agreement.  The respective obligations of Executive and the Company as provided in Sections 5, 6, 7 and 8 of this Agreement shall survive cessation or termination of Executive's employment hereunder.

(n)    <u>Section 409A of the Code</u>.

(i)    The intent of the parties is that payments and benefits under this Agreement comply with, or be exempt from, Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder (collectively

"Section 409A of the Code") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith.

(ii)     A termination of employment shall not be deemed to have occurred for purposes of this Agreement providing for the payment of any amounts or benefits subject to Section 409A of the Code upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A of the Code and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." ."  If Executive is deemed on the date of termination to be a "specified employee" within the meaning of that term under Code Section 409A(a)(2)(B), then with regard to any payment that is considered non-qualified deferred compensation under Section 409A of the Code payable on account of a "separation from service," such payment or benefit shall be made or provided at the date which is the earlier of (A) the day following the expiration of the six (6)-month period measured from the date of such "separation from service" of Executive, and (B) the date of Executive's death (the "Delay Period").  Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section 8(n) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to Executive in a lump sum, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

(iii)     (A) All expenses or other reimbursements provided herein shall be payable in accordance with the Company's policies in effect from time to time, but in any event shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by Executive, (B) no such reimbursement or expenses eligible for reimbursement in any taxable year shall in any way affect the expenses eligible for reimbursement in any other taxable year and (C) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchanged for another benefit.

(iv)     For purposes of Section 409A of the Code, Executive's right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.

(v)     Notwithstanding the foregoing, the Company makes no representations regarding the tax implications of the compensation and benefits to be paid to Executive under this Agreement, including, without limitation, under Section 409A of the Code. The parties agree that in the event a qualified tax advisor to the Company or to Executive (neither party being required to retain such advisor) reasonably advises that the terms hereof would result in Executive being subject to tax under Section 409A of the Code, Executive and the Company shall negotiate in good faith to amend this Agreement to the extent necessary to prevent the assessment of any such tax.

16

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed on its behalf by an individual thereunto duly authorized and Executive has duly executed this Agreement, all as of the date and year first written above.

**SIGA TECHNOLOGIES, INC.**

By: _____

Name:
Title:

_____

Dr. Dennis E. Hruby

17

<u>Schedule A</u>

AM General, LLC
Deluxe Entertainment Services Group, Inc.
Flavors Holdings Incorporated
Harland Clarke
Harland Clarke Holding Corp.
Mafco Worldwide Corporation
Merisant Company
Revlon, Inc.
Scantron
Scientific Games Corporation
Valassis Communications, Inc.
vTv Therapeutics LLC