**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| **SIGA TECHNOLOGIES, INC.,** | : | **14-12623 (SHL)** |
| **Debtor.** | : | |

**DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF**
**CONFIRMATION OF DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN**
**AND IN RESPONSE TO OBJECTIONS TO PLAN**

*Stephen Karotkin*
*Kevin Bostel*
*Jessica Diab*
*Andriana Georgallas*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
212-310-8000 (T)
212-310-8007 (F)

*Attorneys for Debtor*
*and Debtor in Possession*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................1

FACTS ....................7

ARGUMENT ....................7

I. THE OBJECTIONS SHOULD BE OVERRULED AND THE PLAN CONFIRMED ....................7

A. The Plan was Proposed in Good Faith. ....................8

B. The Plan Satisfies the Requirements of Section 1129(b) of the Bankruptcy Code as to Class 4 (Equity Interests). ....................10

C. The Release and Exculpation Provisions of the Plan Are Appropriately Limited and Proper. ....................14

II. THE PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY CODE ....................17

A. The Plan Satisfies the Requirements under Section 1129(a) of the Bankruptcy Code ....................18

1. Section 1129(a)(1): The Plan Complies with All Applicable Provisions of the Bankruptcy Code ....................18

a. Classification of Claims and Interests ....................18

b. Required Contents of the Plan ....................20

(i) Section 1123(a)(1): Designation of Classes of Claims and Interests ....................20

(ii) Section 1123(a)(2): Classes that Are Not Impaired under the Plan ....................20

(iii) Section 1123(a)(3): Treatment of Classes That Are Impaired under the Plan ....................20

(iv) Section 1123(a)(4): Equal Treatment within Each Class ....................21

(v) Section 1123(a)(5): Adequate Means for Implementation ....................21

(vi) Section 1123(a)(6): Prohibition on the Issuance of Nonvoting Securities ....................22

(vii) Section 1123(a)(7): Provisions Regarding Directors and Officers ....................22

c. Permissive Contents of the Plan ....................23

(i) Section 1123(b)(1): Impairment of Claims and Interests ....................24

(ii) Section 1123(b)(2): Executory Contracts and Unexpired Leases ..... 24

(iii) Section 1123(b)(3): Settlement of Claims and Causes of Action ..... 24

(iv) Section 1123(b)(4): Sale of Property of the Estate ..... 25

(v) Section 1123(b)(5): Modifying of Creditor Rights ..... 25

(vi) Section 1123(b)(6): Other Appropriate Provisions ..... 26

(vii) Section 1123(d): Cure of Defaults ..... 26

2. Section 1129(a)(2): The Debtor Has Complied with the Provisions of the Bankruptcy Code ..... 26

a. Post-petition Disclosure and Solicitation ..... 27

b. Acceptance of the Plan ..... 28

3. Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law ..... 29

4. Section 1129(a)(4): The Plan Provides That Professional Fees and Expenses Are Subject to Court Approval ..... 30

5. Section 1129(a)(5): The Debtor Has Satisfied the Requirement to Disclose All Necessary Information Regarding Directors, Officers, and Insiders ..... 30

6. Section 1129(a)(7): The Plan Is in the Best Interests of All Creditors ..... 31

7. Section 1129(a)(8): The Plan Has Been Accepted by Each Impaired Class, and, as to Such Classes, the Requirements of Section 1129(a)(8) Have Been Satisfied ..... 33

8. Section 1129(a)(9): The Plan Provides for Payment in Full of All Allowed Priority Claims ..... 34

9. Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted the Plan ..... 35

10. Section 1129(a)(11): The Plan Is Feasible ..... 35

11. Section 1129(a)(12): All Statutory Fees Have Been or Will Be Paid ..... 37

B. The Plan Satisfies the "Cram Down" Requirement under Section 1129(b) of the Bankruptcy Code with Respect to Class 4 ..... 37

1. Section 1129(b)(1): The Plan Does Not Discriminate Unfairly ..... 38

2. Section 1129(b)(2): The Plan is Fair and Equitable ..... 39

C. Section 1129(c)-(e): The Plan Satisfies the Remaining Applicable 1129 Requirements ..... 40

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007)....................18, 32

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court, NY, NY (In re Chateaugay Corp.)*,
89 F.3d 942 (2d Cir. 1996)....................18

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle P'ship*,
526 U.S. 434 (1999)....................11, 31

*In re Boston Generating, LLC*,
440 B.R. 302 (Bankr. S.D.N.Y. 2010)....................11

*In re Brewery Park Assocs. L.P.*,
No. 10-11555, 2011 WL 1980289 (Bankr. E.D. Apr. 29, 2011)....................14

*In re Buttonwood Partners, Ltd.*,
111 B.R. 57 (Bankr. S.D.N.Y. 1990)....................38

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010)....................8, 11, 17

*In re Chrysler LLC*,
405 B.R. 84 (Bankr. S.D.N.Y. 2009)....................12

*In re DBSD N. Am., Inc.*,
419 B.R. 179 (Bankr. S.D.N.Y. 2009)....................15

*In re Drexel Burnham Lambert Grp. Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992)....................18, 27

*In re Extended Stay Inc.*,
No. 09-13764, 2010 WL 6561113 (Bankr. S.D.N.Y. July 20, 2010)....................38

*In re Finlay Enters., Inc.*,
No. 09-14873, 2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010)....................38, 39

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014)....................11

*In re Granite Broad. Corp.*,
369 B.R. 120 (Bankr. S.D.N.Y. 2007)....................11, 13

*Heartland Fed. Savings & Loan Ass'n v. Briscoe Enter. Ltd. II (In re Briscoe Enter. Ltd., II),*
138 B.R. 795 (N.D. Tex. 1992)....................9

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II),*
994 F.2d 1160 (5th Cir. 1993) ....................9, 17

*Iridium Operating LLC v. Motorola, Inc. (In re Iridium Operating LLC),*
373 B.R. 283 (Bankr. S.D.N.Y. 2007)....................11

*In re Johns-Manville Corp.,*
68 B.R. 618 (Bankr. S.D.N.Y. 1986)....................38

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns),*
419 B.R. 221 (Bankr. S.D.N.Y. 2009)....................16, 17, 19

*Kane v. John-Manville Corp. (In re Johns-Manville Corp.),*
843 F.2d 636 (2d Cir. 1988)....................8, 18, 35

*In re Kent Terminal Corp.,*
166 B.R. 555 (Bankr. S.D.N.Y. 1994)....................17

*In re The Leslie Fay Cos., Inc.,*
207 B.R. 764 (Bankr. S.D.N.Y. 1997)....................8, 9

*In re LightSquared Inc.,*
513 B.R. 56 (Bankr. S.D.N.Y. 2014)....................38

*In re Motors Liquidation Co.,*
447 B.R. 198 (Bankr. S.D.N.Y. 2011)....................14

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.),*
761 F.2d 1374 (9th Cir. 1985) ....................36

*In re PWS Holding Corp.,*
228 F.3d 224 (3d Cir. 2000)....................27

*In re Resorts Int'l, Inc.,*
145 B.R. 412 (Bankr. D.N.J. 1990) ....................30

*In re River Vill. Assocs.,*
161 B.R. 127 (Bankr. E.D. Pa. 1993) ....................30

