PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Telephone: 212.969.3000
Martin J. Bienenstock
Scott K. Rutsky
Ehud Barak

*Attorneys for the Statutory Creditors' Committee of SIGA Technologies, Inc.*

**Hearing Date & Time: April 5, 2016 at 11:00 a.m. (ET)**
**Response Deadline: March 30, 2016 at 4:00 p.m. (ET)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ***In re*** **SIGA TECHNOLOGIES, INC.,** **Debtor.** | **Chapter 11** **Case No. 14-12623 (SHL)** |
| **SIGA TECHNOLOGIES, INC. and STATUTORY CREDITORS COMMITTEE** **Movants,** **Against** **ESOPUS CREEK VALUE SERIES FUND LP – SERIES "A," JET CAPITAL MANAGEMENT, LP and NANTAHALA CAPITAL PARTNERS, LP** **Respondents.** | |

**RESPONSE OF STATUTORY CREDITORS' COMMITTEE (A) IN SUPPORT OF CONFIRMATION OF FIRST AMENDED CHAPTER 11 PLAN, AND (B) IN OPPOSITION TO OBJECTIONS TO CONFIRMATION OF DEBTOR'S FIRST AMENDED CHAPTER 11 PLAN**

The statutory creditors' committee (the "Committee") of SIGA Technologies, Inc. ("SIGA") submits this response (the "Response") (a) in support of confirmation of the First Amended Chapter 11 Plan [ECF No. 763] (the "Plan"), and (b) in opposition to (i) *Objection of Esopus Creek Value Series Fund LP – Series "A" to Confirmation* [ECF No. 834] (the "Objection" of "Esopus"), (ii) *Joinder of Jet Capital Management, LP to Objection of Esopus* [ECF No. 835], and (iii) *Objection of Nantahala Capital Partners to Confirmation* [ECF No. 840] (the "Nantahala Objection") as follows:

## TABLE OF CONTENTS

**Page**

Preliminary Statement................................................................................................................ 1

Response ..................................................................................................................................... 2

A. The Plan Provides SIGA Maximum Flexibility to Create Equity Value ............... 2

B. The Plan Satisfies the Requirements of Bankruptcy Code Section 1129(a)........... 8

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999) .......... 1, 5

*Bank of America v. 203 North LaSalle Street Partnership*,
119 S. Ct. 1411 (1999) .......... 7

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
722 F.2d 1063 (2d Cir. 1983) .......... 9

*Holmes v. Air Line Pilots Ass'n*,
745 F. Supp. 2d 176 (E.D.N.Y. 2010) .......... 14

*In re Appraisal of Dole Food Co., Inc.*,
114 A.3d 541 (Del. Ch. 2014) .......... 7

*In re Bos. Generating, LLC*,
440 B.R. 302 (Bankr. S.D.N.Y. 2010) .......... 5

*In re Brewery Park Associates, L.P.*,
2011 WL 1980289 (Bankr. E.D. Pa. Apr. 29, 2011) .......... 13

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010) .......... 5

*In re Drexel Burnham Lambert Grp., Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) .......... 9

*In re Energy Future Holdings Corp.*,
No. 14-10979-CSS (Bankr. Del. Dec. 7, 2015), ECF No. 7243 .......... 15

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014) .......... 5

*In re Grant Broad. Corp.*,
369 B.R. 120 (Bankr. S.D.N.Y. 2007) .......... 5

*In re Graphics Props. Holdings, Inc.*,
No. 09-11701 (MG), 2009 Bankr. LEXIS 5259 (Bankr. S.D.N.Y. Nov. 10, 2009) .......... 10, 15

*In re Mark IV Indus.*,
No. 09-12795 (SMB), 2009 Bankr. LEXIS 5385 (Bankr. S.D.N.Y. Sept. 23, 2009) .......... 15

*In re Motors Liquidation Co.*,
447 B.R. 198 (Bankr. S.D.N.Y. 2011) ........................................ 10

*In re Motors Liquidation Co.*,
477 B.R. 198 (Bankr. S.D.N.Y. 2011) ........................................ 14

*In re Penn Central Transportation Co.*,
596 F.2d 1102 (3d Cir. 1979) ........................................ 6, 7

*In re Residential Capital, LLC*,
No. 12-12020 (MG), 2013 Bankr. LEXIS 5683 (Bankr. S.D.N.Y. Dec. 11, 2013) ........................................ 10

*In re Scrub Island Dev. Grp. Ltd.*,
523 B.R. 862 (Bankr. M.D. Fla. 2015) ........................................ 3