*In re Texaco Inc.,*
84 B.R. 893 (Bankr. S.D.N.Y.)....................30

*In re U.S. Truck Co.*,
47 B.R. 932 (E.D. Mich. 1985)....36

*VFB LLC v. Campbell Soup Co.*,
482 F.3d 624 (3d Cir. 2007)....11

*In re Young Broad. Inc.*,
430 B.R. 99 (Bankr. S.D.N.Y. 2010)....17

**STATUTES**

11 U.S.C. § 327....30

11 U.S.C. § 328....30

11 U.S.C. § 330....30

11 U.S.C. § 331....30

11 U.S.C. § 365....24

11 U.S.C. § 503(b)....30, 34

11 U.S.C. § 507....37

11 U.S.C. § 507(a)....19, 34

11 U.S.C. § 1122....18, 19, 20, 26

11 U.S.C. § 1122(a)....18

11 U.S.C. § 1123....18, 26

11 U.S.C. § 1123(a)....20

11 U.S.C. § 1123(a)(2)....20

11 U.S.C. § 1123(a)(3)....9, 20, 21

11 U.S.C. § 1123(a)(4)....21

11 U.S.C. § 1123(a)(5)....21, 22

11 U.S.C. § 1123(a)(6)....22

11 U.S.C. § 1123(a)(7)....22, 23

11 U.S.C. § 1123(a)(8)....20

11 U.S.C. § 1123(b) ....................23

11 U.S.C. § 1123(b)(1) ....................24

11 U.S.C. § 1123(b)(2) ....................24

11 U.S.C. § 1123(b)(3)(A) ....................24, 25

11 U.S.C. § 1123(b)(3)(B) ....................25

11 U.S.C. § 1123(b)(4) ....................25

11 U.S.C. § 1123(b)(5) ....................25

11 U.S.C. § 1123(b)(6) ....................26

11 U.S.C. § 1123(d) ....................26

11 U.S.C. § 1125 ....................27, 28

11 U.S.C. § 1125(b) ....................27

11 U.S.C. § 1126 ....................27, 28

11 U.S.C. § 1126(c) ....................29

11 U.S.C. § 1126(f) ....................28, 33

11 U.S.C. § 1126(g) ....................28, 34

11 U.S.C. § 1129 ....................2, 17, 40

11 U.S.C. § 1129(a) ....................3, 17, 18, 37

11 U.S.C. § 1129(a)(1) ....................18, 26

11 U.S.C. § 1129(a)(2) ....................26, 27, 29

11 U.S.C. § 1129(a)(3) ....................7, 8, 29

11 U.S.C. § 1129(a)(4) ....................30

11 U.S.C. § 1129(a)(5) ....................23, 30, 31

11 U.S.C. § 1129(a)(6) ....................17

11 U.S.C. § 1129(a)(7) ....................31, 32, 33

11 U.S.C. § 1129(a)(8) ....................33, 34, 37

11 U.S.C. § 1129(a)(9) .......... 34, 35

11 U.S.C. § 1129(a)(9)(A) .......... 34

11 U.S.C. § 1129(a)(9)(B) .......... 34

11 U.S.C. § 1129(a)(9)(C) .......... 34

11 U.S.C. § 1129(a)(10) .......... 35

11 U.S.C. § 1129(a)(11) .......... 35, 36

11 U.S.C. § 1129(a)(12) .......... 37

11 U.S.C. § 1129(a)(13) .......... 17

11 U.S.C. § 1129(a)(14) .......... 17

11 U.S.C. § 1129(a)(15) .......... 17

11 U.S.C. § 1129(a)(16) .......... 17

11 U.S.C. § 1129(b) .......... 5, 7, 8, 10, 14, 34, 37, 38, 39

11 U.S.C. § 1129(b)(1) .......... 38

11 U.S.C. § 1129(b)(2)(C) .......... 39

11 U.S.C. § 1129(c) .......... 40

11 U.S.C. § 1129(d) .......... 40

11 U.S.C. § 1129(e) .......... 40

31 U.S.C. § 3717 .......... 37

**FEDERAL RULES**

FED. R. BANKR. P. 2004 .......... 15

**LEGISLATIVE HISTORY**

H.R. REP. NO. 95-595 (1977) .......... 18, 27

S. REP. NO. 95-989, (1978) .......... 18, 27

TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:

SIGA Technologies, Inc. ("**SIGA**" or the "**Debtor**")[1] as debtor and debtor in possession, respectfully represents:

## PRELIMINARY STATEMENT

On March 30, 2016, SIGA filed its Second Amended Chapter 11 Plan, dated March 30, 2016 (as the same may be further amended, modified, or supplemented, the "**Plan**") (ECF No. 849). The Plan is supported by the statutory committee of unsecured creditors appointed in the Debtor's chapter 11 case (the "**Creditors' Committee**") and PharmAthene, Inc. ("**PharmAthene**"), which has a final judgment against SIGA in the amount of approximately $205 million (as of December 31, 2015). The Plan was accepted by one hundred percent (100%) of the creditors entitled to vote and that voted thereon.

The following three objections (the "**Objections**") have been filed to confirmation of the Plan which largely present the same issues the objecting parties raised in connection with the approval of the Disclosure Statement:

1. Objection of Esopus Creek Value Series Fund LP – Series "A" ("**Esopus**") to Confirmation of Debtor's First Amended Chapter 11 Plan, dated March 21, 2016 (ECF No. 834) (the "**Esopus Objection**");

2. Objection of Nantahala Capital Partners ("**Nantahala**") to Confirmation of Debtor's First Amended Chapter 11 Plan, dated March 23, 2016 (ECF No. 840); and

3. Joinder of Jet Capital Management LP to Objection of Esopus Creek Value Series Fund LP – Series "A" to Confirmation of Debtor's First Amended Plan, dated March 21, 2016 (ECF No. 835).

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan (as defined herein) or the First Amended Disclosure Statement for Debtor's First Amended Chapter 11 Plan, dated February 16, 2016 (ECF No. 772) (the "**Disclosure Statement**").

This Memorandum, in the first instance, addresses the Objections, demonstrating why they should be overruled, and, thereafter, addresses the requirements for confirmation of the Plan under section 1129 of title 11, United States Code (the "**Bankruptcy Code**") and how the Plan satisfies each requirement, thereby warranting prompt confirmation and implementation of the Plan.

To appropriately consider confirmation of the Plan and the Objections, it is necessary to put the Plan, the Objections, and SIGA's Chapter 11 Case into context:

- The Plan represents the culmination of months of protracted, hard fought, and good faith negotiations among the Debtor, the Creditors' Committee, and PharmAthene. The Plan finally resolves nearly a decade of litigation, provides for the treatment and satisfaction of PharmAthene's final judgment in the amount of approximately $205 million (as of December 31, 2015), and assures the ongoing long-term viability of SIGA's business operations and its ability to fulfill its contractual obligations to the United States Government, its sole source of cash inflows.
- The Plan affords SIGA up to seven (7) months (commencing on March 23, 2016, the date on which PharmAthene's judgment became final) to raise the capital necessary to satisfy the PharmAthene Allowed Claim, without PharmAthene having the ability to take any action to enforce its final judgment or otherwise realize on its claim;
- The Plan enables SIGA to promptly emerge from chapter 11 and thereby have the ability to take advantage of business opportunities that otherwise

may not be available because of the uncertainties attendant to its Chapter 11 Case and the disposition of the PharmAthene Allowed Claim;

- The Plan completely avoids the consequences of the immediate statutory termination of the Debtor's exclusive periods, including the inevitable filing of a plan by the Creditors' Committee and PharmAthene that would result in the imminent cancellation of all existing Equity Interests in SIGA without any recovery whatsoever or any hope of preserving any value for such Equity Interests;
- Any ability of the Debtor or, for that matter, any existing shareholder or other interested party to propose and confirm an alternative plan of reorganization that preserves value for existing shareholders over PharmAthene's objection, faces enormous, if not insurmountable obstacles, in view of the composition of the Debtor's creditor constituency and the requirements of section 1129(a) of the Bankruptcy Code;
- As recognized by the Court, SIGA's Board of Directors is comprised of significant holders of SIGA's existing common stock. Their interests are completely aligned with all other stockholders (including the objecting parties) and they have the incentive to and will assure that every realistic alternative will be fully explored and pursued to preserve equity value to the maximum extent possible. Indeed, that effort is underway. For Esopus or any other objecting party to assert that SIGA or its Board of Directors have another agenda or would simply turn SIGA over to PharmAthene, belies every single achievement of SIGA and its Board of

> Directors in this case, exemplified by the terms of the Plan they have negotiated.[2]

Indeed, it is plainly evident that the only alternative to confirmation of the Plan for SIGA's existing shareholders is quite stark and draconian — not another plan that provides a distribution to shareholders or any possibility of preserving shareholder value, but rather a plan that will result in the immediate extinguishment of all equity interests and no ability whatsoever to pursue a capital raise or other transaction to preserve those interests.

The Objections must be overruled. Any suggestion that the Plan was not filed in good faith ignores the incontrovertible facts of the dynamics of SIGA's Chapter 11 Case, the Plan negotiations, the results achieved in the face of the PharmAthene final judgment, the opportunity the Plan provides to preserve shareholder value in view of that final judgment, and the obvious constraints on the ability to impose any other chapter 11 plan on PharmAthene.

[2] As appropriately noted by the Court at the hearing held on February 2, 2016, to consider approval of the Disclosure Statement:

> Esopus seems to misunderstand the nature of the debtor's plan in its objection which insinuates that there's some concealed motive to hand over the equity to PharmAthene, and that position ignores the reality of the case.
>
> It's at odds with the fact that the debtor fought to extend exclusivity to keep control of the case and prevent PharmAthene or the committee from presenting their own plans of reorganization. It's at odds with the fact that the debtor sought additional time until July 2016 to raise money to pay the judgment so the debtor doesn't have to turn over the equity. It ignores that the debtor's board members are also equity holders. And perhaps then it's not surprising that the objection is short on details of how and why this supposed plan to — would work as to handing over the equity [to] PharmAthene and how and why that would actually happen.