*In re Smurfit–Stone Container Corp. S'holder Litig.*,
2011 WL 2028076 (Del.Ch. May 20, 2011) ........................................ 7

*In re Sutton*,
78 B.R. 341 (Bankr. S.D. Fla. 1987) ........................................ 10, 11

*In re Walker*,
165 B.R. 994 (E.D. Va. 1994) ........................................ 11, 12

*Matter of Shell Oil Co.*,
607 A.2d 1213 (Del.1992) ........................................ 7

**STATUTES**

11 U.S.C. § 1129 ........................................ 8

11 U.S.C. § 1121(d) ........................................ 10

11 U.S.C. § 1123(a)(3) ........................................ 12

11 U.S.C. § 1129(b) ........................................ 13

11 U.S.C. § 1129(a)(5)(A)(ii) ........................................ 15

**OTHER AUTHORITIES**

Stuart C. Gilson, et al., *Valuation of Bankrupt Firms* ........................................ 6

## **Preliminary Statement**[1]

1. The Committee's Support for the Plan. The Plan is the result of over a year of intensive arm's-length negotiation among SIGA, MacAndrews & Forbes, Inc. (SIGA's controlling shareholder) ("M&F"), PharmAthene Inc. ("PharmAthene") and the Committee. The Plan will pay SIGA's creditors and provide maximum value and opportunity to its equity holders while preserving SIGA as going concern.

2. The Plan Provided and Provides SIGA the Best of all Worlds. When the Plan was filed on December 15, 2015, no one knew how long the appellate process would last or its results. The Committee bit the bullet and allowed SIGA to use ***ALL*** the time and money necessary to prosecute appeals and all possible remands, even permitting SIGA the time to petition for *certiorari* in the U.S. Supreme Court if it determined to do so. As we enter the 19th month of this case, the Plan gives SIGA seven more months from PharmAthene's Final Order dated March 23rd to raise money to pay its creditors. SIGA can borrow money. SIGA can sell up to all its shares. Or, SIGA can do both. Only if SIGA does not implement any transaction raising enough money to pay its creditors would SIGA's existing shareholders lose their interests. There can be no better market test of solvency—which the Supreme Court prefers to hypothetical valuations based on a battle of the experts[2]—than SIGA's actual attempts to raise funds to pay its unsecured liabilities.

3. SIGA and its Shareholders Have Already Reaped Benefits from the Plan. SIGA has completed the appellate process. The Delaware courts' judgments are no longer subject to review or *certiorari*. Having reaped those benefits, Esopus is not satisfied with having seven

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan. Because of the substantial overlap between the Esopus Objection and the Nantahala Objection, the Committee responses to the Esopus Objection shall also apply to the Nantahala Objection where applicable.

[2] *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 436 (1999).

more months and every opportunity to raise money to pay SIGA's creditors. The Objection conveniently omits the fact SIGA's dominant creditor has waited over ten years for payment of SIGA's liability now established with finality by the Delaware courts.

4. The Objections Ignore Reality. The reality is that SIGA today does not have the cash needed to pay all unsecured claims in full. The reality is that none of the objectors have offered SIGA a funding proposal. And, as shown below, the reality is that all other objective factors strongly militate against SIGA's solvency at present. For all of their rhetoric, nothing in the objections demonstrates solvency. Despite *these* realities, the Plan provides SIGA and its shareholders a better deal than the law requires by enabling equity holders to benefit from any upside in SIGA's business after confirmation, such as the potential for obtaining of FDA approval of SIGA's main drug, entering into new contracts to drive value, or improvements in the capital markets. SIGA's emergence from chapter 11 as a going concern now, rather than later, will save jobs, reduce administrative expenses, enable SIGA to pursue new business opportunities for its drug candidates, and avoid competing plans that may destroy value. All pertinent public policies are served. SIGA's plan should be lauded, not criticized.

## Response

### A. The Plan Provides SIGA Maximum Flexibility to Create Equity Value

5. The Plan is the Product of Intensive Arms' Length Negotiations. After over a decade of acrimonious litigation, SIGA, its dominant shareholder (M&F), the Committee, and PharmAthene negotiated a creative yet balanced resolution to this unique case. SIGA is now poised to emerge from bankruptcy as a going concern with a Plan that protects both creditors' and shareholders' rights, including a seven month runway to tap the marketplace to pay its debt in full and preserve any equity value.

6. Such an outcome is exactly what the Bankruptcy Code contemplates by giving chapter 11 debtors "great flexibility to formulate a plan—limited only by the debtor's creativity and the prohibition in § 1123(b)(6) that the plan provisions not be in 'inconsistent' with the Bankruptcy Code." *In re Scrub Island Dev. Grp. Ltd.*, 523 B.R. 862, 865 (Bankr. M.D. Fla. 2015). The Plan leaves SIGA's shareholders as shareholders. At its core, Esopus' objection is that Esopus wants better rights than shareholders have. It does not like being subordinate to SIGA's debt.