Hr'g Tr. 49: 9–25, Feb. 2, 2016.

Moreover, shareholder rights hardly are being trampled or otherwise inappropriately affected by the Plan. As the applicable authority clearly notes and as this Court has recognized, the market is the best barometer of value. The Plan enables the Debtor to, and the Debtor already has begun to, pursue a robust and comprehensive market test to raise the capital necessary to satisfy the PharmAthene Allowed Claim. It has every incentive to do so. If that effort does not generate the value necessary to satisfy the PharmAthene Allowed Claim in full, then shareholders have no right to complain that the requirements of section 1129(b) of the Bankruptcy Code have not been satisfied as to their Class under the Plan. In fact, if Esopus and the other objectors seriously believe the Debtor's value exceeds the amount of its creditor claims and PharmAthene's final judgment, they will have every opportunity to put some economic substance behind their conclusory allegations by making a proposal to provide the capital necessary to pay the PharmAthene Allowed Claim.

Additionally, the release and exculpation provisions in the Plan are customary and appropriate. First, despite the Objections' attempt to confuse matters, it is absolutely clear that the release provisions set forth in Section 10.9 of the Plan are releases of estate claims and in no way encompass any so-called "third party releases." Secondly, the exculpation provision in Section 10.8 of the Plan covers matters relating to the administration of the Chapter 11 Case and the negotiation and implementation of the Plan and applies only to estate fiduciaries. As has been recognized, disgruntled, litigious parties should not be permitted to pursue the Exculpated Parties for carrying out the Plan, particularly where all of such parties are estate fiduciaries and most have the right to be indemnified by the Debtor and the Reorganized Debtor.

Moreover, to the extent there are any legitimate concerns raised in the Objections, they already have been addressed:

- At the request of the Court, the Plan was amended since approval of the Disclosure Statement to provide that if the PharmAthene Allowed Claim is to be treated under Option 4 of the Plan ("[s]uch other treatment as may be mutually agreed to in writing by the Debtor or Reorganized Debtor, as applicable, and PharmAthene"), this Court shall retain jurisdiction, subsequent to the Effective Date, to review and approve the same, with all interested parties having the right to object (Plan § 4.3(b)(vi));
- To resolve objections raised at the hearing to consider approval of the Disclosure Statement (and raised again now in the Objections), the Debtor agreed with Esopus and Nantahala to add the exact language set forth in Section 6.16(d) of the Plan to address their concerns as to a potential transaction being entered into to satisfy the PharmAthene Allowed Claim in which MacAndrews & Forbes Incorporated ("**MacAndrews**") or any of its affiliates was a participant. Despite this agreed resolution among the parties, Esopus and Nantahala are now saying that agreement is no longer valid and they want more; and
- For the avoidance of doubt, SIGA is happy to clarify a matter that fully addresses a principal concern raised in the Objections as to the rights of shareholders subsequent to the Effective Date with respect to a transaction to satisfy the PharmAthene Claim in full under Option 1 of the Plan ("[p]ayment in full in Cash of the unpaid balance of the PharmAthene Allowed Claim"): To the extent any such transaction is required to be

submitted to a shareholder vote under applicable Delaware law, the Plan does not eliminate such requirement.

It is undeniably clear that SIGA has negotiated a consensual Plan that provides the best, and likely the only viable means, to preserve value for its existing shareholders. The parochial interests of the Objecting Parties should not be permitted to frustrate this accomplishment, particularly where the only other alternative is the imminent confirmation and implementation of a plan that will result in the prompt extinguishment of all shareholder interests.

## FACTS

The pertinent facts are set forth in the Disclosure Statement, the Plan, and any testimony and declarations that may be adduced or submitted at or in connection with the Confirmation Hearing. Such facts are incorporated herein as if fully set forth herein.

## ARGUMENT

### I.

### THE OBJECTIONS SHOULD BE OVERRULED AND THE PLAN CONFIRMED

1. Distilled to their essentials, the Objections fall into the following categories:

   a. The Plan has not been proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code;

   b. The Plan does not satisfy the "cram down" requirements of section 1129(b) as to Class 4 (Equity Interests) because there is no valuation; and

   c. The release and exculpation provisions of the Plan are too broad.

2. As set forth above, the Objections are not supported by the facts or applicable law and should be overruled. The good faith of the Plan is self-evident and the provisions of the Plan, including the opportunity to conduct a robust market test to be executed by management

and SIGA's Board of Directors, the interests of which are completely aligned with SIGA's shareholders, plainly satisfies all requirements of section 1129(b) with respect to Class 4 (Equity Interests). Moreover, under the circumstances of this case, including the statutory termination of the exclusive periods and the realistic alternatives available to shareholders, the exculpation and release provisions in the Plan are not only customary, but also entirely appropriate.

**A. The Plan was Proposed in Good Faith.**

3. It is generally recognized in this District that in determining whether a chapter 11 plan has been proposed in good faith within the meaning of section 1129(a)(3) of the Bankruptcy Code, the plan proponent must show that the "the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Kane v. John-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) (internal quotations omitted). "Whether a reorganization plan has been proposed in good faith must be viewed in the totality of the circumstances, and the requirement of Section 1129(a)(3) 'speaks more to the *process of plan development than to the content of the plan*.'" *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (*emphasis added*) (quoting *In re Bush Indus., Inc.*, 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004)). Generally, this standard is satisfied "if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *In re The Leslie Fay Cos., Inc.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (internal quotations omitted).

4. Applying these standards to the Plan, it is clear the Plan was proposed in good faith. The administration of this case and the process of formulating the Plan epitomizes the intent and purpose of chapter 11 — a hard fought negotiation that resolves years of litigation, assures the Debtor's ongoing viability, and provides the Debtor with a substantial period of time not otherwise available to address a finally determined liability that it currently has no ability to

satisfy. As noted by the Court in *Leslie Fay*, that the Plan is supported by the Creditors' Committee is additional evidence that the Plan was proposed in good faith. *Leslie Fay*, 207 B.R. at 781 ("The fact that the plan is proposed by the committee as well as the debtors is strong evidence that the plan is proposed in good faith.").

5. The risk that existing shareholders ultimately may not retain any value (in the event the market test permitted by the Plan does not provide SIGA with the ability to pay the PharmAthene Allowed Claim in full), does not alter the good faith underlying the Plan, particularly where the only realistic alternative likely will result in the cancellation of all Equity Interests with no distribution. The Plan also plainly provides for the means for its implementation, including by permitting a substantial amount of time for the capital raise or other transaction to satisfy the PharmAthene Allowed Claim to be managed and controlled by SIGA and its Board of Directors, and the ability to fully engage in that process without any undue interference or enforcement action by PharmAthene.[3]

6. Additionally, Esopus' allegation (Esopus Objection ¶ 26) that SIGA's retention of Piper Jaffray & Co., ("**Piper Jaffray**") as its financial advisor is somehow improper lacks merit. SIGA's retention of Piper Jaffray plainly demonstrates and confirms the commitment of SIGA and its Board of Directors to take full advantage of the time negotiated and provided for in the

---

[3] The assertion in the Esopus Objection that the Plan fails to comply with section 1123(a)(3) of the Bankruptcy Code ("a plan shall specify the treatment of any class of claims or interests that is impaired under the plan"), hardly warrants a response. The Plan, in fact, does provide for the treatment of Equity Interests — holders thereof will either retain some value or their interests will be cancelled based on the market test. The fact that the precise distribution, if any, is unknown is irrelevant. A plan does not automatically fail to satisfy section 1123(a)(3) merely because the value received by a class of claims or equity interests may vary depending on events that occur post-confirmation. *See e.g., Heartland Fed. Savings & Loan Ass'n v. Briscoe Enter. Ltd. II (In re Briscoe Enter. Ltd., II)*, 138 B.R. 795 (N.D. Tex. 1992), *rev'd*, 994 F.2d 1160, 1163 n.5 (5th Cir. 1993) (holding that section 1123(a)(3) was satisfied where plan provided that unsecured creditors *may* receive periodic cash payments on account of their claim if there is sufficient net cash flows in the trust and the trustee determines, in its discretion, that the excess cash of the trust need not be reserved for any other purpose.).