7. Esopus' Contradictory Positions Ignore the Objectives of the Plan. Fundamentally, Esopus' objection pretends SIGA has "no plan," Objection ¶ 1, even though Esopus has shown an appreciation and understanding that the market test underlying the Plan results in an outcome consistent with the Bankruptcy Code.[3]

8. If, despite an up to seven month process, the market demonstrates the value of SIGA is below the approximately $200 million PharmAthene claim, then it will be objectively clear that the company is insolvent and specific procedures are triggered that will give PharmAthene 100% of the stock. Shareholders will not lose anything because it will be demonstrated that they have no value to lose. But if the money is raised, shareholders will retain their interests. Tellingly, Esopus would have this Court believe the very mechanism that will allow shareholders to retain their interests is somehow problematic. But, as this Court itself has recognized, Esopus' contention that the market test prescribed in the Plan would prejudice shareholders "misunderstand[s] the nature of the debtor's plan . . . [and] ignores the reality of the case." Feb. 2, 2015 Hr'g Tr. 49:09–13.

9. Esopus itself admits value is the real issue: "[the] whole issue in this case is the

[3] Feb. 2, 2015 Hr'g Tr. 40:15–19. (MR. GOLDMAN: "If we go out and try to raise some capital and we can't, then we'll know that the turnover plan to PharmAthene is the plan. And no one will be able to really contest that. We will have done the market test . . .").

value of the company." *Id.* at 40:12–13. As noted, the Plan's market test addresses value. Cutting through Esopus' various arguments, Esopus' primary objection is timing: "if the debtor says it wants to raise the capital. We're just saying let's do it now." *Id.* at 45:07–08. SIGA could have negotiated a plan that pays all creditors on the Effective Date or gives them 100% of the company. For its own business reasons, SIGA negotiated a plan in which it undertakes to raise money after the Effective Date. This is a business judgment not susceptible to second guessing. Esopus ignores the clear incentives SIGA and its board have in maximizing its equity value. Ultimately, if Esopus truly believes the equity value exceeds PharmAthene's claim, it is welcome to back its value proposition with cash.

10. Esopus Ignores the Absence of Objective Facts Showing Solvency at Present. Esopus only points to SIGA's aspirations about solvency. Objection ¶ 30. The cold, hard truth is that any argument supporting SIGA's solvency necessarily involves speculation on many fronts including whether and when SIGA will obtain FDA approval for Tecovirimat, whether BARDA (as it did just months ago) will impose additional dosage or other changes to Tecovirimat resulting in material unreimbursed expense to SIGA, SIGA's prospects of obtaining new contracts, and the impact of industry competition. Today, many objective facts refute solvency:

- The fair value of SIGA's assets is less than its liabilities. SIGA's latest balance sheet, as of December 31, 2015, shows negative equity of over $280 million.[4]
- SIGA does not have the ability to pay its debts as they come due. As of today, SIGA is unable to satisfy PharmAthene's claim.
- SIGA is consuming cash, not adding cash.

Market indicators, and the highly competitive nature of the pharmaceutical business, also point to a lack of solvency:

---

[4] SIGA Technologies, Inc., Annual Report (Form 10-K) at 49 (Mar. 4, 2016) (showing a total stockholders' equity deficit of $284,248,550 as of December 31, 2015).

- The Committee is unaware of any offers to acquire or fund SIGA, including any offer by Esopus, notwithstanding that SIGA is an SEC filing company and has been in play for years.
- SIGA stock is currently trading at option prices in the $0.40s—an approximately 70% decline in share price since the beginning of the chapter 11 case.
- SIGA currently derives substantially all its revenues from a contract with BARDA. There are uncertainties in whether SIGA will recognize revenues in the time periods it anticipates or at all. Furthermore, there is no assurance SIGA will be able to secure future contracts or grants.[5]
- The FDA has not approved any of SIGA's biopharmaceutical product candidates—uncertainties exist as to whether and when SIGA will obtain FDA approval.[6]

11. A Post-Emergence Market Test is the Right Approach. While no specific valuation method is mandated by the Bankruptcy Code,[7] the Supreme Court recognized that "the best way to determine value is exposure to a market."[8] Indeed, courts in this district have repeatedly observed that a market test is the best way to determine value.[9] Here, the post-emergence market test embodied in the Plan does far more than provide a valuation of the company: it gives SIGA's shareholders an unprecedented runway and favorable conditions for maximizing their equity value. Not only does it enable SIGA to prove that it is solvent, any benefits to SIGA that occur during post-emergence runway period, such as FDA approval of its drug or new contracts, would inure to the benefit of shareholders.