Plan to assure that the market is thoroughly tested and that every potential transaction is explored and scrutinized to preserve value for existing equity. Further, it should be noted that Piper Jaffray's compensation arrangements have not yet been finalized, but will be contingent on a successful transaction, thereby assuring that their motivation and economic interests are fully aligned with SIGA and its Board of Directors in achieving a transaction that preserves value for all of SIGA's existing shareholders.[4]

**B. The Plan Satisfies the Requirements of <u>Section 1129(b) of the Bankruptcy Code as to Class 4 (Equity Interests).</u>**

7. The Objections also assert that the Plan does not satisfy the requirements of section 1129(b) of the Bankruptcy Code with respect to SIGA's existing equity because this Court is not conducting a formal valuation hearing as to the value of SIGA's equity that may potentially be turned over to PharmAthene under Option 3 of the Plan if the capital raise or other transaction is not successful. The Objections are unfounded. As courts in this District and others have recognized, the market is the best barometer of value and the Plan provides for precisely such a market valuation. Moreover, the Plan enables that market test to take place over an extensive period of time, an opportunity that simply will not be available if the Plan is not confirmed. Thus, should SIGA ultimately be compelled under the Plan to turn over its equity to PharmAthene, it will do so only as a last resort, after having conducted a robust, months-long market test in which every opportunity to preserve equity will have been explored and exhausted. In that circumstance, no one can legitimately argue that PharmAthene will receive more than one-hundred percent (100%) of the PharmAthene Allowed Claim.

[4] It is telling to note Esopus' reference in footnote 13 of its Objection to the *American Airlines* chapter 11 case and, as Esopus' footnote states "[ . . . ] the debtors [in that case] agreed to pay the fees of the settling parties." Perhaps this is the real motivation behind the Esopus Objection.

8. As noted by the United States Supreme Court in the seminal case *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle P'ship*, 526 U.S. 434, 457 (1999), "[T]he best way to determine value is exposure to a market." *See also VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("Absent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.") (internal citations omitted).

9. Courts in this District also have noted the importance of the market in determining value. *See In re Chemtura Corp.*, 439 B.R. at 586 ("Another matter that informs my finding that the Debtors' TEV doesn't exceed $2.05 billion is the lack of buyers or investors for the Debtors at higher values or values within the Equity Committee's range—a species of 'market' information that informs, though it does not solely support, my conclusion that the Debtors have met their burden as to value here."); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 260 (Bankr. S.D.N.Y. 2014) ("The Court finds it telling that no equity holder, including large hedge funds on the Equity Committee, has expressed any interest in investing its own money in a transaction involving the Debtors."); *see also In re Granite Broad. Corp.*, 369 B.R. 120, 143 (Bankr. S.D.N.Y. 2007) ("[T]here is no dispute that in many circumstances the best evidence of value is what a third party is willing to pay in an arm's length transaction."); *Iridium Operating LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2007) (adopting the reasoning in *Campbell Soup* and stating that "the public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value and, when available to the Court, is the preferred standard of valuation."); *In re Boston Generating, LLC*, 440 B.R. 302, 326 (Bankr. S.D.N.Y. 2010) ("It is generally accepted, however, that absent a showing that there has been a clear

market failure, the behavior in the marketplace is the best indicator of enterprise value."); *In re Chrysler LLC*, 405 B.R. 84, 98 (Bankr. S.D.N.Y. 2009) ("the true test of value is the sale process itself.").

10. Here, the Plan encompasses a robust market test to be pursued by SIGA and its Board of Directors whose interests in succeeding in that effort are paramount and identical to the interests of SIGA's shareholders. [5]

11. As stated, SIGA already has retained Piper Jaffray as its financial advisor and its effort is well underway. As described in the Declaration of James Douglas in Support of Confirmation of Debtor's Second Amended Chapter 11 Plan, filed contemporaneously herewith (the "**Douglas Declaration**"), Piper Jaffray has a particular expertise in the Debtor's industry and its mandate is broad: to explore any and all means of raising capital or any other transaction that will permit SIGA to pay the PharmAthene Allowed Claim in full. Importantly, in Mr. Douglas' opinion, it will be materially more difficult for SIGA to raise capital or consummate a transaction if confirmation and the occurrence of the Plan Effective Date are delayed; he views

[5] At the hearing held on February 16, 2016, to consider approval of the Disclosure Statement, the Court noted the relevance of the Plan's market test to a determination of SIGA's equity value:

> [ . . . ] that the ability to get a capital raise that would pay off PharmAthene in this first option [of the Plan], which is a full-pay option, that that [sic] is demonstrating that the value of the company is more than the value owed to PharmAthene. And so I don't know what more — and it's done in the marketplace. And I don't know what more a court would be asked to do. I don't know if that's setting any precise price on value beyond making that finding that it's more than what's owed to PharmAthene would be anything that I would do, so you'd be essentially where you would be if the capital raise was done in the courthouse. [ . . . ] The first option is they raise the money and they pay off PharmAthene. And they raise the money because they're able to demonstrate in the marketplace that the company is worth more than the money they need to raise.

Hr'g Tr. 16:18–17:3. 21–25, Feb. 16, 2016.

Plan confirmation and SIGA's prompt emergence from chapter 11 as critical to the marketing effort.

12. And, if Esopus or any other objecting party or other shareholder believes SIGA's existing equity is being undervalued, they will have every opportunity to put their money up to preserve that perceived value and "back their beliefs with their purses." *Granite Broad.*, 369 B.R. at 140-41 ("People who must back their beliefs with their purses are more likely to assess the value of the [asset] accurately than are people who simply seek to make an argument.") (quoting *In re Cent. Ice Cream Co.*, 836 F.2d 1068, 1072, n.3 (7th Cir. 1987)).

13. In addition, as noted above, at the request and with the agreement of both Esopus and Nantahala to resolve their objections to the approval of the Disclosure Statement, Section 6.16(d) was added to the Plan to address any legitimate concern they may have that MacAndrews, SIGA's largest shareholder, whose interest in preserving value for equity holders is totally consistent with that of all other shareholders, would somehow "game" the process. Although this resolution of their objection and the precise language of Section 6.16(d) of the Plan was agreed to by the parties, SIGA and MacAndrews nevertheless are willing to expand it further by deleting, as now requested by Nantahala in its Objection, the parenthetical in Section 6.16(d) that states: "(so long as at the time of such issuance and sale MacAndrews is an affiliate (as defined for securities law purposes) of the Reorganized Debtor)." The Plan treats all shareholders the same, whether those shareholders are members of SIGA's Board of Directors, MacAndrews, Esopus, Nantahala, or anyone else.

14. Moreover, as stated above, SIGA will clarify and thereby moot another principal element of the Objections, with respect to the rights of existing shareholders subsequent to the Effective Date if Option 1 under the Plan is selected ("[p]ayment in full in Cash of the unpaid

balance of the PharmAthene Allowed Claim”). To the extent any transaction to be implemented to satisfy the PharmAthene Allowed Claim under Option 1 would require a shareholder vote under applicable Delaware law, the Plan shall not eliminate that requirement.[6]

15. In view of the forgoing, including the fact that Option 4 under the Plan will be subject to Court approval, the Debtor submits that the Plan satisfies all requirements under section 1129(b) of the Bankruptcy Code.[7]

**C. The Release and Exculpation Provisions of the Plan Are Appropriately Limited and Proper.**

16. As an initial matter, it must be noted that Section 10.9 of the Plan which provides for releases, does not encompass *any* third-party releases. Rather, it is clear that Section 10.9 provides solely for releases of SIGA’s claims and it is appropriately circumscribed to carve out any claims for willful misconduct, gross negligence, fraud, malpractice, criminal conduct, or *ultra vires* acts. Accordingly, as noted in *In re Motors Liquidation Co*., 447 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) (“Releases by estates involve a give-up of potential rights that are owned by the estate, and are perfectly permissible in a plan, either as parts of plan settlements or otherwise, though the court must satisfy itself (at least if anyone raises the issue) that the give-up is an appropriate exercise of business judgment, and, possibly, in the best interests of the

[6] Esopus’ complaint that shareholders were somehow disenfranchised because they were not permitted to vote on the Plan and were deemed to reject is nonsensical. The rights of all shareholders to object to confirmation were fully preserved. Moreover, the only other potential consequence of a shareholder vote would have been acceptance of the Plan, which would have eliminated any possible objection by Esopus.

[7] Esopus’ reliance on *In re Brewery Park Assocs. L.P.*, No. 10-11555, 2011 WL 1980289 (Bankr. E.D. Apr. 29, 2011) is misplaced. The case is distinguishable for a number of reasons: (a) it involved a husband and wife limited partnership with an undeveloped piece of property; (b) the nonconsensual plan being considered by the Court was proposed by the secured creditor who acknowledged that its proposed marketing plan for the property was inadequate and any hope of receiving an offer other than a credit bid by the secured creditor was completely illusory; and (c) because of the inadequate marketing plan, the secured creditor was likely to end up owning the property through a credit bid at a value substantially less than the value the secured creditor itself attributed to the property, thereby also generating a sizeable deficiency claim.

estate.”). *See also In re DBSD N. Am., Inc.,* 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (approving plan provision that released and discharged claims and causes of action by the debtors on the basis that such releases and discharges “represent a valid exercise of the Debtors’ business judgment, and are fair, reasonable and in the best interests of the estate.”), *aff’d*, No. 90–3061 (REG), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff’d in part, rev’d in part sub nom. DISH Network Corp. v. DBSD N. Am. Inc. (In re DBSD N. Am.)*, 634 F.3d 79 (2d Cir. 2011).