12. Esopus Cannot Overrule SIGA's Business Decision. Esopus' objections challenge SIGA's business decision to raise money outside bankruptcy. As a minority

---

5 SIGA Technologies, Inc., Annual Report (Form 10-K) at 15 (Mar. 6, 2015).

6 *Id.* at 19.

7 *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 242–43 (Bankr. S.D.N.Y. 2014).

8 *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 436 (1999).

9 *See, e.g., In re Bos. Generating, LLC*, 440 B.R. 302, 325-26 (Bankr. S.D.N.Y. 2010) ("It is generally accepted, however, that absent a showing that there has been a clear market failure, the behavior in the marketplace is the best indicator of enterprise value."); *In re Chemtura Corp.*, 439 B.R. 561, 587 (Bankr. S.D.N.Y. 2010) (court looked to results of market process to inform decision on debtor's total enterprise value when presented with differing valuations prepared by various groups of experts); *In re Grant Broad. Corp.*, 369 B.R. 120, 143 (Bankr. S.D.N.Y. 2007) ("[T]here is no dispute that in many circumstances the best evidence of value is what a third party is willing to pay in an arm's length transaction.").

shareholder, Esopus lacks standing to do so. Besides, business judgments are not on trial at confirmation, especially when they are more than plausible. Emergence from bankruptcy increases the quality and quantity of information regarding a debtor's assets by freeing the debtor of administrative bankruptcy controls.[10] And certainly no party can seriously contest that it is easier to test the market outside of chapter 11. Subjecting what may be multiple money raising transactions to further court review would serve to unduly hamstring and potentially jeopardize the capital raising process to the direct prejudice of the entities involved.

13. Esopus Has No Entitlement to a Valuation. Esopus asserts a valuation is required when shareholders' interests are eliminated. Objection ¶ 29. Here, the Plan leaves shareholders in place, not even diluted. Shareholders are, however, always subject to having their shares eliminated or diluted when the company is unable to pay its debts. The Bankruptcy Code does not grant shareholders protection from a reorganized debtor's inability to pay debts in the future.

14. Contrary to what Esopus says in the Objection, Esopus has admitted that a market test is an acceptable approach—its only divergence from the Plan is it would like the test to be conducted in bankruptcy. Feb. 2, 2015 Hr'g Tr. 45:07–08. But Esopus provides no rationale, nor does it attempt to argue, that the market's valuation of SIGA while in bankruptcy would be superior to the market's valuation post-emergence. Instead, Esopus cites *In re Penn Central Transportation Co.*, 596 F.2d 1102 (3d Cir. 1979), for a proposition *Penn Central* does not propound, namely that "a market test conducted post-confirmation with no court review is not an acceptable valuation under the Bankruptcy Code." Objection ¶ 34. *Penn Central* (decided under the Bankruptcy Act of 1898, as amended) considered whether the market's valuation of securities issued in a railroad reorganization should be used to value the securities, or whether

[10] Stuart C. Gilson, et al., *Valuation of Bankrupt Firms*, 13 Rev. of Fin. Studies 43, 44 (2000) (observing that there is no active market for control of assets under the structure of chapter 11 and that cash flow projections of the firm, upon which the market would rely, are often strategically distorted to enhance bargaining outcomes).

the court should determine a higher "reorganization value" of the securities to offset the public's potentially unduly distorted perception based on the bankruptcy. *Id.* at 1116–17. *Penn Central* ended up choosing the market value. *Id.* More importantly, the valuation in *Penn Central* was to value securities distributable to secured creditors. Here, the valuation's purpose is to determine whether SIGA can raise approximately $200 million cash by selling part or all of itself and/or by borrowing. Manifestly, the best way to do that is to do that.

15. There can be no realistic dispute that the market is the best test, the only realistic test, and the test chosen by the Supreme Court to value the enterprise (an office building) in *Bank of America v. 203 North LaSalle Street Partnership*, 119 S. Ct. 1411, 1423–24 (1999). Courts recognize that valuation is an art, not a science.[11] This is especially true in this case, where other types of valuation would require paid experts to make guesses that FDA approval will be obtained, BARDA or the FDA will not require more enhancements to SIGA's drug at SIGA's expense, BARDA will order more drugs from SIGA, and no competition will overtake SIGA.