17. Based on the foregoing, the release provision in the Plan is entirely proper and a valid exercise of the Debtor’s business judgment. As stated, the release provision is limited to the Debtor’s claims and applies largely to matters related to the administration the Chapter 11 Case. The release of the 2004 Derivative Causes of Action by the Debtor also is completely justified. First, as the Debtor has consistently stated, the so-called claims subject to the Creditors’ Committee’s investigation pursuant to Bankruptcy Rule 2004 have no basis whatsoever in law or in fact, in addition to being barred by applicable statutes of limitation. It would be a complete waste of time, money, and the Debtor’s resources to pursue any such claims, and, in any event, the Debtor does not believe it is releasing any claims that have any value whatsoever. More importantly perhaps, is the fact that the parties that are the subject of those purported claims are essential to SIGA’s ongoing viability and the performance of the BARDA contracts, and integral to the success of any capital raise. Indeed, under these circumstances, the pursuit of these worthless claims would be not only counterproductive but also antithetical to the success of a capital raise. In view of the foregoing, the release provision clearly represents an appropriate exercise of the Debtor’s business judgment and is in the best interests of the Debtor’s estate, particularly holders of Equity Interests.

18. The exculpation provision in Section 10.8 of the Plan also is proper and appropriately circumscribed. First, the exculpation provision is limited to estate fiduciaries in the context of their activities related to the Chapter 11 Case, the negotiation of the Plan, and the implementation of the Plan, including the fundamental element thereof — the treatment of the PharmAthene Allowed Claim. In addition, all Exculpated Parties (other than the Creditors' Committee and its advisors) will have ongoing rights to indemnification from the Reorganized Debtor. *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) (stating that "when reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate" and finding that the releases at issue were in the best interest of the estate because the releases "have limited value and are procedurally efficient in view of the fact that most of the [releasees] have indemnification rights such that any claims by the Debtors against them would ultimately lead to claims being asserted against the Debtors."), *appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012).

19. The Debtor's management and Board of Directors have negotiated a Plan that provides the best possible means, and likely the only means, to preserve equity value. The exculpation provision in the Plan is appropriately limited to protect them from disgruntled, litigious stakeholders seeking an avenue for a recovery to which they are otherwise not entitled.

## II.

## THE PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY CODE

20. To achieve confirmation of the Plan, the Debtor must demonstrate that the Plan satisfies section 1129 of the Bankruptcy Code by a preponderance of the evidence. As the United States Court of Appeals for the Fifth Circuit stated in *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*: "The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown." 994 F.2d at 1165 (5th Cir. 1993), *see In re Chemtura Corp*., 439 B.R. at 608; *In re Young Broad. Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010); *In re Charter Commc'ns*, 419 B.R. at 243–44; *see also In re Kent Terminal Corp*., 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994) (holding that "the final burden of proof at [ . . . ] confirmation hearings remains a preponderance of the evidence").

21. Through filings with the Court and the evidence to be presented at the Confirmation Hearing, the Debtor will demonstrate, by a preponderance of the evidence, that all the applicable subsections of section 1129[8] of the Bankruptcy Code have been satisfied with respect to the Plan and, therefore, it should be confirmed.

[8] The confirmation requirements set forth in subsections (a)(6), (a)(13), (a)(14), (a)(15), and (a)(16) of section 1129 of the Bankruptcy Code are not applicable to the Plan. Section 1129(a)(6) concerns the need for government approval of rate changes subject to government regulatory jurisdiction; section 1129(a)(13) concerns payment of retiree benefits for which the Debtor has no obligations; section 1129(a)(14) concerns debtors required by order or statute to pay domestic support obligations; section 1129(a)(15) applies to individual debtors; and section 1129(a)(16) is only relevant where certain property is transferred under circumstances not applicable here.

### A. The Plan Satisfies the Requirements under Section 1129(a) of the Bankruptcy Code

#### 1. Section 1129(a)(1): The Plan Complies with All Applicable Provisions of the Bankruptcy Code

22. Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code. The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and contents of the plan, respectively. *See* H.R. REP. NO. 95-595, at 412 (1977); S. REP. NO. 95-989, at 126 (1978); *see also In re Johns-Manville Corp.*, 843 F.2d at 648–49; *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992). As demonstrated below, the Plan complies fully with the requirements of both of these sections as well as with all other provisions of the Bankruptcy Code.

##### a. Classification of Claims and Interests

23. Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Under this section, a plan may provide for multiple classes of claims or interests as long as each claim or interest within a class is substantially similar to other claims or interests in that class. In addition, substantially similar claims may not be classified separately when it is done for an illegitimate reason. *See e.g., Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court, NY, NY (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (stating that "classification is constrained by two straight-forward rules: Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason"); *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 246–47 (Bankr. S.D.N.Y. 2007) (explaining law on classification of claims as interpreted within the

Second Circuit), *appeal dismissed*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008).

24. The Plan provides for the separate classification of Claims and Equity Interests in four Classes based upon differences in the legal nature and/or priority of such Claims and Equity Interests.[9]

- **Class 1** provides for the separate classification of Secured Claims;
- **Class 2** provides for the separate classification of all Priority Non-Tax Claims identified in section 507(a) of the Bankruptcy Code that are entitled to priority in payment (other than Administrative Expenses and Priority Tax Claims);
- **Class 3** provides for the separate classification of General Unsecured Claims, including the PharmAthene Claim; and
- **Class 4** provides for the separate classification of Equity Interests.

25. Each of the Claims or Equity Interests in each particular Class is substantially similar to the other Claims or Equity Interests in such Class. Accordingly, the classification of Claims and Equity Interests in the Plan complies with section 1122 of the Bankruptcy Code. *See In re Charter Commc'ns*, 419 B.R. at 264 n.35 (explaining that debtors "enjoy considerable discretion when classifying similar claims in different classes").

[9] Administrative Expenses and Priority Tax Claims are not classified and are separately treated.

**b. Required Contents of the Plan**

26. Section 1123(a) of the Bankruptcy Code sets forth seven (7) requirements with which the proponent of every chapter 11 plan, other than individual debtors, must comply.[10] As demonstrated herein, the Plan fully complies with each of these enumerated requirements.

(i) **Section 1123(a)(1): Designation of Classes of Claims and Interests**

27. Section 1123(a)(1) requires that a plan designate classes of claims and equity interests subject to section 1122 of the Bankruptcy Code. In addition to Administrative Expenses and Priority Tax Claims, which need not be designated, Article III of the Plan designates four (4) Classes of Claims and Equity Interests, as discussed above. Accordingly, the Plan satisfies the requirements of section 1123(a)(1).

(ii) **Section 1123(a)(2): Classes that Are Not Impaired under the Plan**

28. Section 1123(a)(2) requires a plan to specify any class of claims or interests that is not impaired under a plan. In accordance therewith, Article III of the Plan specifies that Class 1 (Secured Claims) and Class 2 (Priority Non-Tax Claims) are unimpaired under the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

(iii) **Section 1123(a)(3): Treatment of Classes That Are Impaired under the Plan**

29. Section 1123(a)(3) requires a plan to specify the treatment of impaired classes of claims or interest. Article IV of the Plan sets forth the treatment of Class 3 (General Unsecured Claims) and Class 4 (Equity Interests), each of which constitutes an impaired class under the

[10] An eighth requirement, set forth in 11 U.S.C. § 1123(a)(8), only applies in a case in which the debtor is an individual.

Plan. *See also supra* note 3. Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

(iv) **Section 1123(a)(4): Equal Treatment within Each Class**

30. Section 1123(a)(4) requires that a plan provide the same treatment for each claim or interest within a particular class unless any claim or interest holder agrees to less favorable treatment than other class members. Article IV of the Plan specifies the treatment of Claims and Equity Interests in each respective Class and, as required by section 1123(a)(4), provides for the same treatment by the Debtor for each Claim or Equity Interest in each respective Class unless the holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest, as required by section 1123(a)(4) of the Bankruptcy Code. As part of the negotiations that led to the filing of this consensual Plan, PharmAthene, which holds a Claim in Class 3 (General Unsecured Claims), agreed to accept treatment that may be less favorable than the treatment of other Claims in such class.