16. <u>SIGA, its Board and M&F Have Every Reason to Preserve Shareholder Value.</u> Esopus' insinuation that SIGA's management would simply hand over the keys to PharmAthene ignores the substantial investment SIGA's controlling shareholder has in SIGA, as well as the shares held by SIGA board members. The actions undertaken by the parties to date underscores their shared interest in providing the objectively best outcome for all sides. As the Court noted with respect to the same argument: "[T]he debtor fought to extend exclusivity to keep control of the case and prevent PharmAthene or the committee from presenting their own plans of reorganization. . . . [and] sought additional time until July 2016 to raise money to pay the judgment so the debtor doesn't have to turn over the equity. . . . [T]he debtor's board members

---

[11] *See, e.g., In re Appraisal of Dole Food Co., Inc.*, 114 A.3d 541, 554 (Del. Ch. 2014); *Matter of Shell Oil Co.*, 607 A.2d 1213, 1221 (Del.1992) ("Valuation is an art rather than a science."); *In re Smurfit–Stone Container Corp. S'holder Litig.*,2011 WL 2028076, at *24 (Del.Ch. May 20, 2011) (same).

are also equity holders." Feb. 2, 2016 Hr'g Tr. 49:14–25. To lay to rest any doubt about its intentions, SIGA is already taking proactive steps to maximize the 210-day period for raising capital by engaging PiperJaffray—a highly regarded investment banking firm with particular expertise in biopharmaceuticals—as financial advisors.[12]

17. There is also no reason to believe M&F's interests are not aligned with the rest of SIGA's equity holders. M&F, with an approximately 25% equity stake in SIGA, has perhaps more incentive than any other shareholder to ensure that SIGA engages in appropriate efforts to raise capital in the marketplace. Further, to remove any suggestion of unfairness in the capital raising process, the Plan (at section 6.16(d)) already included a provision requested by Esopus and Nantahala to permit all shareholders to purchase, on a *pro rata* basis, common or preferred equity that may be sold to M&F, on the same terms as M&F. This provision has now been further modified by SIGA to address newly minted concerns raised by these objectors.

18. <u>Failure to Confirm this Plan Would Likely Result in a Worse Outcome to Shareholders</u>. Esopus is well aware that if the Plan is not confirmed, SIGA's statutory exclusivity period will terminate—opening the door to competing plans. The alternative is a plan that leaves equity holders with nothing. The Committee could propose a plan that would continue SIGA as a going concern, but without the 210-day runway to raise capital, and would provide for immediate cancellation of SIGA's current equity interests on the Effective Date.

**B. <u>The Plan Satisfies the Requirements of Bankruptcy Code Section 1129(a).</u>**

19. <u>The Plan is Proposed in Good Faith</u>. There can be no serious dispute that the Plan is proposed in good faith—the Plan preserves the company as a going concern, saves jobs, reduces administrative expenses, avoids competing plans, and allows SIGA to pursue FDA

---

[12] *See* Press Release, SIGA Technologies, Inc., SIGA Technologies Engages PiperJaffray as Financial Advisor (Mar. 15, 2016), http://investor.siga.com/releasedetail.cfm?ReleaseID=960793.15.

approval and enter into new contracts.[13] Even under the cherry picked language Esopus cites in its Objection, all SIGA must show is a "*likelihood* that the Plan will achieve a result consistent with the standards prescribed by the Code."[14] The Plan surpasses this standard as SIGA will continue to operate as a going concern under any scenario.

20. Further, the Plan has been carefully devised so that all outcomes under the plan are consistent with the standards prescribed by the Code: if the market proves the company is solvent, shareholders will retain their equity interests—and SIGA will continue its normal operations. But if the market proves SIGA is insolvent, SIGA will still continue as a going concern under PharmAthene's ownership (as mandated by the absolute priority rule).

21. Esopus cites *In re Abbotts Dairies of Pa., Inc.* for the proposition that the good faith requirement is meant to "prevent[] a debtor-in-possession or trustee from effectively abrogating the creditor protections of Chapter 11." 788 F.2d 143, 150 n.5 (3d Cir. 1986) (quotations omitted). This language says nothing about *shareholder* protections. SIGA, its board of directors, and controlling shareholder vigorously bargained for the 210-day post-emergence market test to salvage equity interests through the market. Far from being "inconsistent" with the Bankruptcy Code, the Plan is a triumph of the chapter 11 process as it satisfies the rights of SIGA's creditors while providing shareholders the opportunity for full unimpairment.

22. <u>The Plan Provides Adequate Means of Implementation</u>. Esopus argues that the Plan does not provide adequate means of implementation under section 1123(a)(5). According to Esopus, "[w]here a plan does not provide *any* information about the amount and form of creditor *or* shareholder treatment, the purpose of a reorganization is not accomplished."