(v) **Section 1123(a)(5): Adequate Means for Implementation**

31. Section 1123(a)(5) requires that a plan provide "adequate means for the plan's implementation." 11 U.S.C. § 1123(a)(5). Articles V, VI, VII, VIII, X, and various other provisions of the Plan, as well as the Exhibits thereto and the documents and agreements set forth in the Plan Supplement, set forth the means for implementation of the Plan as required by section 1123(a)(5). Together, these provisions, documents, and agreements provide for, among other things: (i) provisions governing distributions under the Plan to holders of Allowed Claims; (ii) the covenants to be in effect pending treatment of the PharmAthene Allowed Claim; and (iii) procedures for disputed claims and executory contracts. As stated above, the Plan also provides the Debtor with up to seven (7) months from March 23, 2016 to raise the capital

necessary to satisfy the PharmAthene Allowed Claim. In addition, the Plan Supplement includes, among other things, substantially final copies of the Reorganized Debtor's Amended and Restated By-Laws, Amended and Restated Certificate of Incorporation, the Schedule of Assumed Contracts and Leases, and the Schedule of Rejected Contracts and Leases. Accordingly, the Plan, together with the documents and agreements set forth in the Plan Supplement, provide the means for implementation of the Plan as required by section 1123(a)(5) of the Bankruptcy Code.

(vi) **Section 1123(a)(6): Prohibition on the Issuance of Nonvoting Securities**

32. Section 1123(a)(6) prohibits the issuance of nonvoting equity securities, and requires amendment of a debtor's charter to so provide. This section also requires that a corporate charter provide an appropriate distribution of voting power among the classes of securities possessing voting power. The Reorganized Debtor's Amended and Restated Certificate of Incorporation, a substantially final form of which is annexed to the Plan Supplement as Exhibit A1, prohibits the issuance of nonvoting equity securities in compliance with section 1123(a)(6) of the Bankruptcy Code.

(vii) **Section 1123(a)(7): Provisions Regarding Directors and Officers**

33. Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7). Section 6.15(d) of the Plan provides that the initial members of the Board of Directors of the Reorganized Debtor, as well as the members of the Board of Directors who will be appointed in the unlikely event of a reconstitution of the Reorganized Debtor's Board of Directors upon a Plan Covenant Event of

Default in accordance with Section 6.6(d) of the Plan, will be identified by no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

34. Annexed as Exhibit I to the Plan Supplement is a list of the initial members of the Board of Directors of the Reorganized Debtor, which are (a) Eric A. Rose, Chairman of the Board of Directors and Chief Executive Officer, (b) James J. Antal, (c) Michael J. Bayer, (d) Thomas E. Constance, (e) Jeffrey B. Kindler, (f) Joseph W. Marshall, (g) Paul G. Savas, (h) Bruce Slovin, and (i) Andrew L. Stern, each of whom have served on the Debtor's Board of Directors since the Commencement Date. The executive officers of the Reorganized Debtor, also listed thereon, are (a) Eric A. Rose, Chief Executive Officer, (b) Daniel J. Luckshire, Executive Vice President, Chief Financial Officer, and Corporate Secretary, and (c) Dennis E. Hruby, Vice President and Chief Scientific Officer. Exhibit I to the Plan Supplement also sets forth the members of the Board of Directors who will be appointed in the unlikely event of a reconstitution of the Reorganized Debtor's Board of Directors in accordance with Section 6.6(d) of the Plan. The members of the initial Board of Directors currently are members of the Debtor's Board of Directors, are familiar with the Debtor's business, and are stockholders of SIGA with interests aligned with the other stockholders of SIGA and, therefore, every incentive to maximize value. The Debtor submits that the Plan contains no provisions on the selection of directors or officers that are contrary to the interests of holders of Claims or Equity Interests or to public policy, and, accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

**c. Permissive Contents of the Plan**

35. Section 1123(b) of the Bankruptcy Code sets forth the permissive provisions that may be incorporated into a chapter 11 plan. As demonstrated below, the Debtor's incorporation of such permissive provisions in the Plan is consistent with section 1123(b).

(i) **Section 1123(b)(1): Impairment of Claims and Interests**

36. Section 1123(b)(1) of the Bankruptcy Code provides that a plan "may impair or leave unimpaired any class of claims, secured or unsecured, or of interests." As contemplated by section 1123(b)(1), Article IV of the Plan describes the treatment (i) for the following unimpaired Classes of Claims: Class 1 (Secured Claims) and Class 2 (Priority Non-Tax Claims) and (ii) for the following impaired Classes of Claims and Equity Interests: Class 3 (General Unsecured Claims) and Class 4 (Equity Interests).

(ii) **Section 1123(b)(2): Executory Contracts and Unexpired Leases**

37. Section 1123(b)(2) of the Bankruptcy Code provides that a plan may provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code. As authorized by section 1123(b)(2), Section 8.1 of the Plan provides that, on the Effective Date, the Reorganized Debtor will be deemed to have assumed each executory contract or unexpired lease to which the Debtor is a party, except for an executory contract or unexpired lease that (a) was previously assumed, assumed and assigned, or rejected, (b) is specifically designated as a contract or unexpired lease to be rejected on the Schedule of Rejected Contracts and Leases, (c) is the subject of a motion to reject filed by the Debtor prior to the Confirmation Date, or (d) is the subject of a pending Cure Dispute. The Schedule of Assumed Contracts and Leases and the Schedule of Rejected Contracts and Leases are included in the Plan Supplement as Exhibits G and H, respectively.

(iii) **Section 1123(b)(3): Settlement of Claims and Causes of Action**

38. Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."

11 U.S.C. § 1123(b)(3)(A). As permitted by section 1123(b)(3)(A), and as discussed in detail in Part I of this Memorandum, Section 10.9 of the Plan provides for a release of claims and causes of action owned by the Debtor.

39. Section 1123(b)(3)(B) of the Bankruptcy Code provides that a plan "may provide for the retention and enforcement by the debtor" of certain claims or interests. As permitted by Section 1123(b)(3)(B), Section 10.10 of the Plan preserves for the Reorganized Debtor any rights, Causes of Action, right of setoff, or other legal or equitable defenses of the Debtor or Reorganized Debtor, except as otherwise provided in the Plan.

(iv) **Section 1123(b)(4): Sale of Property of the Estate**

40. The Plan does not provide for the sale, transfer, or assignment of all or substantially all of the Debtor's property and, therefore, section 1123(b)(4) of the Bankruptcy Code is not applicable to this Chapter 11 Case.

(v) **Section 1123(b)(5): Modifying of Creditor Rights**

41. Section 1123(b)(5) of the Bankruptcy Code provides that a plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims." 11 U.S.C. § 1123(b)(5). As set forth in Article IV of the Plan, the Plan modifies the rights of holders of Claims in Class 3 (General Unsecured Claims) and holders of interests in Class 4 (Equity Interests) and leaves unaffected the rights of holders of Claims in Classes 1 (Secured Claims) and 2 (Priority Non-Tax Claims).

(vi) **Section 1123(b)(6): Other Appropriate Provisions**

42. Section 1123(b)(6) of the Bankruptcy Code is a "catchall" provision, which permits inclusion in a plan of any appropriate provision as long as such provision is not inconsistent with applicable sections of the Bankruptcy Code. Annexed as Exhibit A to the Plan is the Schedule of Plan Covenants which sets forth certain covenants (the "**Plan Covenants**") with which, pursuant to Section 6.3 of the Plan, the Reorganized Debtor and any Subsidiary must comply from and after the Effective Date through and including the Plan Covenant Termination Date. The Plan Covenants were negotiated and carefully designed to permit the Debtor to operate its business in the ordinary course and without any undue restrictions pending the final resolution and treatment of the PharmAthene Allowed Claim, as provided in the Plan.

(vii) **Section 1123(d): Cure of Defaults**

43. Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable non-bankruptcy law." 11 U.S.C. § 1123(d). Annexed as Exhibit G to the Plan Supplement is the Schedule of Assumed Contracts and Leases which sets forth a list of executory contracts and leases to be assumed by the Debtor and the cure amount, if any. Accordingly, the Plan complies with section 1123(d) of the Bankruptcy Code.

44. Based upon the foregoing, the Plan complies fully with the requirements of sections 1122 and 1123, as well as with all other provisions of the Bankruptcy Code, and thus satisfies the requirement of section 1129(a)(1) of the Bankruptcy Code.

**2. Section 1129(a)(2): The Debtor Has Complied <u>with the Provisions of the Bankruptcy Code</u>**

45. Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent comply with the applicable provisions of the Bankruptcy Code. The legislative history to section

1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. H.R. REP. NO. 95-595, at 412; S. REP. NO. 95-989, at 126 ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. at 759. As demonstrated below, the Debtor has complied with the applicable provisions of title 11, including the provisions of sections 1125 and 1126 regarding disclosure and plan solicitation, as well as the Solicitation Order (as defined herein), regarding disclosure and Plan solicitation.