---

[13] *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) ("[T]he purpose of a business reorganization is to restructure a business' finances to enable it to operate productively, provide jobs for its employees, pay its creditors and produce a return for its stockholders…").

[14] *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992) (emphasis added) (quoting *In re Texaco Inc.*, 84 B.R. 893, 907 (Bankr. S.D.N.Y. 1988)).

Objection ¶ 18 (emphasis added). Far from failing to provide *any* information about the amount and form of creditor or shareholder treatment, the Plan dictates three limited outcomes.[15] Importantly, the Bankruptcy Code does not demand that a plan dictate *all* aspects of the *ultimate* form of reorganization with absolute precision or certainty (nor does Esopus provide any authority for this position). In fact, the opposite is true: courts routinely confirm chapter 11 plans providing for estate claims and claims against the estate to be resolved post-confirmation without approval from the bankruptcy court.[16]

23. The other decisions cited by Esopus to support their argument each involve circumstances wholly inapposite here. Esopus cites to *In re Sutton*, 78 B.R. 341, 342 (Bankr. S.D. Fla. 1987). In converting Sutton's chapter 11 case to chapter 7, the court found there was "no pretense even of an effective business reorganization, merely a liquidation of one asset" which the debtor sought "merely to delay or frustrate the legitimate effort of the [judgment creditor] to enforce its rights." *Id.* Here, SIGA emphasized many times in its various pleadings that it sought to maintain its business as a going concern and preserve its relationship with BARDA as SIGA's primary revenue source.[17] Furthermore, SIGA's Plan was the product of extensive negotiation with SIGA's judgment creditor, PharmAthene—which clearly was not the case in *Sutton*. Lastly, unlike the plan in *Sutton*, which "produced no specific offer of purchase, no specific sale date, and no credible basis to value the stock," SIGA's Plan (i) contains a

---

[15] Under the Plan, either: (i) SIGA will raise capital in excess of PharmAthene's claim and its shareholders will thus retain their interests, (ii) SIGA will fail to raise the capital to pay PharmAthene's claim due to insolvency and PharmAthene will receive 100% of the equity in satisfaction of its claim, or (iii) PharmAthene and SIGA will agree to some other settlement, subject to Court approval.

[16] *See e.g. In re Residential Capital, LLC,* No. 12-12020 (MG), 2013 Bankr. LEXIS 5683, at *118–19 (Bankr. S.D.N.Y. Dec. 11, 2013) (allowing liquidating trustee exclusive authority to determine and initiate causes of action without notice or approval of the Bankruptcy Court); *In re Motors Liquidation Co.,* 447 B.R. 198, 206–07 (Bankr. S.D.N.Y. 2011) (allowing trust administrator to settle claims without court approval); *In re Graphics Props. Holdings, Inc.,* No. 09-11701 (MG), 2009 Bankr. LEXIS 5259, at *33–34 (Bankr. S.D.N.Y. Nov. 10, 2009) (allowing reorganized debtors to compromise or settle any claims without court supervision or approval).

[17] *See, e.g.,* Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. § 1121(d) Extending Exclusive Periods ¶ 15, ECF No. 207.

specific offer from PharmAthene to satisfy its claim, (ii) prescribes a 210-day runway, and (iii) provides a credible valuation in the form of a post-emergence market test. *Id.*

24. *In re Moritz Walk, LP* is also inapposite. 2011 WL 4372405 (Bankr. S.D. Tex. Sept. 19, 2011). The plan in that case provided for a new entity to be formed with ownership percentages different from those of the existing equity holders of the debtor. *Id.* at *4. New investors were to own a portion of the new entity, but the debtor had yet to determine the percentages or specify what criteria, if any, would be used to determine them. *Id.* While the court did rule that the plan lacked adequate means for implementation given the general partner's sole discretion to implement a capital structure of the new entity without disclosure to the court or to creditors, *id.* at *7, the court's determination was influenced by the fact that a felon convicted of bank fraud would have a role in the reorganized entity. Distrustful of that, the court noted that "very close scrutiny of the financial arrangements contemplated in the debtor's plan" was warranted. *Id*. at *7 n.7. No such concern is present in SIGA's case. SIGA's post-confirmation restructuring takes place inside a defined framework. A capital raising transaction will be determined by what the market finds to be the fair value of the company. SIGA shareholders retain all their shares except those, if any, that have to be sold to raise the money to pay PharmAthene's allowed claim. While SIGA is given discretion within the Plan's framework to pursue the best possible deal, the suggestion that it would abuse this discretion is fanciful given its strong incentives as equity owner and the protections built into the Plan. *See supra* ¶¶ A.16, A.17; *infra* ¶ 31.