**a. Post-petition Disclosure and Solicitation**

46. Under section 1125 of the Bankruptcy Code, prior to the solicitation of votes on a plan of reorganization, a debtor must disclose information that is adequate to permit an informed judgment by creditors and shareholders entitled to vote on the plan. By Order, dated February 16, 2016 (ECF No. 774) (the "**Solicitation Order**"), and after notice and a hearing, the Court approved the Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's creditors to make an informed judgment regarding whether to accept or reject the Plan. As set forth in (i) the Affidavit of Christina Pullo, sworn to on February 24, 2016 (ECF No. 788) (the "**Prime Clerk Affidavit**"), each holder of a Claim or Equity Interest was sent the solicitation materials required by the Solicitation Order, including, for holders of Claims entitled to vote, the Disclosure Statement (with the Plan annexed thereto), the Solicitation Order (without exhibits), the Confirmation Hearing Notice, and an appropriate form of ballot and return envelope (such ballot and return envelope being referred to as a "**Ballot**"). The solicitation materials sent to Class 3 (General Unsecured Claims) was transmitted

in connection with the solicitation of votes to accept the Plan in compliance with section 1125 of the Bankruptcy Code and the Solicitation Order. The Debtor did not solicit acceptances of the Plan from any creditor or equity interest holder prior to the transmission of the Disclosure Statement.

**b. Acceptance of the Plan**

47. Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of the Plan. Under section 1126, only holders of Allowed Claims in impaired Classes of Claims and Equity Interests that will receive or retain property under the Plan on account of such Claims or Equity Interests may vote to accept or reject the Plan. In accordance with section 1126 of the Bankruptcy Code, the Debtor solicited acceptances of the Plan from the holders of Claims in Class 3 (General Unsecured Claims). In accordance with Articles III and IV of the Plan, the Solicitation Order, and sections 1126(f) and (g), the Debtor did not solicit acceptances from the holders of Claims or Equity Interests in (i) Class 1 (Allowed Secured Claims) or Class 2 (Allowed Priority Non-Tax Claims), as the holders of such Allowed Claims are not impaired under the Plan and thus are presumed to accept the Plan or (ii) Class 4 (Equity Interests), as holders of such interests may receive no distribution or property on account of their Equity Interest and thus are deemed not to have accepted the Plan.

48. Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired Classes of claims entitled to vote to accept or reject a plan of reorganization:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

49. As evidenced by the Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtor's First Amended Chapter 11 Plan (the "**Voting Certification**") (ECF No. 842), the Plan has been accepted by creditors holding Allowed Claims in Class 3 (General Unsecured Claims), the only Class entitled to vote, in excess of two-thirds in amount and one half in number of those voting. Specifically, as set forth in the Voting Certification, one hundred percent (100% ) of creditors in Class 3, in number and in dollar amount, who voted on the Plan, voted to accept the Plan.

50. Based upon the foregoing, the requirements of section 1129(a)(2) have been satisfied.

### 3. Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law

51. Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). For the reasons set forth in Part I of this Memorandum, the Plan is proposed in good faith.

### 4. Section 1129(a)(4): The Plan Provides That Professional Fees and Expenses Are Subject to Court Approval

52. Section 1129(a)(4) of the Bankruptcy Code provides that any payment made or to be made by the plan proponent, the debtor, or a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case or the plan, be subject to approval by the Court as reasonable. Section 1129(a)(4) has been construed to require that all payments of professional fees which are made from estate assets be subject to review and approval as to their reasonableness by the Court. *See In re River Vill. Assocs.*, 161 B.R. 127, 141 (Bankr. E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 475–76 (Bankr. D.N.J. 1990); *In re Texaco Inc.*, 84 B.R. 893, 908 (Bankr. S.D.N.Y.), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988).

53. Pursuant to the interim application procedures established under section 331 of the Bankruptcy Code, the Court authorized and approved the payment of certain fees and expenses of professionals retained in this Chapter 11 Case. All such fees and expenses, as well as all other accrued fees and expenses of professionals through the Confirmation Date, remain subject to final review for reasonableness by the Court under sections 327, 328, 330, 331, and 503(b) of the Bankruptcy Code.

54. Based upon the foregoing, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

### 5. Section 1129(a)(5): The Debtor Has Satisfied the Requirement to Disclose All Necessary Information Regarding Directors, Officers, and Insiders

55. Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor; that the appointment or continuance of such officers and directors be consistent with the

interests of creditors and equity security holders and with public policy; and that there be disclosure of the identity and compensation of any insiders to be retained or employed by the reorganized debtor.

56. As set forth above, Exhibit I to the Plan Supplement sets forth the identity and affiliations of the persons proposed to serve as members of the Board of Directors of the Reorganized Debtor and as officers of the Reorganized Debtor. These proposed individuals are intimately familiar with the Debtor's business, finances, and the Plan. Moreover, the Debtor's officers are responsible for relationships with its contract counterparties (including the Debtor's relationship with BARDA, its most significant contract counterparty). For these reasons, these persons are very important to the Debtor's post-petition operations and its revenue generating capacity. As such, the Debtor submits that the appointment of such individuals is consistent with the interests of holders of Claims against, and Equity Interests in, the Debtor and with public policy.

57. Annexed as Exhibit C to the Plan are the employment agreements, in substantially final form, for those insiders who will be employed or retained as officers by the Reorganized Debtor. These employment agreements include the nature of such insider's compensation. For the foregoing reasons, the Debtor submits that the Plan satisfies the requirements of section 1129(a)(5).

### 6. Section 1129(a)(7): The Plan Is in the Best Interests of All Creditors

58. Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and stockholders. The best interests test focuses on individual dissenting creditors rather than classes of claims. *See 203 N. LaSalle St. P'ship,* 526 U.S. at 441 n.13. It requires that each holder of a claim or equity interest either accepts the plan or will receive or

retain under the plan property having a value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

59. Under the best interests test, "the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7. In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation." *In re Adelphia Commc'ns Corp.*, 368 B.R. at 252. As section 1129(a)(7) makes clear, the liquidation analysis applies only to nonaccepting holders of impaired claims or equity interests.

60. The best interest test does not apply to the holders of Claims in Class 1 (Secured Claims) and Class 2 (Priority Non-Tax Claims) as they are unimpaired. The best interest test is satisfied as to each holder of a Claim in Class 3 (General Unsecured Claims), because each holder in such Class (other than PharmAthene which has voted to accept the Plan), will receive payment in full, in Cash, as provided in the Plan. Accordingly, the holders of such Claims are receiving or retaining under the Plan the maximum recovery to which they are entitled and, as a result, could not receive greater recovery under chapter 7.

61. As the Debtor's liquidation analysis (the "**Liquidation Analysis**") annexed to the Declaration of Marc J. Brown in Support of Confirmation of the Plan, dated March 30, 2016 and filed contemporaneously herewith demonstrates, the holders of Equity Interests in Class 4 will receive property of a value that is not less than they would receive if SIGA were liquidated under chapter 7. Specifically, pursuant to the Plan, holders of interests in Class 4 (Equity Interests) may retain their interests or such interests may be canceled, with no distribution or consideration

being received in respect thereof. Nonetheless, as demonstrated by the Debtor's Liquidation Analysis, if the Debtor were liquidated under chapter 7, no funds would be available for holders of interests in Class 4 due to, among other things, (i) claims arising from the rejection and breach of executory contracts that have been assumed or would have been assumed under the Plan, (ii) significant claims arising as a result of the Debtor's failure to comply with its obligations under the BARDA Contracts, (iii) fees payable to a trustee in bankruptcy and its professional advisors administering the chapter 7 case, (iv) the substantial increases in claims that would be satisfied on a priority basis, and (v) the amount of the Debtor's prepetition unsecured claims, including the PharmAthene Allowed Claim. As the Liquidation Analysis also demonstrates, holders of Claims in Class 3 (General Unsecured Claims) would receive a fraction of the amount of their Claims if the Debtor were liquidated under chapter 7.

62. Based on the Debtor's Liquidation Analysis and for the foregoing reasons, it is clear that confirmation of the Plan will provide each holder of an Allowed Claim or Allowed Equity Interest with a recovery that is not less than such holder would receive or retain if the Debtor were liquidated under chapter 7. Accordingly, the Plan satisfies the requirements of section 1129(a)(7).