25. Finally, Esopus cites to *In re Walker,* 165 B.R. 994, 1003 (E.D. Va. 1994). However, the facts in *Walker* are completely different from those here. In *Walker,* the bankruptcy court found that the debtor was deliberately delaying liquidation in order to gain a

financial windfall. *Id.* at 1003. Given the debtor's questionable motives, the district court on appeal was concerned that the plan provided "no objective criteria by which to make confirmation judgments." *Id.* at 1004. In other words, the court did not want to give *carte blanche* to a debtor that was found to have improper motives. Such concerns are not present here where SIGA is operating in good faith and the post-emergence treatment will be dependent on objective market outcomes.

26. The Plan Specifies Shareholder Treatment under § 1123(a)(3). Section 1123(a)(3) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(a)(3). Leaving shares in place, but subject to future dilution or loss due to debt obligations, is a standard and legal treatment of shareholders. Indeed, the treatment of shareholders is specified by numerous provisions in the Plan: the "floor" for shareholders—that PharmAthene will get 100% of the equity—is clearly defined. Further, the Plan provides ample, specific, protections for equity: (i) as of the effective date, equity holders' interest will be reinstated, and (ii) equity holders will have a right to participate in any equity raise in which M&F participates on a *pro rata* basis.

27. In an attempt to conjure up a situation resulting in potential prejudice to shareholders, Esopus asserts that "[t]he reorganization transaction could, for example, consist of an asset sale for just one dollar more than the PharmAthene claim." Objection ¶ 22. But such an outcome would neither be prejudicial nor inequitable. If the market determines that the value of SIGA is just one dollar more than the PharmAthene claim, then it merely reveals that shareholders did not have any equity value to salvage. Yet, even under this scenario, the Plan does not foreclose shareholders who believe the market under-values SIGA from participating in a transaction and obtaining an interest in SIGA or its assets at a steal.

28. The Plan is Fair and Equitable. Esopus argues the Plan is not "fair and equitable" because transferring SIGA's stock to PharmAthene may pay PharmAthene more than the full amount of its claim in violation of section 1129(b) of the Bankruptcy Code. *See* Objection ¶¶ 28–30. Apart from Esopus' disregard of all objective factors showing a lack of solvency at present, after seven months at market, if SIGA is unable to raise enough funds to pay PharmAthene in full, SIGA's insolvency will have been established, fully justifying PharmAthene's receipt of 100% of SIGA's stock. Thus, the market will dictate whether there is equity value to salvage. Esopus' counsel has admitted as much. *See supra* ¶ A.7.

29. In support of its position, Esopus cites the wholly inapposite case of *In re Brewery Park Associates, L.P.*, 2011 WL 1980289 (Bankr. E.D. Pa. Apr. 29, 2011). There, the court denied confirmation of the secured lender's proposed plan, and granted the debtor's motion to dismiss the case so the parties could resort to state court. The proposed plan in *Brewery Park* was filed during the recent recession and provided that, if no qualifying bid was received in a six-month time frame, realty with an agreed valuation of $5 million would revert to the secured creditor based on its $2 million credit bid. *Id.* at 14. Because the court determined that a bidder was unlikely to emerge in less than two years, it found the plan would "very probably overpay [the creditor's] allowed secured claim to the detriment of classes with lower priority, including the equity security holders." *Id.* Here, there has been no allegation that the 210-day runway is insufficient time to find a bidder; in fact, this timeframe was demanded by SIGA. Further, the parties in *Brewery Park* agreed to a valuation of the real estate that was 2.5 times greater than the credit bid, a situation not present in this case.

30. The Exculpation and Release Provisions are Reasonable and Appropriate. The Plan's exculpation and release provisions are appropriately crafted and reasonable in form and

scope. The Plan does not contain any non-debtor, third-party releases; rather, the Plan's release provision releases only Causes of Actions belonging to SIGA. The Plan does not purport to release Causes of Action held by third-parties against non-debtor entities unrelated to this case.

31. The objectors also overstate the significance of the exculpation clause in the Plan (section 10.8), complaining that it prevents shareholders from raising complaints about post-confirmation efforts to raise capital—insinuating that SIGA and others may engage in malfeasance that could go unchecked. Objection ¶¶ 35–39. However, nothing in the Plan or the exculpation clause would excuse or prevent any shareholder from raising claims of alleged malfeasance. To the contrary, the Plan specifically does not exculpate actions that constitute "willful misconduct, gross negligence, fraud, criminal conduct or *ultra vires* acts." Plan § 10.8. What the exculpation clause would prevent, however, is the imposition of unwarranted strike suits from shareholders who may be unwilling or unable to participate in a capital raise process.