### 7. Section 1129(a)(8): The Plan Has Been Accepted by Each Impaired Class, and, as to Such Classes, the Requirements of Section 1129(a)(8) Have Been Satisfied

63. Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accept the plan, as follows: "With respect to each class of claims or interests - (A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). As set forth above, holders of Claims in Classes 1 (Secured Claims) and 2 (Priority Non-Tax Claims) are not impaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Additionally, as evidenced by the Voting Certification filed with the Court, the Plan has been accepted by well in excess of two-thirds in amount and one half in number of creditors in Class 3 (General Unsecured Claims) entitled to vote and who voted. Thus, as to such Classes, the requirements of section 1129(a)(8) have been satisfied.

64. Holders of Equity Interests in Class 4 may not receive or retain any property on account of their Equity Interests in the Debtor and, as such, are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code. Nonetheless, as demonstrated below, the Plan may be confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

**8. Section 1129(a)(9): The Plan Provides for Payment in Full of All Allowed Priority Claims**

65. Section 1129(a)(9) of the Bankruptcy Code requires that persons holding allowed claims entitled to priority under section 507(a) receive specified cash payments under the plan. Unless the holder of a particular claim agrees to a different treatment with respect to such claim, section 1129(a)(9) of the Bankruptcy Code sets forth the treatment the plan must provide.

66. Pursuant to Articles II and IV of the Plan, and in accordance with sections 1129(a)(9)(A) and (B), the Plan provides that all Allowed Administrative Expenses under section 503(b) of the Bankruptcy Code and all Allowed Priority Non-Tax Claims under section 507(a) (excluding Priority Tax Claims under section 507(a)(8) described below) will be paid in full, in Cash, on the Effective Date or as soon thereafter as is reasonably practicable.

67. The Plan satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code in respect of the treatment of Priority Tax Claims under section 507(a)(8). Pursuant to Section 2.3 of the Plan and except as otherwise may be agreed, holders of Allowed Priority Tax Claims will be paid in full, in Cash, on the Effective Date or as soon thereafter as is reasonably

practicable. Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

### 9. Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted the Plan

68. Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one Class of impaired Claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). The Plan satisfies this requirement because Class 3 (General Unsecured Claims) is impaired and has accepted the Plan, without including the acceptance of the Plan by any insiders in such Class.

### 10. Section 1129(a)(11): The Plan Is Feasible

69. Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that the Plan is feasible as a condition precedent to confirmation. Specifically, it requires that confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the debtor or any successor to the debtor, unless such liquidation or reorganization is proposed in the plan. As described below, the Plan is feasible within the meaning of this provision.

70. The feasibility test set forth in section 1129(a)(11) requires the Court to determine whether the Plan is workable and has a reasonable likelihood of success. *See In re Johns-Manville Corp.*, 843 F.2d at 649. The key element of feasibility is whether there is a reasonable probability that the provisions of the plan can be performed. The purpose of the feasibility test is to protect against visionary or speculative plans. As noted by the United States Court of Appeals for the Ninth Circuit: "'The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'" *Pizza of Haw., Inc. v. Shakey's,*

*Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 Collier on Bankruptcy ¶ 1129.02[11] at 1129–34 (15th ed. 1984)). However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds. *See In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

71. For purposes of determining whether the Plan satisfies the above-described feasibility standards, the Debtor has analyzed its ability to fulfill its obligations under the Plan. The Debtor believes the Plan is feasible because it has more than adequate Cash to make all distributions with respect to all Allowed Secured Claims (Class 1), Allowed Non-Tax Priority Claims (Class 2), and Allowed General Unsecured Claims (Class 3) other than the PharmAthene Allowed Claim. With respect to treatment of the PharmAthene Allowed Claim, the Debtor has certain options under the Plan. The Debtor may satisfy the PharmAthene Allowed Claim in full, in Cash; deliver to PharmAthene all of the New Common Stock; or satisfy the PharmAthene Allowed Claim with some other treatment as may be mutually agreed to in writing by the Reorganized Debtor and PharmAthene and approved by this Court. This flexibility to treat the PharmAthene Allowed Claim in and of itself demonstrates the Plan's feasibility because if the Debtor is not capable of raising the capital to satisfy such claim in full, the claim will be satisfied in equity or pursuant to a mutually agreeable settlement that is approved by this Court. Therefore, under any scenario, subsequent liquidation or need for further reorganization is not only highly unlikely but also remote. Accordingly, the Debtor believes that the Plan satisfies the feasibility requirement under section 1129(a)(11) of the Bankruptcy Code.

### 11. Section 1129(a)(12): All Statutory Fees Have Been or Will Be Paid

72. Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan." Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses. In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Section 13.5 of the Plan provides that on the Effective Date, and thereafter as may be required, such fees, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code, shall be paid by the Debtor.

### B. The Plan Satisfies the "Cram Down" Requirement under Section 1129(b) of the Bankruptcy Code with Respect to Class 4

73. Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances where not all impaired classes of claims and equity interests accept a plan, as required by section 1129(a)(8). The mechanism is known colloquially as "cram down."

Section 1129(b) provides in pertinent part:

> [I]f all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b). Thus, under section 1129(b), the Bankruptcy Court may "cram down" a plan over the rejection of a plan by impaired classes of claims or equity interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes.

74. As stated, holders of interests in Class 4 (Equity Interests) are deemed to reject the Plan. As set forth above, Class 3 (General Unsecured Creditors), the only impaired Class entitled to vote has voted to accept the Plan. Accordingly, the Debtor invokes section 1129(b) with respect to Class 4 only.

**1. <u>Section 1129(b)(1): The Plan Does Not Discriminate Unfairly</u>**

75. The unfair discrimination standard of section 1129(b)(1) ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other similarly situated classes. *See In re LightSquared Inc.*, 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014). Generally a plan unfairly discriminates in violation of section 1129(b)(1) of the Bankruptcy Code only if similar classes are treated differently without a reasonable basis for the disparate treatment. *See In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990). Accordingly, as between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1988), or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment, *see, e.g.*, *Buttonwood Partners*, 111 B.R. at 63.

76. The holders of Equity Interests in Class 4 are legally distinct in nature from all other Classes — no other class has similar legal rights. Due to the unique priority afforded to these interest holders, the Plan does not discriminate unfairly with respect to such interests. *See In re Extended Stay Inc.*, No. 09-13764, 2010 WL 6561113, at *10 (Bankr. S.D.N.Y. July 20, 2010) (plan did not unfairly discriminate with respect to rejecting class of equity interests where no holders of equity interests were treated differently); *In re Finlay Enters., Inc.*, No. 09-14873, 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010) (holding that plan did not unfairly

discriminate against rejecting class of equity interests because no other class of interests existed and, therefore, rejecting class was of a different legal nature and priority than the other classes).

**2. Section 1129(b)(2): The Plan is Fair and Equitable**

77. To be "fair and equitable" as to holders of equity interests, section 1129(b)(2)(C) of the Bankruptcy Code requires a plan to provide either (i) that each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) that a holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

78. The "fair and equitable" rule is satisfied as to the holders of Equity Interests in Class 4, as no interests junior to such class will receive or retain any property under the Plan on account of such junior interests. *See In re Finlay Enters. Inc.*, 2010 WL 6580628, at *7 (holding that the fair and equitable test was satisfied where no interest junior to the interests of the rejecting class received any property under the plan).

79. Moreover, and as set forth in detail in Part I of this Memorandum, no senior creditor will receive in excess of the full value of its claim under the Plan. In particular, if the PharmAthene Allowed Claim is treated under Section 4.3(b)(i)(C) of the Plan (Option 3) or as provided in Section 4.3(b)(ii) of the Plan, which, in each case will result in the cancellation of all Equity Interests with no distribution being received by the holders thereof, such a cancellation will occur only after SIGA has engaged in a full market test (as the Plan permits) to attempt to raise the capital necessary to satisfy the PharmAthene Allowed Claim in Cash and that effort has failed. As described above, under such circumstances, the Plan satisfies the requirements of section 1129(b) as to Class 4 (Equity Interests) and may be confirmed despite the deemed rejection by such Class.

### C. Section 1129(c)-(e): The Plan Satisfies the Remaining Applicable 1129 Requirements

80. The Plan is the only plan filed in this case, and accordingly, section 1129(c) of the Bankruptcy Code is inapplicable in this Chapter 11 Case. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, and the Plan therefore satisfies the requirements of section 1129(d) of the Bankruptcy Code. Finally, this Chapter 11 Case is not a "small business case[s]," as that term is defined in the Bankruptcy Code, and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

## CONCLUSION

81. The Plan complies with and satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Objections should be overruled, and the Plan should be confirmed.

Dated: New York, New York
March 30, 2016

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtor
and Debtor in Possession

By: /s/ Stephen Karotkin
Stephen Karotkin

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtor and Debtor in Possession*