32. Even the so-called "future" actions to be performed by SIGA in raising the capital to pay the PharmAthene claim are all contemplated in some description under the Plan and will occur in less than 200 days after the Effective Date. If any party should be worried about such exculpation, it should be PharmAthene as it might not receive the value of its claim and will be left holding the stock of the company (with no assurances as to its value). Furthermore, courts often approve exculpations clauses concerning actions occurring post-confirmation.[18]

33. In this case the exculpation provisions are especially important. Esopus' actions suggest that it will seek to recoup any loss on its investment in SIGA by suing SIGA's board of

---

[18] *See Holmes v. Air Line Pilots Ass'n*, 745 F. Supp. 2d 176, 199–200 (E.D.N.Y. 2010) (approving exculpation clause that covered prospective actions; the language of the clause exculpated parties from liability arising out of "the administration of the Plan," which necessarily occurs after the effective date of the plan); *see, e.g.*, *In re Motors Liquidation Co.*, 477 B.R. 198 (Bankr. S.D.N.Y. 2011) (confirming plan containing exculpation clause covering actions taken in connection with the "administration of the Plan."); *In re Graphics Props. Holdings, Inc.*, No. 09-11701 (MG), 2009 Bankr. LEXIS 5259 (Bankr. S.D.N.Y. Nov. 10, 2009) (same); *In re Mark IV Indus.*, No. 09-12795 (SMB), 2009 Bankr. LEXIS 5385 (Bankr. S.D.N.Y. Sept. 23, 2009) (same).

directors and whoever else enters Esopus' crosshairs. Directors and parties that have negotiated such a unique and beneficial plan should not be led to confirmation with a gun to their head. Esopus' Objection exposes its *modus operandi* to extract hold-out value. The Court should not allow Esopus another opportunity to use the same tactics post-confirmation.[19]

34. The Plan Complies with Section 1129(a)(5). Esopus argues that the continuance of SIGA's current directors post-emergence somehow violates the public policy requirement of section 1129(a)(5). However, the argument misconstrues the appropriate standard. In assessing the public policy requirement, courts look to whether "demonstrated incompetence or malevolence is a hallmark of the proposed management." Collier on Bankruptcy ¶ 1129.02[5][b]. Esopus does not allege that SIGA's current board and officers are incompetent or malevolent, nor is there any reason to doubt their qualifications. Even in a scenario where PharmAthene is allowed to reconstitute the board,[20] its election of directors would still be consistent with public policy. First, these directors are excluded from decisions regarding the treatment of the PharmAthene claim. Plan § 6.6(d). Second, section 1129(a)(5) specifically requires that the appointment of directors be consistent with *creditors'* interests, and not just shareholders' interests. *See* 11 U.S.C. § 1129(a)(5)(A)(ii) ("appointment [must be] consistent with the interests of ***creditors*** and equity security holders and with public policy"). Finally, Esopus's concerns about shareholder rights have no relevance under this standard which simply focuses on the capabilities and intentions of the directors and not corporate governance provisions.

---

[19] In *In re Energy Future Holdings Corp.*, No. 14-10979-CSS (Bankr. Del. Dec. 7, 2015), ECF No. 7243, the court approved a settlement that included a release of claims against the debtors' directors and officers and its sponsors prior to the confirmation of a plan. The court noted that eliminating the hold-up risk is another reason to approve the releases prior to the confirmation, which will the cloud of complex and costly litigation for the debtors' restructuring. *Id.* ¶ 135. Likewise here, the Exculpated Parties under the Plan serve important functions in implementing the Plan, and without such releases, the Exculpated Parties would be reluctant to serve in the necessary roles to ensure that SIGA successfully emerges from bankruptcy as a going concern.

[20] This scenario is only triggered if (i) PharmAthene has not been paid and (ii) an event of default has occurred and is continuing under the Plan Covenants. Plan §6.5.

**WHEREFORE** the Committee respectfully requests that the Court enter an order: (i) overruling the Objections, (ii) confirming the plan without further delay, and (iii) granting the Committee such other and further relief as the Court deems just and proper.

Dated: March 30, 2016
New York, New York

**PROSKAUER ROSE LLP**

By: /s/ Martin J. Bienenstock
Martin J. Bienenstock
Scott K. Rutsky
Ehud Barak
Eleven Times Square
New York, New York 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Statutory Creditors' Committee of SIGA Technologies, Inc.*